## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| FALCON V, L.L.C., *et al.*,[1] | CASE NO. 19- |
| DEBTORS. | (JOINTLY ADMINISTERED) |

## EMERGENCY MOTION FOR AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Falcon V, L.L.C. ("Falcon"), ORX Resources, L.L.C. ("ORX"), and Falcon V Holdings, L.L.C. ("Holdings"), as debtors and debtors in possession (collectively, the "Debtors") move for entry of an interim order and also a final order pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules of the United States Bankruptcy Court for the Middle District of Louisiana (the "Bankruptcy Local Rules"), for approval of use of cash collateral and of postpetition financing. More specifically, Debtors seek orders of this Court, after hearings, first on an interim basis and thereafter on a final basis as follows:

(a) authorizing the Debtors to obtain postpetition financing up to an aggregate principal amount of $1.5 million on an interim basis and after hearing to be fixed by this Court up to the aggregate amount of $6.8 million on a final basis (the "Financing") pursuant to (i) the proposed interim order, substantially in the form attached hereto as **Exhibit 1** ("Interim DIP Order"), and (ii) that certain Superpriority Debtor in Possession Credit Facility dated as of May __, 2019 attached to the Interim DIP Order as **Exhibit A**

---

[1]       The Debtors are the following three entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Falcon V, L.L.C. (1725); Falcon V Holdings, L.L.C. (8542); and ORX Resources, L.L.C. (9032).  The address of the Debtors is 400 Poydras Street, Suite 1100, New Orleans, Louisiana 70130.

(the "DIP Credit Agreement"), and such other agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, including the agreements related to the Financing, (the "DIP Loan Documents"), among Debtors, as borrowers, 405 Baxterville, LLC and such other financial  institutions from time to time parties thereto as lenders (each individually a "DIP Lender," and collectively, the "DIP Lenders"), and 405 Baxterville, LLC, as administrative and collateral agent for the DIP Lenders (the "DIP Agent" together with the DIP Lenders, the "DIP Secured Parties");

(b) granting to the DIP Agent for the benefit of the DIP Secured Parties (i) first priority priming liens (the "DIP Liens") on the collateral described within the DIP Loan Documents (the "DIP Collateral") to secure all amounts owed under the DIP Loan Documents (the "DIP Obligations"), and (ii) the DIP Superpriority Claims (as defined below);

(c) authorizing the Debtors to (a) use the cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code, the "Cash Collateral") pursuant to section 363 of the Bankruptcy Code, subject to the Budget, attached to the Interim DIP Order as **Exhibit B**, and all other legal, valid, binding, perfected, enforceable, first priority (in each case, subject to permitted exceptions under the Prepetition Credit Agreement (as defined below)) liens on and security interests in the Debtors' real or personal property constituting Collateral (as defined in the Prepetition Credit Agreement, and hereinafter referred to as the "Prepetition Collateral") and (b) provide adequate protection to the Prepetition Secured Parties (as defined below) under the Prepetition Credit Agreement and the Prepetition Documents (as defined below);

(d) granting adequate protection to the Prepetition Lenders (as defined below) as requested herein;

(e) approving the Budget (as defined below (including the Initial DIP Budget as defined below, which is the Approved Budget as defined in the DIP Credit Agreement) with respect to both funding of the proceeds of the postpetition loan proposed herein on an interim basis and use of cash collateral of the Prepetition Lenders;

(f) modifying the automatic stay as requested herein; and

(g) scheduling a final hearing in accordance with Bankruptcy Rule 4001(c)(2) (the "Final Hearing") to consider entry of a final order (the "Final Order") approving the relief requested herein on a final basis.

## JURISDICTION, VENUE AND PROCEDURAL BACKGROUND

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b).

2. The statutory bases for the relief requested herein are sections 105(a), 363, 364, 1107 and 1108 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, and 6004.

3. On this date (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of title 11 of the U.S. Code. The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4. An official committee of unsecured creditors has yet to be appointed in these Chapter 11 cases. Further, no trustee or examiner has been requested or appointed in any of these Chapter 11 cases.

5. In support of this motion (the "Motion"), the Debtors rely on the *Declaration of James E. Orth, President & Chief Executive Officer of the Debtors, In Support of the Chapter 11 Petitions and First-Day Motions* (the "First Day Declaration") filed contemporaneously with this Motion.

## BACKGROUND

6. The Debtors, affiliates of one another (i) engage in the exploration, development, production and acquisition of oil and natural gas properties located onshore in Louisiana and hold legal title to Louisiana onshore oil and gas leases (Falcon), (ii) provide operator services for the oil and gas properties and act as the designated operator, with the State of Louisiana (ORX), and (iii) own Falcon (Holdings).

7. Falcon holds legal title to the oil and gas properties and is party to a contract operator agreement with ORX. Under the terms of the agreement, ORX serves as the operator of record for the leases and performs certain operator services related to the oil and gas leases in exchange for a management fee of $300,000 per month. Both Falcon and Holdings have no

employees.  The Debtors maintain their principal office in New Orleans, Louisiana.

8.      As more fully described in this Motion and the First Day Declaration, several factors have severely affected the Debtors' financial condition and near-term liquidity, precipitating the commencement of these Chapter 11 cases and requiring the Debtors to seek immediate access to the Debtors' proposed Financing.  In fact, the First Day Declaration details the decline in the production from the Falcon oil and gas properties and the inability of the Debtors to obtain capital that would be necessary to implement the scope of development that could offset the decline in the production revenues that has occurred over the time period described.

9.      The simple overarching fact is that the properties of the Debtors and income production have declined in value such that it is impossible to service the Prepetition Secured Indebtedness (as defined below) and maintain operations.  The Debtors are without sources of equity capital and have been unable to refinance the Prepetition Secured Indebtedness, despite exhausting all available potential sources of refinancing.  Because the value of reserves for which financing sources would give collateral valuation for determining credit availability have dropped to well below the outstanding principal balance of the Prepetition Secured Indebtedness, the only alternatives facing the Debtors are liquidation or reorganization through a plan providing for a conversion of Prepetition Secured Indebtedness to equity ownership in reorganized entities.

10.     To get to the confirmation of the plan that has been proposed, Debtors have to obtain financing and the right to use cash collateral.  The DIP Agent and DIP Secured Parties and the Prepetition Agent and Prepetition Lenders (currently the same entities) have agreed, in essence to finance the reorganization process through the DIP Loan Documents and loans

thereunder and the use of cash collateral.

11.     The Prepetition Agent (and Prepetition Lenders) understandably determined that they would not consent to any priming loan from third party sources to finance the reorganization process, and the Debtors have been unable to establish that they could offer adequate protection to the Prepetition Lenders as required under section 364(d).  Therefore, because the Debtors' attempts at refinancing have not succeeded, the only alternative to the financing requested in this Motion could be subordinate financing, for which the Debtors could offer no collateral value.  The proposal submitted by the DIP Lenders and DIP Agent was determined by the Debtors and their advisors to be the most advantageous, with the most favorable economics and terms.  The DIP Credit Agreement was the product of arm's-length negotiation with the DIP Lenders.

