UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| In re: | Chapter 11 |
| Falcon V, L.L.C., et al., | Case No. 19-10547 |
| Debtors. | Jointly Administered |
| | Re: Docket Nos., 27, 58 |

**OBJECTION OF ANGELO, GORDON ENERGY SERVICER, LLC TO DEBTORS' MOTION FOR ORDER AUTHORIZING POSTPETITION FINANCING**

Angelo, Gordon Energy Servicer, LLC ("Angelo Gordon"), in its capacity as an unsecured creditor of debtor Falcon V, L.L.C., submits this objection (the "Objection") to the *Emergency Motion for an Order (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion", Docket No. 27), filed by the above-captioned debtors and debtors-in-possession (the "Debtors"). In further support of its Objection, Angelo Gordon respectfully states as follows:

**Summary of Objection**

1.  The Debtors commenced their bankruptcy proceedings less than two weeks ago with the stated goal of quickly confirming a plan of reorganization (the "Proposed Plan") that will effectively transfer ownership of all of the Debtors' assets to their prepetition lender (and proposed postpetition lender), 405 Baxterville, LLC (the "Baxterville Lender"). Troublingly for prepetition creditors (other than the Baxterville Lender), the Proposed Plan will either completely eliminate any recovery rights of general unsecured creditors (if their class fails to accept the Proposed Plan)

or provide all unsecured creditors (who, including Angelo Gordon, are collectively owed an undetermined amount that exceeds $7 million) with the "opportunity" to collect their pro-rata share of a *de-minimis* $200,000 reserve.

2. The Debtors' alleged need to completely eviscerate all unsecured creditor rights in exchange for a de-minimis "tip" payment is puzzling in light of other allegations set forth in the Debtors' first day affidavit and other materials filed at the start of these cases, which suggest that three months ago, the Debtors were actively engaged in efforts to raise as much as $80 million in new debt and equity financing based on enthusiasm in the Debtors' recently acquired lease rights in the "Austin Chalk Play." Indeed, the Debtors appear to believe in their interest in the "Austin Chalk Play" so much that they continued to invest more than $1,000,000 into that play after the commencement of these cases, even as their Proposed Plan suggested that the Debtors would be strained to pay more than $200,000 in respect of their millions of dollars of undisputed, general unsecured claims.

3. How and why tens of millions of enterprise value could magically vanish from the Debtors in a span of less than 6 months should (and will) be the subject of further investigation during the Debtors' bankruptcy cases. However, there presently is little information available to the Debtors' creditor body to complete such an investigation. The Debtors have not filed a disclosure statement to accompany the Proposed Plan, have not put forth any valuation evidence to substantiate the implicit valuation set forth in the Proposed Plan, have not established any sale or marketing process to test the alleged valuation put forth in the Proposed Plan, and recently obtained an extension of the deadline to file their schedules of assets and liabilities and statements of financial affairs until June 14, 2019.

4. Through the DIP Motion, the Debtors ask that the Court enter a final order, a little more than 2 weeks after the Petition Date (and less than a week after Committee formation), that will entrench the Baxterville Lender within the Debtors' capital structure, provide the Baxterville Lender with inappropriate protections and excessive control over the future direction of the Debtors' bankruptcy cases, and stifle the ability of the Committee and other creditors and interested parties to evaluate reorganization options. It is not appropriate for the Court to grant the Baxterville Lender such sweeping protections and benefits when no investigation into the Debtors' valuation or prepetition transactions has been conducted, little to no information to conduct such an investigation is available, and the proposed post-petition financing from the Baxterville Lender will be used to further a plan process that is focused upon effectively eviscerating all general unsecured creditor recovery rights.

5. Though Angelo Gordon recognizes that some postpetition financing may be necessary in order to further the Debtors' reorganization efforts, Angelo Gordon submits that the following adjustments must be made to the proposed financing terms set forth in the DIP Motion:

    a. The DIP Motion should not be approved on a final basis at this time. Any further DIP credit extensions should be made via second, interim order that preserves all rights of the Committee and other unsecured creditors;

    b. The Debtors should not be allowed to fully draw the remaining DIP facility balance with their next draw – DIP facility draws should be staggered over time and narrowly tailored to address immediate funding needs only;

    c. The DIP budget and order must include appropriate line items and carve-outs for legal and financial professionals of a Committee;

    d. The DIP order must provide the Committee with a longer investigation period than the 60 day period currently proposed;