12.     As a result, by this Motion the Debtors seek authorization to obtain postpetition Financing pursuant to the terms set forth in this Motion, the DIP Credit Agreement and the DIP Orders.

### CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001

13.     The following is a summary of the material terms of the Interim DIP Order:

| DIP Loan Facility[2] | |
|---|---|
| **Borrower**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 1.1 | Falcon V Holdings, L.L.C.<br><br>ORX Resources, L.L.C.<br><br>Falcon V Holdings, L.L.C. |
| **DIP Agent**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 1.1 | [405 Baxterville, LLC] |
| **DIP Lenders** | [405 Baxterville, LLC] and the financial  institutions from time to time parties |

---

[2] NTD – Conform to Credit Agreement.

| | |
|---|---|
| Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 1.1 | thereto as lenders |
| **DIP Facility**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement §§ 2.1 and 2.20 | A senior secured superpriority debtor in possession revolving credit facility up to an aggregate principal amount of $1.5 million on an interim basis and after hearing to be fixed by this Court up to the aggregate amount of $6.8 million on a final basis. |
| **Interest**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement §§ 1.2 and 2.2 | DIP Loans will bear interest at 10.00% *per annum*, but in no event shall such rate exceed, as to any Lender, the Highest Lawful Rate.  Such interest shall be payable at the end of the relevant interest period.<br><br>During the continuance of an Event of Default, DIP Loans will bear interest at an additional 3.00% *per annum*. |
| **Fees**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 2.3 | Upfront Fee:  each DIP Lender shall receive its *pro rata* share of an upfront fee equal to 3.0% of the aggregate commitments under the Financing, earned and payable in cash upon entry of the Interim DIP Order.<br><br>DIP Agent Fees:  as set forth in the Agent Fee Letter. |
| **Maturity**<br><br>Fed. R. Bankr. P. 4001(b)(1)(ii) and (c)(1)(B)<br><br>DIP Credit Agreement, § 1.2 | The "Maturity Date" is date that is **140** days after entry of the Final Order. |
| **DIP Termination Date**<br><br>Fed. R. Bankr. P. 4001(b)(1)(ii) and (c)(1)(B)<br><br>DIP Credit Agreement, §§ 1.1 and 2.19 | The date of the earliest to occur of the following:<br><br>the Maturity Date;<br><br>fifteen (15) days after the date the DIP Motion is filed if the Interim Order has not been entered prior to the expiration of such period;<br><br>forty-five (45) days after the date the DIP Motion is filed if the Final Order has not been entered prior to the expiration of such period;<br><br>the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Facility or such treatment that is otherwise acceptable to the Agent and the Lenders in their sole discretion;<br><br>the date which is the closing date of any sale of all or substantially all of the Debtor's assets;<br><br>the filing of a motion or other pleading requesting (or the entry of an order approving) the appointment of a trustee or an estate fiduciary or an examiner with special powers with the Debtors fail to timely oppose without the prior written consent of the Lenders;<br><br>the entry of an order by the Court approving the dismissal or conversion of the Cases; and<br><br>the filing or support by and Debtor of a plan of reorganization that (x) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Facility or provide for such treatment that is otherwise acceptable to the Agent and the Lenders in their sole discretion and (y) is not otherwise acceptable to the Agent and the Lenders in their sole discretion. |

| | |
|---|---|
| **Use of Proceeds**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement Recitals and § 2.2 | The Borrowers shall use the proceeds of the Term Loans solely for the following purposes (and to the extent identified in the Budget): (a) to fund Operating Disbursements, (b) to fund Other Disbursements, and (c) to fund any other purpose approved by the Required Lenders. |
| **Collateral and Priority; Liens on Avoidance Actions**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(i), (ii)<br><br>DIP Credit Agreement §§ 1.1, 2.2, and Schedule 4.5A | <u>DIP Priority Liens</u>.  Each Borrower shall, at all times: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several super-priority administrative expense claim status in the Case of each Borrower (the "<u>Superpriority Claims</u>"); (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable perfected first priority security interest and Lien on the Collateral of each Borrower (A) to the extent such Collateral is not subject to valid, perfected and non-avoidable Liens as of the Petition Date and (B) excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (collectively "<u>Avoidance Actions</u>") (it being understood and agreed that notwithstanding such exclusion of Avoidance Actions, upon entry of the Final Order, to the extent approved by the Court, such Lien shall attach to any proceeds of Avoidance Actions solely to the extent that all other Collateral is insufficient to satisfy the obligations hereunder and under the Loan Documents secured by the Priming Liens); (iii) except as otherwise provided in the immediately following clause (iv), pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable junior perfected security interest and Lien on the Collateral of each Borrower to the extent that such Collateral is subject to (A) valid, perfected and unavoidable Liens in favor of third parties that were in existence immediately prior to the Petition Date, subject as to priority to such Liens in favor of such third parties, or (B) valid and unavoidable Liens (or rights to such Liens) in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the existing Liens that secure obligations of the applicable Borrower under the Prepetition Loan Documents, which existing Liens will be primed by the Liens described in clause (iv) below), subject as to priority to such Liens in favor of such third parties; and (iv) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable perfected first priority priming security interest and Lien on the Collateral of each Borrower (collectively, the "<u>Priming Liens</u>") to the extent that such Collateral is subject to existing Liens that secure the obligations of the applicable Borrower under the Prepetition Loan Documents (the "<u>Primed Liens</u>"), all of which Primed Liens shall be primed by and made subject and subordinate to the perfected first priority senior Liens to be granted to the Agent, which senior Priming Liens in favor of the Agent shall also prime any Liens granted after the commencement of the Cases to provide adequate protection Liens in respect of any of the Primed Liens ((i) through (iv) above, subject in each case to the Carve-Out and as set forth in the Orders).<br><br><u>DIP Collateral</u>.  shall mean the Oil and Gas Properties, all of the Equity Interests in Falcon, ORX and Online and any other Property of any Person now or at any time used or intended as security for the payment or performance of all or any portion of the Obligations, and expressly including "as extracted collateral" as defined in the UCC or the Uniform Commercial Code of any other applicable state. |
| **Optional Prepayments**<br><br>DIP Credit Agreement § 1.1, 2.7 and 6.30 | The Borrower shall have the right at any time and from time to time to prepay any DIP Loans in whole or in part. |