    e. No plan milestones should be included in the next interim DIP order, and plan milestones should only be allowed after the Committee (and its financial advisor) have had an opportunity to investigate the Debtors' financial position;

      f.      The DIP facility should not provide the Baxterville Lender with liens upon unencumbered assets or proceeds thereof (including, without limitation, any avoidance action proceeds and commercial tort claims that were not encumbered on the Petition Date);

      g.      The DIP facility should not include minimum cash balance requirements, "MAE" qualifiers, or other inappropriate terms;

      h.      The DIP orders should not provide for a waiver of 506(c) rights or 552 "equities of the case" rights; and

      i.      The DIP orders should require the Debtors to share with the Committee any financial reports furnished to the Baxterville Lender.

6. Absent such adjustments, it is puzzling to imagine how creditors (other than the Baxterville Lender) would be better served by approving the financing terms proposed in the DIP Motion on a final basis. Accordingly, Angelo Gordon respectfully requests that the Court either (a) condition any approval of the DIP Motion upon revisions to the postpetition credit agreement and financing order addressing the points set forth above; or (b) deny the relief requested in the DIP Motion.

**Background Facts**

**A. Commencement of the Debtors' Bankruptcy Proceedings**

7. The Debtors commenced chapter 11 proceedings in this Court on May 10, 2019 (the "Petition Date").

8. On the Petition Date, the Debtors filed a proposed "Top 20" list of the Debtors' largest unsecured creditors. That list failed to identify Angelo Gordon (who holds a prepetition unsecured claim in excess of $3 million), the Debtors' largest unsecured creditor, as a prepetition creditor of the Debtors. Approximately one week ago, on May 14, the Debtors filed an amended "Top 20" list. That list identified Angelo Gordon as the Debtors' largest unsecured creditor, and also identified other creditors that collectively, held more than $7 million of unsecured claims.

9.     On May 21, 2019, the United States Trustee appointed an official committee of unsecured creditors in these cases (the "<u>Committee</u>"). Angelo Gordon is a Committee member.

**B.     The DIP Motion**

10.    On the Petition Date, the Debtors filed the DIP Motion. Through the DIP Motion, the Debtors requested authority to borrow under a postpetition, delayed-draw term loan facility. Though the DIP facility is allegedly intended to assist the Debtors with financing their operations during the course of their bankruptcy proceeding (which is anticipated to take more than 90 days to complete), the budget included with the DIP Motion proposes that the DIP facility be fully drawn by June 2, 2019, in order to provide the Debtors with funds to cover costs that could be incurred as late as August 11, 2019.

11.    The proposed, final $4.5 million DIP facility borrowing for the week ending June 2, 2019 is intended to pay what appear to be a number of large, "one time" expenditures including:

   a. $1.07 million to pay ad-valorem taxes (though no motion to pay such taxes has yet been filed);

   b. $625,000 to pay, in advance, a full 12 months of insurance premiums;

   c. $317,500 to pay a surety bond premium;

   d. $136,500 to pay an "upfront" DIP fee; and

   e. $160,000 to pay professional fees of the Debtors (though no interim compensation order or fee application requesting such debtor compensation has been filed).

12.    Additionally, the DIP Motion's proposed budget implies that the Debtors intend to use $650,000 of their June 2 draw in order to pay an anticipated investment banker transaction fee that the budget shows will not be payable until August, 2019.

**B.    The Proposed Plan**

13. The Debtors filed their Proposed Plan on the Petition Date. The Proposed Plan generally contemplates a transfer of ownership of the Debtors to the Baxterville Lender, in satisfaction of an undetermined amount of the Baxterville Lender's alleged prepetition secured claim.

14. The Proposed Plan provides few (if any) distributions to general unsecured creditors. At best (and only if the general unsecured creditor class accepts the plan), general unsecured creditors will receive a pro-rata share of $200,000. At worst, general unsecured creditors will receive no distribution under the plan.

15. Perhaps even more troubling for general unsecured creditors, Section 4.15 of the Proposed Plan would cancel and extinguish all potential avoidance actions (other than avoidance actions used for defensive purposes only) on the Proposed Plan's effective date. Thus, in the event that the Proposed Plan (financed by the Baxterville Lender) were confirmed, general unsecured creditors could not even look to avoidance actions to enhance the pithy recoveries offered under the Proposed Plan.