| | |
|---|---|
| **Mandatory Prepayments**<br><br>DIP Credit Agreement § 1.1 and 2.8 | Mandatory prepayment requirements shall include the following:<br><br>the incurrence of any Indebtedness not permitted by the DIP Credit Agreement (without waiving or modifying in any way remedies available to the Agent or the Lenders as a result of any Event of Default arising from such incurrence of Indebtedness by any one or more of the Borrowers); and<br><br>asset sales not permitted by DIP Credit Agreement (without waiving or modifying in any way remedies available to the Agent or the Lenders as a result of any Event of Default arising from such asset sales by any one or more of the Borrowers), and any insurance claim, except as to any proceeds allowed by the Agent to repair or replace damaged Property giving rise to the relevant insurance claim; provided that no prepayment shall be required to the extent the net cash proceeds from such asset sales and insurance claims do not exceed $100,000 in a single transaction or related series of transactions or $200,000 in the aggregate for the term of this Agreement (and only such excess shall be required to be prepaid) and to the extent any net cash proceeds from such asset sales and insurance claims remain after the foregoing application to the Obligations, the remaining Commitments of the Lenders shall be permanently reduced dollar for dollar on a pro rata basis by such remaining net cash proceeds. |
| **Conditions Precedent to Each Borrowing**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement Article III | The obligations of the Lenders to close this Agreement and to make the Interim Funding Loan, if any, is subject to the satisfaction of each of the following conditions provided for in Article III of the DIP Agreement: |
| **Covenants**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement Articles V and VI | Usual and customary for financings of this type, including:<br><br>*Affirmative Covenants*: Financial statement and other reporting (including without limitation weekly cash reporting); notices of events of default, material adverse effects, and similar events; payment of obligations; preservation of existence; maintenance of properties; maintenance of insurance; compliance with laws (including environmental laws); maintenance of books and records; inspection rights; use of proceeds; compliance with the Budget; pledges of equity in new subsidiaries; issuance of guaranties by new subsidiaries; provision of further assurances; maintenance and approval of the cash management system (including execution of control agreements and maintaining accounts with the DIP Agent); certain bankruptcy matters; continued retention of restructuring advisor and/or financial advisor reasonably satisfactory to the DIP Agent (it being agreed that Seaport Global Securities LLC is reasonably satisfactory to the DIP Agent); monthly lender calls; bi-weekly update calls for DIP Agent and its advisors; delivery of such other information with respect to the Loan Parties and their respective subsidiaries as any of the DIP Secured Parties may reasonably request.<br><br>*Negative Covenants*: Limitations on the following:  incurrence of liens; incurrence of indebtedness; making of investments, loans, and advances; mergers, consolidations, acquisitions, and other fundamental changes; ; dispositions; dispositions; dividends, distributions, and other restricted payments; changes in business; transactions with affiliates; burdensome agreements; use of proceeds; amendments of organizational documents and material contracts; accounting changes; prepayments of indebtedness; sale/leaseback transactions; swap contracts; gas imbalances, take-or-pay, or other prepayments; use of bank accounts; certain bankruptcy matters. |

| | |
|---|---|
| **Events of Default**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B) and (c)(1)(B)(iii)<br><br>DIP Credit Agreement Article VII | Usual and customary for financings of this type and more specifically identified in Article VII of the DIP Credit Agreement, but include the occurrence of one or more of the following:<br><br>failure to pay any principal, interest, fee, or any other amount of any DIP Loan as and when due and payable;<br><br>failure to observe or perform covenants, subject to a grace period for certain affirmative covenants;<br><br>inaccuracy of any representation or warranty;<br><br>any change of control;<br><br>failure to observe or perform any material provision of an organizational document;<br><br>invalidity of the DIP Loan Documents;<br><br>breach or invalidity of the Interim Order or Final Order;<br><br>(i) invalidity of liens granted with respect to the DIP Facility in the priority set forth in the DIP Orders, or (ii) invalidity, disallowance, or extinguishment of all obligations under the DIP Facility (the "DIP Obligations" or lack of superpriority status of  such DIP Obligations);<br><br>filing of any motion by any Loan Party seeking modification of the Interim Order or Final Order without prior written consent or altering the payments made to the DIP Secured Parties;<br><br>filing of any motion by any Loan Party to dismiss or convert the Cases to cases under Chapter 7, or the occurrence of such dismissal or conversion;<br><br>appointment of a trustee or examiner with expanded powers;<br><br>failure to satisfy any of the plan milestones set forth under "*Plan Milestones*" below. |
| **Plan Milestones**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(vi)<br><br>DIP Credit Agreement § 5.28 | The following "Milestones" shall apply to this Agreement, subject to extension by the Agent in its sole discretion:<br><br>on the Petition Date, the Debtors shall file a joint Chapter 11 plan (the "Chapter 11 Plan"), in form and substance acceptable to the Agent and the Prepetition Agent, pursuant to which, among other things, the Obligations (as defined in the Prepetition Loan Agreement) will be converted into equity of the Debtors;<br><br>the Court shall have entered an order (the "Disclosure Statement Order") approving the disclosure statement accompanying the Chapter 11 Plan (the "Disclosure Statement") in form and substance acceptable to the Prepetition Agent and the Agent and granting related relief by the 45th day after the Petition Date;<br><br>an order confirming the Chapter 11 Plan (the "Confirmation Order"), in form and substance acceptable to the Prepetition Agent and the Agent, shall have been entered by the Court by the 90th day following the Petition Date; and<br><br>the Effective Date (as defined in the Chapter 11 Plan) shall have occurred by the 15th day following entry of the Confirmation Order. |

| | |
|---|---|
| **DIP Budget**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement §§ 1.1 and 4.26 | The DIP Budget shall consist of the following.<br><br>Approved Budget shall mean the Budget attached to the Interim Order, in form and substance satisfactory to the Agent and the Required Lenders, in their sole discretion.<br><br>Initial Budget shall mean the Budget setting forth the projected financial operations of the Debtors for the 13-week period commencing with the week in which the Final Order Entry Date occurs, approved and in form and substance satisfactory to the Agent and the Required Lenders, in their sole discretion<br><br>Budget shall mean the thirteen-week rolling operating budget and cash flow forecast which shall reflect the good faith projection of the Borrowers in the cases of all weekly cash receipts and disbursements in connection with the operation of the Borrowers' business during such thirteen-week period, including but not limited to, collections, payroll, capital expenditures and other major cash outlays, in form and substance satisfactory to Agent and the Required Lenders in their sole discretion. |
| **DIP Budget Reporting; Authorized Variance**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement §§ 5.26 and 6.26 | On or before the last Business Day of each calendar week after the Closing Date (the "Testing Date"), the Borrowers shall prepare and deliver to the Agent and the Lenders a Budget Variance Report.<br><br>The Budget shall be tested on a weekly basis (of Monday through Sunday) on the last Business Day of each week as required under Section 5.26.  Any deviation from the Budget in excess of the Permitted Variances (as described below in Section 6.26(b)) shall constitute non-compliance with the Budget and the terms of the Loan Documents and an Event of Default; provided that the Required Lenders shall have the authority to provide written pre-approval for any deviations in excess of the Permitted Variances.<br><br>As of any Testing Date, for the Testing Period(s) ending on such Testing Date, the Borrowers shall not allow (i) any Operating Disbursements made by the Borrowers during such Testing Period (reduced by any applicable accrued and unused Carry Forward Amounts for the applicable Disbursement Line Item with respect to each Operating Disbursement) to be (x) greater than 120% of the applicable Disbursement Line Item related to such Operating Disbursements for the Borrowers set forth in the Budget for such Testing Period and (y) greater than 110% of the applicable Disbursement Line Item related to such Operating Disbursements for the Borrowers set forth in the Budget on a cumulative basis for that portion of the Budget ending on the Testing Date; (ii) the aggregate Operating Disbursements made by the Borrowers during such Testing Period (reduced by any applicable accrued and unused Carry Forward Amounts) to be (x) greater than 120% of the aggregate Operating Disbursements for the Borrowers set forth in the Budget for such Testing Period and (y) greater than 110% of the aggregate Operating Disbursements for the Borrowers set forth in the Budget on a cumulative basis for that portion of the Budget ending on the Testing Date; (iii) the aggregate Receipts received by the Borrowers during such Testing Period (increased by any applicable accrued and unused Carry Forward Amounts) to be (x) less than 80% of the aggregate Receipts for the Borrowers set forth in the Budget for such Testing Period or (y) less than 90% of the aggregate Receipts for the Borrowers set forth in the Budget on a cumulative basis for that portion of the Budget ending on the Testing Date; (iv) the aggregate Professionals Fees disbursements made by the Borrowers on a cumulative basis over each Testing Period (reduced by any applicable accrued and unused Carry Forward Amounts related to Professional Fees) to be greater than 110% of the aggregate Professional Fees set forth in the Budget on a cumulative basis for that portion of the Budget ending on the Testing Periods (the variance in Disbursement Line Items described in the foregoing clause (i), the variance in Operating Disbursements described in the foregoing clause (ii), |