16. The DIP Motion contains milestones relating to confirmation of a the Proposed Plan. Among other things, it requires that a disclosure statement relating to the Proposed Plan be filed within 45 days of the Petition Date, and that the Proposed Plan be confirmed within 90 days of the Petition Date. To date, no disclosure statement has been filed.

## Objection

**A.    Final Approval of the DIP Motion is Not Appropriate**

17. Several key unknown factors exist in these cases, most notably the Debtors' enterprise valuation (which the Debtors' first day materials suggest could range between $80

million and less than $40 million). Though the Debtors and Baxterville Lender (who presumably have been working on this transaction structure for weeks or months) have significant knowledge of the Debtors' business affairs and valuation, the Committee and other unsecured creditors, who stand to lose the most in these cases, presently have little to no information about such matters.

18. The Debtors' schedules and statements of financial affairs may not be available until almost a month from now, no enterprise valuation information has been set forth (notwithstanding the fact that valuation will be a key to understanding the DIP Motion and Proposed Plan), and virtually no funds have been set aside in the proposed DIP Motion budget to for Committee investigation of the Debtors' affairs. Furthermore, there appears to be no process in place to test the Debtors' proposed (but undisclosed) enterprise valuation through soliciting higher and better purchase or financing offers, as would be customary in a typical "363 sale" process.

19. Approving the DIP Motion on a final basis, barely more than 2 weeks after the Petition Date (and less than a week after Committee formation), will lock the Debtors into pursuit of a Proposed Plan transaction that will eviscerate unsecured creditor recovery rights before the Committee and other unsecured creditors have a chance to acquire information regarding the Debtors that the Baxterville Lender (and Debtors) already possess. Indeed, expedited, approval of a DIP Motion that finances the Debtors' efforts to wipe out unsecured creditors would only serve to benefit the Baxterville Lender and would not be in the best interests of all creditors. It is well settled that the Court should not give final approval to a DIP financing facility that will benefit only the DIP Lender.

20. As set forth below, the Debtors' present, immediate borrowing needs appear to be significantly less than amount proposed in the DIP budget, and such borrowing needs could be

satisfied through entry of a second, interim DIP financing order that addresses the other concerns raised below.  Such an approach will allow the Committee and other unsecured creditors to critically review the DIP Motion and Proposed Plan transaction, collectively respond to such proposals in an orderly and appropriate manner, and prevent potentially devastating destruction to unsecured creditor value that would likely occur by hastily approving the DIP Motion on a final basis and "fast tracking" the Proposed Plan process.

**B.      Modifications to DIP Financing Terms are Required for Any Further DIP Orders**

21.     The Baxterville Lender's proposed DIP facility contains a number of deficiencies and other terms that must be addressed before the Court should authorize the Debtors to engage in any further postpetition borrowings from the Baxterville Lender.  Those adjustments include, but are not limited to, each of the points listed below:

**(a).     Borrowings are Excessive and Should be Tailored to Immediate Needs**

22.     Though the Baxterville Lender's proposed DIP facility is styled as a "delayed draw" term loan facility, the Debtors presently intend to borrow the full amount of the DIP facility by the end of this month, even though the Debtors do not appear to have an immediate need for the amounts drawn until weeks and/or months later in the case.  Drawing the full amount of the DIP facility, before amounts are needed, will merely enhance the Baxterville Lender's leverage over the future direction of this case and magnify the amount of interest payable on the fully drawn DIP facility.  Such a "front end" loading of the DIP facility balance effectively functions as a disguised "break up" fee that is designed to chill other restructuring alternatives.

23.     The Debtors should modify the proposed DIP budget to reduce the amount (or delay the timing) for each of the items below that would otherwise be the subject of an imminent DIP facility draw:

a. The DIP Motion presently contemplates drawing $1.07 million to pay outstanding, ad-valorem taxes during the week ending June 2, 2019, even though no motion has been filed requesting the payment of such taxes. Immediate payment of such taxes is not appropriate at this time until a clearer picture of the Debtors' valuation is available and Court authorization to make such payment has been obtained. The DIP budget should eliminate the $1.07 million disbursement for ad-valorem taxes and also reduce the proposed DIP borrowing to account for this amount;

b. The DIP Motion presently contemplates drawing $625,000 to pay, in advance, a full 12 months of insurance premiums during the week ending June 2, 2019. It is not appropriate to obtain a DIP facility draw to pay such amounts in advance (thereby saddling the estates with additional, "all assets" liens), when the Debtors could also likely finance such insurance premiums through an insurance premium finance company, which would reduce the amount of global encumbrances against estate assets (the insurance premium finance company would only be secured by unearned premiums) and reduce the Debtor's immediate need for cash disbursements. The Debtors should finance their insurance premium renewals and limit DIP draws to any amounts needed to pay monthly insurance premium payments;