| | |
|---|---|
| | the variance in Receipts described in the foregoing clause (iii) and the variance in Professional Fees described in the foregoing clause (iv), the "Permitted Variances"). |
| | For the purposes of the above calculations, it is agreed that to the extent that the Professional Fees incurred by counsel to the Lenders exceed the amounts for such line items in the Budget, such excess amounts shall be disregarded when calculating the Permitted Variance. |
| **Stipulations on Prepetition Liens and Claims; Effect of Stipulations** | The Interim Order shall contain usual and customary stipulations regarding the validity, priority, and enforceability of the Prepetition Obligations, Prepetition Liens, and Prepetition Collateral. |
| | The Debtors' stipulations shall be binding upon the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all parties in interest (and all of their respective successors in interest and assigns), subject to usual and customary challenge rights of parties in interest other than the Debtors. |
| **Carve-Out**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement §§ 1.1 and 5.33 | "Carve-Out" shall mean an amount equal to the sum of (i) fees and expenses incurred by bankruptcy Professionals (A) which fees are unpaid as of the delivery of the Carve Out Trigger Notice (as defined below) and (B) which fees are provided for the in the Budget; (ii) fees and expenses in an amount not to exceed $150,000 incurred by bankruptcy Professionals from and after the delivery of the Carve Out Trigger Notice (the "Post-Termination Fee Carve Out"); and (iii) fees payable pursuant to 28 U.S.C. § 1930 or to the clerk of the Court. |
| **Indemnification**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(ix)<br><br>DIP Credit Agreement §§ 5.21 and 8.7 | Usual and customary for financings of this type. |

### **Statement Regarding Significant Provisions**

14.    The Interim DIP Order and Final DIP Order include certain of the provisions (the "Significant Provisions") that the Debtors bring to the Court's attention and are summarized as follows:

(a)    ***Cross-Collateralization***.  The Interim and Final Orders **do not and will not** provide for "roll-up" or cross collateralization.

(b)    ***Validity, Perfection, and Amount of Prepetition Liens.***  The Interim and Final Orders do and will contain usual and customary stipulations regarding the validity, priority, and enforceability of the Prepetition Obligations, Prepetition Liens, and Prepetition Collateral.

(c)    ***506(c) Waiver.***  The Interim and Final Orders do and will waive each of the provisions of section 506(c) and any claims under section 552(b) of the Bankruptcy Code as to the DIP Lenders, the Prepetition Secured Parties,

the DIP Liens, the Adequate Protection Liens, and the Prepetition Liens, subject to the Carve-Out.

(d) ***Liens on Avoidance Actions.*** The Interim and Final Orders do and will grant the DIP Lenders liens on any proceeds of Avoidance Actions solely to the extent that all other Collateral is insufficient to satisfy the obligations under the DIP Loan Documents.

(e) ***Provisions Deeming Prepetition Debt to be Post Petition Debt.*** The Interim and Final Orders **do and will have no provision** deeming prepetition debt to be postpetition debt.

(f) ***Provisions Imposing Plan or Disclosure Statement Filing Deadlines.*** The Interim and Final Orders do and will include certain milestones for filing of a Plan and Disclosure Statement, entry of a Confirmation Order and occurrence of a Plan Effective Date.

(g) ***Provisions Granting Administrative Claims.*** The DIP Agent is granted a superpriority administrative expense claim in each of the Cases pursuant to section 364(c)(1) of the Bankruptcy Code and under section 507(b) with priority over all other administrative expenses pursuant to the Bankruptcy Code, which superpriority claims of the DIP Agent and DIP Secured Parties shall be subordinate only to the Carve-Out. Further, the Prepetition Secured Parties are granted an allowed superpriority administrative expense claim in each of the Cases as adequate protection for the diminution in the value, if any, of the Prepetition Collateral to the extent such diminution is not paid or satisfied by the adequate protection liens provided for herein.

## STATEMENT OF FACTS

### I. Business Overview

15. The Debtors are engaged in the exploration, development, production and acquisition of oil and natural gas properties located onshore in Louisiana. The basic construct of operations is such that Falcon is record title holder of all onshore oil and gas assets. Under a contract operating agreement, ORX operates approximately 98% of Falcon's net production. Holdings is the 100% owner of Falcon. The Debtors operate to explore, develop, and produce crude oil, natural gas and NGLs, and sell to customers in the USA. Revenue consists primarily of sales of oil and gas production

16.     As of the Petition Date, Falcon owned interests in approximately 89 oil, gas and related wells which include 18 currently producing, 14 salt water disposal (SWD) wells, 10 non-operating/overriding royalty interest wells, and 47 shut-in wells, and estimated proved reserves of approximately 85 Bcfe (20% Liquids).   As well, the Debtors hold interests in numerous contingent resources with estimated prospective resources of approximately 57 MMBOE (assuming Debtors can close the Assignment transaction with Anadarko separately requested by an emergency motion – if not, the potential resources would be reduced by approximately 30%). Finally, Falcon owns equipment, facilities, etc. related to the ownership of these oil and gas assets.

**II.     Prepetition Secured Financing Loan Structure and Prepetition Claims**

17.     Falcon V, L.L.C., Falcon V. Holdings, L.L.C., and ORX Resources, L.L.C., as borrowers, 405 Baxterville LLC, as administrative agent (in its capacity as such, the "Prepetition Agent"), and the lenders party thereto (in their respective capacities as such, the "Prepetition Lenders") are parties to that certain Loan Agreement dated as of May 24, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Loan Agreement," and together with all related loan and security documents (in each case as amended, restated, supplemented or otherwise modified from time to time, collectively with the Prepetition Loan Agreement, the "Prepetition Loan Documents").