c. The DIP Motion presently contemplates drawing $317,500 to pay a surety bond premium during the week ending June 2, 2019. Just as with the other insurance amounts above, the Debtors should attempt to finance this surety bond premium with a specialty, insurance finance company and limit DIP draws to minimum amounts needed to make payments in any specific month;

d. The DIP Motion contemplates drawing $136,500 to pay an "upfront" DIP fee during the week ending June 2, 2019. Such a fee is not appropriate because the lender here is also a de-facto purchaser of the Debtors' enterprise and such fee is not needed to entice the Baxterville Lender to continue to fund the Debtors' operations; and

e. The DIP Motion contemplates drawing $160,000 to pay Debtor professional fees during the week ended June 2, 2019, even though no interim compensation order or fee application requesting such debtor compensation has been filed, and thus such amount cannot be paid until a later date. Draws for professional fee payments should be limited to the dates and times when such amounts are legally authorized to be disbursed to professionals.

24. After accounting for each of the adjustments above, the Debtors' proposed DIP budget would likely show that the Debtors' projected net cash burn for the week ended June 2, 2019 is approximately $300,000. Because the Debtors are projected to have an ending cash balance of approximately $630,000 as of the end of the previous week, these adjustments would

show that the Debtors may have no immediate need to engage in further DIP borrowings. Quite simply, the Court should not allow the Debtors to borrow more than $4.5 million on a final basis, barely two weeks into the case (and just days after Committee formation), when it is possible that they may have no need (or only a limited borrowing need) in the immediate future.

    **(b).    Budgeted Amounts for Unsecured Creditor Investigations and a Longer Investigation Period are Required**

    25.    Presently, the proposed DIP Motion budget has no provision for Committee professional fees (including legal and financial advisors for the Committee). The extent, nature, and validity of the Baxterville Lender's alleged prepetition liens, and the Debtors' enterprise valuation, will be of paramount importance in these proceedings. The Debtors have already budgeted almost $850,000 for the payment of the Debtors' (non-financial advisor) professionals, $650,000 for the payment of the Debtors' financial advisor, and $510,000 for the payment of the Baxterville Lender's professionals, each of whom already represent persons well versed in the Debtors' business affairs. The DIP budget will need to make similar provisions for the payment of legal and financial professional fees for the Committee (who will need to quickly digest a ton of available information already known to the Debtors and Baxterville Lender).

    26.    Furthermore, the proposed Interim DIP Order appears to authorize the expenditure of only $25,000 in connection with investigating or pursuing potential claims and causes of action against the Baxterville Lender. Such a budgeted amount is wholly inadequate, and the investigation budget should be increased. Furthermore, there should be no limit on the amounts payable to Committee professionals that are able to successfully prosecute any claims or causes of action against the Baxterville Lender.

    27.    Finally, the Interim DIP Order presently proposes a limited period of 60 days after the Petition Date (or 45 days after the formation of an official committee of unsecured creditors)

to pursue certain claims against the Baxterville Lender. Such a challenge period is not sufficient and must be extended. Furthermore, the Committee should be granted automatic standing to pursue any potential "challenge action" claims against the Baxterville Lender.

    **(c).**     **Proposed Plan Milestones Are Not Appropriate at this Time**

    28.     If approved on a final basis, the order approving the DIP Motion would require the Debtors to adhere to milestones designed to ensure a "fast track" confirmation of the Proposed Plan within 90 days after the Petition Date. Any such plan milestones are not appropriate at this time, as the valuation of the Debtors has not been determined and no creditor (other than the Baxterville Lender) could make an informed decision regarding the Debtors' Proposed Plan until all valuation questions have been resolved. Approving any such proposed plan milestones at this juncture, before the Committee has had an opportunity to review the Debtors' financial affairs in connection with its financial advisor, would merely exacerbate the Baxterville Lender's ability to exercise control over these cases and attempt to divert potential equity value from the Debtors' other creditors.