18.     The principal amount of the obligations owed by the Debtors, on a joint and several basis, to the Prepetition Agent and Prepetition Lenders under the Prepetition Loan Agreement, exclusive of accrued but unpaid interest, costs, fees and expenses, was not less than $[41,000,000.00] as of the Petition Date.   All obligations of the Debtors arising under or in connection with the Prepetition Loan Agreement or any other Prepetition Loan Document shall

collectively be referred to herein as the "Prepetition Secured Indebtedness."

19.     Pursuant to the Prepetition Loan Documents, the Prepetition Agent was granted, for its benefit and the benefit of the Prepetition Lenders and the other secured parties thereunder (the "Prepetition Secured Parties"), first-priority and properly perfected continuing liens, mortgages, and security interests (subject to liens expressly permitted under the Prepetition Loan Documents) in, to and upon property of the Debtors including (i) a pledge on all of the equity units of Falcon and ORX, (ii) mortgages on all of real property owned by the Debtors as well as the Debtors' mineral interests and oil and gas properties, (iii) deposit account control agreements on the Debtors' bank accounts, and (iv) UCC-1 financing statements covering all the Debtors' interests in current and future production, proceeds, receivables, and movable property (the "Prepetition Liens").

20.     The Debtors incurred the Prepetition Secured Indebtedness in connection with the refinancing of a loan from Angelo, Gordon & Co. ("Angelo Gordon").  In connection with the refinancing, the Debtors issued a note payable to Angelo Gordon for approximately $3,000,000. This liability is evidenced by an unsecured, subordinated note and carries a 10% annual payment-in-kind interest rate feature.  This note has a five-year term.

21.     As of the Petition Date, the Debtors believe that they are current on their royalty payments, but as royalties are paid upon receipt of production proceeds, amounts are due or will come due postpetition for royalties that accrued for at least the most recent full production month plus any partial production month prepetition.  The Debtors also have on-going lease related obligations that the Debtors propose to pay in the ordinary course of business.  The amounts for payment of royalties and related lease obligations are included in the Budget.

22.     ORX is an operator qualified by the State of Louisiana to operate and hold leases

14

and serves as operator of approximately 90% of the Wells.  As operator of these Wells, ORX must obtain a variety of specialty chemicals, gas, metals, plastics, and other raw materials from specialized vendors and other service providers.  ORX as operator and Falcon as owner obtains materials and services from a limited number of highly specialized vendors, service providers, and other businesses, often on an order-by-order basis and/or, in some instances, through contracts with service providers.  The Debtors estimate that, as of the Petition Date, the Debtors owes a total of approximately $3 million on account of goods and services provided to ORX and Falcon from third parties as operator of the Leases and their businesses (the "Operating Costs"), certain of which are under contracts subject to assumption under section 365 of the Bankruptcy Code, others under work orders or MSA's (which in effect set terms in the event work is ordered).  Of these Operating Costs that are owed, the Debtors have identified several critical vendors and herewith have requested authority from the Court to pay the prepetition claims of these critical vendors.  The estimated amount of critical vendor claims that the Debtors seek to pay is $850,000.  The Debtors also owe approximately $320,000 to its insurance broker McGriff, Seibels & Williams, Inc. for past due premiums to renew surety bonds with Argonaut Insurance Company.  The Debtors are also seeking authority to continue their surety bond program and pay these past due amounts (through the use of cash collateral and debtor in possession financing). The critical vendor and surety bond payments are included in the Debtors' Budget (defined below).  As such, upon approval of payment of these amounts by the Court, the Debtors estimate that current unpaid prepetition Operating Costs are approximately $1.9 million.

23.    The Debtors also currently owe approximately $1.1 million in past due *ad valorem* taxes to several Parishes.  The Debtors propose to pay these amounts as set forth in the Budget and/or in connection with its proposed plan of reorganization.

24.     In the ordinary course of business, the Debtors obtain financial and accounting services from third parties.  The accounting and finance function is largely outsourced to Energy Management Consultants, L.L.C. ("EMC") and overseen since June 2018 by Mary Hood, the Debtors' financial consultant.  EMC and ORX are parties to a Consulting Services Agreement dated January 1, 2017 whereby EMC provides accounting services, utilizing EMC's accounting software system, generates accounting reports for the Debtors, and assists the Debtors with accounting and financial matters.  The Debtors propose to maintain and perform the Consulting Agreement with EMC on a month to month basis, resume and increase the contract payment rates to $56,000 per month, subject to the DIP Lenders' approval, in connection with the agreement with EMC to maintain the contract services post-petition.  The Debtors also propose to maintain the services of Mary Hood as financial consultant to the Debtors.  These amounts are included in the Budget.

25.     Falcon also executed that certain Partial Assignment of Oil, Gas and Mineral Leases dated March 1, 2019 (the "Assignment") with Anadarko E&P Onshore LLC ("Anadarko") whereby Anadarko agreed to assign its right title and interest in and to certain oil, gas and mineral leases in the Port Hudson Field.  Falcon agreed to pay Anadarko the sum of $1,200,000.00 for the Assignment of one hundred percent (100%) of Anadarko's ownership of the Port Hudson Field leases.  In connection therewith, Falcon and Anadarko executed a letter agreement (the "Letter Agreement") extending the Assignment payment deadline forty-five (45) days or no later than May 17, 2019.  In consideration for Anadarko granting Falcon the additional time necessary to complete the funding process, Falcon agreed to remit to Anadarko $180,000 as a non-refundable deposit to be credited against the acquisition amount of $1,200,000, should closing occur.  Failure by Falcon to close by May 17, 2019 results in

Anadarko retaining the deposit, and Falcon losing the rights to the properties. Falcon has included the payment of $1,020,000 to Anadarko in the Budget.

26.     Finally, the Budget includes a "contingency amount" of $750,000 included by the Debtors for any unforeseen expenditures that may be required during these cases. The Debtors are uncertain whether such funds will be necessary and will only request such funds in the event any unforeseen emergency circumstances may arise.

### III.    The Debtors' Immediate Need for Use of Cash Collateral

27.     The Debtors require immediate access to postpetition financing and the use of Cash Collateral to operate their businesses, preserve value and pursue their restructuring goals. The Debtors, in consultation with advisors, have reviewed and analyzed the Debtors' projected cash needs and have prepared a Budget (as updated from time to time in accordance with the DIP Credit Agreement) outlining the Debtors' postpetition cash needs during the anticipated length of these cases. The Debtors believe that the Budget is an accurate reflection of their funding requirements (for the amounts outlined above) over the identified period, will allow them to meet their obligations, and is reasonable and appropriate under the circumstances.