    **(d).**     **The Baxterville Lender Should Not Obtain Liens on Unencumbered Assets**

    29.     The DIP Motion proposes to grant the Baxterville Lender a lien upon potentially unencumbered assets including, without limitation, potential unencumbered commercial tort claims and proceeds of avoidance actions. Granting liens against those unencumbered assets in order to secure the Debtors' proposed DIP facility would impart material prejudice to the Debtors' unsecured creditors and potentially leave them in a worse situation than if no DIP facility were obtained. Unencumbered assets frequently represent a key recovery source for unsecured creditors in bankruptcy proceedings and any such unencumbered assets (or proceeds thereof) should not secure the DIP facility.

### (e).   The Proposed DIP Credit Agreement Contains Other Inappropriate Terms

30.     Though the following items are not an exclusive list of potential deficiencies in the Debtors' proposed postpetition financing documents, there are certain items that warrant immediate adjustment.  The Debtors' proposed DIP credit agreement contains a borrowing condition requiring that, after giving effect to the borrowing, the Debtors maintain minimum cash balances of at least $1,000,000.  Such a "minimum cash" balance condition serves little purpose other than to increase the total amount of the DIP facility, accelerate DIP facility borrowings, and increase the ultimate amount of postpetition interest payable to the Baxterville Lender.  Such minimum cash balance borrowing conditions should be eliminated.

31.     The Debtors' proposed DIP credit agreement also contains borrowing conditions precedent that require that no "Material Adverse Effect" shall have occurred at any time since February 28, 2019.  The significance of February 28, 2019 (a date months prior to the petition date) is puzzling, but in any event, it is not appropriate to condition the Debtors' ability to borrow on the absence of "Material Adverse Effect", much less a "Material Adverse Effect" that could have been in existence months before the Petition Date.  Such "MAE" conditions precedent should be removed.

32.     Finally, the Debtors' proposed DIP credit agreement contemplates having any fees and costs payable to the Baxterville Lender's counsel payable upon demand.  It is not appropriate to have any such fees and costs payable upon demand, without first allowing the Debtors and Committee to review the reasonableness of the Baxterville Lender's fee reimbursement requests.  No such professional fee or indemnity amounts should be reimbursed by the Debtors to the Baxterville Lender until the Debtors and Committee have had fourteen (14) days to review the terms and reasonableness of any such reimbursement requests.

### (f).     Waivers of 506(c) and 552 Rights are Not Appropriate

33.     The proposed final DIP financing order would waive the Debtors' surcharge rights under section 506(c) and the "equities of the case" exception under bankruptcy code section 552(b). Such waivers are not appropriate in these cases, and any further DIP financing orders should preserve the Debtors' 506(c) rights and ability to utilize the "equities of the case" exception under Bankruptcy Code section 552(b).

### (g).     Unsecured Creditors Should Also Receive Reports Issued to the Baxterville Lender

34.     The Debtors' postpetition financing order and credit agreement contemplate that the Debtors will furnish variance reports, monthly financial statements, and other reports to the Baxterville Lender. The Court should require that the Debtors provide the Committee with copies of any such reports furnished to the Baxterville Lender, concurrently with their transmission to the Baxterville Lender.

### Reservation of Rights

35.     Angelo Gordon reserves all of its rights, claims, defenses, and remedies regarding the DIP Motion and Proposed Plan, including the right to amend, modify, or supplement this Objection at any time prior to the hearing to consider the DIP Motion.

WHEREFORE, Angelo Gordon respectfully requests that the Court deny the relief sought in the DIP Motion or, alternately, condition any further approval of the DIP Motion upon addressing the matters raised in this Objection.

#67908819

Dated: May 22, 2019

        Respectfully Submitted,

        **STEWART ROBBINS & BROWN LLC**
        301 Main Street, Suite 1640
        P. O. Box 2348
        Baton Rouge, LA  70821-2348
        (225) 231-9998 Telephone
        (225) 709-9467 Fax

By:   /s/ Paul Douglas Stewart, Jr.
        **Paul Douglas Stewart, Jr.** (La. #24661)
        dstewart@stewartrobbins.com
        **Brandon A. Brown** (La. #25592)
        bbrown@stewartrobbins.com

        -and-

        **HOLLAND & KNIGHT LLP**

By:   /s/ Brent McIlwain
        **Brent McIlwain (*pro hac vice*)**
        **Fred Stovall**
        **Brian Smith**
        200 Crescent Court, Suite 1600
        Dallas, TX 75201
        Telephone:   214-964-9500
        Fax:            214-964-9501
        Email:        brent.mcilwain@hklaw.com
                         fred.stovall@hklaw.com
                         brian.smith@hklaw.com

        *Counsel to Angelo, Gordon Energy Servicer, LLC*