28.     The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503 of the Bankruptcy Code, or other financing under sections 364(c) or (d) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Loan Documents. A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting the DIP Agent, for the benefit of the DIP Secured Parties, superpriority claims and priming liens and security interests, pursuant to sections 364(c)(1), (2), (3), and 364(d) of the Bankruptcy Code and the DIP Loan Documents. After considering all alternatives, the Debtors have concluded, in the exercise of their prudent

business judgment, that the credit facility provided under the DIP Loan Documents represents the best and only working capital financing available to the Debtors at this time. Additionally, the terms of the Financing are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

## RELIEF REQUESTED

### I.   The Debtors Should Be Authorized to Obtain DIP Financing Under Section 364 of the Bankruptcy Code.

29.   It is essential that the Debtors obtain access to sufficient postpetition financing and use of Cash Collateral to avoid immediate and irreparable harm to their businesses. The preservation of estate assets, the Debtors' continuing viability and their ability to reach the stage of these cases for confirmation of a plan of reorganization, depends heavily upon the expeditious approval of the relief requested herein.

30.   Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. *See* 11 U.S.C. § 364. If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, or is secured by a senior lien on unencumbered property, or a junior lien on encumbered property, or a combination of the foregoing. *See* 11 U.S.C. § 364(c). In addition, pursuant to section 364(d) of the Bankruptcy Code, a court may authorize a debtor to obtain postpetition credit secured by a lien that is equal or senior in priority to existing liens on encumbered property (*i.e.*, a "priming" lien) when a debtor is unable to obtain credit on other terms and the interests of existing lienholders are adequately protected, or if the existing lienholders consent to

such priming.

31.    The Debtors propose to obtain financing that will "prime" certain of the Debtors' pre-petition liens.  Therefore, the approval of the DIP Financing is governed by both sections 364(c) and 364(d) of the Bankruptcy Code.

**A.    The Debtors Have Satisfied the Conditions Under Section 364(c) to Obtain Financing on a Senior Secured and Superpriority Basis.**

32.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code as an administrative expense."  11 U.S.C. § 364(c); *see In re Ames Dep't Stores*, 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

33.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

(a)    the debtor is unable to obtain unsecured credit under section 364(b) (*i.e.*, by granting a lender administrative expense priority);

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. *See, e.g., In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying these factors); *In re Ames Dep't Stores*, 115 B.R. at 39.

**1.    <u>The Debtors Were Unable to Obtain Necessary Postpetition Financing on an Unsecured Basis</u>**

34.    First, financing is necessary.  As shown by the Budget, the Debtors are in need of Financing as a source of funding in addition to use of Cash Collateral in consideration of granting replacement liens to replenish diminution of value of the Collateral of the Prepetition

Lenders.  So, credit is needed.  To show that the credit required is not obtainable on an unsecured

basis, a debtor need only demonstrate a good faith effort that credit was not available without the

protections of section 364(c) of the Bankruptcy Code.  Thus, the statute imposes no duty to seek

credit from every possible lender before concluding that such credit is unavailable.  *In re Ames*

*Dep't Stores*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing

where it approached four lending institutions, was rejected by two, and selected the least onerous

financing option from the remaining two lenders).  Moreover, where few lenders are likely to be

able and willing to extend the necessary credit to the debtor, "it would be unrealistic and

unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing."  *In re Sky*

*Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v.*

*Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

35.    In connection with the restructuring, the Debtors initiated a dialog with the

Prepetition Agent and its advisors for purposes of negotiating postpetition debtor-in-possession

financing (the "Financing"), including new liquidity and the use of cash collateral.  In an attempt

to refinance, the Debtors have contacted multiple sources and such attempts have proved

unsuccessful.  Second, all of the Debtors' assets are collateral for the Prepetition Lender's debt.

As such, collateral values will not support a priming lien because the Debtors would be unable to

provide adequate protection of any new lenders' security interests and lien value.  Finally, any

subordinated loan that the Debtors could obtain would in effect be unsecured because there is no

collateral value over and above the Prepetition Secured Indebtedness.  For these reasons,

negotiating a DIP loan with the Prepetition Agent and their advisors was in the best interest of

the Debtors.

36.    The Debtors' efforts to seek refinancing and additional sources of capital from

third-parties, as well as vigorous negotiations with the DIP Lenders were reasonable and sufficient and satisfy the statutory requirements of section 364(c) of the Bankruptcy Code. *See, e.g., In re Ames Dep't Stores*, 115 B.R. at 40.

### 2.     The Financing is Necessary to preserve the Assets of the Estate

37.     As discussed, the Debtors need the Financing to preserve the value of their estates for the benefit of all creditors and other parties in interest. Specifically, the Debtors need the Financing to maintain operations and signal to their suppliers and other vendors that they are credit-worthy and that their vendors can and should continue to provide their products to the Debtors on substantially the same credit terms as during the pre-petition period. As described herein, the Debtors need Financing to provide ongoing working capital requirements of the Debtors and to pay fees, costs, expenses, insurance, lease renewals, *ad valorem* taxes, critical vendors, and surety bond premiums and other administrative expenses relating to these Chapter 11 cases. Absent the Financing and use of the Cash Collateral, the Debtors will be unable to operate their business or prosecute these Chapter 11 cases, and the Debtors' vendors may refuse to provide the goods (and credit) the Debtors' businesses require.

### 3.     The Terms of the DIP Facility are Fair, Reasonable and Appropriate Under the Circumstances

38.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

39.     The terms of the DIP Credit Agreement and the proposed DIP Orders were

negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders, resulting in agreements designed to permit the Debtors to obtain the needed liquidity to maximize the value of their assets through confirmation of a chapter 11 plan.  The DIP Credit Agreement contemplates a revolving DIP Facility in the aggregate principal amount of up to $6.8 Million, and the terms of a plan of reorganization that includes a refinancing on an exit basis of the Financing and an agreed portion of the Prepetition Secured Indebtedness, with a contribution of the remaining Prepetition Secured Indebtedness to equity in the reorganized debtors – assuming confirmation and effectiveness.  With the Court's approval of the DIP Facility, the Debtors will be well situated to confirm a Chapter 11 plan.

**B.    The Financing and DIP Credit Agreement are in the Best Interests of the Debtors' Estates and Creditors**

40.    Approval of the Financing and DIP Credit Agreement are in the best interests of the Debtors' estates and their creditors.  Given that the Debtors do not currently have any other executable options for financing in these cases that would permit the Debtors to remain viable, the Debtors, in the exercise of their sound business judgment, believe that they have negotiated for the best possible terms for the Financing.  As mentioned, any alternative financing would be provided on an unsecured basis because there is no collateral value over and above the Prepetition Secured Indebtedness.  As such, the Debtors' most viable option for Financing was by negotiating with the Prepetition Lenders.  Under such circumstances, the Debtors submit that the Financing and DIP Credit Agreement are unquestionably in the best interest of their estates and creditors.

**II.    The Debtors' Proposed Adequate Protection Should Be Approved.**

41.    Parties with an interest in cash collateral or collateral that may be used to secure postpetition financing are entitled to adequate protection.  11 U.S.C. § 363(e).  In addition, a

debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  11 U.S.C. § 364(d)(1)(B).

42.    Here, the Prepetition Lenders have consented to the Debtors' use of cash collateral in conformity with this Motion and subject to the terms and limitations set forth in the Interim DIP Order.  Further, section 363(e) provides that "on request of an entity that has an interest in property…proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral.

43.    Although the Bankruptcy Code does not provide an all-encompassing definition of what constitutes adequate protection, section 361 of the Bankruptcy Code provides a non-exhaustive list of factors that may constitute adequate protection.  A determination of adequate protection is decided on a case-by-case basis, and involves a consideration of the "nature of the creditor's interest in the property, [and] the potential harm to the creditor as a result of the property's decline in value of the method of protection."  *In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986).

44.    For the use of the Cash Collateral, the Debtors are granting the Prepetition Lenders DIP Liens on Postpetition Collateral, with such Postpetition Collateral as well to be collateral for postpetition advances, in accordance with the DIP Credit Agreement.  The Debtors anticipate that the aforementioned first priority liens and security interests will adequately protect the Prepetition Lenders from any diminution in the value of their interest in their collateral resulting from the use of the Cash Collateral. *In re First Douth Sav., Ass'n*, 820 F.2d 700, 710

(5th Cir. 1987) (granting a creditor replacement liens to the extent of diminution in the value of their security interest constitutes adequate protection under section 361).

45.     The Debtors will also provide the Prepetition Lenders with required weekly reporting of financial information relating to projected revenues and expenses, actual revenue and expenses, and variances from the Budget, as applicable, as well as reasonable access to, among other things, the Debtors' management, books, and records, including the reporting required under the DIP Facility and Amended Credit Agreement.   *See, e.g.*, *Mutual Benefit Life Ins. Co. v. Stanley Station Assocs., L.P. (In re Stanley Station Assocs., L.P.)*, 140 B.R. 806, 809 (D. Kan. 1992) ("In addition, we believe the request of MBL for 'timely filing of proper monthly operating reports…' falls within the ambit of adequate protection…"); *Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's, Inc.)*, 140 B.R. 643, 706 (Bankr. W.D. Mich. 1992) (reports required as part of adequate protection).

46.     The Debtors submit that the replacement liens and the provision of timely financial reporting will adequately protect the Prepetition Lenders for the Debtors' use of Cash Collateral.   Thus, the Prepetition Lenders' interests are adequately protected, and the requirements for adequate protection under sections 361 and 363 of the Bankruptcy Code have been satisfied.

47.     The Debtors' proposed adequate protection package is consistent with the relief granted by other courts in similar circumstances. *See, e.g.*, *In re Castex Energy Partners, L.P.*, No. 17-35835 (Bankr. S.D. Tex. Nov. 14, 2017) (granting superpriority administrative claims, adequate protection replacement liens, adequate protection payments, and fees and expenses on an interim basis to first lien secured creditors); *In re Energy XXI Ltd.,* No. 16-31928 (DRJ) (Bankr. S.D. Tex. Apr. 15, 2016) (same); *In re Goodrich Petrol. Corp.*, No. 16-31975 (MI

(Bankr. S.D. Tex. Apr. 18, 2016) (same); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Mar. 29, 2016) (same); *In re Sabine Oil & Gas Corp.*, No. 15-11853 (SCC) (Bankr. S.D.N.Y. Sept. 16, 2015) (same).

### III.  Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment

48.     As described above, the Debtors have contacted multiple sources and such attempts have proved unsuccessful.  Second, all of the Debtors' assets are collateral for the Prepetition Secured Indebtedness.  As such, collateral values will not support a priming lien because the Debtors would be unable to provide adequate protection of any new lenders' security interests and lien value.  Finally, any subordinated loan that the Debtors could obtain would in effect be unsecured because there is no collateral value over and above the Prepetition Secured Indebtedness.

49.     Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (stating that "[c]ourts have generally deferred to a debtor's business judgment in granting section 364 financing"); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors").  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311

(5th Cir. 1985).

50.     The Debtors, with the assistance of their advisors, have exercised their sound business judgment in determining that a postpetition credit facility is appropriate and have satisfied the legal prerequisites to incur debt under the DIP Credit Agreement.  In light of this, the Debtors' decision to enter into the DIP Credit Agreement is a sound exercise of the Debtors' business judgment, including, as discussed below, the following aspects of the Financing:  (a) the Carve-Out; (b) the Budget; and (c) the payment of certain fees under the DIP Credit Agreement. Accordingly, the Court should grant the Debtors authority to enter into the DIP Credit Agreement and obtain funds from the DIP Lenders on the secured, administrative superpriority basis described above, pursuant to section 364 of the Bankruptcy Code.

### A.    The Scope of the Carve-Out is Appropriate

51.     The proposed DIP Credit Agreement subjects the claims and liens of the DIP Lenders to the Carve-Out.  Similar carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *See In re Castex Energy Partners, L.P.*, No. 17-35835 (Bankr. S.D. Tex. Nov. 14, 2017) (granting a postpetition financing order with a carve-out for professional fees); *In re Autoseis*, Case No. 14-20130 (Bankr. S.D. Tex. March 27, 2014) (same);  *In re ATP Oil & Gas Corp.*, Case No. 12-36187 (Bankr. S.D. Tex. Aug. 17, 2012) (same);  *Ames*, 115 B.R. at 40.  The DIP Credit Agreement does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  *See Ames*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of these

Chapter 11 cases by ensuring that assets remain for the payment of professional fees of the Debtors and any official committees, notwithstanding the grant of liens and claims under the DIP Credit Agreement.

52.    Importantly, the Carve-Out set forth in the DIP Orders (a) does not cause disparate treatment with respect to the professionals retained by any official committee of unsecured creditors (if one should be appointed) and the professionals retained by the Debtors, (b) includes the fees to be paid to the U.S. Trustee, and (c) does not impair the ability of any party to object to such fees, expenses, reimbursement or compensation.

### B.    The Budget is Appropriate

53.    As described above, the Debtors' access to Cash Collateral and Financing will be subject to the Budget, which, after extensive negotiations, has been approved by the DIP Lenders.  After diligent consideration of all known circumstances, and upon consultation with their advisors, the Debtors believe, in their reasonable business judgment, that the proposed Budget (including the variances permitted thereunder pursuant to the DIP Credit Agreement) is achievable, reasonable under the circumstances, and will allow the Debtors to operate in Chapter 11 without the accrual of unpaid liabilities.  Furthermore, the Debtors believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the DIP Credit Agreement and the Budget.  Accordingly, the Debtors submit that the proposed Budget is appropriate.

### C.    The Payment of Fees under the DIP Credit Agreement is Appropriate

54.    The fees and charges to be paid to the DIP Lenders and DIP Agent, as expressly provided in the DIP Credit Agreement, are reasonable and appropriate under the circumstances. Courts routinely authorize debtor-in-possession lenders to impose fees beyond the explicit liens

and rights specified in section 364 of the Bankruptcy Code.  Moreover, such fees are often permitted where the associated financing is, in the debtors' business judgment, beneficial to the debtors' estates.  *See In re Castex Energy Partners, L.P.*, No. 17-35835 (Bankr. S.D. Tex. Nov. 14, 2017) (approving a 2.5% up-front fee); *In re Aleris Int'l Inc.*, No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving a 3.5% front-end net adjustment against each lender's initial commitment); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (Bankr. D. Del. Jan. 30, 2008) (approving a 2.5% fee related to refinancing and extending a postpetition financing facility); *see also In re Great Atl. & Pac. Tea Co.*, No. 10 24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (approving 3% letter of credit fee); *In re InSight Health Servs. Holdings Corp.*, No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.5% DIP closing fee).

**IV.    Request for Use of Cash Collateral**

55.    By this Motion, the Debtors also request authority to use Cash Collateral on the terms set forth in the proposed DIP Orders.  The Debtors submit that this use of Cash Collateral is authorized pursuant to section 363(c) of the Bankruptcy Code.  Section 363(c) of the Bankruptcy Code provides as follows:

> (1)    If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

> (2)    The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless— each entity that has an interest in such cash collateral consents; or the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section. 11 U.S.C. § 363(c).

56.    Section 363(e) of the Bankruptcy Code further provides, in pertinent part, that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by

the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

57.     The Debtors are seeking the use of Cash Collateral on a consensual basis, and the Debtors have negotiated the use of Cash Collateral at arm's length and in good faith with the Prepetition Lenders.    The terms of the DIP Orders provide Prepetition Lenders with the following "adequate protection":   (a) replacement liens, (b) administrative claims and (c) cash payments of reasonable fees and expenses of counsel and advisors to the Prepetition Agent.   As described in more detail above, these protections satisfy the adequate protection requirements of section 363(e).

58.     It is essential to the success of the Debtors' Chapter 11 cases that the Debtors immediately obtain authority to use Cash Collateral.   The Debtors must maintain sufficient access to cash to continue to operate their businesses as a going concern for the direct benefit of all stakeholders and to develop and implement their reorganization.   The preservation of estate assets, the Debtors continuing viability and their ability to successfully reorganize and maximize value for stakeholders, thus, depend heavily upon the expeditious approval of the relief requested herein.    All of the Debtors' cash constitutes encumbered Cash Collateral.    The Debtors, therefore, seek immediate authority to access the DIP Facility and use Cash Collateral on an interim basis as set forth in this Motion and in the Interim DIP Order to prevent immediate and irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).

## V.    Request for Modification of the Automatic Stay

59.     Bankruptcy Code section 362 provides for an automatic stay upon the filing of a bankruptcy petition.   The proposed Interim DIP Order contemplates the modification of the automatic stay (to the extent applicable), to the extent necessary to permit the (a) Debtors and (b) DIP Agent to implement the terms of the Interim DIP Order.  Stay modifications of this kind are

ordinary and standard features for the use of cash collateral, and in the Debtors' business judgment, are reasonable and fair under the present circumstances. *See, e.g.*, *In re Castex Energy Partners, L.P.*, No. 17-35835 (Bankr. S.D. Tex. Nov. 14, 2017) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (same); *In re ATP Oil and Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 17, 2012) (same); *In re MPF Holdings US LLC*, No. 08-36084 (JB) (Bankr. S.D. Tex. Feb. 18, 2009) (same); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (same).

60.     Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim DIP Order and DIP Credit Agreement to permit the Debtors to grant security interests and liens described above, and to perform such acts as may be required to assure the perfection and priority of such security interests and liens.

## VI.   The Proposed Financing was Negotiated in Good Faith

61.     The terms and conditions of the DIP Credit Agreement and the use of Cash Collateral are fair and reasonable and were negotiated by the parties in good faith and at arm's length.  Therefore, the DIP Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Credit Agreement, or any Interim or Final DIP Order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

62.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the

use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  The Debtors request that the Court conduct an expedited Interim Hearing on the Motion and authorize the Debtors to use the Cash Collateral for a 4-week period detailed within the Budget and in accordance with the terms of the Interim DIP Order and the Budget.

## VII.  Interim Relief is Warranted

63.     The Debtors are seeking immediate access to the Financing, pursuant to the terms of the Interim DIP Order.  This Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).

64.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion.  If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

The Debtors have an immediate postpetition need to access the Financing.  As described in greater detail in the Declarations, the Debtors will be unable to operate their business as a going concern in the near term without the ability to access the Financing and use Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  On the other hand, the Debtors will use liquidity obtained under the DIP Credit Agreement and Cash Collateral to, among other things, procure goods and services from vendors, make the Assignment payment to Anadarko to protect its interest in the properties, pay critical vendors, pay employee payroll and related benefits, and satisfy other working capital needs during these Chapter 11 Cases.  In short, the Debtors' ability to finance their operations

and the availability of sufficient working capital and liquidity to the Debtors through the use of the Financing and Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtors' estates.

65.     The Debtors, therefore, seek immediate authority to access the Financing on an interim basis and as set forth in this Motion and in the Interim DIP Order to prevent immediate and irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Rules 4001(b) and 4001(c).  Accordingly, to the extent the Debtors require the use of Cash Collateral and postpetition financing, the Debtors respectfully submit they have satisfied the requirements of Bankruptcy Rule 4001 to support an expedited preliminary hearing and immediate Financing and Cash Collateral availability on an interim basis.

## VIII.    Request for Final Hearing

66.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request the Court set a date for the Final Hearing as soon as practicable and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.

### WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

67.     To implement the foregoing successfully, the Debtors request that the interim order to be entered by the Court provide that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h), with respect to the Interim DIP Order submitted herewith so that there will be no interruption of the Debtors' ability to conduct business.

### NOTICE

68.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Middle District of Louisiana; (b) the Debtors' thirty (30) largest unsecured

creditors on a consolidated basis, as identified in their Chapter 11 petitions; (c) both Hunton

Andrews Kurth LLP, counsel to 405 Baxterville LLC, the Debtors' prepetition secured lender

and DIP Lender, and to 405 Baxterville LLC; (d) the Internal Revenue Service; (e) parties that

have filed a lien on the Debtors' assets and (f) any party that has requested notice pursuant to

Bankruptcy Rule 2002 as of the time of service.  Debtors submit that no other or further notice

need be provided.

<u>**NO PRIOR REQUEST**</u>

69.    No prior request for relief sought in this Motion has been made to this or any

other court.

**WHEREFORE**, the Debtors respectfully request entry of an Interim DIP Order,

substantially in the form attached hereto as <u>**Exhibit A**</u>, granting the relief requested herein and

granting such other relief as is just and proper.

Dated: May __, 2019.

<div style="margin-left: 40%;">

Respectfully submitted,

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
**Louis M. Phillips (#10505)**
**Patrick (Rick) M. Shelby (#31963)**
**Amelia L. Bueche (#36817)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Email: rick.shelby@kellyhart.com
Email: amelia.bueche@kellyhart.com

*Proposed Counsel for the Debtors*

</div>