## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF LOUISIANA

IN RE:

FALCON V, L.L.C., *et al.*,[1]                     CASE NO. 19-10547
                                                   CHAPTER 11
    DEBTORS.                                       JOINTLY ADMINISTERED

### SECOND INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Considering the emergency motion (the "Motion") of Falcon V, LLC., *et al.*, debtors and debtors-in-possession (the "Debtors") in these cases (the "Chapter 11 Cases"), for entry of interim and final orders pursuant to title 11 of the United States Code (the "Bankruptcy Code") sections 105, 361, 362, 363, 364 and 507, Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002, 4001, 6004, and 9014, and the Local Rules (the "Bankruptcy Local Rules") of the United States Bankruptcy Court for the Middle District of Louisiana, (i) authorizing the Debtors to (a) obtain postpetition financing up to an aggregate principal amount of $5.8 million on a final basis and up to $1.5 million on an interim basis (the "Financing") pursuant to that certain Superpriority Debtor in Possession Credit Facility dated as of May 14, 2019 attached to the Motion (the "DIP Credit Agreement")[2], and other agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, including the agreements related to the Financing, (the "DIP Loan Documents"), among Debtors, as borrowers (the "Borrowers"),

---

[1]        The "Debtors" are the following entities (the corresponding bankruptcy case numbers follow in parentheses): Falcon V, L.L.C. (Case No. 19-10547), ORX Resources, L.L.C. (Case No. 19-10548), and Falcon V Holdings, L.L.C. (Case No. 19-10561). The address of the Debtors is 400 Poydras Street, Suite 1100, New Orleans, Louisiana 70130..

[2]        Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement (as defined below), as applicable. A copy of the DIP Credit Agreement is attached hereto as **Exhibit A.**

405 Baxterville, LLC and the financial institutions from time to time parties thereto as lenders (each individually a "DIP Lender," and collectively, the "DIP Lenders"), and 405 Baxterville, LLC, as administrative and collateral agent for the DIP Lenders (the "DIP Agent" together with the DIP Lenders, the "DIP Secured Parties"); (b) authorizing the Debtors to use "cash collateral" as such term is defined in Bankruptcy Code section 363 (the "Cash Collateral"), (ii) grant (x) to the DIP Agent for the benefit of the DIP Secured Parties the DIP Liens (defined below) on the DIP Collateral (defined below) to secure all amounts owed under the DIP Loan Documents (the "DIP Obligations") on a first priority priming basis and (y) to the DIP Secured Parties the DIP Superpriority Claims (as defined below) in respect of the DIP Obligations, subject to the terms and conditions this order; (iii) modify the automatic stay to the extent this order provides; and (iv) grant adequate protection to the Prepetition Lenders (as defined below); and (b) in accordance with Bankruptcy Rule 4001(c)(2), requesting that this court schedule a final hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") granting on a final basis the relief the Motion requests; the May 14, 2019 hearing (the "First Interim Hearing") to consider the Motion on an interim basis; and the court's entry of the Interim Order [P-58] (the "First Interim Order") on May 14, 2019 (the "Interim Order Entry Date"); the second hearing held May 29, 2019, which the Debtors, the DIP Secured Parties and the Prepetition Secured Parties agreed would be a second interim hearing ("Second Interim Hearing") to consider issuance of a second interim order instead of a Final Order ("Second Interim Order") and the pleadings filed with the court, the evidence presented at the Interim Hearing, the Second Interim Hearing and the entire record of these cases; the Debtors having given notice of the Motion, the Interim Hearing and the Second Interim Hearing pursuant to Bankruptcy Rule 4001(b); and that proper notice of the Motion, the Interim Hearing and the Second Interim Hearing has been given;

THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.      Filing Date.  On May 10, 2019 (the "First Petition Date"), Falcon V., LLC, and ORX Resources, LLC each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this court.  On May 14, 2019, Falcon V Holdings, LLC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this court.

B.      Jurisdiction; Venue.  The court has jurisdiction over the Chapter 11 Cases, the parties, and the Debtors' property pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D).  Venue of the Chapter 11 Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought are Bankruptcy Code sections 105, 361, 362, 363, 364, 365 and 507; Bankruptcy Rules 2002, 4001, 6004 and 9014; and the Bankruptcy Local Rules.

C.      Committee Formation.   On May 21, 2019, the United States Trustee appointed the committee of unsecured creditors pursuant to Bankruptcy Code section 1102 of the (the "Committee").

D.      Stipulations Regarding DIP Loan Documents and DIP Secured Parties.  In requesting the Financing, the Debtors acknowledge, represent, stipulate, and agree that:

      (a)     none of the DIP Secured Parties are control persons or insiders of the Debtors by virtue of determining to make any loan, providing the Financing or performing obligations under the DIP Loan Documents;

      (b)     as of the date of this order, no claims or causes of action exist against any of the DIP Secured Parties with respect to, in connection with,

related to, or arising from the DIP Loan Documents that may be asserted by the Debtors;

(c)     the Debtors forever and irrevocably release, discharge, and acquit the former, future or current DIP Secured Parties and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "DIP Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened as of the date hereof including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the Financing, the DIP Loan Documents, the DIP Obligations, and ancillary documentation, guarantees, security documentation and collateral documents executed in support of the foregoing or the transactions contemplated hereunder or thereunder including, without limitation,

(i) any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), except as permitted in this order, so-called "lender liability" claims, counterclaims, cross-claims, recoupment, defenses, disallowance (whether equitable or otherwise), impairment, or any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the DIP Secured Parties with respect to the DIP Loan Documents. This release does not constitute a release of any claims against any DIP Releasees in any other capacity or role other than with respect to the Financing and DIP Loan Documents. The releases by the Debtors of the DIP Releasees granted in paragraph D shall not be Challenge Matters and shall be effective upon the Interim Order Entry Date.

E.      Stipulations Concerning Prepetition Loan Documents and Prepetition Secured Parties. Subject to paragraphs 16 and 17 of this Second Interim Order, the Debtors admit, stipulate, and agree that:

(a)      Prepetition Loan Documents. Falcon V, L.L.C., Falcon V. Holdings, L.L.C., and ORX Resources, L.L.C., as borrowers, 405 Baxterville LLC., as administrative agent (in its capacity as such, the

"Prepetition Agent"), and the lenders party thereto (in their respective capacities as such, the "Prepetition Lenders") are parties to that Loan Agreement dated as of May 24, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Loan Agreement," and together with all related loan and security documents (in each case as amended, restated, supplemented or otherwise modified from time to time, collectively with the Prepetition Loan Agreement, the "Prepetition Loan Documents").

(b)    Prepetition Indebtedness.  The principal amount of the obligations the Debtors (as defined below) owed on a joint and several basis to the Prepetition Agent and Prepetition Lenders under the Prepetition Loan Agreement, exclusive of accrued but unpaid interest, costs, fees and expenses, was not less than $42,583,523.65 as of the Petition Date.  All obligations of the Debtors arising under or in connection with the Prepetition Loan Agreement or any other Prepetition Loan Document shall collectively be referred to in this order as the "Prepetition Indebtedness."

(c)    Prepetition First Liens, Prepetition Collateral.  Pursuant to the Prepetition Loan Documents, the Prepetition Agent was granted, for its benefit and the benefit of the Prepetition Lenders and the other secured parties thereunder (the "Prepetition Secured Parties"), first-priority and properly perfected continuing liens, mortgages, and security interests (subject to liens expressly permitted under the Prepetition Loan Documents) on and in the Prepetition Collateral (as defined below in this sub-paragraph),

which for the avoidance of doubt, includes all Cash Collateral, to secure the repayment of the Prepetition Indebtedness. Such liens, mortgages, and security interests of the Prepetition Agent on and in the Prepetition Collateral are referred to in this order as the "Prepetition Liens." The "Prepetition Collateral" shall mean the "Collateral" (as defined in the Prepetition Loan Agreement).

(d)    Not Control Persons. None of the Prepetition Secured Parties are control persons or insiders of the Debtors. As of the date of this order, no claims or causes of action that may be asserted by the Debtors exist against any of the Prepetition Secured Parties with respect to, in connection with, related to, or arising from the Prepetition Loan Documents.

F.    Necessity of Financing. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under Bankruptcy Code section 503, or other financing under Bankruptcy Code sections 364(c) or (d), on equal or more favorable terms than those set forth in the DIP Loan Documents. A loan facility in the amount provided by the DIP Loan Documents is not available to the Debtors without granting the DIP Agent, for the benefit of the DIP Secured Parties, superpriority claims and priming liens and security interests, pursuant to Bankruptcy Code sections 364(c)(1), (2), (3), and 364(d), as provided in this Second Interim Order and the DIP Loan Documents. After considering all alternatives, the Debtors have concluded, in the exercise of their prudent business judgment, that the credit facility provided under the DIP Loan Documents represents the best and only working capital financing available to the Debtors at this time. The Debtors have been unsuccessful in their attempts to find any alternative financing. Additionally, the terms of the Financing are fair and reasonable and reflect

the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

G.    Purpose of Financing.  The Debtors require the Financing described in the Motion and as expressly provided in the DIP Loan Documents to: (i) pay costs, fees and expenses associated with or payable under the Financing under the terms of this Second Interim Order; (ii) pay professional fees subject to the DIP Budget (as defined below); (iii) provide ongoing working capital requirements of the Debtors and to pay fees, costs, expenses and other administrative expenses relating to the Chapter 11 Cases, in each case, subject to any necessary Court approvals and consistent with the DIP Budget subject to any Budget Variances (defined below); and (iv) make the currently identified capital expenditures and other payments of postpetition payables as permitted under the DIP Loan Documents, in each case subject to the conditions as set forth in this order and in the DIP Loan Documents and consistent in all material respects with the DIP Budget and any Budget Variances.

H.    Debtors' Stipulations Regarding Interim Borrowing.  Pursuant to the Interim Order, among other things the court authorized the Debtors to borrow up to $1.5 million of the DIP Financing.  Pursuant to the Interim Order, the court authorized and empowered the Debtors to execute and deliver the DIP Loan Documents and to incur and perform all of the DIP Obligations in accordance with, and subject to, the terms of the Interim Order and DIP Loan Documents.  On May 16, 2019, the DIP Credit Agreement was executed and the Debtors were authorized to borrow on the terms and conditions set forth in the DIP Loan Documents and the Interim Order.

I.    Adequate Protection.  The Prepetition Lenders are entitled to receive adequate protection to the extent of any diminution in value of their interests in the Prepetition Collateral (including Cash Collateral) pursuant to Bankruptcy Code sections 361, 362, 363 and

364 of the (the "Adequate Protection Obligations").  Pursuant to Bankruptcy Code sections 361, 363 and 507(b), as adequate protection, the Prepetition Lenders shall receive postpetition replacement liens and superpriority adequate protection claims in accordance with the terms of this Second Interim Order.  Furthermore, the Prepetition Lenders will be entitled to certain reporting from the Debtors. Financial Reports provided to the Prepetition Lenders and DIP Lenders will be contemporaneously provided to the Committee.

       J.      DIP Budget.  Attached to this order as **Exhibit B** is a 13-week budget setting forth the Debtors' anticipated cash receipts and expenditures for the next 13-weeks (the "Initial DIP Budget").  The "DIP Budget" shall mean the Initial DIP Budget, together with such modifications and amendments thereto as may be agreed to in form and substance by the Debtors and the DIP Agent, reviewed by the Committee (which shall have the right to object to any such modifications and amendments), and approved by the court, including the form of Budget for which approval will be sought at the Final Hearing, which shall reflect the Debtors' good-faith projection of all weekly cash receipts and disbursements in connection with the operation of the Debtors' business during such 13-week period, delivered pursuant to the terms of the DIP Loan Documents, delivered by the Debtors to counsel for the DIP Agent and DIP Lenders.  Good Cause. Based upon the record presented to the court by the Debtors, it appears that the ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Loan Documents and use Cash Collateral is vital to the Debtors and the Debtors' estates and creditors.  The Debtors reasonably believe that the liquidity to be provided under the DIP Loan Documents and from use of Cash Collateral will enable the Debtors to continue to operate their businesses in the ordinary course, preserve and maximize the value of their businesses, and provide sufficient funding to enable the Debtors to proceed toward confirming a plan of reorganization.  Good cause has,

therefore, been shown for the relief sought in the Motion and for the setting of a Final Hearing on it.

K.    <u>Good Faith</u>.    The DIP Secured Parties and their respective affiliates, subsidiaries, parents, officers, shareholders, directors, employees, investment advisers and sub-advisers, attorneys, and agents have acted in good faith in negotiating the terms of the DIP Loan Documents.  The Financing and the DIP Loan Documents have been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all the obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Loan Documents shall be deemed to have been extended by each of the DIP Secured Parties in accordance with the DIP Loan Documents, in good faith, as that term is used in Bankruptcy Code section 364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e); and the DIP Obligations, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) and the terms, conditions, benefits, and privileges of the Interim Order and this Second Interim Order, regardless of whether the Interim Order or this Second Interim Order is subsequently reversed, vacated, modified, or otherwise is no longer in full force and effect or the Chapter 11 Cases are subsequently converted or dismissed.  Additionally, the Prepetition Agent and the Prepetition Lenders and their respective affiliates, subsidiaries, parents, officers, shareholders, directors, employees, investment advisers and sub-advisers, attorneys, and agents have acted in good faith in consenting or not otherwise objecting to the Debtors' use of Cash Collateral pursuant to the Interim Order and this Second Interim Order.  The agreements and arrangements authorized in the Interim Order and this Second Interim Order have been negotiated at arms' length with all parties represented by experienced counsel, are fair and reasonable under the circumstances, are enforceable in accordance with their

terms and have been entered into in good faith.  Accordingly, the Debtors use' Cash Collateral and other Prepetition Collateral pursuant to the Interim Order and this Second Interim Order shall be deemed to have been negotiated in good faith.

L.   Consideration.   The Debtors will receive and have received fair consideration and reasonably equivalent value in exchange for access to the Financing, and all other financial accommodations provided under the Financing, the DIP Loan Documents, the Interim Order and this Second Interim Order.

M.   Immediate Entry of Second Interim Order.  The Debtors have requested immediate entry of this Second Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). The permission granted in this order to enter into the DIP Loan Documents and to obtain funds thereunder on a Second Interim basis under the DIP Budget is necessary to avoid immediate and irreparable harm to the Debtors, and loss of valuable assets and rights of the Debtors' estates. Granting the relief set forth in this Second Interim Order is in the best interests of the Debtors and the Debtors' estates and creditors as its implementation will, among other things, allow for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses during the pendency of these Chapter 11 Cases.  Based upon the foregoing findings, acknowledgements, and conclusions; and considering the record at the Interim Hearing and Second Interim Hearing:

## **IT IS ORDERED**:

1.   Disposition.  Any objections to the Motion that have not previously been withdrawn, waived, settled or resolved and all reservations of rights included therein are denied and overruled on their merits.

2.      Effectiveness.  This Second Interim Order shall be immediately valid on signing and effective and enforceable on the date it is entered on the docket of the Chapter 11 Cases (the "Second Interim Order Entry Date").

3.      Authorization of the Financing and DIP Loan Documents

(a)      The Debtors are authorized to execute and enter into the DIP Loan Documents.  The DIP Loan Documents, the Interim Order, and this Second Interim Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Lenders in connection with the Financing.

(b)      The Borrowers are authorized on a Second Interim basis to borrow up to the principal amount of $3.75 million (inclusive of the amount authorized by the First Interim Order), all of which the Debtors shall use as expressly permitted by the DIP Loan Documents, the DIP Budget and any Budget Variances.  The Debtors are authorized to use proceeds of the Financing in accordance with the DIP Budget subject to the variance set forth in section 6.26 of the DIP Credit Agreement (the "Budget Variance").  The first Budget Variance Report showing budget to actual and any variance shall be delivered by the Debtors to the DIP Agent and DIP Lenders in accordance with the terms of the DIP Loan Documents, and shall also be provided to the Committee and the Prepetition Lenders. This Second Interim Order approves only the use of Cash Collateral to pay the budgeted items in Exhibit B through Week 4 of the DIP Budget.  The Committee reserves its right as to the classification of the amounts advanced to pay insurance premiums under the DIP Budget and that such amounts should not be DIP Obligations, with the Debtors, DIP Agent and DIP Lenders reserving their rights to contest any such argument.

(c)     In furtherance of the foregoing and without further approval of this court, the Debtors are authorized, and directed, if so required under the terms of the DIP Loan Documents, to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all related fees and expenses, that may be required or necessary for the Debtors' performance of their obligations under the Financing, including, without limitation:

(i)     the execution, delivery, and performance of the DIP Loan Documents, including, without limitation, the DIP Credit Agreement, any security and pledge agreements, and any mortgages contemplated thereby;

(ii)    subject to paragraph 10 of this order, the execution, delivery and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents, in each case in such form as agreed among the Debtors and the required other parties as set forth in more detail in paragraph 11 below;

(iii)   the non-refundable payment of the fees referred to in the DIP Loan Documents and described in more detail in the Motion, including the fees of the DIP Agent, and, subject to paragraph 7, costs and expenses payable under the DIP Loan Documents; and

(iv)    the performance of all other acts required under or in connection with the DIP Loan Documents.

(d)     All of the DIP Liens and  Prepetition Lenders' Adequate Protection Liens shall be valid, enforceable, effective and perfected as of the Interim Order Entry Date and the Second Interim Order Date and without the necessity of the execution of mortgages,

security agreements, pledge agreements, financing statements, or other agreements.  The Prepetition Lenders' Adequate Protection Liens are valid and enforceable only to the extent that the prepetition liens of the Prepetition Lenders are valid, enforceable and not subject to avoidance.

(e)    The DIP Loan Documents and DIP Obligations constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each of their successors and assigns, and each person or entity party to the DIP Loan Documents in accordance with their respective terms and the terms of the Interim Order and this Second Interim Order, and shall survive conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or the dismissal of the Chapter 11 Cases.  No obligation, payment, transfer, or grant of security under the DIP Loan Documents, the Interim Order or this Second Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance (whether equitable or otherwise), impairment, or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity.

4.    <u>Carve-Out</u>.  The Debtors' obligations to the DIP Secured Parties and the liens, security interests and superpriority claims granted in this order and/or under the DIP Loan Documents, including the DIP Liens, the DIP Superpriority Claims and the Adequate Protection Claims, shall be subject and subordinate to the Carve-Out.  "<u>Carve-Out</u>" shall mean the sum of (i) fees and expenses incurred by bankruptcy professionals (x) whose retention has been approved by the court that are unpaid as of the delivery of the Carve-Out Trigger Notice (as defined below)

and (y) provided for in the DIP Budget; (ii) fees and expenses in an amount not to exceed $150,000 incurred from and after the delivery of a Carve-Out Trigger Notice (as defined below) by bankruptcy professionals whose retention has been approved by the court (the "Post-Termination Fee Carve-Out"); and (iii) fees owed pursuant to 28 U.S.C. §1930 or fees owed the clerk of the court. "Carve-Out Trigger Notice" shall mean the written notice, including by email, delivered by the DIP Agent (at the direction of the DIP Lenders) to the Debtors, their counsel, the U.S. Trustee, counsel for the Prepetition Lenders and counsel for the Committee, which may be delivered following the occurrence and continuation of an Event of Default or the Termination Date in accordance with the terms of the DIP Loan Documents. Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the DIP Secured Parties or their respective officers, directors, employees, agents, advisers and counsel, including, without limitation, challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Loan Documents in favor of the DIP Agent, for the benefit of the DIP Secured Parties. For the avoidance of doubt and notwithstanding anything to the contrary in this order, in the DIP Credit Agreement, or in any loan or financing documents, the Carve-Out shall be senior to all liens and claims securing the DIP Obligations, any prepetition secured obligations, and any and all other forms of adequate protection, liens or claims securing the DIP Obligations or any prepetition secured obligations. None of the proceeds of the DIP Collateral or the DIP Loans shall be used in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Secured Parties or their respective officers, directors, employees,

agents, advisors and counsel, including with respect to any of the liens created in connection with the DIP Financing.  For the avoidance of doubt, payments made by the Debtors pursuant to the DIP Budget prior to delivery of the Carve-Out Trigger Notice shall not be subject to avoidance by any party-in-interest in these Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Agent, the Prepetition Lenders, any committee or examiner appointed in these Chapter 11 Cases, and the Debtors, and their respective successors and assigns (including any trustee or fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estate of the Debtors) whether in these Chapter 11 Cases, in any Superseding Cases, or upon any dismissal of any such chapter 11 or chapter 7 case.

5.    DIP Lender Superpriority Claim.    Pursuant to Bankruptcy Code section 364(c)(1), all the DIP Obligations shall constitute allowed senior administrative expense claims against the Debtors with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), and over any and all other administrative expenses or other claims arising under Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 (the "DIP Superpriority Claims"), which for purposes of Bankruptcy Code section 1129(a)(9)(A) shall be considered administrative expenses allowed under Bankruptcy Code section 503(b).  The DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Debtors and their estates and all proceeds thereof, excluding Avoidance Actions (as defined below) but including, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations, Avoidance Proceeds (as defined below).

6.    <u>DIP Liens</u>.

(a)    As security for the DIP Obligations, effective and perfected as of the Interim Order Entry Date and the Second Interim Order Date, the following security interests and liens, are granted by the Debtors to each of the DIP Secured Parties on DIP Collateral as defined in this order.  The "<u>DIP Collateral</u>" shall mean all property of the Debtors of any kind or nature whatsoever, including, but not be limited to, (i) any cash of the Debtors (wherever maintained) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Dates, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in oil and gas leases and wells, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, any seismic data and any claims and causes of the Debtors, including, but not limited to, claims under section 549 of the Bankruptcy Code; (ii) any commercial tort claims and causes of action of any of the Debtors and any claims or causes of action against any directors or officers of the Debtors as well as including any proceeds of, or property recovered in connection with, any successful claims and causes of action against any directors or officers of the Debtors; and (iii) excluding any claims and causes of action of the Debtors under Bankruptcy Code sections 544, 545, 547, 548, and 550, or any other avoidance actions under the Bankruptcy Code or other applicable law (collectively, the "<u>Avoidance Actions</u>" which, for the avoidance of doubt, excludes Debtors' claims and causes of action under Bankruptcy Code section 549 or similar state or other applicable law and the proceeds of each of the foregoing), but including, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Obligations secured by the DIP Liens, any proceeds of, or property recovered in connection with, any successful Avoidance Action (whether by judgment, settlement or otherwise, and unencumbered or not, the "<u>Avoidance</u>

Proceeds"). All such liens on and security interests in the DIP Collateral granted to the DIP Secured Parties, pursuant to the Interim Order, this Second Interim Order or the DIP Loan Documents (collectively, the "DIP Liens"), are as follows:

(i) Priming Lien Pursuant to Section 364(d)(1). A first priority, priming security interest in and lien pursuant to Bankruptcy Code section 364(d)(1) on all encumbered DIP Collateral (the "Section 364(d)(1) Liens"), which shall be senior to any existing liens or claims, including, but not limited to, the Prepetition Liens of the Prepetition Lenders or postpetition liens granted to the Prepetition Lenders, and subject only to (i) the Carve-Out, (ii) valid, perfected, and non-avoidable liens on property of a Debtor that are in existence on the Petition Date and are senior in priority to the Prepetition Liens, and (iii) valid and non-avoidable liens on property of a Debtor that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) and are senior in priority to the Prepetition Liens (the foregoing clauses (ii) and (iii) being referred to collectively as the "Permitted Prior Liens");

(ii) First Priority Lien on Unencumbered Property Pursuant to Section 364(c)(2). A first priority security interest in and lien pursuant to Bankruptcy Code section 364(c)(2) on all unencumbered DIP Collateral (the "Section 364(c)(2) Liens"), which be subject only to the Carve-Out;

(iii) Junior Lien on Certain Encumbered Property Pursuant to Section 364(c)(3). A junior security interest and lien pursuant to Bankruptcy Code section 364(c)(3) on all DIP Collateral that is subject to a Permitted Prior Lien (the "Section 364(c)(3) Liens,") which also shall be subject to the Carve-Out;

(iv) <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens shall not be subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551 or (b) any liens arising after the Petition Dates including, without limitation, liens granted under prior orders of the court, or any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of the Debtors.

(b)      The DIP Liens shall be effective immediately upon the Interim Order Entry Date.

(c)      The DIP Liens shall be and are fully perfected liens and security interests, effective and perfected upon the Interim Order Entry Date without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, or other agreements or documents, such that no additional steps need be taken by the DIP Secured Parties to perfect such liens and security interests.  Any provision of any lease, agreement, contract, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors, or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for any Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, shall have no force or effect with respect to the transactions granting the DIP Liens in the Debtor's interest in such fee, leasehold or other interest or other collateral or the proceeds of any assignment, sale or other transfer thereof.

(d)      Subject to the Carve Out, the DIP Liens, DIP Superpriority Claim, and other rights, benefits, and remedies granted under the Interim Order and this Second Interim

Order to the DIP Secured Parties shall continue in the Chapter 11 Cases, in any superseding case under the Bankruptcy Code resulting from conversion of the Chapter 11 Cases (the "Superseding Cases") and following any dismissal of the Chapter 11 Cases, and such liens, security interests, and claims shall maintain their priority as provided in the Interim Order and this Second Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash and completely satisfied and all of the commitments thereunder have been terminated in accordance with the DIP Loan Documents.

7.      Fees and Expenses of DIP Agent, DIP Lenders, Prepetition Agent and Prepetition Lenders.  The Debtors shall, no later than fourteen (14) days after receipt of a summary statement setting forth the applicable timekeepers, as well as the hours worked by and expenses incurred by such timekeepers, in connection with the Chapter 11 Cases whether incurred before or after the Petition Date (with copies provided via electronic mail to the U.S. Trustee and counsel for the Committee (collectively, the "Fee Notice Parties")), indefeasibly pay or reimburse, the DIP Agent, the DIP Lenders, the Prepetition Agent and Prepetition Lenders for their respective reasonable fees and out-of-pocket costs, expenses and charges (collectively, the " DIP Lender Professional Fees"), including, but not limited to, the reasonable fees, costs, and expenses of Hunton Andrews Kurth LLP as counsel to DIP Agent and Prepetition Agent, and any other advisors or professionals retained by the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders.  The Debtors and the Fee Notice Parties may object to the reasonableness of the fees, costs and expenses included in any such professional fee invoice; provided that, any such objection shall be barred and deemed waived unless filed with this court and served on the applicable professional by 12:00 p.m., prevailing Central Time, on the date that is no later than fourteen (14) days after the objecting party's receipt of the applicable professional fee invoice.  If such objection

is timely received, the Debtors shall promptly pay the portion of such invoice not subject to such objection, and this court shall determine any such objection unless otherwise resolved by the applicable parties.  Any hearing on an objection to payment of any fees, costs, and expenses set forth in a professional fee invoice shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses which are the subject of such objection and whether the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders are entitled to such fees, costs and expenses under this Second Interim Order.  For the avoidance of doubt, none of the fees, costs, and expenses of the DIP Agent, DIP Lenders, Prepetition Agent, or Prepetition Lenders shall be subject to court approval (except in the event of an objection as described below) or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this court.  All fees, costs and expenses payable under the DIP Loan Documents to the DIP Secured Parties shall be included and constitute part of the DIP Obligations and be secured by the DIP Liens.  Notwithstanding anything to the contrary in this order, the fees, costs, and expenses of the DIP Secured Parties under and in connection with negotiation and preparation of the DIP Loan Documents, including, without limitation, the legal fees and expenses of any professionals retained by the DIP Agent in accordance with the DIP Loan Documents, shall be earned, non-refundable and payable pursuant to the terms of the DIP Loan Documents out of the Interim Funding Loan and fully entitled to all protections of Bankruptcy Code section 364(e).  For the avoidance of doubt, the Debtors shall be responsible to pay, subject to the procedures outlined in this paragraph, all fees and expenses incurred by the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders in connection with any action taken in these Chapter 11 Cases including, but not limited to, acting as a stalking horse purchaser and/or credit bidding on any proposed sale of assets by the Debtors.  The Committee reserves its right to later

seek to recharacterize payments made to the Prepetition Agent or Prepetition Lenders as principal payments of the Prepetition Indebtedness or, alternatively, payment of the Prepetition Lenders' Adequate Protection Superpriority Claims, if any, in the event the Prepetition Agent and Prepetition Lenders are determined to be undersecured by the court pursuant to Bankruptcy Code section 506, and the Prepetition Agent and Prepetition Lenders reserve all of their rights regarding same.

        8.    <u>Prepetition Lenders' Adequate Protection.</u>

        (a)    <u>Prepetition Lenders' Adequate Protection Liens.</u>  Pursuant to and to the extent required by Bankruptcy Code sections 361, 362, 363 and 364, if there is a diminution in value of the interests of the Prepetition Lenders in their Prepetition Collateral (including Cash Collateral) from and after the Interim Order Entry Date which diminution is entitled to protection by Bankruptcy Code sections 361, 362, 363 and 364 resulting from the use, sale, or lease by the Debtors of the applicable collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the Prepetition Lenders' Prepetition Liens thereto and to the Carve-Out, and the imposition or enforcement of the automatic stay of Bankruptcy Code section 362(a) ("<u>Diminution in Prepetition Lenders' Collateral Value</u>"), the Prepetition Lenders are granted, subject to the terms and conditions set forth below, pursuant to Bankruptcy Code sections 361, 363(e) and 364, replacement Liens upon all of the DIP Collateral (such adequate protection replacement liens, the "<u>Prepetition Lenders' Adequate Protection Liens</u>"), which shall be subject and subordinate only to the DIP Liens, Permitted Prior Liens and the Carve-Out and shall be senior in priority to the prepetition liens of the Prepetition Lenders. The Prepetition Lenders' Adequate Protection Liens and the Prepetition Lenders' Adequate Protection Superpriority Claim (as defined below) (A) shall not be subject to Bankruptcy Code

sections 510, 549, 550 or 551, subject to entry of the Final Order, Bankruptcy Code section 506(c) or the "equities of the case" exception of Bankruptcy Code section 552, (B) shall not be subordinate to, or *pari passu* with, (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551 or otherwise or (y) any intercompany or affiliate liens or claims of the Debtors, and (C) shall be valid and enforceable against any trustee or any other estate representative appointed in these Chapter 11 Cases or any Superseding Cases, and/or upon the dismissal of the cases.

(b)     Prepetition Lenders' Adequate Protection Superpriority Claims. To the extent of Diminution in Value of the Prepetition Lenders' Collateral, the Prepetition Lenders are further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "Prepetition Lenders' Adequate Protection Superpriority Claims"), pursuant to Bankruptcy Code section 507(b), with priority over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 and any other provision of the Bankruptcy Code, junior only to the DIP Superpriority Claims, any super-priority adequate protection claims of holders of Permitted Prior Liens and the Carve-Out to the extent provided herein and in the DIP Loan Documents, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof; provided, however, that the Prepetition Lenders shall not receive or retain any payments, property, or other amounts in respect of the Prepetition Lenders' Adequate Protection Superpriority Claims unless and until all DIP Obligations have been paid in full.  For the avoidance of doubt, the Prepetition Lenders' Adequate Protection Superpriority Claims shall only be payable from Avoidance Proceeds to the

extent all other DIP Collateral is insufficient to satisfy the Prepetition Lenders' Adequate
Protection Superpriority Claims.

9.    <u>Right to Seek Additional Adequate Protection</u>.  Notwithstanding any other
provision in this order, the grant of adequate protection to the Prepetition Lenders by this order is
without prejudice to the right of the Prepetition Lenders to seek, including in connection with the
Final Order, a modification of the grant of adequate protection provided so as to provide different
or additional adequate protection, and without prejudice to the right of the Debtors or any other
party in interest including the Committee to contest such modification.  Nothing in this order shall
be deemed to waive, modify or otherwise impair the respective rights of the Prepetition Lenders
under their prepetition agreements or under equity or law, and the Prepetition Lenders expressly
reserve all of their respective rights and remedies whether now existing or hereafter arising under
their prepetition agreements and/or equity or law in connection with all termination events and
defaults and events of default under such agreements and all parties in interest including the
Committee reserve any objections thereto.  Notwithstanding repayment of the DIP Obligations, all
covenants, agreements and Events of Default contained in the DIP Loan Documents shall remain
in full force and effect and apply to the Debtors use of Cash Collateral.

10.    <u>Reporting</u>.  The Debtors shall provide to the Prepetition Agent and the
Committee the financial statements that the Debtors are required to provide to the DIP Agent under
the DIP Credit Agreement.

11.    <u>Amendments, Consents, Waivers, and Modifications</u>.  The Debtors, with
the express written consent of the DIP Agent, acting at the direction of the required DIP Lenders,
and, to the extent required by the DIP Credit Agreement, may enter into any amendments,
consents, waivers, or modifications to the DIP Loan Documents that are not materially adverse to

the Debtors without the need for further notice and hearing or any order of this court; provided, however, that, without the consent of the court on notice and a hearing, no such amendments, consents, waivers or modifications shall (i) shorten the maturity of the Financing, (ii) increase the commitments thereunder or the rate of interest payable under the DIP Loan Documents, (iii) require the payment of any new or additional fee, or (iv) amend the Events of Default or covenants in the DIP Loan Documents to be materially more restrictive to the Debtors.  No consent shall be implied by any other action, inaction, or acquiescence of any of the DIP Secured Parties. Advance copies of any proposed amendments, waivers, consents, or other modifications will be provided to counsel for the Committee, which shall have three business days to object on grounds that the proposed amendments, waivers, consents, or other modification are material and should be subject to court approval, upon notice to parties in interest.  The foregoing shall be without prejudice to the Debtors' right to seek court approval of any modification or amendment on an expedited basis or the rights of the Committee to object to any such approval.

           12.    Perfection of DIP Liens.

           (a)    The DIP Agent is authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder, in each case, without the necessity to pay any mortgage recording fee or similar fee or tax.  Whether or not the DIP Agent, on behalf of the DIP Secured Parties in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder,

such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination.  The Debtors shall, if requested, execute and deliver to the DIP Agent all such agreements, financing statements, instruments and other documents as the DIP may reasonably request to more fully evidence, confirm, validate, perfect, preserve, and enforce the DIP Liens and all such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of the Interim Order or Second Interim Order may be filed by the DIP Agent with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are directed to accept such certified copy of the Interim Order or this Second Interim Order for filing and recording.

13.    <u>Access to Collateral</u>.  (a) The Debtors shall provide the Committee, DIP Lenders and the Prepetition Lenders, and/or their agents, representatives, or professionals, with access to, and on-site inspections of, the Debtors' property and company records, as may be reasonably requested, during normal business hours, on no less than three (3) Business Days' advance notice to Debtors' counsel, and within seven (7) Business Days of the request being made to the Debtors' counsel, unless the parties agree otherwise on the actual inspection date.

(b)    Notwithstanding anything in this order to the contrary, and without limiting any other rights or remedies of the DIP Secured Parties in the Interim Order or this Second Interim Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon five (5) Business Days' written notice to the landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property with a contemporary copy to the Committee, that an Event of Default under

the DIP Loan Documents or a default by the Debtors of any of their obligations under this Second Interim Order has occurred and is continuing, the DIP Agent (i) may, only subject to any separate agreement by and between the applicable landlord or licensor (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) subject to applicable law, shall be entitled to all the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade-names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien or license of any third party and which are used by the Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph without interference from lienholders or licensors thereunder.  To the extent applicable law prohibits the forgoing access or use of rights, the DIP Agent shall have the right to an expedited hearing on five (5) Business Days' notice to obtain court authorization to obtain such access and/or use of such rights.

14.    <u>Automatic Stay Modified</u>.    The automatic stay of Bankruptcy Code section 362 is modified without the need for any further court order to:

(a)    whether or not an Event of Default (as defined in the DIP Loan Documents) under the DIP Loan Documents has occurred, (i) require proceeds from DIP Collateral and other collections received by the Debtors to be deposited in accordance with the requirements of the DIP Loan Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Secured Parties under the DIP Loan Documents in accordance with any requirements of the DIP Loan Documents, and (ii) require mandatory prepayments in accordance with the requirements of the DIP Loan Documents, in each case, without further order of this court; and

(b)     immediately upon the occurrence and during the continuation of an Event of Default (as defined in DIP Loan Documents), allow the DIP Agent (acting at the direction of the required DIP Lenders) to deliver a written notice of its intention to declare a termination of the Debtors' ability and rights to access or use proceeds of the Financing (any such declaration, a "Termination Declaration").  The Termination Declaration shall be given by written notice (including electronic mail) to the Debtors, the U.S. Trustee, and counsel to the Committee (the date any such Termination Declaration is given shall be referred to herein as the "Termination Declaration Date").  Upon the Termination Declaration Date, unless such Event of Default is waived in writing (including via email) by the DIP Agent in its sole discretion, cured by the Debtors, or otherwise stayed or invalidated by this court, the authority and approval of the Debtors to access or use the Financing and the commitment of the DIP Secured Parties to provide additional financing pursuant to the Interim Order or this Second Interim Order shall automatically terminate. Unless the Debtors or the Committee have obtained a court order within five (5) Business Days after the Termination Declaration Date staying or otherwise modifying the Termination Declaration, the DIP Agent and DIP Secured Parties are authorized to exercise any and all rights and remedies in accordance with the terms of the DIP Loan Documents, and to take all actions required or permitted by the DIP Loan Documents without necessity of further court orders; provided that the DIP Agent shall give not fewer than five (5) Business Days' prior written notice (including electronic mail) of such action to the Debtors, the U.S. Trustee and counsel to the Committee.  During the five (5) business days after the Termination Declaration Date (the "Remedies Notice Period"), the Debtors shall be entitled to continue to use Cash Collateral in accordance with the terms of this Second Interim Order, and, during the Remedies Notice Period, the Debtors or the Committee may

request an expedited hearing before the Court (the DIP Agent, the DIP Secured Parties, the Debtors and the Committee consent to an expedited hearing on any request to stay or modify the Termination Declaration or for the nonconsensual use of Cash Collateral) solely to determine whether an Event of Default has occurred and is continuing and/or seek nonconsensual use of Cash Collateral. Unless the Debtors cure, the DIP Agent waives, the court otherwise stays or invalidates the applicable Event of Default, or the court orders otherwise, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period as to the DIP Agent, DIP Lenders, Prepetition Agent and Prepetition Lenders without further notice to or order of this court, and the Debtors shall, other than to fund the Carve Out to the extent provided in this Second Interim Order, no longer have the right to use Cash Collateral unless otherwise ordered by the court and the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders shall be permitted to exercise any and all remedies set forth herein, in the DIP Loan Documents or the Prepetition Loan Documents, and as otherwise available at law against their respective collateral, without further order of or notice, application or motion to this court, and without restriction or restraint by any stay under Bankruptcy Code sections 362 or 105 or otherwise.

15.     Subsequent Reversal or Modification. This Second Interim Order is entered pursuant to, *inter alia*, Bankruptcy Code section 364 and Bankruptcy Rules 4001(b) and (c), granting the DIP Secured Parties all protections afforded by Bankruptcy Code section 364(e). If any or all of the provisions of this Second Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by the Debtors to the DIP Secured Parties prior to the date of receipt by the DIP Agent of written notice of the effective date of such action, (ii) the payment of any fees required under this Second Interim Order or the DIP Loan Documents, and/or (iii) the validity and

enforceability of any lien, claim, obligation, right, remedy or priority authorized or created under this Second Interim Order or pursuant to the DIP Loan Documents as of such date.

16.    <u>Restriction on Use of DIP Lenders' Funds</u>.  Notwithstanding anything in this order to the contrary, no Cash Collateral, DIP Collateral, proceeds thereof, proceeds of the Financing, or any portion of the Carve-Out may be used by the Debtors, the Debtors' estates, the Committee, any trustee or examiner appointed in the Chapter 11 Cases or any chapter 7 trustee, or any other person, party or entity to, in any jurisdiction anywhere in the world, directly or indirectly to (a) request authorization to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than (i) from the DIP Agent or (ii) if the financing is sufficient to indefeasibly pay all DIP Obligations in full in cash and the financing upon approval by the court (which may be in connection with a plan of reorganization), is immediately so used; (b) assert, join, commence, support, investigate, or prosecute any action for any claim, counter-claim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, solely in their capacity as DIP Lenders, and DIP Releasees with respect to (i) any action arising under the Bankruptcy Code against a DIP Releasee; (ii) any so-called "lender liability" claims and causes of action against a DIP Releasee; (iii) any action with respect to the legality, enforceability, validity, extent (other than the amount thereof), perfection, and priority of the DIP Obligations, the DIP Superpriority Claims, the DIP Loan Documents, or the legality, enforceability, validity, extent, perfection, and priority of the DIP Liens; (iv) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counter claims or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or

regulation against or with respect to the DIP Liens, DIP Obligations, or the DIP Superpriority Claims, in whole or in part; (v) appeal or otherwise challenge this Second Interim Order, the DIP Loan Documents, or any of the transactions contemplated herein or therein; and/or (vi) any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the DIP Secured Parties' rights in respect of their respective liens on and security interests in the DIP Collateral or any of their rights, powers, or benefits hereunder or in the DIP Loan Documents anywhere in the world; (c) seek to modify any of the rights granted to the DIP Secured Parties hereunder or under the DIP Loan Documents  and/or (d) pay any claim of a prepetition creditor except as permitted under the DIP Loan Documents in accordance with the DIP Budget. Notwithstanding the foregoing, the restrictions and limitations of paragraph 15 shall not apply to a successful action on the part of the Debtors or the Committee whereby under paragraph 13 of this Second Interim Order the Debtors or the Committee obtain a court order staying or otherwise modifying a Termination Declaration.

17.    <u>Restriction on Use of Cash Collateral.</u>  Notwithstanding anything in this Second Interim Order to the contrary, but subject to the last sentence of this paragraph, no more than $35,000 of the proceeds of the DIP Financing, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Carve Out shall be used for the payment or reimbursement of Estate Professional Fees incurred in connection with, or with respect to, any action, suit, arbitration, proceeding, application, motion, complaint, adversary proceeding, or other litigation of any type, kind, or nature whatsoever (or the investigation, preparation, or prosecution of any of the foregoing) against any of the Prepetition Agent or Prepetition Lenders, including (a) to investigate, assert, commence, or prosecute any claims or causes of action whatsoever (whether for monetary or injunctive relief, including any actions under chapter 5 of the Bankruptcy Code), (b) to prepare or prosecute an objection to, contest or challenge in any manner, or raise any defenses to, the

validity, perfection, priority, or enforceability of any of their respective claims, security interests, or liens in, on or against the Debtors or the Prepetition Collateral or seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, any of such claims, security interests, or liens, or (c), to object, contest, or interfere with in any way the enforcement or realization upon any of the Prepetition Collateral by any of the Prepetition Lenders upon an Event of Default or termination of use of Cash Collateral; or (d) to investigate or pursue any of the Challenge Matters (as defined below). For the avoidance of doubt, no restriction on the use of proceeds of the Financing as set forth in paragraph 15 or the use of Cash Collateral set forth in paragraph 16 shall be construed to restrict or limit the ability of the Committee to fulfill and comply with its statutory duties under the Bankruptcy Code, but shall limit the authorization for the use of proceeds of the Financing or Cash Collateral to pay for any such exercise.

  18. <u>Preservation of Rights.</u>

  a. Subject to paragraph 16 and 17 of this Second Interim Order and the limitations specified in this paragraph 18 of this Second Interim Order, the stipulations, admissions, releases, and waivers contained in paragraph E of this Second Interim Order (collectively, the "<u>Challenge Matters</u>") shall be binding on all Persons, entities, and parties in interest, including the estates and any committee appointed in these cases, if any, and any subsequent trustee of the Debtors' estates, whether in the Chapter 11 Cases or any subsequently filed chapter 11 case or chapter 7 case (a "<u>Successor Case</u>"), unless, and solely to the extent that, any such party in interest with standing and requisite authority, has filed a complaint or other appropriate pleadings commencing an adversary proceeding challenging or otherwise contesting the Challenge Matters (a "<u>Challenge Proceeding</u>") prior to the

"Action Filing Deadline," which means the date that is (i) 60 days after the Petition Date for parties other than the Committee and (ii) 60 days after the appointment of the Committee, for the Committee. To the extent no such party in interest obtains standing and timely and properly commences such Challenge Proceeding prior to the Action Filing Deadline, then, without further notice, motion, or application to, order of, or hearing before, this court and without the need or requirement to file any proof of claim, the Challenge Matters shall become binding, conclusive, and final on the Committee, the Debtors (and any subsequent trustee of the Debtors' estates) and any other Person, entity or party in interest in the Chapter 11 Cases and any Successor Case, and the Prepetition Indebtedness and the Prepetition Liens shall be deemed enforceable, valid, non-avoidable, and perfected with a first priority for all purposes in the Chapter 11 Cases and any Successor Case and shall not be subject to challenge or objection by any Person, entity, or other party in interest. For the avoidance of doubt, the Debtors are not authorized and shall not bring any Challenge Matters.

b.       Notwithstanding anything to the contrary in this order, if any such Challenge Proceeding is properly and timely commenced, the Challenge Matters shall nonetheless remain binding on all Persons, entities, and parties in interest and preclusive as provided in the foregoing sub-paragraph above except to the extent that such Challenge Matters are expressly challenged in such Challenge Proceeding.

c.       Nothing in the Interim Order or this Second Interim Order confers standing on any Person, entity, or party in interest (including any statutory committee

appointed in these Chapter 11 Cases) to assert any claim on behalf of any Debtor or any estate of any Debtor, or relieves any Person, entity, or party in interest (including any statutory committee, if any) from any requirement under the Bankruptcy Code or otherwise to obtain standing and authorization from this court prior to asserting any claim on behalf of any Debtor or any estate of any Debtor, provided however that the Committee is not required to send any "La. World Exposition" type demand letter to the Debtors, or take any other action or formality prior to filing a pleading requesting standing and authority to pursue Challenge Matters.

19.    <u>Collateral Rights</u>.    Except as expressly provided in the DIP Budget or permitted in the Interim Order, this Second Interim Order or the DIP Loan Documents, in the event that any person or entity that holds a lien on or security interest in DIP Collateral of the Debtors' estates, that is junior and/or subordinate to the DIP Liens receives or is paid the proceeds of such DIP Collateral, prior to indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations under the DIP Loan Documents, and termination of the commitments under the DIP Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral of the Debtors' estates, in trust for the DIP Lenders, and shall immediately turnover such proceeds to the DIP Agent for application in accordance with the DIP Loan Documents and this Second Interim Order.

20.    <u>Prohibition on Additional Liens</u>.    Except as provided in the DIP Loan Documents or this Second Interim Order, the Debtors shall be enjoined and prohibited from, at any time during the Chapter 11 Cases until such time as the DIP Obligations have been indefeasibly paid in full, granting liens on or security interests in the DIP Collateral or any portion

thereof to any other entities, pursuant to Bankruptcy Code section 364(d) or otherwise, which liens are junior to, senior to, or *pari passu* with the DIP Liens or the Adequate Protection Liens.

21.    No Waiver.  This Second Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that any of the DIP Secured Parties or Prepetition Lenders or the Committee may have to bring or be heard on any matter brought before this court.

22.    Sale/Conversion/Dismissal/Plan.

(a)    No order providing for either the sale of the ownership of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under Bankruptcy Code section 363 shall be entered by the court unless, in connection and concurrently with any such event, (i) the proceeds of such sale shall be used to indefeasibly pay in full in cash and completely satisfy the DIP Obligations and the commitments under the DIP Loan Documents are terminated; (ii) such sale is expressly permitted under the DIP Loan Documents; or (iii) DIP Agent otherwise consents.

(b)    If an order dismissing or converting the Chapter 11 Cases under Bankruptcy Code sections 305 or 1112 or otherwise or an order appointing a chapter 11 trustee or an examiner with expanded powers is at any time entered:

i.    Unless otherwise agreed to by the DIP Agent, such order shall, in each case subject to the Carve-Out and the Permitted Prior Liens, be subject to: (a) the DIP Liens, the DIP Superpriority Claim, the DIP Obligations and the DIP Loan Documents, which shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Second Interim Order until all DIP Obligations hereunder are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Loan Documents

are terminated in accordance with the DIP Loan Documents, and (b) all postpetition indebtedness, obligation or liability incurred by the Debtors to the DIP Secured Parties prior to the date of such order, including, without limitation, the DIP Obligations, shall be governed in all respects by the original provisions of the Interim Order and this Second Interim unless the Final Order has been entered, in which case the Final Order shall govern,  and the DIP Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Loan Documents with respect to all such indebtedness, obligation or liability;

      ii.      to the extent permitted by applicable law, this court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the Carve-Out, DIP Liens and the DIP Superpriority Claims.

23.    <u>Priority of Terms</u>.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Loan Documents, the Motion, any other order of this court, or any other agreements, on the one hand, and (b) the terms and provisions of the Interim Order or this Second Interim Order, on the other hand, unless such term or provision is phrased in terms of "as defined in" or "as more fully described in" the DIP Loan Documents or words of similar import, the terms and provisions of the Interim Order or this Second Interim Order shall govern.  To the extent of any conflict between the Interim Order and this Second Interim Order, the Second Interim Order shall govern.   Except as specifically amended, supplemented, inconsistent with or otherwise modified by this Second Interim Order, all the provisions of the Interim Order shall remain in effect and are ratified by this Second Interim Order.

24. <u>No Third Party Beneficiary</u>. Except as explicitly set forth in this Second Interim Order, no rights are created under this order for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

25. <u>Rights Under Sections 363(k) and 1129(b)</u>. The full amount of the DIP Obligations may be used by the DIP Lenders to "credit bid" for the assets and property of the Debtors as provided for in Bankruptcy Code section 363(k) without the need for further court order authorizing the same and whether such sale is effectuated through Bankruptcy Code section 363 and/or section 1129(b) or otherwise. The Debtor shall pay the fees and expenses of the DIP Lender in connection with any such credit bid, subject to the procedures set forth in paragraph 7 hereof. Subject to entry of the Final Order and subject to paragraphs 17 and 18 of this order, the full amount of the Prepetition Obligations may be used by the Prepetition Lenders to "credit bid" for the assets and property of the Debtors as provided for in Bankruptcy Code section 363(k) without the need for further court order authorizing the same and whether such sale is effectuated through Bankruptcy Code section 363 and/or section 1129(b) or otherwise. The Debtor shall pay the fees and expenses of the Prepetition Lenders in connection with any such credit bid, subject to the procedures set forth in paragraph 7 of this order.

26. <u>Preservation of Prepetition Priorities.</u> Nothing in this Second Interim Order is intended to change or otherwise modify the prepetition priorities among prepetition secured creditors of the Debtors, including (i) any lien or recoupment rights to the extent such liens or rights are valid, enforceable, nonavoidable and perfected, and (ii) any claims of the lienholders or any other mechanic or materialmen to the extent their liens are valid, enforceable, non-avoidable and perfected, including as permitted by Bankruptcy Code section 546(b); and nothing in this Second Interim Order, including the granting of adequate protection liens or DIP Liens, shall be deemed to have changed or modified such prepetition priorities, all of which are expressly

preserved.  The preservation of prepetition priorities expressly includes lien, setoff, recoupment, contract and other security rights.

27.    <u>Proofs of Claim</u>.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the court, none of the DIP Agent, any of the DIP Lenders, the Prepetition Agent or any of the Prepetition Lenders shall be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein in or otherwise in relation to the DIP Credit Agreement, the DIP Loan Documents or the Prepetition Loan Documents.

28.    <u>Best Efforts</u>.  If requested to do so by the DIP Agent, the Debtors shall use their best efforts (subject to applicable law, including, without limitation, the Debtors' fiduciary duties thereunder) to assist and cooperate with the sale of the DIP Collateral.

29.    <u>No Consent</u>.  No action, inaction or acquiescence by the DIP Secured Parties, including funding the Debtors' ongoing operations under the Interim Order or this Second Interim Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Secured Parties or Prepetition Secured Parties to a charge against the DIP Collateral pursuant to Bankruptcy Code sections 506(c), 552(b) or 105(a) or any other provision of the Bankruptcy Code or applicable law.  Subject to entry of a Final Order, none of the DIP Secured Parties or Prepetition Secured Parties shall be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.  Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties are entitled to all rights and benefits of Bankruptcy Code section 552(b) and the "equities of the case" exception shall not apply.

30.    <u>Milestones</u>.  For the avoidance of doubt, failure of the Debtors to satisfy the milestones (the "<u>Milestones</u>") set forth in the DIP Loan Documents shall constitute an Event of Default under the terms of the DIP Loan Documents; *provided* that the failure of the Debtors to

satisfy the Milestones caused solely as a result of scheduling issues with the court shall not constitute an Event of Default.  A copy of the Milestones are attached to this order as **Exhibit C.**

31.  <u>No Marshalling.</u>  Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshalling" with respect to any of their respective interests in the DIP Collateral or Prepetition Collateral.

32.  <u>Section 506(c) Waiver.</u>  Subject to entry of the Final Order, no costs or expenses of administration or other charge, lien, assessment or claim incurred at any time (including any expenses set forth in the Approved Budget) by any Debtors or any other person or entity shall be imposed against any or all of the DIP Secured Parties or Prepetition Secured Parties, their respective claims, or their respective collateral under Bankruptcy Code section 506(c) or otherwise, and the Debtors, on behalf of their estates, waive any such rights.

33.  <u>Disposition of DIP Collateral</u>. Subject to entry of the Final Order, unless the DIP Obligations and the Prepetition Secured Debt are indefeasibly paid in full, in cash, upon the closing of a sale or other disposition of the DIP Collateral or Prepetition Collateral, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or any Prepetition Collateral (or enter into any binding agreement to do so) (other than the sale of crude oil, natural gas, or other hydrocarbons in the ordinary course of business) without the prior written consent of the DIP Agent and, solely with respect to the Prepetition Collateral, the Prepetition Agent (and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party or Prepetition Secured Party or any order of this Court), except as permitted in the DIP Loan Documents and/or the Prepetition Loan Documents, as applicable, and this Second Interim Order.   Except to the extent otherwise expressly provided in the DIP Loan Documents, all proceeds from the sale, transfer, lease, encumbrance, or other

disposition of any DIP Collateral (other than the sale of crude oil, natural gas, or other hydrocarbons in the ordinary course of business) shall be remitted to the DIP Agent for application to the DIP Obligations in accordance with the DIP Loan Documents.  Subject to entry of the Final Order, any additional proceeds after payment of the DIP Obligations shall then be remitted to the Prepetition Agent for payment of the Prepetition Secured Debt in accordance with the terms of the Final Order, the DIP Loan Documents or the Prepetition Loan Documents, as the case may be.

34.    No Duty to Monitor Compliance.  The DIP Agent, DIP Lenders, Prepetition Agent and Prepetition Lenders may assume the Debtors will comply with this Second Interim Order and the DIP Budget and shall not:  (a) have any obligation with respect to the Debtors' use of Cash Collateral or proceeds of the Financing (other than its consent to the use of Cash Collateral or proceeds of the Financing in accordance with and subject to terms of this Second Interim Order; (b) be obligated to directly pay any expenses incurred or authorized to be incurred pursuant to this Second Interim Order (including any amounts specified in the DIP Budget); or (c) be obligated to ensure or monitor that sufficient Cash Collateral or proceeds of the Financing exists to pay any expenses incurred or authorized to be incurred pursuant to this Second Interim Order.

35.    Adequate Notice. The notice given by the Debtors of the Second Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the Bankruptcy Local Rules.  Under the circumstances, no further notice of the request for the relief granted at the Second Interim Hearing is required.  The Debtors shall promptly serve copies of this Second Interim Order and notice of the Final Hearing on any person included on the limited master service list approved or established in this case within five (5) Business Days of the Second Interim Order Entry Date.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the court no later than five (5) Business Days before the Final Hearing.

36.    <u>Binding Effect Successors and Assigns</u>.  The DIP Loan Documents and the provisions of the Interim Order and this Second Interim Order, including all findings in this order, shall be binding upon all parties-in-interest in this Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition Agent, the Prepetition Lenders, any committee or examiner appointed in this Chapter 11 Case, and the Debtors, and their respective successors and assigns (including any trustee or fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estate of the Debtors) whether in these Chapter 11 Cases, in any Superseding Cases, or upon any dismissal of any such chapter 11 or chapter 7 case and shall inure to the benefit of the DIP Secured Parties and the Debtors, and their respective successors and assigns, <u>provided</u>, <u>however</u>, that the agreement of the DIP Secured Parties to extend financing under the DIP Loan Documents, in each case, shall terminate upon the appointment of any chapter 7 or 11 trustee, examiner with expanded powers, or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan (whether under the DIP Credit Agreement, a promissory note, or otherwise) or in exercising any rights or remedies as and when permitted pursuant to the Interim Order, this Second Interim Order or the DIP Loan Documents, the DIP Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, or their creditors, shareholders, or estates.  Each stipulation, admission and agreement contained in part D of this Second Interim Order shall also be binding upon all persons and entities under all circumstances and for all purposes.

37.    <u>Headings</u>.  Section headings used in this order are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Second Interim Order.

38.     <u>Final Hearing Date</u>.  The Final Hearing to consider the entry of the Second Interim Order approving relief sought in the Motion shall be held on June 13, 2019 at 2:00 p.m. (CT) before the Honorable Douglas D. Dodd in the United States Bankruptcy Court, Middle District of Louisiana, 707 Florida Street, Baton Rouge, Louisiana 70801 (the "<u>Final Hearing</u>"). The notice of form of proposed Final Order shall be filed with the court at least three (3) days prior to the Final Hearing.  Objections and responses to the Motion with respect to entry of the Final Order shall be filed and served on or before June 6, 2019 at 4:00 p.m., except that objections and responses to the Motion by the Committee and the United States Trustee shall be filed and served on or before June 10, 2019 at 4:00 p.m.

39.     <u>Retention of Jurisdiction</u>.  This court has and will retain jurisdiction to enforce this Second Interim Order.

Baton Rouge, Louisiana, May 30, 2019.

<u>**s/ Douglas D. Dodd**</u>
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE

## **<u>EXHIBIT A</u>**

### **DIP CREDIT AGREEMENT**

1. DIP Term Loan Credit Agreement
2. Promissory Note
3. Security Agreement
4. Pledge Agreement

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION
TERM LOAN CREDIT AGREEMENT

AMONG

FALCON V, L.L.C.,
FALCON V HOLDINGS, L.L.C.,
ORX RESOURCES, L.L.C.,
AND SUBSIDIARIES
each as Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as Borrowers

and

405 BAXTERVILLE LLC,
as Administrative Agent

and

THE LENDERS SIGNATORY HERETO,
as Lenders

May 14, 2019

# TABLE OF CONTENTS

Page

ARTICLE I

                    DEFINITIONS AND INTERPRETATION ...................................................2
1.1     Terms Defined Above ...............................................................2
1.2     Additional Defined Terms.........................................................2
1.3     Undefined Financial Accounting Terms ..................................22
1.4     References ................................................................................23
1.5     Articles and Sections................................................................23
1.6     Number and Gender .................................................................23
1.7     Incorporation of Schedules and Exhibits ................................23
1.8     Negotiated Transaction ............................................................23

ARTICLE II

                    TERMS OF DIP FACILITY.....................................................24
2.1     Term Loans. .............................................................................24
2.2     Use of Loan Proceeds..............................................................24
2.3     Repayment of Term Loans.......................................................25
2.4     Fees..........................................................................................25
2.5     Outstanding Amounts..............................................................25
2.6     Taxes and Time, Place, and Method of Payments. .................26
2.7     Pro Rata Treatment; Adjustments. ..........................................28
2.8     Voluntary Prepayments............................................................29
2.9     Mandatory Prepayments...........................................................29
2.10    Loans to Satisfy Obligations of Borrowers .............................30
2.11    General Provisions Relating to Interest....................................30
2.12    Yield Protection.......................................................................31
2.13    Replacement Lenders. ..............................................................32
2.14    Security Interest in Accounts; Right of Offset.........................33
2.15    Illegality ..................................................................................33
2.16    Regulatory Change...................................................................33
2.17    Power of Attorney....................................................................34
2.18    Keepwell..................................................................................34
2.19    Joint and Several Liability........................................................35
2.20    Termination of the DIP Facility ..............................................35
2.21    Priority and Liens. ...................................................................35
2.22    Payment of Obligations............................................................37

ARTICLE III

                    CONDITIONS .........................................................................37
3.1     Conditions of the Closing Date ................................................37
3.2     Conditions of the Funding Date ...............................................40

3.3     Conditions to All Term Loans.................................................................40
3.4     Conditions to All Term Loan Disbursements ........................................41

ARTICLE IV

        REPRESENTATIONS AND WARRANTIES................................42
4.1     Due Authorization ..................................................................................42
4.2     Existence .................................................................................................42
4.3     Valid and Binding Obligations ..............................................................43
4.4     Security Documents ...............................................................................43
4.5     Title to Property .....................................................................................43
4.6     Scope and Accuracy of Financial Statements ......................................43
4.7     No Material Adverse Effect or Default .................................................43
4.8     No Material Misstatements ....................................................................44
4.9     Liabilities, Litigation and Restrictions .................................................44
4.10    Authorizations; Consents ......................................................................44
4.11    Compliance with Laws...........................................................................44
4.12    ERISA .....................................................................................................44
4.13    Environmental Laws ..............................................................................44
4.14    Compliance with Federal Reserve Regulations ...................................45
4.15    Investment Company Act Compliance .................................................45
4.16    Proper Filing of Tax Returns; Payment of Taxes Due ........................45
4.17    Refunds....................................................................................................45
4.18    Gas Contracts .........................................................................................45
4.19    Intellectual Property ..............................................................................46
4.20    Casualties or Taking of Property...........................................................46
4.21    Location of Borrowers ...........................................................................46
4.22    Subsidiaries ............................................................................................46
4.23    Compliance with Anti-Terrorism Laws ...............................................46
4.24    Identification Numbers ..........................................................................47
4.25    Bankruptcy Orders .................................................................................47
4.26    Budget .....................................................................................................47
4.27    Related Party Transactions ....................................................................47
4.28    Pre-Petition Indebtedness and Pre-Petition Collateral .......................47

ARTICLE V

        AFFIRMATIVE COVENANTS................................................48
5.1     Maintenance and Access to Records.....................................................48
5.2     Monthly Unaudited Financial Statements and Compliance Certificates .........48
5.3     Annual Audited Financial Statements and Compliance Certificate..................48
5.4     Reserve Reports; LOE Reports; Production Reports; Payables Aging;
        Additional Drilling Plans and Financial Projections............................48
5.5     Title Opinions; Title Defects; Mortgaged Properties...........................49
5.6     Notices of Certain Events.......................................................................50
5.7     Letters in Lieu of Transfer Orders or Division Orders.........................50
5.8     Commodity Hedging ..............................................................................51

HW_US:73367004.8

| | | |
|---|---|---|
| 5.9 | Tax Returns | 51 |
| 5.10 | Additional Information | 51 |
| 5.11 | Compliance with Laws | 51 |
| 5.12 | Payment of Assessments and Charges | 51 |
| 5.13 | Maintenance of Existence or Qualification and Good Standing | 51 |
| 5.14 | Payment of Notes; Performance of Obligations | 51 |
| 5.15 | Further Assurances | 52 |
| 5.16 | Initial Expenses of Agent | 52 |
| 5.17 | Subsequent Expenses of Agent and Lenders | 52 |
| 5.18 | Maintenance and Inspection of Properties | 53 |
| 5.19 | Maintenance of Insurance | 53 |
| 5.20 | Environmental Indemnification | 53 |
| 5.21 | General Indemnification | 54 |
| 5.22 | Evidence of Compliance with Anti-Terrorism Laws | 54 |
| 5.23 | Board and Management Meetings | 54 |
| 5.24 | Intentionally Deleted | 54 |
| 5.25 | Borrower Report | 54 |
| 5.26 | Budget Variance Report, Cash Forecasts & Lender Conference Calls | 55 |
| 5.27 | Certain Other Bankruptcy Orders | 55 |
| 5.28 | Certain Case Milestones | 56 |
| 5.29 | Appointment of Chief Restructuring Officer | 56 |

ARTICLE VI

| | | |
|---|---|---|
| | NEGATIVE COVENANTS | 56 |
| 6.1 | Indebtedness | 56 |
| 6.2 | Contingent Obligations | 57 |
| 6.3 | Liens | 57 |
| 6.4 | Sales of Assets | 57 |
| 6.5 | Leasebacks | 57 |
| 6.6 | Sale or Discount of Receivables | 57 |
| 6.7 | Loans or Advances | 57 |
| 6.8 | Investments | 57 |
| 6.9 | Dividends and Distributions | 58 |
| 6.10 | Issuance of Equity; Changes in Corporate Structure | 58 |
| 6.11 | Transactions with Affiliates and Certain Other Person | 58 |
| 6.12 | Lines of Business | 58 |
| 6.13 | Plan Obligation | 58 |
| 6.14 | Anti-Terrorism Laws | 58 |
| 6.15 | Amendment of Material Contracts | 59 |
| 6.16 | Provisions of Commodity Hedge Agreements | 59 |
| 6.17 | Maintenance of Commodity Hedge Agreements | 59 |
| 6.18 | Deposit Accounts | 59 |
| 6.19 | Drilling Plans | 59 |
| 6.20 | Subsidiaries | 59 |
| 6.21 | Intentionally Omitted | 59 |
| 6.22 | Capital Expenditures | 59 |

HW_US:73367004.8

6.23    Intentionally Omitted. .................................................................59
6.24    Intentionally Omitted. .................................................................59
6.25    Intentionally Omitted .................................................................60
6.26    Budget Variances .......................................................................60
6.27    Organizational Documents .........................................................60
6.28    Use of Proceeds .........................................................................61
6.29    Additional Bankruptcy Matters ..................................................61
6.30    Prepayments or Amendments of Existing Debt ...........................61

ARTICLE VII

          EVENTS OF DEFAULT ..............................................................62
7.1    Enumeration of Events of Default...............................................62
7.2    Remedies. ...................................................................................65

ARTICLE VIII

          THE AGENT ...............................................................................66
8.1    Appointment...............................................................................66
8.2    Delegation of Duties...................................................................67
8.3    Exculpatory Provisions ..............................................................67
8.4    Reliance by Agent ......................................................................67
8.5    Notice of Default........................................................................68
8.6    Non-Reliance on Agent and Other Lenders ................................68
8.7    Indemnification ..........................................................................69
8.8    Restitution .................................................................................69
8.9    Agent in Its Individual Capacity ................................................70
8.10    Successor Agent .........................................................................70
8.11    Applicable Parties ......................................................................70
8.12    Releases......................................................................................70

ARTICLE IX

          MISCELLANEOUS ...................................................................71
9.1    Assignments; Participations. ......................................................71
9.2    Survival of Representations, Warranties, and Covenants .............72
9.3    Notices and Other Communications ...........................................72
9.4    Parties in Interest.......................................................................74
9.5    Rights of Third Parties...............................................................74
9.6    Renewals; Extensions.................................................................74
9.7    No Waiver; Rights Cumulative ..................................................74
9.8    Survival Upon Unenforceability ................................................74
9.9    Amendments; Waivers................................................................74
9.10    Controlling Agreement ..............................................................75
9.11    Disposition of Collateral ............................................................75
9.12    Governing Law...........................................................................75

HW_US:73367004.8

9.13   Forum Selection and Consent to Non-Exclusive Jurisdiction; Waiver of
       Jury Trial............................................................................................75
9.14   Integration ...........................................................................................76
9.15   Waiver of Punitive and Consequential Damages..............................77
9.16   Counterparts .........................................................................................77
9.17   USA Patriot Act Notice.......................................................................77
9.18   Tax Shelter Regulations ......................................................................77
9.19   Contribution and Indemnification ......................................................78
9.20   Inconsistencies with Other Documents ..............................................78

- 5 -

LIST OF SCHEDULES

Schedule 1.2B    – Percentage Shares ............................................................................S-1.2B-i
Schedule 4.5A    – Liens........................................................................................................S-4.5-i
Schedule 4.5B    – Real Property ..........................................................................................S-4.5-i
Schedule 4.6      – Accounts Payable ....................................................................................S-4.6-i
Schedule 4.9      – Liabilities and Litigation.........................................................................S-4.9-i
Schedule 4.10    – Authorizations; Consents .......................................................................S-4.10-i
Schedule 4.13    – Environmental Disclosures .....................................................................S-4.13-i
Schedule 4.17    – Refunds ...................................................................................................S-4.17-i
Schedule 4.18    – Gas Contracts ..........................................................................................S-4.18-i
Schedule 4.22    – Subsidiaries.............................................................................................S-4.22-i
Schedule 4.24    – EIN, Jurisdiction of Formation and Location .......................................S-4.24-i
Schedule 4.27    – Related Party Transfers...........................................................................S-4.27-i
Schedule 6.18    – Deposit Accounts ....................................................................................S-6.18-i

LIST OF EXHIBITS

Exhibit A         Form of Note.............................................................................................. A-i
Exhibit B         Form of Compliance Certificate ............................................................... B-i
Exhibit C         Form of Assignment Agreement................................................................ C-i
Exhibit D         Form of Budget Compliance Certificate................................................... D-i
Exhibit E         Form of Borrowing Request .......................................................................E-i

## SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION
## TERM LOAN CREDIT AGREEMENT

This **SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT** is made and entered into effective May 14, 2019, by and among **FALCON V, L.L.C.**, a Louisiana limited liability company ("Falcon"), **FALCON V HOLDINGS, L.L.C.**, a Delaware limited liability company ("Holdings"), and **ORX RESOURCES, L.L.C.**, a Delaware limited liability company ("ORX"), and each direct and indirect Subsidiary of any of the foregoing, each a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code (each a "Borrower" and, collectively, the "Borrowers"), each lender that is a signatory hereto or becomes a party hereto as provided in Section 9.1 (individually, together with its successors and assigns, a "Lender" and, collectively, together with their respective successors and assigns, the "Lenders"), and **405 BAXTERVILLE LLC**, a Delaware limited liability company ("Baxterville"), as administrative agent for the Lenders (in such capacity, together with its successors in such capacity pursuant to the terms hereof, the "Agent").

## PRELIMINARY STATEMENTS

WHEREAS, on May 10, 2019 (the "Petition Date"), Falcon, Holdings and ORX filed voluntary petitions with the Bankruptcy Court (such entities filing such petitions, together with any other Affiliates that become debtors in the Cases, are hereinafter referred to as the "Debtors"), initiating their respective cases that are pending under Chapter 11 of the Bankruptcy Code (the case of each Debtor, each, a "Case" and collectively, the "Cases");

WHEREAS, the Debtors have continued in the possession of their assets and in the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, for their general working capital and other corporate needs, the Borrowers have requested the Lenders provide a multiple delayed draw term loan facility denominated in Dollars in the aggregate principal amount at any time outstanding not in excess of $5,800,000.00 (the "DIP Facility");

WHEREAS, the Lenders are willing to extend such credit to the Borrowers on the terms and subject to the conditions set forth herein;

WHEREAS, the priority of the DIP Facility with respect to the Collateral shall be as set forth in the Interim Order, upon entry thereof by the Bankruptcy Court, and in the Security Documents;

WHEREAS, all of the claims and the Liens granted under the Orders and the Loan Documents to the Agent and for the benefit of the Lenders in respect of the DIP Facility shall be subject to the Carve-Out (other than the Primed Liens); and

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, such parties hereby agree as follows:

ARTICLE I

DEFINITIONS AND INTERPRETATION

1.1     Terms Defined Above    As used in this Agreement, each of the terms "Agent," "Baxterville," "Borrower," "Borrowers," "Case," "Cases," "Debtors," "DIP Facility," "Falcon," "Holdings," "Lender," "Lenders," "ORX" and "Petition Date" shall have the meaning assigned to such term hereinabove.

1.2     Additional Defined Terms.    As used in this Agreement, each of the following terms shall have the meaning assigned thereto in this Section 1.2 or in Sections referred to in this Section 1.2, unless the context otherwise requires:

"AAA" shall mean the American Arbitration Association.

"Additional Amount" shall have the meaning set forth for such term in Section 2.6.

"Additional Costs" shall mean costs which are attributable to the obligation of the Agent or any Lender to maintain the Term Loan, or any reduction in any amount receivable by the Agent or such Lender in respect of any such obligation or any Term Loan, resulting from any Regulatory Change which (a) changes the basis of taxation of any amounts payable to the Agent or such Lender under this Agreement or any Note in respect of any Term Loan (other than taxes imposed on the overall net income of the Agent or such Lender or its Applicable Lending Office (including franchise or similar taxes) for the Term Loan), (b) imposes or modifies any reserve, special deposit, minimum capital, capital ratio or similar requirement relating to any extensions of credit or other assets of, or any deposits with or other liabilities of, the Agent or such Lender with respect to the Term Loans and Dollar deposits in the London interbank market in connection with the Term Loans, or the Commitment of the Agent or such Lender to maintain the Term Loans, or the London interbank market or (c) imposes any other condition affecting this Agreement or any Note or any of such extensions of credit, liabilities or Commitments, in each case with respect to the Term Loans.

"Adjusted Strip Prices" shall mean the 12-month average closing settlement price for crude oil and natural gas future contracts for calendar year 2018 and the 12-month average closing settlement price for each of the succeeding three calendar years, as applicable hereunder, in each case as published by NYMEX and, if not already so adjusted in such published prices, adjusted for severance taxes, ad valorem taxes, gathering, transportation and marketing expenses and historical basis differential.

"Administrator" shall have the meaning assigned to such term in Section 9.13.

"Affiliate" shall mean, as to any Person, any other Person directly or indirectly, controlling, or under common control with, such Person and includes, as to the Borrowers, any Subsidiary of the Borrowers and any "affiliate" of the Borrowers within the meaning of Rule 12b-2 promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, with "control," as used in this definition, meaning possession, directly or indirectly, of the power to direct or cause the direction of management, policies or action through ownership of voting securities, contract, voting trust, or membership in management or in the group appointing or electing management or otherwise through formal or informal arrangements or business relationships.

"Agent Observer" shall mean any representative of the Agent designated by the Agent from time to time by written notice to the Borrowers.

"Agreement" shall mean this Superpriority Secured Debtor-In-Possession Term Loan Credit Agreement, as it may be amended, supplemented, restated, or otherwise modified from time to time.

"Anti-Terrorism Laws" shall mean any laws relating to terrorism or money laundering, including Executive Order No. 13224 and the USA Patriot Act.

"Applicable Lending Office" shall mean, for each Lender, the lending office of such Lender (or an Affiliate of such Lender) designated on the signature pages hereof or in an Assignment Agreement or such other office of such Lender (or an Affiliate of such Lender) as such Lender may from time to time specify to the Agent and the Borrowers as the office by which its Percentage Share of the Term Loan is to be made and maintained.

"Approved Budget" shall mean the Budget attached to the Interim Order, in form and substance satisfactory to the Agent and the Required Lenders, in their sole discretion.

"Approved Hedge Counterparty" shall mean (a) BP, (b) any Lender or (c) a counterparty to a Commodity Hedge Agreement with the Borrowers approved by the Agent.

"Approved Purposes" shall mean the Operating Disbursements, the Other Disbursements, and any disbursements approved by the Required Lenders during the term of this Agreement.

"Arbitration Order" shall have the meaning assigned to such term in Section 9.13.

"Assignment Agreement" shall mean an Assignment Agreement in substantially the form of Exhibit C, with appropriate insertions or such other form as approved by the Agent.

"Avoidance Actions" shall have the meaning assigned to such term in Section 2.21(a).

"Bankruptcy Code" shall mean the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. § 101, et seq.).

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"Benefited Lender" shall have the meaning assigned to such term in Section 2.7(c).

"Blocked Funding Account" shall mean the blocked account, Account No. ending in 0316, held at Citibank, N.A., which blocked account is subject to a blocked account control agreement in favor of the Agent for the benefit of the Lenders, in form and substance satisfactory to the Agent in its sole discretion or other similar agreement or arrangement satisfactory to the Agent in its sole discretion.

"Blocked Person" shall have the meaning assigned to such term in Section 4.23.

"Borrowing Request" shall mean shall mean a written borrowing request in the form of Exhibit E, executed by a Responsible Officer of the Borrowers.

"BP" shall mean BP Energy Company.

"Budget" shall mean the thirteen-week rolling operating budget and cash flow forecast which shall reflect the good faith projection of the Borrowers in the cases of all weekly cash receipts and disbursements in connection with the operation of the Borrowers' business during such thirteen-week period, including but not limited to, collections, payroll, capital expenditures and other major cash outlays, in form and substance satisfactory to Agent and the Required Lenders in their sole discretion.

"Budget Compliance Certificate" shall mean a certificate substantially in the form of Exhibit D.

"Budget Variance Report" shall mean a report, in each case certified by the CRO, if applicable, or a Financial Officer of the Borrowers, in form reasonably satisfactory to the Lenders, delivered in accordance with Section 5.26, showing the amount, if any, by which projected cash receipts and expenditures set forth for the applicable week in the Budget exceed actual cash receipts and expenditures in such week, expressed as a percentage.

- 4 -

"Business Day" shall mean any day other than a Saturday, Sunday, legal holiday for commercial banks under the laws of the State of New York, or any other day when banking is suspended in the State of New York.

"Business Entity" shall mean a corporation, partnership, joint venture, limited liability company, joint stock association, business trust, or other business entity.

"CapEx Account" shall mean the deposit account maintained by the Agent at Citibank, N.A. in which funds for Capital Expenditures shall be held.

"Capital Expenditures" shall have the meaning assigned to such term by GAAP.

"Carry Forward Amount" shall mean the amount of (i) any projected Operating Disbursements or Professional Fees not expended in a given Testing Period or (ii) any total net Receipts exceeding projected Receipts, each of which shall carry forward into, and be available for use in, future Testing Periods.

"Carve-Out" shall mean an amount equal to the sum of (i) fees and expenses incurred by bankruptcy Professionals (A) which fees are unpaid as of the delivery of the Carve Out Trigger Notice (as defined below) and (B) which fees are provided for the in the Budget; (ii) fees and expenses in an amount not to exceed $150,000 incurred by bankruptcy Professionals from and after the delivery of the Carve Out Trigger Notice (the "Post-Termination Fee Carve Out"); and (iii) fees payable pursuant to 28 U.S.C.§ 1930 or to the clerk of the Bankruptcy Court.

Notwithstanding the foregoing, the Carve-Out shall not include, apply to or be available for any fees or expenses incurred by any party in connection with (a) the investigation (except to the extent required by the Bankruptcy Court), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against any of the Lenders or the Agent, and their respective agents, attorneys, advisors or representatives, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the Liens and security interests granted under the Loan Documents (whether in such capacity or otherwise), including, in each case, without limitation, for lender liability or pursuant to section 105, 506(c), 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) attempts to modify any of the rights granted to the Lenders or the Agent; (c) attempts to prevent, hinder or otherwise delay any of the Lenders' or the Agent's assertion, enforcement or realization upon any Collateral in accordance with the Loan Documents and the Final Order other than to seek a determination that an Event of Default has not occurred or is not continuing; or (d) paying any amount on account of any claims arising before the commencement of the Cases unless such payments are approved by an order of the Bankruptcy Court.

For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Loan Documents, the Carve-Out shall be senior to all liens and claims securing the Loan Documents, any adequate protection liens, if any, and the Superpriority Claims, and any and all other Liens or claims securing the DIP Facility.

"Carve-Out Trigger Notice" shall mean the written notice delivered by the Agent (at the direction of the Lenders) to the Debtors, their lead counsel, the U.S. Trustee and lead counsel to the Committee, which notice may be delivered following the occurrence and continuation of an Event of Default.

For the avoidance of doubt, until the delivery of a Carve Out Trigger Notice, the Borrowers shall be permitted to pay fees and expenses incurred by bankruptcy Professionals as the same shall become due and payable, subject to the terms and conditions set forth hereunder (the payment of which shall not reduce the Post-Termination Fee Carve Out).

"Cash Collateral" shall have the meaning specified in the Interim Order or the Final Order, as applicable.

"Change of Management" shall mean James E. Orth shall cease to be active in the day to day management of the Borrowers.

"Chapter 11 Plan" shall have the meaning assigned to such term in Section 5.28(a).

"Closing Date" shall mean the Effective Date of this Agreement.

"Collateral" shall mean the Oil and Gas Properties, all of the Equity Interests in Falcon and ORX and any other Property of any Person now or at any time used or intended as security for the payment or performance of all or any portion of the Obligations, and expressly including "as extracted collateral" as defined in the UCC or the Uniform Commercial Code of any other applicable state.

"Commitment" shall mean, as to each Lender, its obligations to make its Percentage Share of the Term Loans.

"Committee" shall mean any Official Committee of Unsecured Creditors appointed in the Cases, as amended from time to time.

"Commodity Exchange Act" shall mean the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"Commodity Hedge Agreement" shall have the meaning assigned to such term in Section 1a(47) of the Commodity Exchange Act and, if not within the scope of such definition, shall include any crude oil, natural gas or other hydrocarbon floor, collar, cap, swap, price protection or hedge agreements,

including any schedules, annexes and supplements thereto and trade confirmations thereunder.

"Commonly Controlled Entity" shall mean any Person which is under common control with the Borrowers within the meaning of Section 4001 of ERISA.

"Compliance Certificate" shall mean each certificate, substantially in the form attached hereto as Exhibit B, executed by the Financial Officer of the Borrowers and furnished to the Agent from time to time in accordance with the provisions of Section 5.2 or Section 5.3, as the case may be.

"Confirmation Order" shall have the meaning assigned to such term in Section 5.28(c).

"Contingent Obligation" shall mean, as to any Person, any obligation of such Person guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends, or other obligations of any other Person (for purposes of this definition, a "primary obligation") in any manner, whether directly or indirectly, including any obligation of such Person, regardless of whether such obligation is contingent, (a) to purchase any primary obligation or any Property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any primary obligation, or (ii) to maintain working or equity capital of any other Person in respect of any primary obligation, or otherwise to maintain the net worth or solvency of any other Person, (c) to purchase Property, securities or services primarily for the purpose of assuring the owner of any primary obligation of the ability of the Person primarily liable for such primary obligation to make payment thereof, or (d) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof, with the amount of any Contingent Obligation being deemed to be equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Contract Rate" shall mean ten percent (10.0%) per annum, but in no event shall such rate exceed, as to any Lender, the Highest Lawful Rate.

"Contribution Percentage" shall mean, for each party obligated to make a payment due pursuant to the provisions of Section 9.19, the percentage obtained by dividing such party's Obtained Benefit by the aggregate Obtained Benefits of the Borrowers.

"CRO" shall mean the Chief Restructuring Officer for the Debtors, whose employment is approved by the Bankruptcy Court in the Cases, if any.

"Current Assets" shall mean all assets which would, in accordance with GAAP, be included as current assets on a consolidated balance sheet of the

Borrowers as of the date of calculation, after deducting adequate reserves in each case in which a reserve is proper in accordance with GAAP, but excluding deferred tax assets, if any, and non-cash derivative current assets to the extent such positions have not been closed arising from Commodity Hedge Agreements, if any, otherwise included as an asset in preparing such a balance sheet.

"Current Liabilities" shall mean the sum of (a) all liabilities which would, in accordance with GAAP, be included as current liabilities on a consolidated balance sheet of the Borrowers as of the date of calculation, (b) payments on other Liabilities pursuant to the provisions of Section 2.3(a) or Section 2.10, other than the payment of principal due on the Maturity Date and (c) payments on other Liabilities not prohibited by applicable provisions of this Agreement, if any, but excluding from the resulting amount (x) deferred tax obligations, if any, due within one year after the date of determination of such sum, (y) required principal payments in reduction of the Loan Balance and (z) non-cash derivative current liabilities arising from Commodity Hedge Agreements, including those arising from the application of ASC Topic 815, *Derivatives and Hedging* or ASC Topic 410, *Asset Retirement and Environmental Obligations*, to extent any of such items (x), (y) or (z) would otherwise be included as a liability in determining such sum.

"Default" shall mean any event or occurrence, which with the lapse of time or the giving of notice or both would become an Event of Default.

"Default Rate" shall mean an interest rate equal to the Contract Rate plus three percent (3%) per annum, but in no event shall such rate exceed the Highest Lawful Rate.

"Disbursement Date" shall mean the date upon which the Agent on behalf of the Lenders makes disbursements of the Term Loans to the Borrower pursuant to the terms and conditions of this Agreement.

"Disbursement Line Items" shall mean any disbursement line item in a Budget, unless designated as an immaterial line item by the Agent and Required Lenders in their approval thereof; provided that, in no event will Professionals Fees be deemed a "Disbursement Line Item".

"Disclosure Statement" shall have the meaning assigned to such term in Section 5.28(b).

"Disclosure Statement Order" shall have the meaning assigned to such term in Section 5.28(b).

"Dispute" shall have the meaning assigned to such term in Section 9.13.

"Dollars" and "$" shall mean dollars in lawful currency of the United States of America.

- 8 -

"Drilling Plan" shall mean the Borrowers' drilling and capital expenditure plan, in form and substance satisfactory to the Agent in its sole discretion. The Drilling Plan shall provide for proposed maintenance and development of the Oil and Gas Properties during the pendency of the Cases and shall include capital expenditures related to the Major Ivy well.

"Effective Date" shall mean the date on which the conditions specified in Section 3.1 are satisfied.

"Eligible Contract Participant" shall have the meaning assigned to such term in the Commodity Exchange Act and the regulations thereunder.

"Environmental Complaint" shall mean any written or oral complaint, order, directive, claim, citation, notice of environmental report or investigation, or other notice by any Governmental Authority or any other Person with respect to (a) air emissions, (b) spills, releases, or discharges to soils, any improvements located thereon, surface water, groundwater, or the sewer, septic, waste treatment, storage, or disposal systems servicing any Property of the Borrowers, (c) solid or liquid waste disposal, (d) the use, generation, storage, transportation, or disposal of any Hazardous Substance, or (e) other environmental, health, or safety matters affecting any Property of the Borrowers or the business conducted thereon.

"Environmental Laws" shall mean (a) the following federal laws as they may be cited, referenced, and amended from time to time:  the Clean Air Act, the Clean Water Act, the Safe Drinking Water Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Endangered Species Act, the Resource Conservation and Recovery Act, the Hazardous Materials Transportation Act, the Occupational Safety and Health Act, the Oil Pollution Act, the Resource Conservation and Recovery Act, the Superfund Amendments and Reauthorization Act, and the Toxic Substances Control Act; (b) any and all equivalent environmental statutes of any state in which Property of any Borrower is situated, as they may be cited, referenced and amended from time to time; (c) any rules or regulations promulgated under or adopted pursuant to the above federal and state laws; and (d) any other equivalent federal, state, or local statute or any requirement, rule, regulation, code, ordinance, or order adopted pursuant thereto, including those relating to the generation, transportation, treatment, storage, recycling, disposal, handling, or release of Hazardous Substances.

"Equity Interests" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, and the regulations thereunder and interpretations thereof.

- 9 -

"Event of Default" shall mean any of the events specified in Section 7.1.

"Excess Payments" shall have the meaning assigned to such term in Section 9.19.

"Excluded Assets" shall have the meaning assigned to such term in Section 2.21(d).

"Excluded Swap Obligation" shall mean, with respect to the Borrowers, any Swap Obligation if, and to the extent that, all or a portion of the grant by the relevant Borrower of a Lien to secure such Swap Obligation is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of the relevant Borrower's failure, for any reason, to constitute an Eligible Contract Participant at the time the grant of such Lien becomes effective with respect to such Swap Obligation and, if a Swap Obligation arises under a master agreement governing more than one Swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Commodity Hedge Agreements for which such Lien is or becomes illegal.

"Excluded Taxes" shall mean, with respect to any and all payments to the Agent, any Lender or any recipient of any payment to be made by or on account of any Obligation, net income taxes, branch profits taxes, franchises and excise taxes (to the extent imposed in lieu of net income taxes), and all interest, penalties and liabilities with respect thereto, imposed on the Agent or any Lender.

"Executive Order No. 13224" shall mean Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Federal Funds Rate" shall mean, for any day, the rate per annum (rounded upwards to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Agent on such day on such transactions as determined by the Agent.

"Final Order" shall mean an order of the Bankruptcy Court authorizing the DIP Facility, on a final basis, in substantially the form of the Interim Order, with only such modifications in form and substance that are satisfactory to the Agent and the Required Lenders (as the same may be amended, supplemented or modified from time to time after entry thereof with the written consent of the

- 10 -

Agent and the Required Lenders, in their sole discretion), approving this Agreement and entry into the Loan Documents, which Final Order shall, among other things (i) have been entered on such prior notice as approved in the Interim Order, (ii) authorize the extensions of credit in respect of the DIP Facility, each in the amounts and on the terms set forth herein, (iii) grant the Superpriority Claim status and other Collateral and Liens referred to herein and in the other Loan Documents, and (iv) approve the payment by the Borrowers of the fees provided for herein.

"Final Order Entry Date" shall mean the date on which the Final Order is entered by the Bankruptcy Court.

"Financial Officer" shall mean, for any Business Entity, the designated company representative, principal accounting officer, treasurer, manager or controller of such Business Entity.

"Financial Statements" shall mean statements of the financial condition of the Borrowers on a consolidated basis, as at the point in time and for the period indicated, including all notes thereto, and consisting of at least a balance sheet and related statements of operations, shareholders, members' or partners' equity and cash flows and, when required by applicable provisions of this Agreement, to be audited, accompanied by the unqualified certification of a nationally-recognized or regionally-recognized firm of independent certified public accountants or other independent certified public accountants reasonably acceptable to the Agent and footnotes to any of the foregoing, all of which, unless otherwise indicated, shall be prepared in accordance with GAAP consistently applied and in comparative form with respect to the corresponding period of the preceding fiscal year.

"Foreign Lender" shall have the meaning assigned to such term in Section 2.6(f).

"GAAP" shall mean generally accepted accounting principles established by the Financial Accounting Standards Board or the American Institute of Certified Public Accountants and in effect in the United States of America from time to time.

"Governmental Authority" shall mean any nation, country, commonwealth, territory, government, state, county, parish, municipality, or other political subdivision and any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to government.

"Hazardous Substances" shall mean flammables, explosives, radioactive materials, hazardous wastes, asbestos, or any material containing asbestos, polychlorinated biphenyls (PCBs), toxic substances or related materials, petroleum, petroleum products, associated oil or natural gas exploration, production, and development wastes, or any substances defined as "hazardous substances," "hazardous materials," "hazardous wastes," or "toxic substances"

- 11 -

under the Comprehensive Environmental Response, Compensation and Liability Act, the Superfund Amendments and Reauthorization Act, the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Toxic Substances Control Act, or any other Requirement of Law.

"Highest Lawful Rate" shall mean, with respect to any Lender, the maximum non-usurious interest rate, if any (or, if the context so requires, an amount calculated at such rate), that at any time or from time to time may be contracted for, taken, reserved, charged or received under laws applicable to such Lender, as such laws are presently in effect or, to the extent allowed by applicable law, as such laws may hereafter be in effect and which allow a higher maximum non-usurious interest rate than such laws now allow.

"Hydrocarbon Interests" shall mean all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"Hydrocarbons" shall mean oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"Indebtedness" shall mean, as to any Person, without duplication, (a) all liabilities (excluding capital, surplus, reserves for deferred income taxes, deferred compensation liabilities and other deferred liabilities and credits) which in accordance with GAAP would be included in determining total liabilities as shown on the liability side of a balance sheet, (b) all obligations of such Person evidenced by bonds, debentures, promissory notes or similar evidences of indebtedness, (c) all other indebtedness of such Person for borrowed money, (d) all obligations of others, to the extent any such obligation is secured by a Lien on the assets of such Person (whether or not such Person has assumed or become liable for the obligation secured by such Lien), (e) the principal component of all direct or contingent obligations of such Person under letters of credit, banker's acceptances and similar instruments and (f) net obligations of such Person payable with respect to any Commodity Hedge Agreements, except for ordinary course of business settlement payments.

"Indemnified Taxes" shall mean Taxes other than Excluded Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 5.20.

"Initial Budget" shall mean the Budget setting forth the projected financial operations of the Debtors for the 13-week period commencing with the week in which the Final Order Entry Date occurs, approved and in form and substance satisfactory to the Agent and the Required Lenders, in their sole discretion.

HW_US:73367004.8

"Insolvency Proceeding" shall mean application (whether voluntary or instituted by another Person) for or the consent to the appointment of a receiver, trustee, conservator, custodian, or liquidator of any Person or of all or a substantial part of the Property of such Person, or the filing of a petition (whether voluntary or instituted by another Person) commencing a case under Title 11 of the United States of America Code, seeking liquidation, reorganization, or rearrangement or taking advantage of any bankruptcy, insolvency, debtor's relief, or other similar law of the United States of America, the State of Delaware, or any other jurisdiction.

"Intellectual Property" shall mean patents, patent applications, trademarks, tradenames, copyrights, technology, know-how, and processes.

"Interest Payment Date" shall mean, with respect to any Term Loan, the first Business Day of each calendar month.

"Interim Order" shall mean an interim order of the Bankruptcy Court authorizing Borrowers, among other things, to obtain interim financing and incur post-petition indebtedness on terms satisfactory to Agent and the Required Lenders, in their sole discretion.

"Interim Order Entry Date" shall mean the date on which the Interim Order is entered by the Bankruptcy Court.

"Investment" in any Person shall mean any stock, bond, note or other evidence of Indebtedness, or any other security (other than current trade and customer accounts) of, investment or partnership interest in or loan to, such Person.

"Lender Termination Date" shall have the meaning assigned to such term in Section 2.13.

"Liabilities" shall mean, for the Borrowers on a consolidated basis, all Indebtedness and other liabilities and obligations, whether matured or unmatured, liquidated or unliquidated, primary or secondary, direct or indirect or absolute, fixed or contingent, and whether or not required to be considered for purposes of compliance with GAAP.

"Lien" shall mean any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of such Property, whether such interest is based on common law, statute, or contract, and including, but not limited to, the lien or security interest arising from a mortgage, ship mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt, or a lease, consignment, or bailment for security purposes (other than true leases or true consignments), liens of mechanics, materialmen, and artisans, maritime liens and reservations, exceptions, encroachments, easements, rights of way, covenants, conditions, restrictions, leases, and other title exceptions and encumbrances affecting Property which secure an obligation owed to, or a claim by, a Person

- 13 -

other than the owner of such Property (for the purpose of this Agreement, the Borrowers shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, financing lease, or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes).

"Limitation Period" shall mean, with respect to any Lender, any period while any amount remains owing on the Note payable to such Lender and interest on such amount, calculated at the Contract Rate, plus any fees or other sums payable to such Lender under any Loan Document and deemed to be interest under applicable law, would exceed the amount of interest which would accrue at the Highest Lawful Rate.

"Loan Balance" shall mean, at any point in time, the aggregate outstanding principal balance of the Notes at such time.

"Loan Date" shall mean the Interim Funding Date or the Funding Date, as context may require.

"Loan Documents" shall mean this Agreement, the Notes, the Security Documents and all other documents and instruments now or hereafter delivered pursuant to the terms of or in connection with any of the foregoing, and all renewals and extensions of, amendments and supplements to, and restatements of, any or all of the foregoing from time to time in effect.

"Lockbox" shall mean the Post Office Box maintained with or through Citibank, N.A.

"Lockbox Account" shall mean the deposit account maintained by the Agent with Citibank, N.A. and associated with the Lockbox.

"Material Adverse Effect" shall mean (a) any adverse effect on the business, operations, properties, liabilities or financial condition of the Borrowers, on a consolidated basis, which increases, in any material respect, the risk that any of the Obligations will not be repaid as and when due, other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Cases, (b) any material and adverse effect upon the Collateral, including any material and adverse effect upon the value or impairment of any Borrowers' or any other Person's ownership of any material portion of the Collateral, (c) any material adverse effect on the validity or enforceability of any Loan Document or (d) any material adverse effect on the rights or remedies of the Agent or any Lender under an Loan Document.

"Maturity Date" shall mean the date that is 140 days after the Final Order Entry Date.

"Minimum Required Commodity Hedge Agreements" shall mean Commodity Hedge Agreements between one or more of the Borrowers and one or more Approved Hedge Counterparties that are in place as of the date hereof and subject to that certain Intercreditor Agreement dated May 24, 2018 among the Borrowers, Approved Hedge Counterparties and Pre-Petition Agent.

"Mortgaged Properties" shall mean all Oil and Gas Properties of the Borrowers subject to a perfected first priority Lien (subject only to Permitted Liens) in favor of the Agent, as security for the Obligations.

"Mortgages" shall mean, collectively, the mortgages executed by the Borrowers to the Agent for the benefit of the Lenders providing a lien on all Real Property and Oil and Gas Properties owned or leased by the Borrowers.

"Notes" shall mean, collectively, the promissory note or notes executed by the Borrowers and payable to each Lender in the face amount of the Percentage Share of such Lender of the amount of the Term Loan in the form attached hereto as Exhibit A with all blanks in such form completed appropriately, together with all renewals, extensions for any period, increases and rearrangements thereof.

"Notice of Termination" shall have the meaning assigned to such term in Section 2.13.

"NYMEX" shall mean the New York Mercantile Exchange.

"Obligations" shall mean, without duplication of the same amount in more than one category, (a) all Indebtedness of the Borrowers evidenced by the Notes, (b) all other obligations and liabilities of the Borrowers to the Agent or the Lenders, now existing or hereafter incurred, under, arising out of or in connection with any other Loan Document, and (c) amounts owing or to be owing by any Borrowers under any Commodity Hedge Agreements between such Borrowers and any Approved Hedge Counterparty (which it is agreed shall rank *pari passu* with all other items listed in this definition), except Excluded Swap Obligations, and to the extent that any of the foregoing includes or refers to the payment of amounts deemed or constituting interest, only so much thereof as shall have accrued, been earned and which remains unpaid at each relevant time of determination.

"Obtained Benefit" shall mean, with respect to any Borrower, the aggregate amount of benefits, both direct and indirect, obtained by the relevant Borrower from the extension of credit to the Borrowers under this Agreement and not repaid by the relevant Borrower.

"OFAC" shall mean the Office of Foreign Assets Control of the United States of America Department of the Treasury, or any other any successor Governmental Authority.

- 15 -

"Oil and Gas Properties" shall mean (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Operating Accounts" shall mean, collectively, one or more separate deposit accounts, including the deposit accounts maintained by one or more of the Borrowers with Whitney Bank as reflected on Schedule 6.18, each of which deposit accounts shall be subject to a Deposit Account Control Agreement with shifting control among the Borrowers, Whitney Bank and the Agent.

"Operating Disbursements" shall mean disbursements for post-petition operating expenses, capital expenditures and working capital needs of the Borrowers, including, but not limited to, those necessary to fund the Drilling Plan and those activities required to remain in, or return to compliance with the laws in accordance with 28 U.S.C. § 959, and such general and administrative expenses as are contained within the applicable Approved Budget, Initial Budget and any successor Budget.

"Orders" shall mean the Interim Order and Final Order.

"Other Disbursements" shall mean disbursements other than Operating Disbursements, as are contained within the applicable Approved Budget, Initial Budget and any successor Budget, including those to pay (i) interest, fees and expenses (including attorneys' fees) to the Lenders in accordance with the DIP Facility; (ii) Professional Fees and expenses, (iii) income Taxes, (iv) deposits made to utilities pursuant to an order of the Bankruptcy Court, (v) checks outstanding on the Petition Date that are re-issued in accordance with an order of the Bankruptcy Court, and (vi) fees due the Office of the United States Trustee.

"Other Taxes" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"PDP" shall mean Proved Developed Producing Reserves.

"Percentage Share" shall mean, as to each Lender, the applicable percentage set forth on Schedule 1.2B.

"Permitted Liens" shall mean (a) Liens for taxes, assessments, or other governmental charges or levies not yet due or which (if foreclosure, distraint, sale, or other similar proceedings shall not have been initiated) are being contested in good faith by appropriate proceedings, and such reserve as may be required by GAAP shall have been made therefor, (b) Liens in connection with workers' compensation, unemployment insurance or other social security (other than Liens created by Section 4068 of ERISA), old-age pension, employee benefits, or public liability obligations which are not yet due or which are being contested in good faith by appropriate proceedings, if such reserve as may be required by GAAP shall have been made therefor, (c) Liens in favor of vendors, carriers, warehousemen, repairmen, mechanics, workmen, materialmen, constructors, laborers, landlords or similar Liens arising by operation of law in the ordinary course of business in respect of obligations that are not yet due or which are being contested in good faith by appropriate proceedings, if such reserve as may be required by GAAP shall have been made therefor, (d) Liens securing leases of equipment up to the aggregate amount of $100,000 at any time outstanding, provided that, as to any particular lease, the Lien covers only the relevant leased equipment and secures only amounts which are not yet due and payable under the relevant lease or are being contested in good faith by appropriate proceedings and such reserve as required by GAAP shall have been made therefor, (e) Liens in favor of the Agent securing the Obligations and other Liens expressly permitted hereunder or in the Security Documents, and (f) Liens securing the Indebtedness under the Prepetition Loan Documents, provided, however, such Liens shall in all respects be subject and subordinate in priority to the Liens created by the Security Documents as provided herein.

"Permitted Variances" shall have the meaning assigned to it in Section 6.26(b).

"<u>Person</u>" shall mean an individual, corporation, partnership, limited liability company, trust, unincorporated organization, government, any agency or political subdivision of any government or any other form of entity.

"<u>PIK Interest</u>" shall have the meaning assigned to it in <u>Section 2.3(b).</u>

"<u>Plan</u>" shall mean, at any time, any employee benefit plan which is covered by Title IV of ERISA and in respect of which the Borrowers, or any Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>Prepetition Agent</u>" shall mean Baxterville, as administrative agent for the lenders under the Prepetition Loan Agreement.

"<u>Pre-Petition Debt</u>" means, collectively, the Indebtedness of each Debtor outstanding and unpaid on the Petition Date.

"<u>Prepetition Loan Agreement</u>" shall mean that certain Term Loan Credit Agreement dated May 24, 2018, by and among Falcon, Holdings and ORX, as borrowers, the lenders party thereto and Prepetition Agent.

"<u>Prepetition Loan Documents</u>" shall mean the Loan Documents as defined in the Prepetition Loan Agreement.

"<u>Pre-Petition Payment</u>" shall mean a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any (i) Pre-Petition Debt, (ii) "critical vendor payments" or (iii) reclamation claims or other pre-petition claims against any Debtor.

"<u>Primed Liens</u>" shall have the meaning assigned to such term in <u>Section 2.21(a)</u>.

"<u>Priming Liens</u>" shall have the meaning assigned to such term in <u>Section 2.21(a)</u>.

"<u>Principal Office</u>" shall mean the principal office of the Agent in New York, New York, presently located at 405 Lexington Avenue, 59th Floor, New York, New York 10174 or such other location as Agent may designate from time to time.

"<u>Professional Fees</u>" shall mean attorneys' fees and expenses and the fees and expenses of any other Professionals.

"<u>Professionals</u>" shall mean professionals whose retention for the Borrowers or the Committee is approved by order of the Bankruptcy Court within the Bankruptcy Cases.

- 18 -

"Property" shall mean any interest in any kind of property or asset, whether real, personal or mixed, tangible or intangible.

"Proved Developed Producing Reserves" has the meaning assigned to such term in the SPE/SEC Standards.

"Proved Reserves" has the meaning assigned to such term in the SPE/SEC Standards.

"Proved Undeveloped Reserves" has the meaning assigned such term in the SPE/SEC Standards.

"PUD" shall mean Proved Undeveloped Reserves.

"PV-10" shall mean present value discounted at ten percent (10%).

"Qualified ECP Borrower" shall mean, in respect of any Swap Obligation, each Borrower that has total assets exceeding $10,000,000 at the time the relevant grant of any Lien becomes effective with respect to such Swap Obligation or such other Person as constitutes an Eligible Contract Participant and can cause another Person to qualify as an Eligible Contract Participant at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Receipts" shall mean all cash or other collections received from operations in the ordinary course of business, other than cash proceeds or collections from dispositions of Property, any insurance claims or the proceeds of any Term Loans.

"Real Property" shall mean all of each Borrower's right, title and interest in and to the owned and leased premises (other than the Oil and Gas Properties) as of the date hereof or which is hereafter owned or leased by any Borrower.

"Register" shall have the meaning assigned to it in Section 9.1(b).

"Regulatory Change" shall mean, with respect to any Lender, the passage, adoption, institution, or amendment of any federal, state, local, or foreign Requirement of Law, or any interpretation, directive, or request (whether or not having the force of law) of any Governmental Authority or monetary authority charged with the enforcement, interpretation, or administration thereof, occurring after the Closing Date and applying to a class of lenders including such Lender.

"Release of Hazardous Substances" shall mean any emission, spill, release, disposal, or discharge, except in accordance with a valid permit, license, certificate, or approval of the relevant Governmental Authority, of any Hazardous Substance into or upon (a) the air, (b) soils or any improvements located thereon, (c) surface water or groundwater, or (d) the sewer or septic system, or the waste treatment, storage, or disposal system servicing any Property of the Borrowers.

- 19 -

"Reorganization Plan" shall mean a plan of reorganization in any or all of the Cases of the Debtors in form and substance acceptable to the Agent and the Lender, in their sole discretion.

"Replacement Lenders" shall have the meaning assigned to such term in Section 2.13.

"Required Lenders" shall mean Lenders whose Percentage Shares total at least fifty one percent (51%).

"Requirement of Law" shall mean, as to any Person, the certificate or articles of incorporation and by-laws, the certificate or articles of organization and regulations, operating agreement or limited liability company agreement, the agreement of limited partnership or other organizational or governing documents of such Person, and any applicable law, treaty, ordinance, order, judgment, rule, decree, regulation or determination of an arbitrator, court or other Governmental Authority, including rules, regulations, orders and requirements for permits, licenses, registrations, approvals or authorizations, in each case as such now exist or may be hereafter amended and are applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Reserve Report" shall mean each internally-prepared report addressed to the Agent and the Lenders, covering the Reserves attributable to the interests of one or more of the Borrowers in Oil and Gas Properties.

"Reserves" shall mean volumes of Hydrocarbons.

"Responsible Officer" shall mean, as to any Business Entity, its President, any of its Vice Presidents, its Financial Officer, CRO (if applicable) or any other Person duly authorized, in accordance with the applicable organizational documents, bylaws, regulations or resolutions, to act on behalf of such Business Entity.

"SEC" shall mean the Securities and Exchange Commission or any successor Governmental Authority.

"Security Documents" shall mean, collectively, (a) the security documents executed and delivered by the Borrowers securing the Term Loans, and (b) other documents and instruments at any time executed as security for all or any portion of the Obligations, as such instruments may be amended, supplemented, restated or otherwise modified from time to time.

"Specified Equity Contribution" shall mean any voluntary equity contribution in the form of the purchase of common Equity Interests or other Equity Interests of any Borrower having terms acceptable to the Agent made for the purpose of curing a Default or Event of Default as set forth in Section 6.25 hereof.

- 20 -

"<u>SPE Definitions</u>" shall mean, with respect to any term, the definition thereof as adopted by the Board of Directors of the Society of Petroleum Engineers (SPE).

"<u>SPE/SEC Standards</u>" shall mean the more restrictive of the standards and/or definitions, as determined by the Agent, set forth by (a) the SEC and (b) the Society of Petroleum Engineers or the SPE Definitions.

"<u>Subordinated Indebtedness</u>" shall mean any sum of money and/or property, whether now owing or otherwise, owed by one or more of the Borrowers to: (i) any other Borrower, (ii) any manager, member or officer of any Borrower, and (iii) any other party directly or indirectly related to any Borrower.

"<u>Subsidiary</u>" shall mean, as to any Person, any Business Entity of which shares of stock or other Equity Interests having ordinary voting power (other than stock having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other governing body or managers of such Business Entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person; provided that Online Resources, L.L.C., a Louisiana limited liability company, shall not be deemed a "Subsidiary" only for purposes of determining the "Borrowers".

"<u>Superfund Site</u>" shall mean those sites listed on the Environmental Protection Agency National Priority List and eligible for remedial action or any comparable state registries or list in any state of the United States of America.

"<u>Superpriority Claims</u>" shall have the meaning assigned to such term in <u>Section 2.21(a)</u>.

"<u>Swap</u>" has the meaning assigned to such term in Section 1a(47) of the Commodity Exchange Act.

"<u>Swap Obligation</u>" shall mean, with respect to the Borrowers, any obligation to pay or perform under any agreement, contract or transaction that constitutes a Swap.

"<u>Taxes</u>" shall mean any and all present or future taxes, levies, imposts, duties, fees, deductions, charges or withholdings imposed by any Governmental Authority.

"<u>Terminated Lender</u>" shall have the meaning assigned to such term in <u>Section 2.13</u>.

"<u>Termination Date</u>" shall mean the earliest of (a) the Maturity Date; (b) 15 days after the Debtors file a motion with the Bankruptcy Court for approval of the DIP Facility (the "<u>DIP Motion</u>") if the Interim Order has not been entered prior to such date; (c) 45 days after the date the DIP Motion is filed if the Final Order has

not been entered prior to such date; (d) the date on which the Commitments have been terminated, all obligations to permit the disbursement of funds from the Blocked Funding Account have been terminated or all or any portion of the Term Loans have been declared or become due and payable as provided in <u>Section 9.2</u>; (e) the effective date of a confirmed plan of reorganization or liquidation that provides for indefeasible payment in full, in cash of all obligations owing under the DIP Facility or such treatment that is otherwise acceptable to the Agent and the Lenders in their sole discretion; (f) the date which is the closing date of any sale of all or substantially all of the Debtor's assets; (g) the filing of a motion or other pleading requesting (or the entry of an order approving) the appointment of a trustee or an estate fiduciary or an examiner with special powers with the Debtors fail to timely oppose without the prior written consent of the Lenders; (h) the entry of an order by the Bankruptcy Court approving the dismissal or conversion of the Cases; and (i) the filing or support by and Debtor of a plan of reorganization that (x) does not provide for indefeasible payment in full, in cash of all obligations owing under the DIP Facility or provide for such treatment that is otherwise acceptable to the Agent and the Lenders in their sole discretion and (y) is not otherwise acceptable to the Agent and the Lenders in their sole discretion.

"<u>Term Loans</u>" shall mean the loans made by the Lenders to or for the benefit of the Borrowers pursuant to this Agreement.

"<u>Testing Date</u>" shall have the meaning assigned to such term in <u>Section 5.26(a)</u>.

"<u>Testing Period</u>" shall mean the one week period ending on the Testing Date.

"<u>Total Proved Reserves</u>" shall be as defined in the SPE/SEC Standards.

"<u>Transferee</u>" shall mean any Person to which any Lender has sold, assigned, transferred or granted a participation in any of the Obligations, as authorized pursuant to the provisions of <u>Section 9.1</u>, and any Person acquiring, by purchase, assignment, transfer or participation, from any such purchaser, assignee, transferee or participant, any part of such Obligations.

"<u>UCC</u>" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York.

"<u>USA Patriot Act</u>" shall mean the Uniting and Strengthening America by Providing Appropriate Tools required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001), as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

1.3    <u>Undefined Financial Accounting Terms</u>.  Financial accounting terms used in this Agreement without definition are used herein with the respective meanings assigned thereto in accordance with GAAP at the time in effect.

HW_US:73367004.8

1.4     References.  References in this Agreement to Schedule, Exhibit, Article or Section numbers shall be to Schedules, Exhibits, Articles or Sections of this Agreement, unless expressly stated to the contrary.   References in this Agreement to "hereby," "herein," "hereinafter," "hereinabove," "hereinbelow," "hereof," "hereunder" and words of similar import shall be to this Agreement in its entirety and not only to the particular Schedule, Exhibit, Article or Section in which such reference appears.   Specific enumeration herein shall not exclude the general and, in such regard, the terms "includes" and "including" used herein shall mean "includes, without limitation," or "including, without limitation," as the case may be.  Except as otherwise indicated, references in this Agreement to statutes, sections or regulations are to be construed as including all statutory or regulatory provisions consolidating, amending, replacing, succeeding or supplementing the statute, section or regulation referred to.   References in this Agreement to (i) a matter or item being "approved" "consented to" or words of similar import shall mean such action is taken in writing and (ii) "writing" shall include printing, typing, lithography, facsimile reproduction and other means of reproducing words in a tangible visible form.   References in this Agreement to agreements and other contractual instruments shall be deemed to include all exhibits and appendices attached thereto and all subsequent amendments and other modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement.  References in this Agreement to Persons include their respective successors and permitted assigns.

1.5     Articles and Sections.  This Agreement, for convenience only, has been divided into Articles and Sections; and it is understood that the rights and other legal relations of the parties hereto shall be determined from this instrument as an entirety and without regard to the aforesaid division into Articles and Sections and without regard to headings prefixed to such Articles or Sections.

1.6     Number and Gender.  Whenever the context requires, reference herein made to the single number shall be understood to include the plural; and likewise, the plural shall be understood to include the singular.  Definitions of terms defined in the singular or plural shall be equally applicable to the plural or singular, as the case may be, unless otherwise indicated.  Words denoting sex shall be construed to include the masculine, feminine and neuter, when such construction is appropriate; and specific enumeration shall not exclude the general but shall be construed as cumulative.

1.7     Incorporation of Schedules and Exhibits.  The Schedules and Exhibits attached to this Agreement are incorporated herein and shall be considered a part of this Agreement for all purposes.

1.8     Negotiated Transaction.  Each party to this Agreement affirms to the others that it has had the opportunity to consult, and discuss the provisions of this Agreement with, independent counsel and fully understands the legal effect of each provision.

HW_US:73367004.8

ARTICLE II

TERMS OF DIP FACILITY

2.1    Term Loans.

(a)    Subject to the terms and conditions of this Agreement, each Lender severally agrees to make Term Loans (i) on the date of the entry of the Interim Order, which shall be the Closing Date (assuming all conditions to the Closing Date are met) (such date the "Interim Funding Date", and such Term Loan made on the Closing Date, the "Interim Funding Loan"), in an amount not to exceed such Lender's Percentage Share of $1,250,000.00; and (ii) on the Final Order Entry Date (such date the "Funding Date", and such Term Loan made on the Funding Date, the "Funding Date Loan") in an amount not to exceed such Lender's Percentage Share of $4,550,000.00.  Each Lender shall severally make available to the Agent an amount equal to such Lender's Percentage Share of the Interim Funding Loan and the Funding Date Loan to the Blocked Funding Account by 11:00 a.m., New York time, on the Interim Funding Date and the Funding Date, respectively.  Any amount of the Interim Funding Loan or the Funding Date Loan that is disbursed to Borrowers and subsequently repaid or prepaid may not be re-borrowed.  Each Lender's Commitment shall be permanently reduced without further action upon the making of any Term Loan by such Lender in an amount equal to such Lender's Percentage Share of such Term Loan. The portion of the aggregate amount of all Term Loans to be repaid to each Lender shall be evidenced by a single Note in favor of such Lender.  The amounts so received by the Agent shall, upon receipt of all requested funds and subject to the terms and conditions hereof, be made available to one or more of the Borrowers, as directed by the Borrowers pursuant to a Borrowing Request, in immediately available funds, in accordance with this Agreement.

(b)    The Borrowers may request the disbursement of the Term Loans from the Blocked Funding Account by providing at least three (3) Business Days prior written notice thereof to the Agent, in the form of a Borrowing Request, including the date of the requested disbursement and the principal amounts requested to be borrowed (which shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof); provided that the Borrowers may submit one (1) Borrowing Request during any ten (10) Business Day period.

(c)    The failure of any Lender to make the portion of a Term Loan required to be made by it hereunder shall not relieve any other Lender of its obligation to make the portion of the Term Loan required to be made by it, and no Lender shall be responsible for the failure of any other Lender to make its portion of any Term Loan.  Borrower reserves all rights against any such Lender that fails to make the portion of a Term Loan required to be made by it hereunder.

2.2    Use of Loan Proceeds.  The Borrowers shall use the proceeds of the Term Loans solely for the following purposes (and to the extent identified in the Budget): (a) to fund Operating Disbursements, (b) to fund Other Disbursements, and (c) to fund any other purpose approved by Agent and the Required Lenders.

- 24 -

2.3    <u>Repayment of Term Loans</u>.

(a)    <u>Principal</u>.  The Borrowers hereby agree to repay the outstanding principal amount of all Term Loans in full on the Termination Date, together with all other amounts due under this Agreement or the other Loan Documents.

(b)    <u>Interest</u>.  Each Term Loan shall bear interest on the principal amount thereof from the applicable Loan Date, (x) at a rate per annum equal to the Contract Rate in the case of the first three (3) Interest Payments Dates following the Effective Date, which will be payable (A) in kind ("<u>PIK Interest</u>") or (B) so long as the Borrowers shall have given the Agent at least three (3) Business Days' written notice before the applicable Interest Payment Date, in cash, and (y) at a rate per annum equal to the Contract Rate on each Interest Payment Date thereafter, which will be payable in cash.  Accrued cash interest on each Term Loan shall be paid in cash in arrears on each Interest Payment Date applicable to such Term Loan and any PIK Interest shall increase the principal amount of the Term Loans by the accrued amount of PIK Interest on each Interest Payment Date.  Interest on past-due principal and, to the extent permitted by applicable law, past-due interest, shall accrue at the Default Rate and shall be payable upon demand by the Agent.  Notwithstanding the foregoing, during the existence of any Event of Default, such interest shall be payable upon demand by the Agent.  While any Event of Default exists or after acceleration, interest shall accrue and the Borrowers shall pay interest (after as well as before entry of judgment thereon to the extent permitted by law) on any amount payable by the Borrowers hereunder, at a per annum rate equal to the lesser of (A) the Highest Lawful Rate and (B) the Default Rate.

2.4    <u>Fees</u>.

(a)    <u>Upfront Payment on the Interim Funding Date</u>.  The Borrowers shall pay to the Agent for the ratable account of the Lenders a non-refundable upfront payment (which will be structured as a deemed Term Loan to be funded as part of the Interim Funding Loan) equal to $37,500.00, which payment shall be earned on the Interim Order Entry Date and due and payable on the Interim Funding Date.

(b)    <u>Upfront Payment on the Funding Date</u>.  The Borrowers shall pay to the Agent for the ratable account of the Lenders a non-refundable upfront payment (which will be structured as a deemed Term Loan to be funded as part of the Funding Date Loan) equal to $136,500, which payment shall be earned on the Final Order Entry Date and due and payable on the Funding Date.

2.5    <u>Outstanding Amounts</u>.  The outstanding principal balance of the Note of each Lender reflected by the notations of such Lender on its records shall be deemed presumptive evidence of the principal amount owing on such Note.  The liability for payment of principal and interest evidenced by each Note shall be limited to principal amounts actually advanced and outstanding pursuant to this Agreement and interest on such amounts calculated in accordance with this Agreement.  The Agent shall maintain accounts in which it will record (i) the amount of each Term Loan made hereunder; (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder; and (iii) the amount of any sum received by the Agent hereunder for the account of the Lenders and each Lender's share

- 25 -

thereof.  The entries made in the accounts maintained pursuant to this paragraph shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrowers to repay the Term Loans in accordance with their terms.  In the event of any conflict between the records maintained by any Lender and the records of the Agent in respect of such matters, the records of the Agent shall control in the absence of manifest error.

      2.6    <u>Taxes and Time, Place, and Method of Payments</u>.

      (a)    All payments required pursuant to this Agreement or the Notes shall be made without set-off or counterclaim in Dollars and in immediately available funds free and clear of, and without deduction for, any Indemnified Taxes or Other Taxes; <u>provided</u>, <u>however</u> that if any Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased by the amount (the "<u>Additional Amount</u>") necessary so that after making all required deductions (including deductions applicable to additional sums described in this <u>Section 2.6(a)</u>) the Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) each Borrower shall make any such deductions and (iii) each Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.  In addition, to the extent not paid in accordance with the preceding sentence, each Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

      (b)    Subject to the provisions of <u>Section 2.13</u>, the Borrowers, on a joint and several basis with any other Borrower, shall indemnify the Agent and each Lender for Indemnified Taxes and Other Taxes payable by such Person, <u>provided</u>, <u>however</u>, that no Borrower shall be obligated to make payment to the Agent or any Lender in respect of penalties, interest and other similar liabilities attributable to such Indemnified Taxes or Other Taxes if such penalties, interest or other similar liabilities are attributable to the gross negligence or willful misconduct of the Person seeking indemnification; <u>provided</u> <u>further</u>, that neither any Lender nor the Agent shall be entitled to indemnification for Indemnified Taxes and Other Taxes paid by such Person more than three months prior to the date such Lender or the Agent gives notice and demand thereof to the Borrowers (except that, if the indemnification is based on a Regulatory Change giving rise to such Indemnified Taxes or Other Taxes the effect of which is retroactive, then the three month period referred to above shall be extended to include the period of retroactive effect thereof).

      (c)    If a Lender or the Agent shall become aware that it is entitled to claim a refund from a Governmental Authority in respect of Indemnified Taxes or Other Taxes paid by any Borrower pursuant to this <u>Section 2.6</u>, including Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrowers, or with respect to which any Borrower has paid Additional Amounts pursuant to the Loan Documents, it shall promptly notify the relevant Borrower of the availability of such refund claim and, if the Lender or the Agent, as the case may be, determines in good faith that making a claim for refund will not have an adverse effect to its taxes or business operations, it shall, within 10 days after receipt of a request by the Borrowers, make a claim to such Governmental Authority for such refund at the expense of the Borrowers. If a Lender or the Agent receives a refund in respect of any Indemnified Taxes or Other Taxes

- 26 -

paid by any Borrower pursuant to the Loan Documents, it shall within 30 days from the date of such receipt pay over such refund to the relevant Borrower (but only to the extent of Indemnified Taxes or Other Taxes paid pursuant to the Loan Documents, including indemnity payments made or Additional Amounts paid, by the relevant Borrower under this <u>Section 2.6</u> with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all reasonable out of pocket expenses of such Lender or the Agent, as the case may be, and without interest (other than interest paid by the relevant Governmental Authority with respect to such refund).

(d)    If any Lender or the Agent is or becomes eligible under any applicable law, regulation, treaty or other rule to a reduced rate of taxation, or a complete exemption from withholding, with respect to Indemnified Taxes or Other Taxes on payments made to it by the Borrowers or any of them, such Lender or the Agent, as the case may be, shall, upon the request, and at the cost and expense, of the Borrowers, complete and deliver from time to time any certificate, form or other document demanded by the Borrowers, the completion and delivery of which are a precondition to obtaining the benefit of such reduced rate or exemption, <u>provided</u> that the taking of such action by such Lender or the Agent, as the case may be, would not, in the reasonable judgment of such Lender or the Agent, as the case may be, be disadvantageous or prejudicial to such Lender or the Agent, as the case may be, or inconsistent with its internal policies or legal or regulatory restrictions.  For any period with respect to which a Lender or the Agent, as the case may be, has failed to provide any such certificate, form or other document requested by any Borrower, such Lender or the Agent, as the case may be, shall not be entitled to any payment under this <u>Section 2.6</u> in respect of any Indemnified Taxes or Other Taxes that would not have been imposed but for such failure.

(e)    Each Lender organized under the laws of a jurisdiction in the United States of America, any State thereof or the District of Columbia (other than Lenders that are corporations or otherwise exempt from United States of America backup withholding Tax) shall (i) deliver to the Borrowers and the Agent, when such Lender first becomes a Lender, upon the written request of the Borrowers or the Agent, two original copies of United States of America Internal Revenue Service Form W-9 or any successor form, properly completed and duly executed by such Lender, certifying that such Lender is exempt from United States of America backup withholding Tax on payments of interest made under the Loan Documents and (ii) thereafter at each time it is so reasonably requested in writing by the Borrowers or the Agent, deliver within a reasonable time two original copies of an updated Form W-9 or any successor form thereto.

(f)    Each Lender that is organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia (each such Lender, a "<u>Foreign Lender</u>") that is entitled to an exemption from or reduction of withholding Tax under the laws of the jurisdiction in which the Borrowers are located, or any treaty to which such jurisdiction is a party, with respect to payments under the Loan Documents shall deliver to the Borrowers and the Agent, but only at the written request of any Borrower or the Agent, such properly completed and duly executed documentation prescribed by applicable law or reasonably requested by the Borrowers or the Agent as will permit such payments to be made without withholding or at a reduced rate, unless in the good faith opinion of any Foreign Lender such documentation would expose such Foreign Lender to any material adverse consequence or risk.  Such documentation shall be delivered by such Foreign Lender on or before the date it becomes

- 27 -

a Lender.   In addition, each Foreign Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Foreign Lender.   Each Lender (and, in the case of a Foreign Lender its lending office), represents that on the Closing Date, payments made hereunder by the Borrowers or the Agent to it would not be subject to United States of America federal withholding tax.

(g)    Notwithstanding the provisions of <u>Section 2.6(a)</u>, the Borrowers shall not be required to indemnify any Foreign Lender or to pay any Additional Amounts to any Foreign Lender, in respect of United States of America federal withholding tax pursuant to <u>Section 2.6(a)</u>, (i) to the extent that the obligation to withhold amounts with respect to United States of America federal withholding tax existed on the date such Foreign Lender became a Lender; (ii) with respect to payments to a new lending office with respect to such Lender's Percentage Share of the Loan Balance, but only to the extent that such withholding tax exceeds any withholding tax that would have been imposed on such Lender had it not designated such new lending office; (iii) with respect to a change by such Foreign Lender of the jurisdiction in which it is organized, incorporated, controlled or managed, or in which it is doing business, from the date such Foreign Lender changed such jurisdiction, but only to the extent that such withholding tax exceeds any withholding tax that would have been imposed on such Lender had it not changed the jurisdiction in which it is organized, incorporated, controlled or managed, or in which it is doing business; or (iv) to the extent that the obligation to indemnify any Foreign Lender or to pay such Additional Amounts would not have arisen but for a failure by such Foreign Lender to comply with the provisions of <u>Section 2.6(f)</u>.

(h)    All payments by any Borrower hereunder shall be made not later than 1:00 p.m., New York time, on the date specified for payment under this Agreement to the Agent at the Principal Office in Dollars, in immediately available funds and shall be made without any set off, counterclaim or deduction whatsoever.   Any payment received after 1:00 p.m., New York time, shall be deemed to have been made on the next succeeding Business Day for all purposes. Except as provided to the contrary herein, if the due date of any payment hereunder or under any Note would otherwise fall on a day which is not a Business Day, such date shall be extended to the next succeeding Business Day, and interest shall be payable for any principal so extended for the period of such extension.

2.7    <u>Pro Rata Treatment; Adjustments</u>.

(a)    Except to the extent otherwise expressly provided herein (for the avoidance of doubt, including <u>Section 9.9</u>), (i) the borrowings pursuant to this Agreement shall be made from the Lenders pro rata in accordance with their respective Percentage Shares, (ii) each payment by the Borrowers of fees shall be made for the account of the Agent or the Lenders as agreed among them, (iii) each payment in reduction of the Loan Balance shall be made for the account of the Lenders pro rata in accordance with their respective shares of the Loan Balance, (iv) each payment of interest hereunder shall be made for the account of the Lenders pro rata in accordance with their respective shares of the aggregate amount of interest due and payable to the Lenders, and (v) each payment by the Borrowers under Commodity Hedge Agreements with a Lender shall be made only to the Person or Persons entitled thereto.

- 28 -

(b)     The Agent shall distribute all payments with respect to the Obligations to the Lenders promptly upon receipt in like funds as received.  In the event that any payments made hereunder by the Borrowers or one or more of them at any particular time are insufficient to satisfy in full the Obligations due and payable at such time, such payments shall be applied (i) first, to fees and expenses due pursuant to the terms of this Agreement or any other Loan Document, (ii) second, to accrued interest and (iii) third, to the Loan Balance and any other Obligations pro-rata on the basis of the ratio of the amount of all such Obligations then owing to the Agent or the relevant Lender or Affiliate of any Lender, as the case may be, to the total amount of the Obligations then owing.

(c)     If any Lender (for purposes of this Section 2.7(c), a "Benefited Lender") shall at any time receive any payment of all or part of its portion of the Obligations, or receive any Collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 7.1(e) or Section 7.1(f) or otherwise) in an amount greater than such Lender was entitled to receive pursuant to the terms hereof, such Benefited Lender shall purchase for cash from the other Lenders such portion of the Obligations of such other Lenders, or shall provide such other Lenders with the benefits of any such collateral or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds with each of the Lenders according to the terms hereof.  If all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded and the purchase price and benefits returned by such Lender, to the extent of such recovery, but without interest.  The Borrowers agree that each such Lender so purchasing a portion of the Obligations of another Lender may exercise all rights of payment (including rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.  If any Lender ever receives, by voluntary payment, exercise of rights of set-off or banker's lien, counterclaim, cross-action or otherwise, any funds of any Borrowers to be applied to the Obligations, or receives any proceeds by realization on or with respect to any Collateral, all such funds and proceeds shall be forwarded immediately to the Agent for distribution in accordance with the terms of this Agreement.

2.8     Voluntary Prepayments.  Subject to applicable provisions of this Agreement, the Borrowers shall have the right, at any time or from time to time, to prepay the Loan Balance; provided, however, that (a) the Borrowers shall give the Agent written notice of each such prepayment no less than three (3) Business Days prior to prepayment, (b) the Borrowers shall pay all accrued and unpaid interest on the amounts prepaid, and (c) no such prepayment shall serve to postpone the repayment when due of any Obligation or any installments thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date set forth in such notice.

2.9     Mandatory Prepayments.  In addition to payments in reduction of the Loan Balance provided for in Section 2.3, the Borrowers shall immediately pay to the Agent, for application to reduce the amount of the payment due at the Termination Date to repay the then existing Loan Balance in full all proceeds (net of reasonable and customary transaction costs) from:

- 29 -

(a)    the incurrence of any Indebtedness not permitted by the proviso to <u>Section 6.1</u> (without waiving or modifying in any way remedies available to the Agent or the Lenders as a result of any Event of Default arising from such incurrence of Indebtedness by any one or more of the Borrowers); and

(b)    asset sales not permitted by the proviso to <u>Section 6.4</u> (without waiving or modifying in any way remedies available to the Agent or the Lenders as a result of any Event of Default arising from such asset sales by any one or more of the Borrowers), and any insurance claim, except as to any proceeds allowed by the Agent to repair or replace damaged Property giving rise to the relevant insurance claim; provided that no prepayment shall be required pursuant to this <u>Section 2.9(b)</u> to the extent the net cash proceeds from such asset sales and insurance claims do not exceed $100,000 in a single transaction or related series of transactions or $200,000 in the aggregate for the term of this Agreement (and only such excess shall be required to be prepaid) and to the extent any net cash proceeds from such asset sales and insurance claims remain after the foregoing application to the Obligations, the remaining Commitments of the Lenders shall be permanently reduced dollar for dollar on a pro rata basis by such remaining net cash proceeds.

The Borrowers shall provide one (1) Business Day's prior written notice of any mandatory prepayment required hereunder.

2.10    <u>Loans to Satisfy Obligations of Borrowers</u>.  Upon the occurrence and during the continuation of a Default or an Event of Default, the Lenders may, but shall not be obligated to, make loans for the benefit of the Borrowers or any of them and apply proceeds thereof to the satisfaction of any condition, warranty, representation or covenant of any Borrowers contained in this Agreement or any other Loan Document.  Such loans shall be and shall bear interest at the Contract Rate, <u>subject</u>, <u>however</u>, to the provisions of <u>Section 2.3</u> regarding the accrual of interest at the Default Rate, which provisions shall be applicable to any loan made for the benefit of one or more of the Borrowers pursuant to the preceding sentence of this <u>Section 2.10</u>.

2.11    <u>General Provisions Relating to Interest</u>.

(a)    It is the intention of the parties hereto to comply strictly with the usury laws of the State of New York and the United States of America.  In this connection, there shall never be collected, charged or received on the sums advanced hereunder plus the amount of the original issue discount interest in excess of that which would accrue at the Highest Lawful Rate.

(b)    Notwithstanding anything herein or in the Notes to the contrary, during any Limitation Period, the interest rate to be charged on amounts evidenced by the Notes shall be the Highest Lawful Rate, and the obligation, if any, of the Borrowers for the payment of fees or other charges deemed to be interest under applicable law shall be suspended.  During any period or periods of time following a Limitation Period, to the extent permitted by applicable laws of the State of New York or the United States of America, the interest rate to be charged hereunder shall remain at the Highest Lawful Rate until such time as there has been paid to each applicable Lender (i) the amount of interest in excess of that accruing at the Highest Lawful Rate that such Lender would have received during the Limitation Period had the interest rate remained at the

otherwise applicable rate and (ii) all interest and fees otherwise payable to such Lender but for the effect of such Limitation Period.

(c)    If, under any circumstances, the aggregate amounts paid on the Notes or under this Agreement or any other Loan Document include amounts which by law are deemed interest and which would exceed the amount permitted if the Highest Lawful Rate were in effect, the Borrowers stipulate that such payment and collection will have been and will be deemed to have been, to the extent permitted by applicable laws of the State of New York or the United States of America, the result of mathematical error on the part of the Borrowers, the Agent and the Lenders; and the party receiving such excess shall promptly refund the amount of such excess (to the extent only of such interest payments in excess of that which would have accrued and been payable on the basis of the Highest Lawful Rate) upon discovery of such error by such party or notice thereof from the Borrowers.  In the event that the maturity of any Obligation is accelerated, by reason of an election by the Lenders or otherwise, or in the event of any required or permitted prepayment, then the consideration constituting interest under applicable laws may never exceed that payable on the basis of the Highest Lawful Rate, and excess amounts paid which by law are deemed interest, if any, shall be credited by the Agent and the Lenders on the principal amount of the Obligations, or if the principal amount of the Obligations shall have been paid in full, refunded to the Borrowers.

(d)    All sums paid, or agreed to be paid, to the Agent and the Lenders for the use, forbearance and detention of the proceeds of any advance hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term hereof until paid in full so that the actual rate of interest is uniform but does not exceed the Highest Lawful Rate throughout the full term hereof.

2.12    <u>Yield Protection</u>.

(a)    The Borrowers shall pay to each Lender, from time to time on request, such amounts as such Lender may reasonably determine are necessary to compensate such Lender for any costs attributable to the maintenance by such Lender, pursuant to any Regulatory Change, of its Percentage Share of the Loan Balance, including costs attributable to the maintenance of capital in respect of its Percentage Share of the Loan Balance, as well as for any reduction of the rate of return on assets or equity of such Lender to a level below that which such Lender could have achieved but for such Regulatory Change.

(b)    Determinations by the Agent or any Lender for purposes of this <u>Section 2.12</u> of the effect of any Regulatory Change on capital maintained, its costs or rate of return, its obligation to make and maintain its Percentage Share of the Loan Balance or on amounts receivable by it in respect of its Percentage Share of the Loan Balance or such other obligations and the additional amounts required to compensate the Agent and such Lender under this <u>Section 2.12</u> shall be conclusive, absent manifest error, <u>provided</u> that such determinations are made on a reasonable basis.  The Agent or the relevant Lender shall furnish the Borrowers with a certificate setting forth in reasonable detail the basis and amount of any loss, cost or expense incurred as a result of any such event, and the statements set forth therein shall be conclusive, absent manifest error.  The Agent or the relevant Lender shall notify the Borrowers, as promptly as practicable after the Agent or such Lender obtains knowledge of any sums payable pursuant to this <u>Section</u>

2.12 and determines to request compensation therefor, of any event occurring after the Closing Date which will entitle the Agent or such Lender to compensation pursuant to this Section 2.12. Any compensation requested by the Agent or any Lender pursuant to this Section 2.12 shall be due and payable within 30 days of receipt by the Borrowers of any such notice.

(c)    The Agent and the Lenders agree not to request, and the Borrowers shall not be obligated to pay, any sums payable pursuant to this Section 2.12 unless similar sums payable are also generally assessed by the Agent or such Lender against other customers similarly situated where such customers are subject to documents providing for such assessment.

2.13    Replacement Lenders.

(a)    If any Lender has notified the Borrowers of its incurring any loss, cost or expense under Section 2.12, the Borrowers may, unless such Lender has notified the Borrowers that the circumstances giving rise to such notice no longer apply, terminate, in whole but not in part, the Commitment of such Lender (other than Baxterville) (the "Terminated Lender") at any time upon five (5) Business Days' prior written notice to the Terminated Lender and the Agent (such notice referred to herein as a "Notice of Termination").

(b)    In order to effect the termination of the Commitment of the Terminated Lender, the Borrowers shall (i) obtain an agreement with one or more Lenders to increase their Commitments and/or (ii) request any one or more other banking institutions to become a "Lender" in place and instead of such Terminated Lender and agree to accept a Commitment; provided, however, that such one or more other banking institutions are reasonably acceptable to the Agent and become parties hereto by executing an Assignment Agreement (the Lenders or other banking institutions that agree to accept in whole or in part the Commitment of the Terminated Lender being referred to herein as the "Replacement Lenders"), such that the aggregate increased and/or accepted Commitments of the Replacement Lenders under clauses (i) and (ii) immediately above equal the Commitment of the Terminated Lender.

(c)    The Notice of Termination shall include the name of the Terminated Lender, the date the termination will occur (the "Lender Termination Date"), the Replacement Lender or Replacement Lenders to which the Terminated Lender will assign its Commitment, and, if there will be more than one Replacement Lender, the portion of the Terminated Lender's Commitment to be assigned to each Replacement Lender.

(d)    On the Termination Date, (i) the Terminated Lender shall, by execution and delivery of an Assignment Agreement, assign its Commitment to the Replacement Lender or Replacement Lenders (pro rata, if there is more than one Replacement Lender, in proportion to the portion of the Terminated Lender's Commitment to be assigned to each Replacement Lender) indicated in the Notice of Termination and shall assign to the Replacement Lender or Replacement Lenders its Percentage Share of the Loan Balance pro rata as aforesaid), (ii) the Terminated Lender shall endorse its Note, payable, without recourse, representation or warranty, to the order of the Replacement Lender or Replacement Lenders (pro rata as aforesaid), (iii) the Replacement Lender or Replacement Lenders shall purchase the Note held by the Terminated Lender (pro rata as aforesaid) at a price equal to the unpaid principal amount thereof plus interest and fees, if any, accrued and unpaid to the Termination Date and (iv) the Replacement Lender or

Replacement Lenders will thereupon (pro rata as aforesaid) succeed to and be substituted in all respects for the Terminated Lender with like effect as if becoming a Lender pursuant to the terms of Section 9.1(b), and the Terminated Lender will have the rights and benefits of an assignor under Section 9.1(b).  To the extent not in conflict, the terms of Section 9.1(b) shall supplement the provisions of this Section 2.13.

(e)    Any Terminated Lender shall reimburse the Borrowers for all reasonable and necessary fees and expenses of counsel to the Borrowers and, if required by the Replacement Lender or Replacement Lenders, of counsel to the Replacement Lender or Replacement Lenders in connection with replacing such Terminated Lender with a Replacement Lender or Replacement Lenders.

2.14    Security Interest in Accounts; Right of Offset.  As security for the payment and performance of the Obligations, the Borrowers hereby transfer, assign and pledge to the Agent and each Lender (for the pro rata benefit of all Lenders) and grant to the Agent and each Lender (for the pro rata benefit of all Lenders) a security interest in all funds of such Borrower now or hereafter or from time to time on deposit with the Agent or such Lender, with such interest of the Agent and the Lenders to be retransferred, reassigned and/or released at the expense of the Borrowers upon payment in full and complete performance by the Borrowers of all Obligations. All remedies as secured party or assignee of such funds shall be exercisable by the Agent and the Lenders with the oral consent (confirmed promptly in writing) of the Required Lenders upon the occurrence of any Event of Default, regardless of whether the exercise of any such remedy would result in any penalty or loss of interest or profit with respect to any withdrawal of funds deposited in a time deposit account prior to the maturity thereof.  Furthermore, the Borrowers hereby grant to the Agent and each Lender (for the pro rata benefit of all Lenders) the right, exercisable at such time as any Obligation shall mature, whether by acceleration of maturity or otherwise, of offset or banker's lien against all funds of such Borrowers now or hereafter or from time to time on deposit with the Agent or such Lender, regardless of whether the exercise of any such remedy would result in any penalty or loss of interest or profit with respect to any withdrawal of funds deposited in a time deposit account prior to the maturity thereof.  If the foregoing provisions conflict with the provisions of any of the Security Documents, the relevant provision of the relevant Security Document shall control.

2.15    Illegality.  Notwithstanding any other provision of this Agreement, in the event that it becomes unlawful for any Lender or its Applicable Lending Office to maintain loans bearing interest at a rate determined by the Agent to exceed the Maximum Lawful Rate, then the Agent shall charge an interest rate with respect to the Term Loans that will approximate the Contract Rate or Default Rate, as applicable, that was initially agreed to in this Agreement by the parties hereto as reasonably determined by the Agent such that the interest no longer Exceeds the Maximum Lawful Rate.

2.16    Regulatory Change.  In the event that by reason of any Regulatory Change or any other circumstance arising after the Closing Date affecting any Lender, such Lender (a) incurs Additional Costs based on or measured by the excess above a level, as prescribed from time to time by any Governmental Authority with jurisdiction, of the amount of a category of deposits or other liabilities of such Lender which included deposits by reference to which the interest rate applicable to the Loan Balance owed to such Lender is determined as provided in this Agreement

- 33 -

or a category of extensions of credit or other assets of such Lender or (b) becomes subject to restrictions on the amount of such a category of liabilities or assets which it may hold, then, at the election of such Lender with notice to the Agent and the Borrowers, the obligation of such Lender to maintain loans bearing interest at the Contract Rate shall be suspended until such time as such Regulatory Change or other circumstance ceases to be in effect, and the Agent shall charge an interest rate with respect to the Term Loans that will approximate the Contract Rate or Default Rate, as applicable, that was initially agreed to in this Agreement by the parties hereto as reasonably determined by the Agent.

2.17    Power of Attorney.  The Borrowers hereby designate the Agent as its agent and attorney-in-fact, to act in its name, place and stead solely for the purpose of completing and delivering any and all of the letters in lieu of transfer or division orders delivered by such Borrowers pursuant to the provisions of clause (i) of Article III or Section 5.7, including completing any blanks contained in such letters and attaching exhibits thereto describing the relevant Collateral. The Borrowers hereby ratify and confirm all that the Agent shall lawfully do or cause to be done by virtue of this power of attorney and the rights granted with respect to such power of attorney.  This power of attorney is coupled with the interest of the Agent and the Lenders in the Collateral, shall commence and be in full force and effect as of the Closing Date and shall remain in full force and effect and shall be irrevocable so long as any Obligations (other than contingent Obligations with respect to which no claim has been made) remain outstanding.  The powers conferred on the Agent by this appointment are solely to protect the interests of the Agent and the Lenders under the Loan Documents and Commodity Hedge Agreements with respect to the assignment of production proceeds under certain of the Security Documents and shall not impose any duty upon the Agent to exercise any such powers.  The power of attorney under this Section 2.17 is expressly limited to the rights and powers set forth herein and no additional rights or powers are herein created or implied.  The Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and shall not be responsible to the Borrowers or any other Person for any act or failure to act with respect to such powers, except for gross negligence or willful misconduct.

2.18    Keepwell.    Each Qualified ECP Borrower hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Borrower to honor all of its obligations in respect of Swap Obligations constituting a portion of the Obligations; provided, however, that each Qualified ECP Borrower shall only be liable under this Section 2.18 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 2.18, or otherwise hereunder or under any other Loan Document, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not of any greater amount.  The obligations of each Qualified ECP Borrower under this Section 2.18 shall remain in full force and effect until the Obligations are paid and performed in full.  Each Qualified ECP Borrower intends that this Section 2.18 constitute, and this Section 2.18 shall be deemed to constitute, a "keepwell, support or other agreement" for the benefit of each other Borrower for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.    Notwithstanding any other provisions of this Agreement or any other Loan Document, the Obligations owed by any Borrower or secured by any Lien granted by such Borrowers under any Loan Document shall exclude all Excluded Swap Obligations with respect to such Borrower.

- 34 -

2.19    <u>Joint and Several Liability</u>.    The Borrowers acknowledge and agree that each Borrower shall be jointly and severally liable for all obligations of the Borrowers or any of them hereunder or under any other Loan Document.

2.20    <u>Termination of the DIP Facility</u>.    The DIP Facility and the Commitments shall terminate on the Termination Date.

2.21    <u>Priority and Liens</u>.

(a)    Each Borrower hereby covenants and agrees that, subject to Bankruptcy Court approval, the Orders shall provide that its obligations hereunder and under the Loan Documents, including all Term Loans, shall, at all times: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several super-priority administrative expense claim status in the Case of each Borrower (the "<u>Superpriority Claims</u>"); (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable perfected first priority security interest and Lien on the Collateral of each Borrower (A) to the extent such Collateral is not subject to valid, perfected and non-avoidable Liens as of the Petition Date and (B) excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (collectively "<u>Avoidance Actions</u>") (it being understood and agreed that notwithstanding such exclusion of Avoidance Actions, upon entry of the Final Order, to the extent approved by the Bankruptcy Court, such Lien shall attach to any proceeds of Avoidance Actions solely to the extent that all other Collateral is insufficient to satisfy the obligations hereunder and under the Loan Documents secured by the Priming Liens); (iii) except as otherwise provided in the immediately following clause (iv), pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable junior perfected security interest and Lien on the Collateral of each Borrower to the extent that such Collateral is subject to (A) valid, perfected and unavoidable Liens in favor of third parties that were in existence immediately prior to the Petition Date, subject as to priority to such Liens in favor of such third parties, or (B) valid and unavoidable Liens (or rights to such Liens) in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (other than the existing Liens that secure obligations of the applicable Borrower under the Prepetition Loan Documents, which existing Liens will be primed by the Liens described in clause (iv) below), subject as to priority to such Liens in favor of such third parties; and (iv) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a valid, binding, continuing, enforceable perfected first priority priming security interest and Lien on the Collateral of each Borrower (collectively, the "<u>Priming Liens</u>") to the extent that such Collateral is subject to existing Liens that secure the obligations of the applicable Borrower under the Prepetition Loan Documents (the "<u>Primed Liens</u>"), all of which Primed Liens shall be primed by and made subject and subordinate to the perfected first priority senior Liens to be granted to the Agent, which senior Priming Liens in favor of the Agent shall also prime any Liens granted after the commencement of the Cases to provide adequate protection Liens in respect of any of the Primed Liens ((i) through (iv) above, subject in each case to the Carve-Out and as set forth in the Orders).

(b)    Each Borrower hereby confirms and acknowledges that, subject to Bankruptcy Court approval and entry of the Orders, (x) the Liens in favor of the Agent on behalf

- 35 -

of and for the benefit of the Lenders in the DIP Collateral (as defined in the Interim Order), which includes, without limitation, all of such Borrower's Real Property and Oil and Gas Properties, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, deed of trust, assignment or similar instrument and (y) without limiting the foregoing clause (x), subject to Section 2.21(d) below, to secure the full and timely payment and performance of the Obligations, each Borrower hereby MORTGAGES, GRANTS, BARGAINS, ASSIGNS, SELLS, CONVEYS and CONFIRMS, to the Agent, for the ratable benefit of the Lenders, the Oil and Gas Properties, TO HAVE AND TO HOLD by the Agent, and such Borrower does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to such property, assets and interests unto the Agent.

(c)     Subject to Bankruptcy Court approval and entry of the Interim Order, all of the Liens described in this Section 2.21 shall be effective and perfected upon the Interim Order Entry Date without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Agent of, or over, any Collateral, as set forth in the Interim Order.

(d)     Notwithstanding anything to the contrary herein, except as set forth in the Orders, in no event shall the Collateral include (A) if and to the extent invoked pursuant to the Orders, proceeds in an amount equal to the Carve-Out (provided that Collateral shall include residual interest in the Carve-Out), (B)(i) any General Intangibles (as defined in the UCC in effect in the State of New York) or other rights arising under any contracts, instruments, licenses or other documents to the extent the grant, assignment, transfer, creation, attachment, perfection or enforcement of a security interest would (x) constitute a violation of a valid and enforceable restriction in favor of a third party on such grant, assignment, transfer, creation, attachment, perfection or enforcement, unless and until any required consents shall have been obtained, which the applicable Borrower shall use commercially reasonable efforts to obtain or (y) give any other party to such contract, instrument, license or other document a valid and enforceable right to terminate its obligations thereunder or to take any other default remedy thereunder, unless and until any required consents shall have been obtained, which the applicable Borrower shall use commercially reasonable efforts to obtain; provided, that in any event any money or other amounts due or to become due under any such General Intangible, contract, agreement, instrument or license shall not be Excluded Assets (as defined below) and (ii) any property to the extent that the Borrowers are prohibited from granting a security interest in, pledge of, or lien upon any such property by reason of (x) an existing and enforceable negative pledge provision to the extent such provision does not violate the terms of this Agreement, unless and until any required consents shall have been obtained, which the applicable Borrower shall use commercially reasonable efforts to obtain or (y) applicable law or regulation to which such Borrowers are subject, except (in the case of either of the foregoing clauses (ii)(x) and (ii)(y)) to the extent such restriction, termination right or prohibition is rendered unenforceable or ineffective under Sections 9-406, 9-407, 9-408 or 9-409 of the UCC or other applicable law (including the Bankruptcy Code or any order of the Bankruptcy Court entered in connection with the Cases), and (C) Avoidance Actions (but including, subject only to the entry of the Final Order, proceeds thereof solely to the extent that all other Collateral is insufficient to satisfy the obligations hereunder and under the Loan Documents secured by the Priming Liens) (the items referred to in clauses (A) through (C) above being collectively referred to as the "Excluded

Assets"); provided that any proceeds of Excluded Assets (that do not otherwise constitute Excluded Assets) shall be Collateral.  For the avoidance of doubt, notwithstanding the foregoing, the Excluded Assets shall not include the Oil and Gas Properties or any seismic data, rights or related agreements of the Borrowers.

(e)    Unless the Reorganization Plan provides for the indefeasible payment in full in cash and the complete satisfaction of the obligations hereunder and under the Loan Documents or provides for such treatment otherwise acceptable to the Agent and Lenders in their sole discretion, each of the Borrowers agree that (i) its obligations under the Loan Documents shall not be discharged by the entry of an order confirming the Reorganization Plan (and each of the Borrowers, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Agent and the Lenders pursuant to the Orders and the Liens granted to the Agent and the Lenders pursuant to the Orders shall not be affected in any manner by the entry of an order confirming the Reorganization Plan.

2.22    Payment of Obligations.

(a)    Subject to Section 7.2, upon the maturity (whether by acceleration or otherwise) of any of the Obligations of the Borrowers under this Agreement or any of the other Loan Documents, the Agent and the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

(b)    Each Borrower agrees that to the extent that the Obligations hereunder have not been satisfied in full in cash (other than contingent indemnity or expense reimbursement obligations that are cash collateralized) (i) its Obligations arising hereunder shall not be discharged by the entry of any order of the Bankruptcy Court, including but not limited to an order confirming any chapter 11 plan or plans filed in any or all of the Cases and (ii) the Superpriority Claims granted to the Agent and the Lenders pursuant to the Orders and described in Section 2.21 and the Liens granted to Agent pursuant to the Orders and described in Section 2.21 shall not be affected in any manner by the entry of any order of the Bankruptcy Court, including, but not limited to, any order confirming such plan.

ARTICLE III

CONDITIONS

3.1    Conditions of the Closing Date.  The obligations of the Lenders to close this Agreement and to make the Interim Funding Loan, if any, is subject to the satisfaction of each of the following conditions:

(a)    Loan Documents.  This Agreement, the Notes in favor of each Lender and the Agent fee letter, if applicable, together with any other applicable Loan Documents, shall have been duly authorized, executed and delivered to the Agent by the parties thereto, shall be in full force and effect and no Default or Event of Default shall exist hereunder or thereunder;

(b)    Security Documents.  The Agent shall have received a counterpart of all other agreements, documents or instruments required by Agent in its sole discretion to evidence that first-priority (or second priority, as applicable) security interests in all of the Borrowers'

- 37 -

assets have been granted to Agent for the benefit of the Lenders pursuant to the Loan Documents, included without limitation, the Security Documents;

(c)     Interim Order.  The Interim Order Entry Date shall have occurred by within five (5) days after the Petition Date (or such later date as the Lenders may agree), and the Interim Order shall contain provisions granting the superpriority claims and Liens, adequate protection Liens (including, without limitation, payment of interest owed under the Prepetition Loan Documents to the administrative agent thereunder on a current basis) and other Liens described under Section 2.21, which Interim Order shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Lenders;

(d)     Appointment of Trustee or Examiner.  No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with expanded powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases;

(e)     Approved Budget.  The Agent and the Lenders shall have received the Approved Budget certified by a Responsible Officer of the Borrowers as having been prepared in good faith based upon assumptions believed by the Borrowers to be reasonable at the time made;

(f)     Other Agreements.  The Lenders shall be satisfied in their reasonable judgment that there shall not occur as a result of, and after giving effect to, the initial extension of credit hereunder (other than resulting from the filing of the Cases), a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Borrowers' material debt instruments and other material agreements which would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis;

(g)     No Litigation.  There shall exist no material unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Borrowers) threatened in any court or before any arbitrator or governmental instrumentality;

(h)     Approvals.  All government and third party approvals (including any consents) necessary in connection with continuing operations of the Borrowers and the transactions contemplated by the Loan Documents shall have been obtained and be in full force and effect (without the imposition of any adverse conditions that are not reasonably acceptable to the Lenders), and no law or regulation shall be applicable in the judgment of the Lenders that restrains, prevents or imposes materially adverse conditions upon this Agreement, the extension of credit thereunder or the transactions contemplated thereby;

(i)     Insurance.  The Agent shall have received (i) a certificate of insurance coverage of the Borrower evidencing that the Borrower is carrying insurance in accordance with Section 5.19, and (ii) and with respect to any real property on which a "building" or "mobile home" (in each case, as such terms are defined for purposes of the National Flood Insurance Program) is located, (A) a flood determination certificate or letter issued by the appropriate Governmental Authority or third party indicating whether such property is designated as a "flood hazard area" and (B) if such property is designated to be in a "flood hazard area", evidence of flood insurance on such property obtained by the applicable Borrower in such total amount as

- 38 -

required by Regulation H of the Federal Reserve Board, and all official rulings and interpretations thereunder or thereof, and otherwise in compliance with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973;

(j)    Financial Statements.  The Agent shall have received unaudited Financial Statements of Borrowers as of and for the fiscal year ended December 31, 2018 and unaudited Financial Statements of Borrowers as of March 31, 2019;

(k)    Drilling Plan.  The Agent shall have received the Drilling Plan, in form and substance satisfactory to Agent in its sole discretion.

(l)    Organizational Documents.  The Agent shall have received:

(i)    copies of the organizational documents of the Borrowers, accompanied by a certificate dated the Closing Date issued by the secretary or an assistant secretary or another authorized representative of the Borrowers, to the effect that each such copy is correct and complete;

(ii)    a certificate of incumbency dated the Closing Date, including specimen signatures of all officers or other representatives of the Borrowers, who are authorized to execute Loan Documents on behalf of the Borrowers, such certificate being executed by the secretary or an assistant secretary or another authorized representative of the relevant Borrower;

(iii)    copies of resolutions adopted by the relevant governing body of the Borrowers approving the Loan Documents to which the relevant Borrower is a party and authorizing the transactions contemplated herein and therein, accompanied by a certificate dated the Closing Date issued by the secretary or an assistant secretary or another authorized representative of the Borrowers, to the effect that such copies are true and correct copies of resolutions duly adopted at a meeting or by unanimous consent and that such resolutions constitute all the resolutions adopted with respect to such transactions, have not been amended, modified or rescinded in any respect and are in full force and effect as of the date of such certificate; and

(iv)    certificates dated as of a recent date from the appropriate Governmental Authority evidencing the existence or qualification and, if applicable, good standing of the Borrowers in its jurisdiction of organization and in each jurisdiction in which it owns material assets or conducts material operations;

(m)    Searches.  The Agent shall have received results of searches of the uniform commercial code records of the Secretary of State of the State of organization of each Borrower, such search reports reflecting no Liens, other than Permitted Liens, against Borrowers, or any of the Collateral as to which perfection of a Lien is accomplished by the filing of a financing statement;

(n)    Due Diligence. The Agent shall have completed, to its satisfaction, all legal, tax, environmental, business and other due diligence with respect to the business, assets,

liabilities, operations and conditions (financial or otherwise) of each Borrower in scope and determination satisfactory to the Agent in its sole discretion; and

(o)    KYC.  The Lenders and Agent shall have received all documentation and other information required by Governmental Authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, a duly executed W-9 tax form (or such other applicable IRS tax form) for each Borrower.

(p)    Chapter 11 Plan.  The Chapter 11 Plan, in form and substance satisfactory to Agent and the Pre-Petition Agent, has been filed by the Debtors.

3.2    Conditions of the Funding Date.  The obligations of the Lenders to make the Funding Date Loan hereunder on the Funding Date shall not become effective until the date on which each of the following conditions precedent shall have been satisfied or waived by each of the Lenders:

(a)    Closing Conditions.  The conditions of the Closing Date set forth in Section 3.1 shall have occurred;

(b)    Initial Budget.  At least seven (7) Business Days prior to any hearing related to final approval of the DIP Facility, the Agent shall have received the Initial Budget, which shall be approved by the Agent and the Lenders at least two (2) Business Days prior to such hearing and is filed with the Final Order; and

(c)    Final Order.  The Final Order Entry Date shall have occurred not later than forty-five (45) days following the date the DIP Motion is filed (or such later date as the Lenders may reasonably agree), and the Final Order shall be in full force and effect, unstayed, and shall not have been reversed, modified, amended, or vacated without the prior written consent of the Lenders.

3.3    Conditions to All Term Loans.  The obligation of each Lender to make the Term Loans from and after the Closing Date to the Termination Date is subject to the satisfaction of the following conditions precedent on the relevant Loan Date:

(a)    Representations and Warranties.  The representations and warranties in Article IV shall be true and correct in all material respects (except for representations and warranties which are qualified by a materiality qualifier, which shall be true and correct in all respects) on and as of the date of such Term Loan with the same effect as if made on and as of the date of such Term Loan (except to the extent such representations and warranties expressly refer to an earlier date, in which case they shall be true and correct as of such earlier date);

(b)    No Material Adverse Effect.  Since February 28, 2019, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect;

- 40 -

(c)    <u>No Existing Default</u>.  No Default or Event of Default shall exist and be continuing or shall result from such Term Loan or proposed or actual use of the proceeds of such Term Loan;

(d)    <u>No Violation of Law</u>.  The making of such Term Loan shall not violate any Requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently;

(e)    <u>Aggregate Exposure</u>.  After giving effect to such Term Loan, the aggregate outstanding principal amount of Term Loans shall not exceed the amount authorized by the applicable Order;

(f)    <u>Payment of Fees</u>.  The Agent and the Lenders shall have received evidence of payment by the Borrowers to the Agent of all accrued and unpaid fees, costs and expenses payable thereto or to the Agent or any Lender pursuant to the Loan Documents or otherwise required to be paid to the Agent and the Lenders, and in the case of costs and expenses, an invoice for which has been received by the Borrowers at least one Business Day before the date of such Term Loan, including any such costs, fees and expenses arising under or referenced in <u>Section 2.4</u>; and

(g)    <u>Other Documents</u>.  The Agent shall have received such other agreements, documents, instruments, opinions, certificates, waivers, consents and evidences as the Agent or any Lender may reasonably request.

3.4    <u>Conditions to All Term Loan Disbursements</u>.  The obligation of each Lender to make any disbursement from and after the Closing Date to the Termination Date is subject to the satisfaction of the following conditions precedent on the relevant Disbursement Date:

(a)    <u>Borrowing Request</u>.  The Agent shall have received a Borrowing Request from the Borrowers in accordance with <u>Section 2.1(b)</u> or <u>(d)</u>, as applicable.

(b)    <u>Representations and Warranties</u>.  The representations and warranties in <u>Article IV</u> shall be true and correct in all material respects (except for representations and warranties which are qualified by a materiality qualifier, which shall be true and correct in all respects) on and as of the Disbursement Date with the same effect as if made on and as of the Disbursement Date (except to the extent such representations and warranties expressly refer to an earlier date, in which case they shall be true and correct as of such earlier date);

(c)    <u>No Material Adverse Effect</u>.  Since February 28, 2019, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect;

(d)    <u>No Existing Default</u>.  No Default or Event of Default shall exist and be continuing or shall result from such Term Loan or proposed or actual use of the proceeds of such Term Loan;

(e)    <u>No Violation of Law</u>.  The making of such Term Loan shall not violate any Requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently;

- 41 -

(f)    Aggregate Exposure.    After giving effect to such Term Loan, the aggregate outstanding principal amount of Term Loans shall not exceed the amount authorized by the applicable Order;

(g)    Consolidated Cash.    After giving effect to the requested disbursement, and the use of proceeds thereof, the consolidated cash and cash equivalents of the Borrowers, taken as a whole, shall not exceed $1,000,000;

(h)    Compliance with the Budget.    Immediately before and after giving effect to the requested disbursement, the Borrowers shall be in pro forma compliance with the Budget;

(i)    Payment of Fees.    The Agent and the Lenders shall have received evidence of payment by the Borrowers to the Agent of all accrued and unpaid fees, costs and expenses payable thereto or to the Agent or any Lender pursuant to the Loan Documents or otherwise required to be paid to the Agent and the Lenders, and in the case of costs and expenses, an invoice for which has been received by the Borrowers at least one Business Day before the date of such Term Loan, including any such costs, fees and expenses arising under or referenced in Section 2.4; and

(j)    Other Documents.    The Agent shall have received such other agreements, documents, instruments, opinions, certificates, waivers, consents and evidences as the Agent or any Lender may reasonably request.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES

To induce the Agent and the Lenders to enter into this Agreement and to induce the Lenders to make the Term Loans, the Borrowers represent and warrant to the Agent and each Lender (which representations and warranties shall survive the delivery of the Notes) that:

4.1    Due Authorization.    Subject to the entry of the Orders and subject to the terms thereof, the execution and delivery by the Borrowers of this Agreement and the borrowing hereunder, the execution and delivery by the Borrowers of the Notes, the repayment of the Notes, payment of interest and fees provided for in the Notes and this Agreement, the execution and delivery by each Borrower of the Security Documents to which it is a party and the performance by each Borrower of its obligations under the Loan Documents to which it is a party are within the power of the relevant Borrower, have been duly authorized by all necessary action by the relevant Borrower, and do not and will not (a) require the consent of any Governmental Authority, (b) contravene or conflict with any Requirement of Law, (c) contravene or conflict with any indenture, instrument or other agreement to which the relevant Borrower is a party or by which any Property of the relevant Borrower may be presently bound or encumbered or (d) result in or require the creation or imposition of any Lien in, upon or on any Property of the relevant Borrower under any such indenture, instrument or other agreement, other than under any of the Loan Documents to which it is a party.

4.2    Existence.    Each Borrower is a corporation, limited liability company or limited partnership, as the case may be, duly organized, legally existing and, if applicable, in good

- 42 -

standing under the laws of its jurisdiction of organization and is duly qualified as a foreign corporation, foreign limited partnership, or foreign limited liability company, as the case may be, and, if applicable, is in good standing in all jurisdictions wherein the ownership of Property or the operation of its business necessitates same, other than those jurisdictions wherein the failure to so qualify would not have a Material Adverse Effect.

4.3     Valid and Binding Obligations.  Subject to the entry of the Orders and subject to the terms thereof, all Loan Documents to which a Borrower is a party, when duly executed and delivered by the relevant Borrower, constitute the legal, valid and binding obligations of the relevant Borrower enforceable against such Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

4.4     Security Documents.  Subject to the entry of the Orders and subject to the terms thereof, the provisions of each Security Document executed by the Borrowers are effective to create, in favor of the Agent, legal, valid and enforceable Liens in all right, title and interest of the relevant Borrower in the Property of such Borrower described therein, which Liens have the priority set forth in Section 2.21.

4.5     Title to Property.  Except for such encumbrances, preferential rights, whether vested or otherwise, and Liens (except Permitted Liens) set forth on Schedule 4.5A attached hereto, each Borrower has good and defensible title to all of its material Property, free and clear of all encumbrances, preferential rights, whether vested or otherwise, and Liens (except Permitted Liens) related to the Property.  Schedule 4.5B attached hereto sets forth a correct and complete list as of the Closing Date of the location, by state and street address, of all Real Property owned or leased by each Borrower, together with the names and addresses of any landlords.  Notwithstanding the foregoing, Borrowers' Property shall include those leases described within that certain Partial Assignment of Oil, Gas, and Mineral Leases, effective June 1, 2002, between BP America Production Company, assignor and RME Petroleum Company, recorded at ORIG 597, BNDL 11659 of the Clerk of Court and Recorder's office of East Baton Rouge Parish, Louisiana, upon closing of that act of Partial Assignment of Oil, Gas and Mineral Leases attached to and made part of that certain letter agreement between Anadarko E&P Onshore LLC and Falcon, dated April 9, 2019.

4.6     Scope and Accuracy of Financial Statements.  The draft consolidated Financial Statements provided to the Agent in satisfaction of the condition set forth in Section 3.1(j) present fairly (subject to normal year-end audit adjustments) the financial position and results of operations and cash flows of the Borrowers on a consolidated basis, in accordance with GAAP as at the relevant point in time or for the period indicated, as applicable.  Schedule 4.6 attached hereto identifies all accounts payable, other than those arising in the ordinary course of business which are not more than 30 day past due, of each Borrower.

4.7     No Material Adverse Effect or Default.  No event or circumstance has occurred since February 28, 2019, which could reasonably be expected to have a Material Adverse Effect, and no Default has occurred and is continuing.

- 43 -

4.8     No Material Misstatements.    No information, exhibit, statement or report furnished to the Agent or any Lender by or at the direction of the Borrowers in connection with this Agreement or any other Loan Document contains any material misstatement of fact or omits to state a material fact or  any fact necessary to make the statements contained therein not misleading as of the date made or deemed made; provided that, with respect to projected financial information, it represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

4.9     Liabilities, Litigation and Restrictions.    Other than as reflected in the Financial Statements prepared as of December 31, 2018 or as listed on Schedule 4.9 under the heading "Liabilities", no Borrower has any liabilities, including, without limitation, tax liabilities, direct or contingent, which may materially and adversely affect its business or operations or its ownership of its Property.  Except for the Cases and as set forth under the heading "Litigation" on Schedule 4.9, no litigation or other action of any nature involving any Borrower is pending before any Governmental Authority or, to the best knowledge of each Borrower, threatened against or involving such Borrower which might reasonably be expected to result in any impairment of its ownership of any of its Property or have a Material Adverse Effect.

4.10     Authorizations; Consents.    Subject to the entry of the Orders and subject to the terms thereof, except as expressly contemplated by this Agreement or set forth on Schedule 4.10 attached hereto, no authorization, consent, approval, exemption, franchise, permit or license of, or filing with, any Governmental Authority or any other Person is required to authorize or is otherwise required in connection with the valid execution and delivery by the Borrowers of the Loan Documents to which it is a party or any instrument contemplated hereby, the repayment by the Borrowers of the Notes, payment of interest and fees provided in the Notes and this Agreement or the performance by the Borrowers of the Obligations.

4.11     Compliance with Laws.    Subject to the entry of the Orders and subject to the terms thereof, to the Borrowers' knowledge, each Borrower and its Property are in compliance in all material respects with all applicable Requirements of Law, including Environmental Laws and ERISA.

4.12     ERISA.    No Borrowers maintain, nor have the Borrowers maintained, any Plan. No Borrowers currently contribute to or have any obligation to contribute to or otherwise have any liability with respect to any Plan.

4.13     Environmental Laws.    Except as disclosed on Schedule 4.13 attached hereto:

(a)     No Property of the Borrowers (including, but not limited to, the Oil and Gas Properties) is currently on or has ever been on any federal or state list of Superfund Sites;

(b)     no Hazardous Substances have been generated, transported and/or disposed of by the Borrowers at a site which was, at the time of such generation, transportation, and/or disposal, or has since become, a Superfund Site;

(c)     except in accordance with applicable Requirements of Law or the terms of a valid permit, license, certificate or approval of the relevant Governmental Authority, no Release of Hazardous Substances by the Borrowers or from, affecting or related to the Oil and

- 44 -

Gas Properties or any Property of the Borrowers (including, but not limited to, the North Texas Properties) has occurred; and

(d)    no Environmental Complaint has been received by the Borrowers.

4.14    <u>Compliance with Federal Reserve Regulations</u>.  No transaction contemplated by the Loan Documents is in violation of any regulations promulgated by the Board of Governors of the Federal Reserve System, including Regulations T, U or X.

4.15    <u>Investment Company Act Compliance</u>.  None of the Borrowers are, nor is any Borrower directly or indirectly controlled by or acting on behalf of any Person which is, an "investment company" or an "affiliated person" of an "investment company" within the meaning of the Investment Company Act of 1940.

4.16    <u>Proper Filing of Tax Returns; Payment of Taxes Due</u>.  Each Borrower has duly and properly filed its United States of America income tax returns or income tax information returns, and all other tax returns which are required to be filed by the Borrowers, as applicable, and has paid all taxes, if any, shown as due from the Borrowers, as applicable, except (i) ad valorem taxes accrued through 2018, (ii) where appropriate extensions have been filed, (iii) such taxes need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code, (iv) such taxes as are being contested in good faith and as to which adequate provisions and disclosures have been made or (v) such taxes as could not reasonably be expected to have a Material Adverse Effect.  The respective charges and reserves on the books of the Borrowers with respect to Taxes and other governmental charges, if any of such are required by applicable law or GAAP, are adequate, except as could not reasonably be expected to have a Material Adverse Effect.

4.17    <u>Refunds</u>.  Except as described on <u>Schedule 4.17</u>, no orders of, proceedings pending before, or other requirements of, the Federal Energy Regulatory Commission or any other Governmental Authority exist which could result in the Borrowers being required to refund any portion of the proceeds received or to be received from the sale of Hydrocarbons constituting part of the Mortgaged Property or other Oil and Gas Properties owned by it.

4.18    <u>Gas Contracts</u>.  Except as described on <u>Schedule 4.18</u>, (a) none of the Borrowers are obligated, in any material respect, by virtue of any prepayment made under any contract containing a "take-or-pay" or "prepayment" provision or under any similar agreement to deliver Hydrocarbons produced from or allocated to any of the Mortgaged Properties or other Oil and Gas Properties owned by it at some future date without receiving full payment therefor within 90 days of delivery and (b) none of Borrowers have produced gas, in any material amount, subject to, and neither the Borrowers nor any of the Mortgaged Properties or other Oil and Gas Properties are subject to, balancing rights of third parties or subject to balancing duties under Requirements of Law, except (i) as to such matters for which the relevant Borrower has, to the extent required by GAAP, established monetary reserves adequate in amount to satisfy such obligations and segregated such reserves from other accounts or (ii) as could not reasonably be expected to have a Material Adverse Effect.

4.19    Intellectual Property.  Each of the Borrowers owns or is licensed to use all Intellectual Property necessary to conduct all business material to its condition (financial or otherwise), business or operations as such business is currently conducted.  No claim has been asserted or is pending by any Person with respect to the use by the Borrowers of any such Intellectual Property or challenging or questioning the validity or effectiveness of any such Intellectual Property; and no Borrowers know of any valid basis for any such claim.  The use of such Intellectual Property by the relevant Borrower does not infringe on the rights of any Person.

4.20    Casualties or Taking of Property.  Since April 30, 2018, neither the business nor any Property of any Borrower has been materially adversely affected as a result of any casualty or taking of Property or cancellation of contracts, permits or concessions by any Governmental Authority, riot, activities of armed forces or acts of God.

4.21    Location of Borrowers.  The principal place of business and chief executive office of each Borrower is located at the address of such Borrower set forth in Section 9.3 or at such other location as such Borrower may have, by proper written notice hereunder, advised the Agent, provided that such other location is within a state in which appropriate financing statements naming such Borrower as debtor and naming Agent as secured party, have been filed, if required by applicable law.

4.22    Subsidiaries.  Except as set forth on Schedule 4.22, no Borrower has any Subsidiaries.

4.23    Compliance with Anti-Terrorism Laws.  No Borrower nor any Affiliate of any Borrower is in violation of any Anti-Terrorism Law or knowingly engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(a)    None of Borrower nor any Affiliate of any Borrower is any of the following (each a "Blocked Person"):

(i)    a Person that is listed in the annex, to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(ii)    a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224;

(iii)    a Person or entity with which any bank or other financial institution is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224;

- 46 -

(v)    a Person or entity that is named as a "specially designated national" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list; or

(vi)    a Person or entity who is affiliated with a Person or entity listed above.

(b)    None of the Borrowers nor any Affiliate of the Borrowers (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person or (ii) deals in, or otherwise engages in any transaction relating to, any Property or interests in Property blocked pursuant to Executive Order No. 13224.

(c)    None of the Borrowers nor any Affiliate of the Borrowers are in violation of any rules or regulations promulgated by OFAC or of any economic or trade sanctions administered and enforced by OFAC or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any rules or regulations promulgated by OFAC.

4.24    <u>Identification Numbers</u>.  The federal employer identification number of each Borrower and its organizational number with appropriate Governmental Authorities are as set forth on <u>Schedule 4.24</u>.

4.25    <u>Bankruptcy Orders</u>.  The Orders and the transactions contemplated hereby and thereby are in full force and effect, are not subject to a stay and have not been vacated, reversed, modified or amended in any respect adverse to (x) the Required Lenders without the prior written consent of the Agent acting at the direction of the Required Lenders or (y) the Agent without the prior written consent of the Agent.

4.26    <u>Budget</u>.  The Budget was prepared in good faith by the management of the Borrowers, based on assumptions believed by the management of the Borrowers to be reasonable at the time made and upon information believed by the management of the Borrowers to have been accurate based upon the information available to the management of the Borrowers at the time such Budget was furnished.

4.27    <u>Related Party Transactions</u>.  Except as set forth on <u>Schedule 4.27</u> attached hereto, (i) none of the Borrowers are party to or bound by any agreement, contract, whether written or oral, or other instrument with any person or entity that is controlled by, whether directly or indirectly, or in common control with or by one or more of the members of such Borrower, and (ii) none of the Properties owned by the Borrowers are subject to any agreement that grants an interest in and to such Properties to any person or entity that is controlled by, whether directly or indirectly, or in common control with or by one or more of the members of such Borrower.

4.28    <u>Pre-Petition Indebtedness and Pre-Petition Collateral</u>.  No portion of the Liens or the indebtedness under the Prepetition Loan Documents or any payment on account thereof is subject to avoidance, recharacterization, recovery, reduction, subordination, disallowance, impairment or any other challenges pursuant to the Bankruptcy Code or applicable

- 47 -

nonbankruptcy law. The Liens and security interests granted to, or for the benefit of, the administrative agent and lenders under the Prepetition Loan Documents, including with respect to the Cash Collateral, pursuant to the Prepetition Loan Documents, constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code) and perfected first priority Liens on and security interests in the collateral under the Prepetition Loan Documents and are not subject to defense, counterclaim, avoidance, recharacterization, recovery, disallowance or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation by any person or entity, except insofar as such Liens and security interests are subject to the Priming Liens and the Carve-Out.

ARTICLE V

AFFIRMATIVE COVENANTS

So long as any Obligation remains outstanding or unpaid, the Borrowers shall:

5.1    Maintenance and Access to Records. Keep adequate records, in accordance with GAAP, of all of their transactions so that at any time, and from time to time, the Borrowers true and complete financial condition may be readily determined, and promptly following the reasonable request of the Agent or any Lender, make such records available for inspection by the Agent or any Lender and, at the expense of the Borrowers, allow the Agent or any Lender to make and take away copies thereof.

5.2    Monthly Unaudited Financial Statements and Compliance Certificates. Deliver to the Agent, on or before the forty-fifth (45th) day after the close of each fiscal month, (a) a copy of the Financial Statements as of the close of the relevant fiscal month and from the first day of the then current fiscal year to the end of the relevant fiscal month, such Financial Statements to be certified by the Financial Officer of the Borrowers as having been prepared by the Borrowers in accordance with GAAP consistently applied and as a fair presentation of the financial condition of the Borrowers, on a consolidated basis, subject to changes resulting from normal year-end audit adjustments, and (b) a Compliance Certificate prepared, as to Section 2.1 thereof, as of the close of the relevant fiscal month or quarterly period, as applicable, and executed by the Financial Officer of the Borrowers.

5.3    Annual Audited Financial Statements and Compliance Certificate. Deliver to the Agent, on or before the one hundred twenty (120th) day after the close of each fiscal year of the Borrowers, commencing with that ending on December 31, 2018, a copy of the unaudited Financial Statements as at the close of such fiscal year and for the fiscal year then ended.

5.4    Reserve Reports; LOE Reports; Production Reports; Payables Aging; Additional Drilling Plans and Financial Projections.

(a)    Deliver to the Agent, no later than each June 30 beginning in 2019 during the term of this Agreement, a Reserve Report, in form satisfactory to the Agent, prepared as of the preceding May 31st and certified by a Responsible Officer as fairly and accurately setting forth (i) the PDP, PUD, shut-in, behind-pipe and undeveloped Reserves (separately classified as such) attributable to the Mortgaged Properties and other Oil and Gas Properties of the

- 48 -

Borrowers, (ii) the aggregate PV-10 value of the future net income with respect to PDP Reserves attributable to the Mortgaged Properties and other Oil and Gas Properties of the Borrowers, (iii) projections of the annual rate of production, gross income and net income with respect to such PDP Reserves, (iv) information with respect to the "take-or-pay," "prepayment" and gas-balancing liabilities of the Borrowers with respect to such PDP Reserves and (v) general economic assumptions.

(b)    Deliver to the Agent, no later than each December 31st during the term of this Agreement, a Reserve Report, in substantially the format of and providing the information provided in the Reserve Reports provided pursuant to <u>Section 5.4(a)</u>, prepared as of the preceding November 30th and certified by a Responsible Officer as fairly and accurately setting forth the information provided therein.

(c)    Deliver to the Agent, no later than the 45th day following the end of each fiscal month, a report, in form reasonably satisfactory to the Agent, setting forth information as to quantities of production from the Mortgaged Properties, volumes of production sold, volumes of production committed to Commodity Hedge Agreements, pricing, purchasers of production, gross revenues, lease operating expenses and such other information as the Agent or any Lender may request with respect to the relevant monthly period.

(d)    Deliver to the Agent, no later than the 45th day after the end of each fiscal month, an aging of the accounts payable of the Borrowers, on a consolidated basis, at the end of the relevant monthly period.

(e)    Deliver to the Agent, no later than December 31st of each year, a Drilling Plan, in form acceptable to the Agent in its sole discretion, setting forth proposed activities with respect to the Oil and Gas Properties of the Borrowers or any of them during the subsequent fiscal year.

(f)    Deliver to the Agent, no later than December 31st of each year, financial projections for the Borrowers, on a consolidated basis, as at the close of each month of the subsequent fiscal year, which financial projections shall be presented in the form of Financial Statements.

5.5    <u>Title Opinions; Title Defects; Mortgaged Properties</u>.

(a)    Promptly upon the request of the Agent, furnish to the Agent title opinions, in form and by counsel reasonably satisfactory to the Agent, or other confirmation of title reasonably acceptable to the Agent, covering Oil and Gas Properties of the relevant Borrower.

(b)    Promptly, but in any event within 60 days after notice by the Agent of any title defect having a Material Adverse Effect, clear such title defect.

(c)    Promptly upon the request of the Agent, execute and deliver to the Agent additional Security Documents as necessary to maintain, as Mortgaged Properties, Oil and Gas Properties of the Borrowers the PV-10 value of the Proved Reserves attributable to which, in the aggregate, equals at least one hundred percent (100%) of the Total Proved Reserves reflected in

the Reserve Report most recently provided to the Agent pursuant to the provisions of <u>Section 5.4</u>.

5.6    <u>Notices of Certain Events</u>.  Deliver to the Agent, immediately upon having knowledge of the occurrence of any of the following events or circumstances, a written statement with respect thereto, signed by a Responsible Officer of the Borrowers, and setting forth the relevant event or circumstance and the steps being taken by the relevant Borrower with respect to such event or circumstance:

(a)    any Default or Event of Default;

(b)    any default or event of default under any contractual obligation of the Borrowers, or any litigation, investigation or proceeding between the Borrowers and any Governmental Authority which, in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(c)    any litigation or proceeding involving any Borrower as a defendant or in which any Property of any Borrower is subject to a claim and in which the amount involved is $25,000 or more and which is not covered by insurance or in which injunctive or similar relief is sought;

(d)    the receipt by the Borrowers of any Environmental Complaint, which if adversely determined could reasonably be expected to have a Material Adverse Effect;

(e)    any actual, proposed or threatened testing or other investigation by any Governmental Authority or other Person concerning the environmental condition of, or relating to, any Property of the Borrowers following any allegation of a violation of any Requirement of Law;

(f)    any Release of Hazardous Substances by the Borrowers or from, affecting or related to any Property of the Borrowers or Property of others adjacent to Property of the Borrowers which could reasonably be expected to have a Material Adverse Effect, except in accordance with applicable Requirements of Law or the terms of a valid permit, license, certificate or approval of the relevant Governmental Authority, or the violation of any Environmental Law, or the revocation, suspension or forfeiture of or failure to renew, any permit, license, registration, approval or authorization which could reasonably be expected to have a Material Adverse Effect;

(g)    any Change in Management; and

(h)    any other event or condition which could reasonably be expected to have a Material Adverse Effect.

5.7    <u>Letters in Lieu of Transfer Orders or Division Orders</u>.  Promptly upon request by the Agent at any time and from time to time, and without limitation on the rights of the Agent pursuant to the provisions of <u>Section 2.17</u>, execute such letters in lieu of transfer or division orders as are necessary or appropriate to transfer and deliver to the remittances of Agent proceeds from or attributable to any of the Mortgaged Property.

5.8     <u>Commodity Hedging</u>.  Maintain in effect and comply, in all material respects, with the provisions of the Minimum Required Commodity Hedge Agreements.

5.9     <u>Tax Returns</u>.  Furnish to the Agent, promptly upon, but in no event more than 30 days after, each filing of the annual federal income tax return of the Borrowers with the Internal Revenue Service, a copy thereof.

5.10     <u>Additional Information</u>.  Furnish to the Agent and any Lender, promptly upon the request of the Agent, such additional financial or other information concerning the assets, liabilities, operations and transactions of the Borrowers as the Agent may from time to time reasonably request; and notify the Agent not less than ten Business Days prior to the occurrence of any condition or event that may change the proper location for the filing of any financing statement or other public notice or recording for the purpose of perfecting a Lien in any Property of the Borrowers, including any change in its name or the location of the jurisdiction of organization, principal place of business or chief executive office of the relevant Borrower; and upon the request of the Agent, execute such additional Security Documents as may be necessary or appropriate in connection therewith.

5.11     <u>Compliance with Laws</u>.  Except as otherwise excused by the Bankruptcy Court, comply, in all material respects, with all applicable Requirements of Law, including (a) ERISA, (b) Environmental Laws, (c) Anti-Terrorism Laws and (d) all permits, licenses, registrations, approvals and authorizations (i) related to any natural or environmental resource or media located on, above, within, related to or affected by any Property of the Borrowers, (ii) required for the performance of the operations of the Borrowers, or (iii) applicable to the use, generation, handling, storage, treatment, transport, or disposal of any Hazardous Substances; and use its best efforts to cause all employees, agents, contractors, subcontractors and future lessees (pursuant to appropriate lease provisions) of the Borrowers, while such Persons are acting within the scope of their relationship with the relevant Borrower, to comply with all such Requirements of Law as may be necessary or appropriate to enable the relevant Borrower to so comply.

5.12     <u>Payment of Assessments and Charges</u>.  In the case of any Debtor, in accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay all Taxes, assessments, governmental charges, rent and solely to the extent arising post-petition, other Indebtedness, which, if unpaid, might become a Lien against any Property of the Borrowers, except any of the foregoing being contested in good faith and as to which an adequate reserve in accordance with GAAP has been established or unless failure to pay would not have a Material Adverse Effect.

5.13     <u>Maintenance of Existence or Qualification and Good Standing</u>.  Maintain its corporate, limited liability company or limited partnership, as the case may be, existence or qualification and, if applicable, good standing in its jurisdiction of organization and in all jurisdictions wherein any material Property now owned or hereafter acquired or business now or hereafter conducted by it necessitates same.

5.14     <u>Payment of Notes; Performance of Obligations</u>.  Pay the Notes according to the reading, tenor and effect thereof, as modified hereby, and do and perform every act and discharge all of the other Obligations.

- 51 -

5.15    <u>Further Assurances</u>.

(a)    The Borrowers shall promptly (and in no event later than twenty (20) days after becoming aware of the need therefor) do all acts and things, and execute and file or record, all instruments, documents, or agreements reasonably requested by the Agent or the Required Lenders, to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrowers in the Loan Documents including the Notes, to further evidence and more fully describe the Collateral as security for the Obligations, as to correct any omissions in this Agreement or the Security Documents, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement, the Security Documents or the Orders or the priority thereof or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the reasonable discretion of the Agent or the Required Lenders, in connection therewith.

(b)    In addition to the foregoing, the Borrowers shall, within thirty (30) days following request by the Agent, execute and deliver, mortgages, deeds of trust or any other agreements, documents or instruments with respect to the Real Property and Oil and Gas Properties to evidence the first-priority security interests granted to the Agent for the benefit of the Lenders pursuant to the Loan Documents.

5.16    <u>Initial Expenses of Agent</u>.  Upon request by the Agent, promptly reimburse the Agent for, or pay directly, all reasonable fees and expenses of counsel (including, without limitation, local counsel) and financial advisors to the Agent and the Lenders, in connection with the preparation of this Agreement and all documentation contemplated hereby, the satisfaction of the conditions precedent set forth herein, the filing and recordation of Security Documents, and the consummation of the transactions contemplated in this Agreement.

5.17    <u>Subsequent Expenses of Agent and Lenders</u>.  Promptly reimburse (a) all third party out-of-pocket amounts reasonably expended, advanced or incurred by or on behalf of the Agent and Lenders (i) to satisfy any obligation of the Borrowers under any of the Loan Documents; (ii) to ratify, amend, restate or prepare additional Loan Documents, as the case may be; (iii) in connection with the filing and recordation of Security Documents; (iv) in connection with certain back office and administrative services related to the Term Loans provided by Cortland Capital Market Services LLC or such other third party loan servicer as Agent may select from time to time; (v) in connection with all valuation services related to the Term Loans; and (vi) with respect to any aspect of the Cases; and (b) following an Event of Default, all out-of-pocket costs and expenses, if any, of the Agent or any of the Lenders to enforce or protect their respective rights under any of the Loan Documents, including all such out of pocket expenses incurred during any workout, restructuring or negotiations in respect of the Term Loans; and which amounts in (a) and (b) shall include all reasonable attorney's fees (including, without limitation, local counsel), together with interest at the Contract Rate or Default Rate, as applicable, on each such amount from the date of notification by the Agent that the same was expended, advanced or incurred by the Agent or the Lenders until the date it is repaid to the Agent or the Lenders, as applicable.  Notwithstanding any provision to the contrary herein, the Borrowers agree that, upon three (3) days' notice, the Agent may debit the Borrowers' account or accounts that are subject to exclusive control by the Agent for any amounts payable pursuant to this <u>Section 5.17</u>.

- 52 -

5.18    <u>Maintenance and Inspection of Properties</u>.  Maintain or, to the extent that the right or obligation to do so rests with another Person, exercise commercially reasonable efforts to cause such other Person to maintain all of the tangible Properties of the Borrowers in good repair and condition, ordinary wear and tear excepted; make or, to the extent that the right or obligation to do so rests with another Person, exercise commercially reasonable efforts to cause such other Person to make all necessary replacements thereof and operate such Properties in a good and workmanlike manner; and permit any authorized representative of the Agent, upon prior notice to the Borrowers, to visit and inspect, at reasonable times, any tangible Property of the Borrowers.

5.19    <u>Maintenance of Insurance</u>.  Maintain or cause to be maintained insurance with respect to its Properties and businesses against such liabilities, casualties, risks and contingencies as is customary in the relevant industry and sufficient to prevent a Material Adverse Effect, all such insurance to be in amounts and from insurers reasonably acceptable to the Agent and name the Agent as an additional insured and loss payee.

5.20    <u>Environmental Indemnification</u>.  Indemnify and hold the Agent and each of the Lenders and their respective shareholders, officers, directors, employees, agents, attorneys-in-fact and Affiliates and each trustee for the benefit of the Agent or the Lenders under any Security Document (each of the foregoing an "<u>Indemnitee</u>") harmless from and against any and all claims, losses, damages, liabilities, fines, penalties, charges, administrative and judicial proceedings and orders, judgments, remedial actions, requirements and enforcement actions of any kind, and all reasonable costs and expenses incurred in connection therewith (including attorneys' fees and expenses), arising directly or indirectly, in whole or in part, from (a) the presence of any Hazardous Substances on, under, or from any Property of the Borrowers, whether prior to or during the term hereof, (b) any activity carried on or undertaken on any Property of the Borrowers, whether prior to or during the term hereof, and whether by of the Borrowers or any of the predecessors in title, employees, agents, contractors or subcontractors of or any other Person at any time occupying or present on such Property, in connection with the handling, treatment, removal, storage, decontamination, cleanup, transportation or disposal of any Hazardous Substances at any time located or present on or under such Property, (c) any residual contamination on or under any Property of the Borrowers, (d) any contamination of any Property or natural resources arising in connection with the generation, use, handling, storage, transportation or disposal of any Hazardous Substances by the Borrowers or any employees, agents, contractors or subcontractors of the Borrowers while such Persons are acting within the scope of their relationship with the relevant Borrower, irrespective of whether any of such activities were or will be undertaken in accordance with applicable Requirements of Law or (e) the performance and enforcement of any Loan Document or any other act or omission in connection with or related to any Loan Document or the transactions contemplated thereby, including any such claim, loss, damage, liability, fine, penalty, charge, administrative or judicial proceeding, order, judgment, remedial action, requirement, enforcement action, cost or expense, arising from the negligence (but not the gross negligence or willful misconduct), whether sole or concurrent, of any Indemnitee; with the foregoing indemnity surviving satisfaction of all Obligations and the termination of this Agreement, unless all such Obligations have been satisfied wholly in cash and not by way of realization against any Collateral or the conveyance of any Property in lieu thereof, <u>provided</u> that such indemnity shall not extend to any act or omission by the Agent or any Lender with respect to any Property subsequent to the Agent or any Lender

- 53 -

becoming the owner of such Property and with respect to which Property such claim, loss, damage, liability, fine, penalty, charge, proceeding, order, judgment, action or requirement arises subsequent to the acquisition of title thereto by the Agent or any Lender.  All amounts due under this Section 5.20 shall be payable on written demand therefor by the Agent.

      5.21    General Indemnification.  Indemnify and hold each Indemnitee harmless from and against any and all losses, claims, damages, liabilities and related expenses, including reasonable counsel fees and expenses, incurred by or asserted against any Indemnitee arising out of, in any way connected with or as a result of (a) the execution and delivery of this Agreement and the other Loan Documents, the performance by the parties hereto and thereto of their respective obligations hereunder and thereunder and consummation of the transactions contemplated hereby and thereby, (b) the use of proceeds of the Term Loan, or (c) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, including any such loss, claim, damage, liability or expense arising from the negligence, whether sole or concurrent, of any Indemnitee, except to the extent the same is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnitee's gross negligence or willful misconduct; with the foregoing indemnity surviving satisfaction of all Obligations and the termination of this Agreement.  All amounts due under this Section 5.21 shall be payable on written demand therefor.

      5.22    Evidence of Compliance with Anti-Terrorism Laws.  Deliver to the Agent and any Lender any certification or other evidence requested from time to time by the Agent or such Lender, in their reasonable discretion, confirming compliance by the Borrowers with the provisions of any or all applicable Anti-Terrorism Laws.

      5.23    Board and Management Meetings.  Hold (a) a meeting of the governing body of each Borrower or its manager, as the case may be, at least quarterly and, in connection with each such meeting or any proposed action without a meeting, as the case may be, (i) provide to the Agent reasonable advance notice of the meeting or reasonable advance notice of any proposed action without a meeting, (ii) provide to the Agent, reasonably in advance of the meeting or proposed action without a meeting, copies of all written materials provided to the directors and (iii) so long as the Loan Balance exceeds $100,000, allow the Agent Observer to attend the meeting as a non-voting observer (other than any such meetings related to approval of the DIP Facility) and (b) regular operations meetings of the management team of the relevant Borrower and special meetings of such management team at the reasonable request of the Agent. Borrowers will reimburse the Agent Observer for all reasonable and documented out-of-pocket costs and expenses incurred in connection with its participation in any such meetings.

      5.24    Intentionally Deleted.

      5.25    Borrower Report.  The Borrowers shall provide or cause to be provided to the Agent and each Lender a written report from the Responsible Officer, with approval and assistance from the Borrowers' financial advisor, each month (or more frequently as reasonably requested by the Agent) in form and substance reasonably satisfactory to, and addressing such items as are reasonably requested by, the Agent.  The Borrowers shall provide periodic telephonic updates of such reports to the Agent and each Lender from time to time (but not less than weekly), as reasonably requested by the Agent.

5.26    <u>Budget Variance Report, Cash Forecasts & Lender Conference Calls</u>.

(a)    On or before the last Business Day of each calendar week following the end of the calendar week in which Closing Date occurs (the "<u>Testing Date</u>"), the Borrowers shall prepare and deliver to the Agent and the Lenders a Budget Variance Report as of the end of each prior calendar week along with a Budget Compliance Certificate as to compliance with the covenant set forth in <u>Section 6.26</u> executed by a Responsible Officer, together with, in each case, a reconciliation between actual and projected cash receipts and disbursements for such prior calendar week and a written summary of the causes for any material variations.

(b)    No later than three (3) days after the distribution of the Budget Variance Report by the Borrowers to the Lenders pursuant to <u>Section 5.26(a)</u> above, the Borrowers shall host a conference call with the Agent and the Lenders to discuss the financial information provided by the Company pursuant to <u>Sections 5.2</u> - <u>5.4</u>, and/or <u>5.6</u>, as applicable, and this <u>Section 5.26</u>, which conference calls shall be conducted during normal business hours at such times as may be mutually agreed between the Borrowers, the Agent and the Required Lenders.

(c)    No later than five (5) Business Days before the end of each consecutive full four-week period included in the then-effective Budget, the Borrowers shall deliver to the Agent and Lenders a proposed updated Budget for the remaining period covered by the then-effective Budget for the approval of the Agent and the Required Lenders in their sole discretion, which updated Budget must be approved by the Agent and the Required Lenders at least two (2) Business Days before the end of such four-week period.  If the Agent and the Required Lenders reject such updated Budget, the Borrowers shall, within 24 hours of receipt of such notice of rejection, engage in good faith negotiations with the Agent in order to develop a proposed updated Budget that is acceptable to the Agent and Required Lenders in their sole discretion (such revised proposed Budget to be submitted within two (2) Business Days of the Borrower's receipt of a notice of rejection).  Any proposed updated Budget shall, upon approval by the Agent pursuant to this <u>Section 5.26(c)</u>, become the effective Budget and shall replace and supersede the then-effective Budget.  For clarification purposes, in the event the Budget is not approved by the Agent and the Required Lenders, the Budget that was last approved by the Agent and the Required Lenders shall remain in effect.

5.27    <u>Certain Other Bankruptcy Orders</u>.  As soon as practicable in advance of filing with the Bankruptcy Court, but in no event less than two (2) days before filing, the Borrowers shall furnish to the Agent and each Lender (i) the motion seeking approval of and proposed forms of the Orders, which motion shall be in form and substance satisfactory to the Agent in its sole discretion, (ii) all other proposed orders and pleadings related to this Agreement, which orders and pleadings shall be in form and substance reasonably satisfactory to the Agent, (iii) any Reorganization Plan, and/or any disclosure statement related to such plan (which plan or disclosure statement shall comply with the requirements set forth herein), (iv) any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods set forth in section 1121 of the Bankruptcy Code, (v) any motion seeking approval of any sale of the Debtors' assets and any proposed form of a related bidding procedures order and sale order, (vi) any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive plan or severance plan, the assumption, rejection, modification or amendment of any material contract; (vii) any "first day" pleadings intended to

- 55 -

be filed with the Bankruptcy Court on the Petition Date; and (viii) any other pleadings to be filed by Borrowers with the Bankruptcy Court (each of which must be in form and substance satisfactory to the Agent in its sole discretion).

5.28    Certain Case Milestones.    The following "Milestones" shall apply to this Agreement, subject to extension by the Agent in its sole discretion:

(a)    on the Petition Date, the Debtors shall file a joint chapter 11 plan (the "Chapter 11 Plan"), in form and substance acceptable to the Agent and the Prepetition Agent, pursuant to which, among other things, the Obligations (as defined in the Prepetition Loan Agreement) will be converted into equity of the reorganized Debtors;

(b)    the Bankruptcy Court shall have entered an order (the "Disclosure Statement Order") approving the disclosure statement accompanying the Chapter 11 Plan (the "Disclosure Statement") in form and substance acceptable to the Prepetition Agent and the Agent and granting related relief by the 45th day after the Petition Date;

(c)    an order confirming the Chapter 11 Plan (the "Confirmation Order"), in form and substance acceptable to the Prepetition Agent and the Agent, shall have been entered by the Bankruptcy Court by the 90th day following the Petition Date; and

(d)    the Effective Date (as defined in the Chapter 11 Plan) shall have occurred by the 15th day following entry of the Confirmation Order.

5.29    Appointment of Chief Restructuring Officer.    If requested by the Agent, the Borrowers shall promptly retain a CRO on reasonably and customary terms acceptable to the Agent to oversee the bankruptcy process, subject to approval by the Bankruptcy Court.  Once retained, the CRO shall be subject to removal only upon an order of the Bankruptcy Court.

ARTICLE VI

NEGATIVE COVENANTS

So long as any Obligation remains outstanding or unpaid, none of the Borrowers will:

6.1    Indebtedness.    Create, incur, assume or suffer to exist any Indebtedness, whether by way of loan or otherwise; provided, however, the foregoing restriction shall not apply to (a) the Obligations, (b) amounts incurred that are payable as Operating Disbursements including unsecured accounts payable incurred in the ordinary course of business and authorized by the Budget, which are not unpaid in excess of forty-five (45) days beyond invoice date or are being contested in good faith and as to which such reserve as is required by GAAP has been made, (c) Indebtedness of the Borrowers at any time owing by the relevant Borrower under any of the Minimum Required Commodity Hedge Agreements or other Commodity Hedge Agreement with Approved Hedge Counterparties and approved by the Agent, (d) Indebtedness associated with Permitted Liens pursuant to clauses (d) and (f) of the definition thereof, and (e) amounts incurred that are payable as Other Disbursements.

6.2    <u>Contingent Obligations</u>.  Create, incur, assume or suffer to exist any Contingent Obligation; <u>provided</u>, <u>however</u>, the foregoing restriction shall not apply to (a) performance guarantees, performance surety or other bonds or endorsements of items deposited for collection, in each case provided in the ordinary course of business or (b) trade credit incurred or operating leases entered into in the ordinary course of business.

6.3    <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien on any of its Property, whether now owned or hereafter acquired; <u>provided</u>, <u>however</u>, the foregoing restriction shall not apply to Permitted Liens.

6.4    <u>Sales of Assets</u>.  Sell, transfer or otherwise dispose of, any of its Property, whether now owned or hereafter acquired, or enter into any agreement to do so; <u>provided</u>, <u>however</u>, the foregoing restriction shall not apply to (a) the sale of Hydrocarbons or inventory in the ordinary course of business, <u>provided</u> that no contract for the sale of Hydrocarbons shall obligate the relevant Borrower to deliver Hydrocarbons produced from any of its Oil and Gas Properties at some future date without receiving full payment therefor within sixty (60) days of delivery, (b) the sale or other disposition of Property destroyed, lost, worn out, damaged or having only salvage value or no longer used or useful in the business in which it is used, (c) the sale, transfer or other disposition of Property from the Borrowers to any other Borrowers or direct obligor hereunder, or (d) sales or other dispositions of Property, the proceeds of which are used to pay the Obligations in full in cash.

6.5    <u>Leasebacks</u>.  Enter into any agreement to sell or transfer any Property and thereafter rent or lease as lessee such Property or other Property intended for the same use or purpose as the Property sold or transferred.

6.6    <u>Sale or Discount of Receivables</u>.  Except to minimize losses on bona fide debts previously contracted, discount or sell with recourse, or sell for less than the greater of the face or market value thereof, any of its notes receivable or accounts receivable.

6.7    <u>Loans or Advances</u>.  Make or agree to make or allow to remain outstanding any loans or advances to any Person; <u>provided</u>, <u>however</u>, the foregoing restriction shall not apply to (a) advances or extensions of credit in the form of accounts receivable incurred in the ordinary course of business and on terms customary in the relevant industry, (b) loans or advances by the relevant Borrower to any of the other Borrower or (c) other loans or advances not exceeding $25,000, in the aggregate for the Borrowers on a consolidated basis, at any time outstanding. Notwithstanding the forgoing, the Borrowers shall not make any advance or loan to or for the benefit of, whether directly or otherwise, to: (i) any Person directly or indirectly related to any Borrower or (ii) any officer or manager of such Borrower, without the express written consent of the Agent.

6.8    <u>Investments</u>.  Make or acquire Investments in, or purchase or otherwise acquire all or substantially all of the assets of, any Person; <u>provided</u>, <u>however</u>, the foregoing restriction shall not apply to (a) the purchase or acquisition of Oil and Gas Properties, pipelines and gathering systems or other Property related thereto or related to farm-out, farm-in, joint operating, joint venture or area of mutual interest agreements or other similar arrangements which are usual and customary in the oil and gas exploration and production business located

- 57 -

within the geographic boundaries of the United States of America (including, the federal Outer Continental Shelf) and otherwise in accordance with the Drilling Plan, the Budget and this Agreement, (b) Investments in the form of (i) debt securities issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof, with maturities of no more than one year, (ii) commercial paper of a domestic issuer rated at the date of acquisition at least P-2 by Moody's Investor Service, Inc. or A-2 by Standard & Poor's Corporation and with maturities of no more than one year from the date of acquisition, (iii) repurchase agreements covering debt securities or commercial paper of the type permitted in this Section 6.8, or (iv) certificates of deposit, demand deposits, eurodollar time deposits, overnight bank deposits and bankers' acceptances, with maturities of no more than one year from the date of acquisition, issued by or acquired from or through any Lender or any bank or trust company organized under the laws of the United States of America or any state thereof and having capital surplus and undivided profits aggregating at least $100,000,000, (c) other short-term Investments similar in nature and degree of risk to those described in clause (b) of this proviso to this Section 6.8, (d) Investments in money-market funds sponsored or administered by Persons acceptable to the Agent and which funds invest in short-term Investments similar in nature and degree of risk to those described in clause (b) of this proviso to this Section 6.8, or (e) evidences of loans or advances not prohibited by the provisions of Section 6.7.

6.9     Dividends and Distributions.  Declare, pay or make, whether in cash or Property of the relevant Borrower, any dividend or distribution on, or purchase, redeem or otherwise acquire for value, any of its Equity Interests, other than distributions to another Borrower.

6.10    Issuance of Equity; Changes in Corporate Structure.  Issue or agree to issue any Equity Interests in any Borrower or any Subsidiary other than common Equity Interests; enter into any transaction of consolidation, merger or amalgamation (including through a plan of division), or liquidate, wind-up or dissolve (or suffer any liquidation or dissolution).

6.11    Transactions with Affiliates and Certain Other Person.  Directly or indirectly, enter into any transaction (including the sale, lease or exchange of Property or the rendering of service) with any of its Affiliates or with any Person directly or indirectly related to any Borrower or any manager or officer of such Borrower (other than transactions entered into in the normal course of business between the Borrowers and any other Borrower not otherwise prohibited hereunder), other than: (a) upon fair and reasonable terms no less favorable than could be obtained in an arm's length transaction with a Person which was not an Affiliate and (b) upon terms approved by the Agent in writing.

6.12    Lines of Business.  Engage in any line of business other than those in which the relevant Borrower is engaged as of the Closing Date.

6.13    Plan Obligation.  Assume or otherwise become subject to an obligation to contribute to or maintain any Plan or acquire any Person which has at any time had an obligation to contribute to or maintain any Plan.

6.14    Anti-Terrorism Laws.  Conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person; Deal in, or otherwise engage in

- 58 -

any transaction relating to, any Property or interests in Property blocked pursuant to Executive Order No. 13224; Engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate (i) any of the prohibitions set forth in Executive Order No. 13224 or the USA Patriot Act or (ii) any prohibitions set forth in the rules or regulations issued by OFAC or any sanctions against targeted foreign countries, terrorism sponsoring organizations and international narcotics traffickers based on United States of America foreign policy.

6.15   <u>Amendment of Material Contracts</u>.   Amend, supplement, restate or otherwise modify, in any material respect, any material contract or agreement to which the relevant Borrower is a party, including, without limitation, any Drilling Plan or joint operating agreement, without express written consent from the Agent.

6.16   <u>Provisions of Commodity Hedge Agreements</u>.   Enter into any Commodity Hedge Agreement containing any provision obligating the relevant Borrower to provide to the relevant Approved Hedge Counterparty any further collateral, margin, letter of credit or any other form of security or credit support for the obligations, contingent or otherwise, of the relevant Borrower thereunder without approval of the Agent.

6.17   <u>Maintenance of Commodity Hedge Agreements</u>.   Enter into any Commodity Hedge Agreement, whether with an Approved Hedge Counterparty or another Person, other than the Minimum Required Commodity Hedge Agreements or liquidate or terminate any of Minimum Required Commodity Hedge Agreements.

6.18   <u>Deposit Accounts</u>.   Establish or maintain funds on deposit in a deposit account with any financial institution other than in (a) the Lockbox Account, (b) the CapEx Account, or (c) an Operating Account (including deposit accounts used to maintain funds in suspense or royalties due to third-parties) as described on <u>Schedule 6.18</u> attached hereto.

6.19   <u>Drilling Plans</u>.   Make any expenditure with respect to maintenance, exploration or development activities with respect to the Oil and Gas Properties other than as contemplated in the Drilling Plan.

6.20   <u>Subsidiaries</u>.   The formation or acquisition of any new direct or indirect Subsidiary after the Closing Date shall only occur with the consent of the Agent and the Required Lenders.

6.21   <u>Intentionally Omitted</u>.

6.22   <u>Capital Expenditures</u>.   Make or commit or agree to make, in any fiscal quarter, Capital Expenditures (by purchase, lease or otherwise or incur costs associated with the exploration and development of Borrowers' Oil and Gas Properties) except as permitted by the Budget and the Drilling Plan.

6.23   <u>Intentionally Omitted</u>.

6.24   <u>Intentionally Omitted</u>.

HW_US:73367004.8

6.25    <u>Intentionally Omitted</u>.

6.26    <u>Budget Variances</u>.

(a)    The Budget shall be tested on a weekly basis (of Monday through Sunday) on the last Business Day of each week as required under <u>Section 5.26</u>.  Any deviation from the Budget in excess of the Permitted Variances (as described below in <u>Section 6.26(b)</u>) shall constitute non-compliance with the Budget and the terms of the Loan Documents and an Event of Default; provided that the Required Lenders shall have the authority to provide written pre-approval for any deviations in excess of the Permitted Variances.

(b)    As of any Testing Date, for the Testing Period(s) ending on such Testing Date, the Borrowers shall not allow (i) any Operating Disbursements made by the Borrowers during such Testing Period (reduced by any applicable accrued and unused Carry Forward Amounts for the applicable Disbursement Line Item with respect to each Operating Disbursement) to be (x) greater than 120% of the applicable Disbursement Line Item related to such Operating Disbursements for the Borrowers set forth in the Budget for such Testing Period and (y) greater than 110% of the applicable Disbursement Line Item related to such Operating Disbursements for the Borrowers set forth in the Budget on a cumulative basis for that portion of the Budget ending on the Testing Date; (ii) the aggregate Operating Disbursements made by the Borrowers during such Testing Period (reduced by any applicable accrued and unused Carry Forward Amounts) to be (x) greater than 120% of the aggregate Operating Disbursements for the Borrowers set forth in the Budget for such Testing Period and (y) greater than 110% of the aggregate Operating Disbursements for the Borrowers set forth in the Budget on a cumulative basis for that portion of the Budget ending on the Testing Date; (iii) the aggregate Receipts received by the Borrowers during such Testing Period (increased by any applicable accrued and unused Carry Forward Amounts) to be (x) less than 80% of the aggregate Receipts for the Borrowers set forth in the Budget for such Testing Period or (y) less than 90% of the aggregate Receipts for the Borrowers set forth in the Budget on a cumulative basis for that portion of the Budget ending on the Testing Date; (iv) the aggregate Professionals Fees disbursements made by the Borrowers on a cumulative basis over each Testing Period (reduced by any applicable accrued and unused Carry Forward Amounts related to Professional Fees) to be greater than 110% of the aggregate Professional Fees set forth in the Budget on a cumulative basis for that portion of the Budget ending on the Testing Periods (the variance in Disbursement Line Items described in the foregoing clause (i), the variance in Operating Disbursements described in the foregoing clause (ii), the variance in Receipts described in the foregoing clause (iii) and the variance in Professional Fees described in the foregoing clause (iv), the "<u>Permitted Variances</u>").

(c)    For the purposes of the above calculations, it is agreed that to the extent that the Professional Fees incurred by counsel to the Lenders exceed the amounts for such line items in the Budget, such excess amounts shall be disregarded when calculating the Permitted Variance.

6.27    <u>Organizational Documents</u>.    Enter into any amendment or permit any modification of, or waive any material right or obligation of any Person under, any Borrower's applicable certificate or articles of incorporation, certificate of formation, bylaws, limited

- 60 -

liability company agreement or equivalent or comparable document, in each case in a manner that is materially adverse to the Agent or the Lenders.

6.28     Use of Proceeds.  The Borrowers shall not directly or indirectly, use or permit the use of all or any portion of the Loans for any purpose other than the Approved Purposes.  The Borrowers will not directly or indirectly use the proceeds of the Term Loans, or otherwise make available such proceeds to any person, (a) to permit the Borrowers, any or any other party-in-interest or their representatives to challenge or otherwise contest or institute any proceeding to determine (i) the validity, perfection or priority of security interests in favor of any of the Lenders or Prepetition Loan Documents, or (ii) the enforceability of the obligations of the Borrowers under the DIP Facility or Prepetition Loan Documents, (b) to investigate (except as may be required by the Bankruptcy Court), commence, prosecute or defend any claim, motion, proceeding or cause of action against any of the Lenders, the lenders under the Prepetition Loan Documents and their respective agents, attorneys, advisors or representatives including, without limitation, any lender liability claims, subordination claims or any claims attempting to invalidate any of the Loan Documents or Prepetition Loan Documents, (c) to fund acquisitions, capital expenditures or any other expenditure other than as set forth in the Budget, (d) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Terrorism Laws, (e) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Blocked Person, or (f) in a manner that would otherwise violate any Anti-Terrorism Law.

6.29     Additional Bankruptcy Matters.  The Borrowers shall not do any of the following:

(a)     assert or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement or defense of the Loan Documents against any of the Agent or Lenders;

(b)     subject to Section 7.2(b), object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Agent or the Lenders with respect to the Collateral following the occurrence of an Event of Default (provided that any Borrower may contest or dispute whether an Event of Default has occurred);

(c)     except as expressly provided or permitted hereunder or as provided pursuant to any other Order of the Bankruptcy Court which is in form and substance satisfactory to the Required Lenders, make any payment or distribution to any non-Debtor Affiliate or insider of the Borrowers outside of the ordinary course of business; or

(d)     without the consent of the Agent and the Required Lenders, file a motion (or support any motion) seeking to amend or otherwise modify any Order in any manner adverse to the Lenders.

6.30     Prepayments or Amendments of Existing Debt.  The Borrowers shall not directly or indirectly:

(a)     make any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in substance or legal

defeasance), sinking fund or similar payment with respect to, any Indebtedness outstanding on the Closing Date except as permitted in this Agreement or the Orders; or

(b)    amend or modify any other term or provision of the Prepetition Loan Documents, if such amendment or modification would be materially adverse to the Lenders.

## ARTICLE VII

## EVENTS OF DEFAULT

7.1    <u>Enumeration of Events of Default</u>.  Any of the following events shall constitute an Event of Default:

(a)    default shall be made in the payment when due of any installment of principal or interest under this Agreement or the Notes or in the payment when due of any fee or other sum payable under any Loan Document to which the relevant Borrower is a party;

(b)    default shall be made by the Borrowers in the due observance or performance of any of its obligations under the Loan Documents, and, as to compliance with the obligations of the Borrowers under <u>Article V</u> (other than <u>Sections 5.14</u> and <u>5.28</u>), such default shall continue for five (5) days after the earlier of notice thereof to the relevant Borrower or Borrowers by the Agent or knowledge thereof by the relevant Borrower or any of the other Borrowers;

(c)    any representation or warranty made by the Borrowers in any of the Loan Documents to which the relevant Borrower is a party proves to have been untrue in any material respect or any representation, statement (including Financial Statements), certificate or data furnished or made to the Agent or any Lender in connection herewith proves to have been untrue in any material respect as of the date the facts therein set forth were stated or certified;

(d)    default shall be made by any Borrower (as principal or guarantor or other surety) in the payment or performance of any bond, debenture, note or other Indebtedness in excess of $50,000 in the aggregate as to the relevant Borrower or under any credit agreement, loan agreement, indenture, promissory note or similar agreement or instrument executed in connection with any of the foregoing, and such default shall remain unremedied for in excess of the period of grace, if any, with respect thereto; provided that this clause (d) shall not apply to any Indebtedness outstanding hereunder and any Indebtedness of any Borrower that was incurred prior to the Petition Date (or, if later, the date on which such Person became a Debtor);

(e)    the levy against any significant portion of the Property of the Borrowers, or any execution, garnishment, attachment, sequestration or other writ or similar proceeding post-petition in an amount in excess of $50,000 as to the relevant Borrower which is not permanently dismissed or discharged within 60 days after the levy;

(f)    a final and non-appealable order, judgment or decree shall be entered against any Borrower post-petition for money damages and/or Indebtedness due that accrued post-petition in an amount in excess of $50,000, and such order, judgment or decree shall not be dismissed or stayed within 60 days or is not fully covered by insurance;

- 62 -

(g)    any charges are filed or any other action or proceeding is instituted by any Governmental Authority against any Borrower under the Racketeering Influence and Corrupt Organizations Statute (18 U.S.C. §1961 et seq.), the result of which could be the forfeiture or transfer of any material Property of the relevant Borrower subject to a Lien in favor of the Agent without (i) satisfaction or provision for satisfaction of such Lien or (ii) such forfeiture or transfer of such Property being expressly made subject to such Lien;

(h)    no Borrower shall have (i) concealed, removed or diverted, or permitted to be concealed, removed or diverted, any part of its Property, with intent to hinder, delay or defraud its creditors or any of them, (ii) made or suffered a transfer of any of its Property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law with intent to hinder, delay or defraud its creditors, (iii) made any transfer of its Property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid with intent to hinder, delay or defraud its creditors or (iv) shall have suffered or permitted, while insolvent, any creditor to obtain a Lien upon any of its Property through legal proceedings or distraint which is not vacated within 60 days from the date thereof;

(i)    any Security Document shall for any reason not, or cease to, create valid and perfected first-priority Liens against the Property of the Borrower which is a party thereto purportedly covered thereby, except to the extent permitted by this Agreement;

(j)    any Loan Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the payment in full in cash of the Obligations in accordance with the terms hereof) or any Borrower contests in any manner the validity or enforceability of any provision of any Loan Document to which it is a party, or denies that it has any liability under any Loan Document to which it is a party;

(k)    any Borrower purports to revoke, terminate or rescind any Loan Document or any provision of any Loan Document;

(l)    any Borrower pays, in cash or otherwise, any portion of any Subordinated Indebtedness not expressly permitted pursuant to the terms of a subordination agreement in favor of the Agent;

(m)    a Change of Management occurs;

(n)    any Borrower (or any direct or indirect parent of any Borrower) or any Person claiming by or through any of the foregoing, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Agent or any of the Lenders regarding the DIP Facility, unless such suit or other proceeding is in connection with the enforcement of the Loan Documents against the Agent or Lenders;

(o)    other than Chapter 11 Plan, a plan of reorganization shall be confirmed in any of the Cases, or any order shall be entered which dismisses any of the Cases and which order does not provide for termination of the Commitments under this Agreement and indefeasible payment in full in cash of the Obligations under the Loan Documents or provide such treatment that is otherwise acceptable to the Agent and Lenders in their sole discretion, or any of the

Borrowers or any of their Subsidiaries shall file, propose, support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order;

(p)    any Borrower or any of its Subsidiaries shall file any motion seeking authority to consummate the sale of assets of any Borrower or any of its Subsidiaries (other than as permitted under the Loan Documents) pursuant to Section 363 of the Bankruptcy Code, without prior written consent of the Lenders;

(q)    the entry of an order dismissing any of the Cases or converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, or any filing by the Borrowers or any of their Subsidiaries of a motion or other pleading seeking entry of such an order or supporting entry of such an order;

(r)    a trustee, responsible officer or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) is appointed or elected in the any of the Cases, any Borrower or any of its Subsidiaries applies for, consents to, or fails to contest in, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Lenders in their sole discretion;

(s)    the entry of an order or the filing by any Borrower or any of its Subsidiaries of an application, motion or other pleading seeking entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case in a manner adverse in any material respect to the Agent or the Lenders;

(t)    the entry of an order in any of the Cases denying or terminating use of Cash Collateral by the Borrowers or any of their Subsidiaries;

(u)    the entry of an order in any of the Cases granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed against any material assets of the Borrowers or any of their Subsidiaries;

(v)    the entry of a final non-appealable order in the Cases charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders or the commencement of any other actions by the Borrowers or any of their Subsidiaries (or any direct or indirect parent thereof), that challenges the rights and remedies of the Agent or the Lenders under this Agreement in any of the Cases or that is inconsistent with the Loan Documents;

(w)    the entry of an order in any of the Cases seeking authority to use Cash Collateral (other than with the prior written consent of the Agent and the Lenders) or to obtain financing under Section 364 of the Bankruptcy Code (other than the DIP Facility);

(x)    the entry of an order in any of the Cases granting adequate protection to any other person (other than the Orders, relief approved by the Agent and Required Lenders granted to the Approved Hedge Counterparty, and "first day" orders), to the extent such adequate protection is senior or pari passu to the Liens and Superpriority Claims granted to the Agent and Lenders in the Orders;

- 64 -

(y)     the filing or support by the Borrowers or any of their Subsidiaries of a plan of reorganization that (a) does not provide for the indefeasible payment in full, in cash of all obligations owing under this Agreement or such other treatment that is acceptable to Agent and Lenders in their sole discretion; and (b) is not otherwise acceptable to the Agent and the Lenders in their sole and reasonable discretion;

(z)     the filing or support of any pleading by any Borrower or any of its Subsidiaries (or any direct or indirect parent thereof), seeking, or otherwise consenting to, any of the matters set forth in clauses (q) through (y) above;

(aa)     termination or expiration of any exclusivity period for any Borrower of or any of its Subsidiaries to file or solicit acceptances for a plan of reorganization;

(bb)     the making of any Pre-Petition Payments other than (i) as permitted by the Interim Order or the Final Order, (ii) as permitted by any "first day" orders reasonably satisfactory to the Agent and the Lenders, or (iii) as permitted by any other order of the Bankruptcy Court in amounts reasonably satisfactory to the Agent and the Lenders;

(cc)     the entry of an order of the Bankruptcy Court granting, other than in respect of the DIP Facility and the Carve-Out, any claim entitled to superpriority administrative expense claim status in the Cases pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of the Agent and the Lenders under the DIP Facility, or the filing by the Borrowers or any of their Subsidiaries of a motion or application seeking entry of such an order;

(dd)     other than with respect to the Carve-Out and the Liens permitted to have such priority under Section 2.21, and subject to the Orders, relief approved by the Agent and Required Lenders provided to the Approved Hedge Counterparty and "first day" orders, the Company shall create or incur, or the Bankruptcy Court enters an order granting, any Lien which is pari passu with or senior to any Liens under the Loan Documents or the adequate protection Liens granted under the Interim Order; or

(ee)     noncompliance by any Borrower or any of its Subsidiaries with the terms of the Interim Order or the Final Order.

7.2   Remedies.

(a)     Subject to the provisions of the Orders, upon the occurrence of any Event of Default, the Agent may, and upon the request of the Required Lenders shall, by notice in writing to any Borrower, declare all Obligations immediately due and payable, without presentment, demand, protest, notice of protest, default or dishonor, notice of intent to accelerate maturity, notice of acceleration of maturity or other notice of any kind, except as may be provided to the contrary elsewhere herein, all of which are hereby expressly waived by each Borrower.

(b)     Subject to the provisions of the Orders, upon the occurrence of any Event of Default and the giving of five (5) Business Days' notice to the Borrowers (the "Remedies Notice Period"), the Lenders, with the oral consent of the Required Lenders (confirmed promptly

in writing), and the Agent, in accordance with the terms hereof, may, in addition to the foregoing in this Section 7.2, exercise any or all of their rights and remedies provided by law or pursuant to the Loan Documents, including without limitation, the ability of Lenders to credit bid up to 100% of the Obligations then outstanding.  During the Remedies Notice Period, the Borrowers and any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.

(c)      Should the Obligations under the Loan Documents become immediately due and payable in accordance with any of the preceding subsections of this Section 7.2, following the Remedies Notice Period and subject to order(s) of the Bankruptcy Court, the Agent shall be entitled to proceed against the Collateral.

(d)      Proceeds received by the Agent from realization against the Collateral and any other funds received by the Agent from any Borrower when an Event of Default has occurred and is continuing shall be applied (i) first, to fees and expenses due pursuant to the terms of this Agreement, any other Loan Document or any Commodity Hedge Agreement with a Lender, (ii) second, to accrued interest on the Obligations under the Loan Documents or any Commodity Hedge Agreement with a Lender and (iii) third, to the Loan Balance and any other Obligations then due and payable, pro rata in accordance with the ratio of the Loan Balance or such other Obligations, as the case may be, to the sum of the Loan Balance and such other Obligations.  Notwithstanding the foregoing, amounts received from any Borrower that is not an Eligible Contract Participant shall not be applied to any Excluded Swap Obligations owing to a Lender, it being understood that in the event any amount is applied to the Obligations other than Excluded Swap Obligations as a result of this sentence, the Agent shall make such adjustments as it determines are appropriate pursuant to this sentence, from amounts received from Eligible Contract Participants to ensure, as nearly as possible, that the proportional aggregate recoveries with respect to the Obligations described in the preceding sentence of this subsection (d) of this Section 7.2 by Lenders that are the holders of any Excluded Swap Obligations are the same as the proportional aggregate recoveries with respect to other Obligations pursuant to the preceding sentence of this subsection (d) of this Section 7.2.

## ARTICLE VIII

## THE AGENT

8.1     Appointment.  Each Lender hereby designates and appoints the Agent as the agent of such Lender under this Agreement and the other Loan Documents to which the Agent is a party or under which the Agent is granted any right or remedy.  Each Lender authorizes the Agent, as the agent for such Lender, to take such action on behalf of such Lender under the provisions of this Agreement or the other Loan Documents to which the Agent is a party or under which the Agent is granted any right or remedy and to exercise such powers and perform such duties as are expressly delegated to the Agent by the terms of this Agreement or the other Loan Documents to which the Agent is a party or under which the Agent is granted any right or remedy, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement or in any other Loan Document to which the Agent is a party or under which the Agent is granted any right or remedy, the Agent

shall not have any duties or responsibilities except those expressly set forth herein or in any other Loan Document to which the Agent is a party or under which the Agent is granted any right or remedy or any fiduciary relationship with any Lender; and no implied covenants, functions, responsibilities, duties, obligations or liabilities on the part of the Agent shall be read into this Agreement or any other Loan Document to which the Agent is a party or under which the Agent is granted any right or remedy or otherwise exist against the Agent.

8.2    Delegation of Duties.   The Agent may execute any of its duties under this Agreement and the other Loan Documents to which the Agent is a party or under which the Agent is granted any right or remedy by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Agent shall not be responsible to any Lender for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

8.3    Exculpatory Provisions.   Neither the Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) required to initiate or conduct any litigation or collection proceedings hereunder, including in each case, without limitation, any expression of approval or satisfaction or any delivery of a Carve-Out Trigger Notice pursuant to and as defined in the Orders, except with the concurrence of the Required Lenders and contribution by each Lender of its Percentage Share of costs reasonably expected by the Agent to be incurred in connection therewith, (b) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document to which the Agent is a party or under which the Agent is granted any right or remedy (except for gross negligence or willful misconduct of the Agent or such Person) or (c) responsible in any manner to any Lender for any recitals, statements, representations or warranties made by any Borrower or any Responsible Officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any other Loan Document to which the Agent is a party or under which the Agent is granted any right or remedy, or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document to which the Agent is a party or under which the Agent is granted any right or remedy or for any failure of any Borrower to perform its obligations hereunder or thereunder.  The Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document to which the Agent is a party or under which the Agent is granted any right or remedy, or to inspect the Properties, books or records of the Borrowers.

8.4    Reliance by Agent.   The Agent shall be entitled to rely, and shall be fully protected in relying, upon any Note, writing, resolution, notice, consent, certificate, affidavit, letter, telegram, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrowers), independent accountants and other experts selected by the Agent.  The Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless and until a written notice of assignment, negotiation or transfer thereof shall have been received by the Agent.  The Agent shall be fully justified in failing or refusing to take any action under this

- 67 -

Agreement or any other Loan Document to which the Agent is a party or under which the Agent is granted any right or remedy unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and contribution by each Lender of its Percentage Share of costs reasonably expected by the Agent to be incurred in connection therewith. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents to which the Agent is a party or under which the Agent is granted any right or remedy in accordance with a request of the Required Lenders. Such request and any action taken or failure to act pursuant thereto shall be binding upon the Lenders and all future holders of the Notes. In no event shall the Agent be required to take any action that exposes the Agent to liability or that is contrary to any Loan Document to which the Agent is a party or under which the Agent is granted any right or remedy or applicable Requirement of Law.

8.5    <u>Notice of Default</u>. The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Agent has received notice from a Lender or the Borrowers referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." In the event that the Agent receives such a notice, the Agent shall promptly give notice thereof to the Lenders. The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; <u>provided</u> that unless and until the Agent shall have received such directions, subject to the provisions of <u>Section 7.2</u>, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders. In the event that the officer of the Agent primarily responsible for the lending relationship with the Borrowers or any Responsible Officer of any Lender primarily responsible for the lending relationship with the Borrowers becomes aware that a Default or Event of Default has occurred and is continuing, the Agent or such Lender, as the case may be, shall use its good faith efforts to inform the other Lenders and/or the Agent, as the case may be, promptly of such occurrence. Notwithstanding the preceding sentence, failure to comply with the preceding sentence shall not result in any liability to the Agent or any Lender.

8.6    <u>Non-Reliance on Agent and Other Lenders</u>. Each Lender expressly acknowledges that neither the Agent nor any other Lender nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representation or warranty to such Lender and that no act by the Agent or any other Lender hereafter taken, including any review of the affairs of the Borrowers, shall be deemed to constitute any representation or warranty by the Agent or any Lender to any other Lender. Each Lender represents to the Agent that it has, independently and without reliance upon the Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, condition (financial and otherwise) and creditworthiness of the Borrowers and the value of the Properties of the Borrowers and has made its own decision to enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, condition (financial and otherwise) and creditworthiness

- 68 -

of the Borrowers and the value of the Properties of the Borrowers.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agent hereunder, the Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial and otherwise) or creditworthiness of the Borrowers or the value of the Properties of the Borrowers which may come into the possession of the Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

8.7    Indemnification.  Each Lender agrees to indemnify the Agent and its officers, directors, employees, agents, attorneys-in-fact and Affiliates (to the extent not reimbursed by the Borrowers and without limiting the obligation of the Borrowers to do so), ratably according to the Percentage Share of such Lender, from and against any and all liabilities, claims, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind whatsoever which may at any time (including any time following the payment and performance of all Obligations and the termination of this Agreement) be imposed on, incurred by or asserted against the Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates in any way relating to or arising out of this Agreement or any other Loan Document, or any other document contemplated or referred to herein or the transactions contemplated hereby or any action taken or omitted by the Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates under or in connection with any of the foregoing, including any liabilities, claims, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements imposed, incurred or asserted as a result of the negligence, whether sole or concurrent, of the Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from the gross negligence or willful misconduct of the Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.  The agreements in this Section 8.7 shall survive the payment and performance of all Obligations and the termination of this Agreement.

8.8    Restitution.  Should the right of the Agent or any Lender to realize funds with respect to the Obligations be challenged and any application of such funds to the Obligations be reversed, whether by Governmental Authority or otherwise, or should the Borrowers otherwise be entitled to a refund or return of funds distributed to the Lenders in connection with the Obligations, the Agent or such Lender, as the case may be, shall promptly notify the Lenders of such fact.  Not later than Noon, Eastern Standard or Eastern Daylight Savings Time, as the case may be, of the Business Day following such notice, each Lender shall pay to the Agent an amount equal to the ratable share of such Lender of the funds required to be returned to the Borrowers entitled to such funds.  The ratable share of each Lender shall be determined on the basis of the percentage of the payment all or a portion of which is required to be refunded originally distributed to such Lender, if such percentage can be determined, or, if such percentage cannot be determined, on the basis of the Percentage Share of such Lender.  The Agent shall forward such funds to the relevant Borrower or to the Lender required to return such funds.  If any such amount due to the Agent is made available by any Lender after Noon, Eastern Standard or Eastern Daylight Savings Time, as the case may be, of the Business Day following such notice, such Lender shall pay to the Agent (or the Lender required to return funds to the relevant Borrower, as the case may be) for its own account interest on such amount at a rate

- 69 -

equal to the Federal Funds Rate for the period from and including the date on which restitution to the relevant Borrower is made by the Agent (or the Lender required to return funds to the relevant Borrower, as the case may be) to but not including the date on which such Lender failing to timely forward its share of funds required to be returned to the relevant Borrower shall have made its ratable share of such funds available.

8.9     Agent in Its Individual Capacity.  Lender serving as the Agent hereunder and its Affiliates may make loans to, accept deposits from, and generally engage in any kind of business with the Borrowers or any of them as though such Lender were not the agent hereunder.  With respect to any Note issued to the Lender serving as the agent, such Lender shall have the same rights and powers under this Agreement as a Lender and may exercise such rights and powers as though it were not the agent hereunder.  The terms "Lender" and "Lenders" shall include the Agent in its individual capacity as a Lender.

8.10    Successor Agent.  The Agent may resign as Agent upon ten days' notice to the Lenders and the Borrowers.  If the Agent shall resign as Agent under this Agreement and the other Loan Documents, Lenders for which the Percentage Shares aggregate in excess of fifty percent (50%) shall appoint from among the Lenders or Affiliates of Lender a successor agent for the Lenders, whereupon such successor agent shall succeed to the rights, powers and duties of the Agent.  The term "Agent" shall mean such successor agent effective upon its appointment.  The rights, powers and duties of the former Agent as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any holders of the Notes.  After the removal or resignation of any Agent hereunder as Agent, the provisions of this Article VIII and those of any Section of this Agreement relating to the Agent, including Section 5.16, Section 5.17, Section 5.21, Section 5.22 and Section 8.7 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

8.11    Applicable Parties.  The provisions of this Article VIII are solely for the benefit of the Agent and the Lenders, and none of the Borrowers shall have any rights as a third party beneficiary or otherwise under any of the provisions of this Article VIII.  In performing functions and duties hereunder and under the other Loan Documents, the Agent shall act solely as the agent of the Lenders and does not assume, nor shall it be deemed to have assumed, any obligation or relationship of trust or agency with or for the Borrowers or any legal representative, successor or assign of the Borrowers.

8.12    Releases.  Each Lender hereby authorizes the Agent to release any Collateral that is permitted to be sold or released pursuant to the terms of the Loan Documents.  Each Lender hereby authorizes the Agent to execute and deliver to the Borrowers or any of them, at the sole cost and expense of the Borrowers, any and all releases of Liens, termination statements, assignments or other documents reasonably requested by the Borrowers in connection with any sale or other disposition of Property to the extent such sale or other disposition is permitted by the terms of the Loan Documents.

## ARTICLE IX

## MISCELLANEOUS

9.1    <u>Assignments; Participations</u>.

(a)    None of the Borrowers may assign any of its rights or obligations under any Loan Document without the prior written consent of the Agent and the Lenders.

(b)    With the consent of the Agent and, so long as there exists no Default or Event of Default, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement pursuant to an Assignment Agreement.   Any such assignment shall be in the amount of at least $25,000 (or any whole multiple of $25,000 in excess thereof), unless the relevant assignment is to an affiliate of the assigning Lender or is an assignment of the entire Commitment of the assigning Lender.   The assignee shall pay to the Agent, if requested by the Agent, a transfer fee in the amount of $2,500 for each such assignment.   Any such assignment shall become effective upon receipt by the Agent of all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act, the execution and delivery to the Agent of the Assignment Agreement and recordation by the Agent in the Register in accordance with this <u>Section 9.1(b)</u>.   Promptly following receipt of an executed Assignment Agreement, the Agent shall send to the Borrowers a copy of such executed Assignment Agreement.   Promptly following receipt of such executed Assignment Agreement, the Borrowers shall execute and deliver, at their own expense, new Notes to the assignee and, if applicable, the assignor, in accordance with their respective interests, whereupon the prior Notes of the assignor and, if applicable, the assignee, shall be canceled and returned to the Borrowers.   Upon the effectiveness of any assignment pursuant to this <u>Section 9.1(b)</u>, the assignee will become a "Lender," if not already a "Lender," for all purposes of the Loan Documents, and the assignor shall be relieved of its obligations hereunder to the extent of such assignment.   If the assignor no longer holds any rights or obligations under this Agreement, such assignor shall cease to be a "Lender" hereunder, except that its rights under <u>Section 5.17</u>, <u>Section 5.21</u>, <u>Section 5.22</u> and <u>Section 8.7</u>, shall not be affected.   On the last Business Day of each month during which an assignment has become effective pursuant to this <u>Section 9.1(b)</u>, the Agent shall update the Register to show all such assignments effected during such month and will promptly provide a copy thereof to the Borrowers and each Lender.   Agent, acting for this purpose as a non-fiduciary agent of Borrowers, shall maintain at one of its offices located in the Unites States of America a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount and stated interest of the Term Loan owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").   The entries in the Register shall be conclusive and the Borrowers, Agent and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, in the absence of manifest error. Notwithstanding anything to the contrary, any assignment of any Term Loan shall be effective only upon appropriate entries with respect thereto being made in the Register.   The Register shall be available for inspection by any Borrower, Agent and any Lender, at any reasonable time and from time to time upon reasonable prior written notice.   This Section shall be construed so that

- 71 -

the Term Loans are at all times maintained in "registered form" within the meanings of Sections 163(f), 871(h)(2) and 881(c)(2) of the IRC and any related regulations (and any successor provisions).

(c)     Each Lender may transfer, grant or assign participations in all or any portion of its interests hereunder to any Person pursuant to this Section 9.1(c), provided that such Lender shall remain a "Lender" for all purposes of this Agreement and the Transferee of such participation shall not constitute a "Lender" hereunder.  In the case of any such participation, the participant shall not have any rights under any Loan Document, the rights of the participant in respect of such participation to be against the granting Lender as set forth in the agreement with such Lender creating such participation, and all amounts payable by the Borrowers hereunder shall be determined as if such Lender had not sold such participation.  Each agreement creating a participation must include an agreement by the participant to be bound by the provisions of Section 8.3, Section 8.6 and Section 8.7.

(d)     The Agent or any Lender may furnish any information concerning the Borrowers in the possession of the Agent or such Lender from time to time to assignees and participants and prospective assignees and participants.

(e)     Notwithstanding anything in this Section 9.1 to the contrary, any Lender which is a national or state bank may assign and pledge all or any of its Notes or any interest therein to any Federal Reserve Bank or the Department of the Treasury of the United States of America as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any operating circular issued by such Federal Reserve System and/or such Federal Reserve Bank.  No such assignment or pledge shall release the assigning or pledging Lender from its obligations hereunder.

(f)     Notwithstanding any other provisions of this Section 9.1, no transfer or assignment of the interests or obligations of any Lender or grant of participations therein shall be permitted if such transfer, assignment or grant would require the Borrowers to file a registration statement with the Securities and Exchange Commission or any successor Governmental Authority or qualify the Term Loans under the "Blue Sky" laws of any state.

9.2     Survival of Representations, Warranties, and Covenants.  All representations and warranties of the Borrowers and all covenants and agreements herein made by the Borrowers shall survive the execution and delivery of the Notes and shall remain in force and effect so long as any Obligation is outstanding.

9.3     Notices and Other Communications.   Except as to oral notices expressly authorized herein, if any, which oral notices shall be promptly confirmed in writing, all notices, requests and communications hereunder shall be in writing (including by facsimile or electronic mail).  Unless otherwise expressly provided herein, any such notice, request, demand or other communication shall be deemed to have been duly given or made when delivered personally, or, in the case of delivery by mail, when deposited in the mail, certified mail with return receipt requested, postage prepaid, in the case of facsimile notice, when receipt thereof is acknowledged orally or by written confirmation report or, in the case of electronic mail, when sent and no undeliverable notification is received, addressed as follows:

- 72 -

(a)     if to the Agent, to:

> 405 Baxterville LLC
> 405 Lexington Avenue
> 59th Floor
> New York, New York  10174
> Attention:  Greg White
> E-mail:  gwhite@arenaco.com

With a copy to:

> gpaulsen@arenaco.com

and:

> reporting@arenaco.com

With a copy to:

> Hunton Andrews Kurth LLP
> 600 Travies, Suite 4200
> Houston, Texas 77002
> Attention: Timothy A. "Tad" Davidson II
> E-mail:  taddavidson@huntonak.com

(b)     if to any Lender, to the Applicable Lending Office, including, without limitation, each email address of such Lender appearing below such Lender's Applicable Lending Office.

(c)     if to any Borrower, to:

> FALCON V, L.L.C.
> 400 Poydras Street, Suite 1100
> New Orleans, Louisiana 70130
> Attention:  James E. Orth
> E-mail:  jeo@orx.com

With a copy to:

> Kelly Hart Pitre
> One American Place
> 301 Main Street, Suite 1600
> Baton Rouge, Louisiana 70801-1916
> Email: louis.phillips@kellyhart.com

Any party may, by proper written notice hereunder to the others, change the individuals or addresses to which such notices to it shall thereafter be sent.

- 73 -

9.4     Parties in Interest.  Subject to the restrictions on changes in structure set forth in Section 6.10 and other applicable restrictions contained herein, all covenants and agreements herein contained by or on behalf of the Borrowers, the Agent or the Lenders shall be binding upon and inure to the benefit of the relevant Borrower, the Agent or the Lenders, as the case may be, and their respective legal representatives, successors and assigns.

9.5     Rights of Third Parties.  Except as provided in Section 9.5, all provisions herein are imposed solely and exclusively for the benefit of the Agent, the Lenders and the Borrowers and no other Person shall have any right, benefit, priority or interest hereunder or as a result hereof or have standing to require satisfaction of provisions hereof in accordance with their terms.

9.6     Renewals; Extensions.  All provisions of this Agreement relating to the Notes shall apply with equal force and effect to each promissory note hereafter executed which in whole or in part represents a renewal or extension of any part of the Indebtedness of the Borrowers under this Agreement, the Notes or any other Loan Document.

9.7     No Waiver; Rights Cumulative.  No course of dealing on the part of the Agent or the Lenders or their officers or employees, nor any failure or delay by the Agent or the Lenders with respect to exercising any of their rights under any Loan Document shall operate as a waiver thereof.  The rights of the Agent and the Lenders under the Loan Documents shall be cumulative and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.  The making of the Term Loans shall not constitute a waiver of any of the covenants, warranties or conditions of the Borrowers contained herein.  In the event any of the Borrowers are unable to satisfy any such covenant, warranty or condition, the making of the Term Loans shall not have the effect of precluding the Agent or the Lenders from thereafter declaring such inability to be an Event of Default as hereinabove provided.

9.8     Survival Upon Unenforceability.  In the event any one or more of the provisions contained in any of the Loan Documents or in any other instrument referred to herein or executed in connection with the Obligations shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of any Loan Document or of any other instrument referred to herein or executed in connection with such Obligations.

9.9     Amendments; Waivers.  Neither this Agreement nor any provision hereof may be amended, waived, discharged or terminated orally, except by an instrument in writing signed by the Agent and the party against whom enforcement of the amendment, waiver, discharge or termination is sought.  Subject to the preceding sentence, any provision of this Agreement or any other Loan Document may be amended or modified by the Borrowers and the Required Lenders or waived by the Required Lenders; provided that, notwithstanding any provision of this Agreement to the contrary, (a) no amendment, modification or waiver which extends the Maturity Date, forgives the principal amount of any Indebtedness of the Borrowers outstanding under this Agreement or interest thereon or fees owing under this Agreement, releases any guarantor of such Indebtedness, releases all or substantially all of the Property of the Borrowers subject to the Security Documents, reduces the interest rate applicable to the Loan Balance or the fees payable to the Lenders generally, amends or modifies the Superpriority Claim status of the

Lenders under the Orders or under any Loan Document, affects this <u>Section 9.9</u> or modifies the definition of "Required Lenders" shall be effective without the unanimous written consent of all Lenders and the Agent; (b) no amendment, modification or waiver which increases the Percentage Share of any Lender shall be effective without the written consent of such Lender and the Agent; and (c) no amendment, modification or waiver which modifies the rights, duties or obligations of the Agent shall be effective without the written consent of the Agent.

9.10    <u>Controlling Agreement</u>.  In the event of a conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control.

9.11    <u>Disposition of Collateral</u>.  Notwithstanding any term or provision, express or implied, in any of the Security Documents, upon the occurrence of an Event of Default, the realization, liquidation, foreclosure or any other disposition on or of any or all of the Property of the Borrowers subject to the Security Documents shall be in the order and manner and determined in the sole discretion of the Agent; <u>provided</u>, <u>however</u>, that in no event shall the Agent violate applicable law or exercise rights and remedies other than those provided in such Security Documents or otherwise existing at law or in equity.

9.12    <u>Governing Law</u>.  This Agreement and the Notes shall be deemed to be contracts made under and shall be construed in accordance with and governed by the laws of the State of New York, without giving effect to principles thereof relating to conflicts of law.

9.13    <u>Forum Selection and Consent to Non-Exclusive Jurisdiction; Waiver of Jury Trial</u>.

(a)    EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF IN ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST ANY BORROWER, THE AGENT, ANY LENDER, ANY OTHER PARTY HERETO OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO.  EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED EXCLUSIVELY IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT AT THE AGENT'S OPTION IN THE COURTS OF ANY JURISDICTION

- 75 -

WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK AT THE ADDRESS FOR NOTICES SPECIFIED IN SECTION 9.3, IF APPLICABLE; PROVIDED THAT NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.  EACH OF THE PARTIES HERETO HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE EXTENT THAT ANY OF THE PARTIES HERETO HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH SUCH PARTY HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.  IN SUCH REGARD, EACH BORROWER HEREBY SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED IN NEW YORK, NEW YORK COUNTY, NEW YORK, AND HEREBY WAIVES ANY RIGHTS IT MAY HAVE TO TRANSFER OR CHANGE THE JURISDICTION OR VENUE OF ANY LITIGATION BROUGHT AGAINST IT BY THE AGENT OR ANY LENDER.

(b)    EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND CONSENT AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.13(b).

9.14    Integration.  This Agreement and the other Loan Documents constitute the entire agreement among the parties hereto and thereto with respect to the subject hereof and thereof and shall supersede any prior agreement among the parties hereto and thereto, whether written or

oral, relating to the subject matter hereof and thereof, including any term sheet or summary of principal terms provided to the Borrowers by Arena Investors, LP, the Agent or any Lender. Furthermore, in this regard, this Agreement and the other written Loan Documents represent, collectively, the final agreement among the parties thereto and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of such parties. There are no unwritten oral agreements among such parties.

9.15   <u>Waiver of Punitive and Consequential Damages</u>.  Each Borrower, the Agent and each Lender hereby knowingly, voluntarily, intentionally and irrevocably (a) waives, to the maximum extent it may lawfully and effectively do so, any right it may have to claim or recover, in any Dispute based hereon or directly or indirectly at any time arising out of, under or in connection with the Loan Documents or any transaction contemplated thereby or associated therewith, before or after maturity, any special, exemplary, punitive or consequential damages, or damages other than, or in addition to, actual damages and (b) acknowledge that it has been induced to enter into this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby by, among other things, the mutual waivers and certifications contained in this <u>Section 9.15</u>.

9.16   <u>Counterparts</u>.   For the convenience of the parties, this Agreement may be executed in multiple counterparts and by different parties hereto in separate counterparts, each of which for all purposes shall be deemed to be an original, and all such counterparts shall together constitute but one and the same Agreement.   In this regard, each of the parties hereto acknowledges that a counterpart of this Agreement containing a set of counterpart execution pages reflecting the execution of each party hereto shall be sufficient to reflect the execution of this Agreement by each party hereto.

9.17   <u>USA Patriot Act Notice</u>.  Each Lender and the Agent (for itself and not on behalf of any Lender) hereby notifies each Borrower that, pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of the relevant Borrower and other information that will allow such Lender or the Agent, as applicable, to identify each Borrower in accordance with the USA Patriot Act.

9.18   <u>Tax Shelter Regulations</u>.  None of the Borrowers intend to treat the Term Loans and related transactions hereunder and under the other Loan Documents as a "reportable transaction" (within the meanings under current Treasury Regulation Section 1.6011-4 and Proposed Treasury Regulation Section 1.6011-4, promulgated on November 1, 2006).  In the event the Borrowers determines to take any action inconsistent with the foregoing statement, it will promptly notify the Agent thereof.  If the Borrowers so notifies the Agent, the Borrowers acknowledge that one or more of the Lenders may treat its Percentage Share of the Term Loan and the related transactions hereunder and under the other Loan Documents as part of a transaction that is subject to current Treasury Regulation Section 301.6112-1 or Proposed Treasury Regulation Section 301.6112-1, promulgated on November 1, 2006, and, in such case, such Lender or Lenders, as applicable, will maintain the lists and other records required, if any, by such Treasury Regulations.

9.19    <u>Contribution and Indemnification</u>.  In the event that the Borrowers pay (whether through direct payments or as a result of providing Collateral for the Obligations) any amounts on the Obligations in excess of the relevant Borrowers' Obtained Benefit (the "<u>Excess Payments</u>"), the relevant Borrower shall be entitled to make demand on the other Borrowers for such Excess Payments, and to receive from each other Borrowers that received an Obtained Benefit, such Borrowers' Contribution Percentage of the Excess Payment.  If any party obligated to make such a payment is unable to pay the Contribution Percentage of the Excess Payment, each other Borrowers agrees to make a contribution to the party entitled to such payment to the extent necessary so that each Borrowers shares equally the liability for such Excess Payment in relation to the relative Obtained Benefit received by such Borrowers.  In such regard, to the maximum extent permitted by law, each Borrowers shall indemnify, defend and hold harmless the other Borrowers from and against such Borrowers' Contribution Percentage of any and all liability, claims, costs and expenses (including reasonable attorneys' fees and expenses) arising with respect to the Obligations and exceeding such other Borrowers' Obtained Benefit as provided herein.  Any amount due under this <u>Section 9.19</u> shall be due and payable within ten days of demand therefor by the party entitled to payment and shall be made to the party entitled thereto at the address for notices to the Borrowers under this Agreement, in immediately available funds, not later than 2:00 p.m., Eastern Standard or Daylight Time, on the date on which such payment shall come due.  The remedies available to the Borrowers pursuant to the provisions of this <u>Section 9.19</u> are not exclusive.   All rights and claims of contribution, indemnification and reimbursement under this <u>Section 9.19</u> shall be subordinate in right of payment to the prior payment in full of all principal of and interest on the Term Loan and all fees payable hereunder.  The provisions of this <u>Section 9.19</u> shall, to the extent expressly inconsistent with any provision in any Loan Document, supersede such inconsistent provision.

9.20    <u>Inconsistencies with Other Documents</u>.   In the event there is a conflict or inconsistency between this Agreement and any other Loan Document, the terms of this Agreement shall control; provided that any provision of the Security Documents which imposes additional burdens on the Borrowers or any of their respective Subsidiaries or further restricts the rights of Borrowers or any of their respective Subsidiaries or gives the Agent or Lenders additional rights shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect.  To the extent any provision herein or in any other Loan Document is inconsistent with any term of any of the Orders, such Orders shall control.

**(Signatures appear on following pages)**

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

**BORROWERS:**

**FALCON V, L.L.C.,**
a Louisiana limited liability company

By: _James E. Orth_
Name: JAMES E. ORTH
Title: PRESIDENT – MANAGER

**FALCON V HOLDINGS, L.L.C.,**
a Delaware limited liability company

By: _James E. Orth_
Name: JAMES E. ORTH
Title: PRESIDENT– MANAGER

**ORX RESOURCES, L.L.C.,**
a Delaware limited liability company

By: _James E. Orth_
Name: JAMES E. ORTH
Title: PRESIDENT– MANAGER

**(Signatures continue on following pages)**

*Signature Page to Superpriority Secured Debtor-In-Possession Term Loan Credit Agreement*

**AGENT**:

**405 BAXTERVILLE LLC,**
a Delaware limited liability company
as Agent

By:_____
    Lawrence Cutler
    Authorized Signatory

**LENDER**:

**405 BAXTERVILLE LLC,**
a Delaware limited liability company

By:_____
    Lawrence Cutler
    Authorized Signatory

Applicable Lending Office:

405 Lexington Avenue
59th Floor
New York, New York  10174
Attn:  Greg White
E-mail:  gwhite@arenaco.com,
gpaulsen@arenaco.com and
reporting@arenaco.com

**(End of signature pages)**

*Signature Page to Superpriority Secured Debtor-In-Possession Term Loan Credit Agreement*

SCHEDULE 1.2B

PERCENTAGE SHARES

| Name/Address for Notice | Percentage Share | Initial Commitment |
|---|---|---|
| 405 Baxterville LLC<br>405 Lexington Avenue<br>59th Floor<br>New York, New York  10174<br>Attn:  Greg White<br>E-mail:  gwhite@arenaco.com,<br>gpaulsen@arenaco.com and<br>reporting@arenaco.com | 100% | $5,800,000.00 |
| | 100% | $5,800,000.00 |

S-1.2B-i

SCHEDULE 4.5A

LIENS

[to be delivered prior to the Final Order Entry Date]

HW_US:73367004.8

SCHEDULE 4.5B

REAL PROPERTY

5968 Parlange Lane, Livonia, LA
False River Field, Pointe Coupee Parish, LA
716 Port Hudson Cemetery Road, Zachary, LA
6271 Callegan Road W, Morganza, LA
31825 Linder Road, Denham Springs, LA

**Leased:**

400 Poydras Street, Suite 1100, New Orleans, LA 70130

**Landlord Contact Information:**

Christina Krummel Donahoe, CPM® RPA
Senior Property Manager
400 Poydras Street, Suite 1500
New Orleans, Louisiana 70130
504.299.3000 (T)
504.299.3003 (Direct Dial)
504.299.3001 (F)
cdonahoe@hertzgroup.com

HW_US:73367004.8

SCHEDULE 4.6

ACCOUNTS PAYABLE

| Vendor Name | Over 90 Days | 90-61 Days | 60-31 Days | 30 Days-Current | Total Outstanding |
|---|---|---|---|---|---|
| Seismic Exchange Inc. | $900,000 | $0 | $0 | $0 | $900,000 |
| ORX RESOURCES, LLC | $255,591 | $116,095 | $250,000 | $0 | $621,685 |
| Catapult Exploration LLC | $603,373 | $0 | $0 | $0 | $603,373 |
| Pointe Coupee Parish | $502,791 | $0 | $0 | $0 | $502,791 |
| East Baton Rouge Sheriff | $354,536 | $0 | $0 | $0 | $354,536 |
| SBS Energy Services LLC | $342,487 | $0 | $0 | $0 | $342,487 |
| Archrock Services, L.P. | $10,470 | $101,953 | $106,436 | $106,436 | $325,294 |
| Bird & Bird LLP | $0 | $323,995 | $0 | $0 | $323,995 |
| McGriff, Seibels & Williams Inc | $317,250 | $0 | $0 | $0 | $317,250 |
| Slattery, Marino & Roberts | $288,029 | $0 | $0 | $0 | $288,029 |
| Cantor Fitzgerald Europe | $0 | $221,618 | $0 | $0 | $221,618 |
| Livingston Parish | $148,183 | $0 | $0 | $0 | $148,183 |
| Thompson & Knight LLP | $129,697 | $0 | $0 | $0 | $129,697 |
| Eagle Energy Services LLC | $26,738 | $33,291 | $31,936 | $0 | $91,966 |
| Total Pump & Supply LLC | $88,276 | $618 | $476 | $0 | $89,370 |
| Cardinal Coil Tubing | $85,325 | $0 | $0 | $0 | $85,325 |
| Multi-Chem Group LLC | $46,495 | $8,331 | $29,288 | $0 | $84,114 |
| Power Torque Services LLC | $81,844 | $0 | $0 | $0 | $81,844 |
| Knight Oil Tools | $74,202 | $0 | $0 | $0 | $74,202 |
| Tube Tech Services | $71,384 | $0 | $0 | $0 | $71,384 |
| Costa Energy, LLC | $16,162 | $19,732 | $32,449 | $0 | $68,343 |
| Deepwell Energy Services, LLC | $42,028 | $7,854 | $14,119 | $0 | $64,001 |
| ORX EXPLORATION, INC. | $9,211 | $54,373 | $0 | $0 | $63,584 |
| Premium Thru Tubing | $61,717 | $0 | $0 | $0 | $61,717 |
| Petroleum Co-Ordinators, Inc | $55,997 | $0 | $0 | $0 | $55,997 |
| KPMG LLP | $52,000 | $0 | $0 | $0 | $52,000 |
| Delta Oil Tools, LLC | $50,439 | $0 | $0 | $0 | $50,439 |
| Netherland, Sewell & | $45,188 | $0 | $0 | $0 | $45,188 |
| Scada Integrators & Service LLC | $25,006 | $10,234 | $8,533 | $0 | $43,773 |
| Project Consulting Services Inc | $41,244 | $0 | $0 | $0 | $41,244 |
| USA Compression Partners, LLC | $30,977 | $4,516 | $4,516 | $0 | $40,009 |
| West Baton Rouge | $39,257 | $0 | $0 | $0 | $39,257 |
| Rusco Services, Inc | $37,052 | $0 | $0 | $0 | $37,052 |
| Crowe LLP | $31,815 | $0 | $0 | $0 | $31,815 |
| Cameron International Corp | $28,500 | $0 | $0 | $0 | $28,500 |
| Energy Mgt. Consultants, LLC | $0 | $0 | $0 | $28,125 | $28,125 |
| Crowe Clark Whitehill LLP | $0 | $27,552 | $0 | $0 | $27,552 |
| American Eagle Logistics, LLC | $24,487 | $0 | $0 | $0 | $24,487 |
| Partridge-Sibley Industrial | $20,030 | $0 | $3,082 | $0 | $23,112 |
| Wikborg Rein | $0 | $23,014 | $0 | $0 | $23,014 |

S-4.6-i

| | | | | |
|---|---|---|---|---|
| Reliable Production Service, LLC | $22,350 | $0 | $0 | $0 | $22,350 |
| Yellowjacket Oilfield Services, LLC | $22,086 | $0 | $0 | $0 | $22,086 |
| Crescent Drilling Foreman, Inc | $21,900 | $0 | $0 | $0 | $21,900 |
| ABG Sundal Collier ASA | $0 | $21,161 | $0 | $0 | $21,161 |
| HLP Engineering Inc | $13,262 | $4,601 | $0 | $0 | $17,863 |
| Zealous Energy Services, LLC | $17,604 | $0 | $0 | $0 | $17,604 |
| Precision Drilling Company LP | $15,375 | $0 | $0 | $0 | $15,375 |
| Robert Guy Lane | $0 | $13,864 | $0 | $0 | $13,864 |
| AmSouth Bank - Visa Card | $0 | $0 | $12,667 | $0 | $12,667 |
| Kent & Smith Holdings, LLC | $11,721 | $570 | $0 | $0 | $12,291 |
| Premier Equipment Corp Inc | $12,179 | $0 | $0 | $0 | $12,179 |
| Brammer Engineering Inc | $11,800 | $0 | $0 | $0 | $11,800 |
| CF&S Tank Equipment Co. | $11,783 | $0 | $0 | $0 | $11,783 |
| Louisiana Crane & Construction, LLC | $11,400 | $0 | $0 | $0 | $11,400 |
| Carlisle Energy Group Inc | $9,109 | $0 | $0 | $0 | $9,109 |
| Grosse Tete Well Service, Inc | $8,640 | $0 | $0 | $0 | $8,640 |
| Gas Measurement Services, LLC | $5,974 | $1,071 | $786 | $0 | $7,832 |
| Vesco Rental & Pressure Control LLC | $7,555 | $0 | $0 | $0 | $7,555 |
| Wamco LLC | $5,735 | $0 | $0 | $0 | $5,735 |
| Whitetail Oilfield Services, LLC | $0 | $0 | $4,484 | $0 | $4,484 |
| The Paradigm Alliance, Inc. | $0 | $4,464 | $0 | $0 | $4,464 |
| Swivel Rental & Supply LLC | $4,365 | $0 | $0 | $0 | $4,365 |
| Brothers Oilfield Service & Supply LLC | $3,825 | $0 | $0 | $0 | $3,825 |
| Hub City Industries LLC | $3,575 | $0 | $0 | $0 | $3,575 |
| Magnolia Torque & Testing Inc | $3,520 | $0 | $0 | $0 | $3,520 |
| Paul E. Dubroc, Inc. | $0 | $0 | $0 | $3,499 | $3,499 |
| ACCU-Line Wireline Services, LLC | $3,301 | $0 | $0 | $0 | $3,301 |
| Crescent City Litigation Support | $3,238 | $0 | $0 | $0 | $3,238 |
| Chaffe McCall, LLP | $0 | $3,043 | $0 | $0 | $3,043 |
| Cajun Process Solutions LLC | $2,999 | $0 | $0 | $0 | $2,999 |
| Total Energy Solutions LLC | $2,807 | $0 | $0 | $0 | $2,807 |
| ENTERGY | -$23 | $0 | $2,550 | $0 | $2,527 |
| Flowco Production Solutions, LLC | $2,473 | $0 | $0 | $0 | $2,473 |
| Hudson Services Inc | $2,440 | $0 | $0 | $0 | $2,440 |
| Randazzo Giglio & Bailey LLC | $2,406 | $0 | $0 | $0 | $2,406 |
| Kenny Desselle | $0 | $700 | $1,600 | $0 | $2,300 |
| William C P LaCosta | $0 | $0 | $840 | $1,120 | $1,960 |
| OMI Environmental Solutions | $0 | $1,950 | $0 | $0 | $1,950 |
| AT&T | $0 | $0 | $1,884 | $0 | $1,884 |
| Certified Professional Engineers, LLC | $1,750 | $0 | $0 | $0 | $1,750 |
| Acme Truck Line, Inc | $1,623 | $0 | $0 | $0 | $1,623 |
| Airespring Inc | $0 | $0 | $0 | $1,266 | $1,266 |
| K&C Pneumatic & Salvage | $0 | $0 | $0 | $1,210 | $1,210 |
| Hebert Oilfield Services Inc | $1,083 | $0 | $0 | $0 | $1,083 |
| A&B Valve And Piping Systems LLC | $0 | $589 | $465 | $0 | $1,054 |
| R360 Environmental | $1,015 | $0 | $0 | $0 | $1,015 |
| Treads and Care Tire | $0 | $0 | $1,009 | $0 | $1,009 |
| St. Landry Parish | $909 | $0 | $0 | $0 | $909 |
| AT&T Mobility | $0 | $0 | $0 | $694 | $694 |
| Dixie Electric Membership Corp. | $0 | $0 | $690 | $0 | $690 |

S-4.6-ii

| | | | | |
|---|---|---|---|---|
| DANIEL M BABIN TESTAMENTARY TR | $631 | $0 | $0 | $0 | $631 |
| BRIS Engineering LLC | $0 | $511 | $0 | $0 | $511 |
| Rene R Riviere | $0 | $0 | $0 | $500 | $500 |
| Techsavers | $0 | $100 | $400 | $0 | $500 |
| CIT Communication Fin Corp | $0 | $0 | $461 | $0 | $461 |
| National Oilwell Varco LP | $0 | $0 | $450 | $0 | $450 |
| Star Communications | $0 | $0 | $0 | $419 | $419 |
| OQSG | $0 | $0 | $407 | $0 | $407 |
| Xerox Corporation | $0 | $0 | $7 | $322 | $329 |
| Techsavers | $0 | $0 | $150 | $170 | $320 |
| Jacqueline Ritchie | $0 | $0 | $300 | $0 | $300 |
| DIRECTV | $0 | $0 | $0 | $280 | $280 |
| Bellwether Technology Corp. | $0 | $0 | $0 | $279 | $279 |
| Louisiana Office Products, Inc | $0 | $0 | $0 | $263 | $263 |
| TopScreening, LLC | $0 | $258 | $0 | $0 | $258 |
| Waste Management | $0 | $0 | $186 | $0 | $186 |
| DS Waters of America Inc | $0 | $0 | $154 | $0 | $154 |
| AT&T | $0 | $0 | $0 | $152 | $152 |
| Elliott Electric Supply Inc | $0 | $143 | $0 | $0 | $143 |
| Canon Financial Services, Inc. | $0 | $0 | $0 | $139 | $139 |
| Refreshment Solutions, LLC | $0 | $0 | $0 | $138 | $138 |
| DAVID VENTURES INC | $133 | $0 | $0 | $0 | $133 |
| DUSTIN RAY BROWNING | $119 | $0 | $0 | $0 | $119 |
| Ansercall, Inc | $0 | $0 | $0 | $118 | $118 |
| MICHAEL G ALLISON | $100 | $0 | $0 | $0 | $100 |
| CORY DALE BAKER | $100 | $0 | $0 | $0 | $100 |
| ALVIN BALLARD | $100 | $0 | $0 | $0 | $100 |
| THOMAS E BELDING | $100 | $0 | $0 | $0 | $100 |
| STEVE C DELAUNE | $100 | $0 | $0 | $0 | $100 |
| JONATHAN TORRANCE DUPREE | $100 | $0 | $0 | $0 | $100 |
| KAREN WALKER FUSELIER | $100 | $0 | $0 | $0 | $100 |
| PATRICE ELLEN GUILLORY | $100 | $0 | $0 | $0 | $100 |
| CLIFFORD GERARD HEARD JR | $100 | $0 | $0 | $0 | $100 |
| MARY E KARRAS | $100 | $0 | $0 | $0 | $100 |
| BARBARA K KELLY | $100 | $0 | $0 | $0 | $100 |
| TED J MAYEUX | $100 | $0 | $0 | $0 | $100 |
| DAVID WAYNE MCCORMICK | $100 | $0 | $0 | $0 | $100 |
| BILLY KARRELL NETTLES | $100 | $0 | $0 | $0 | $100 |
| JASON SHOWS | $100 | $0 | $0 | $0 | $100 |
| PATRICIA THORGESON SMITH | $100 | $0 | $0 | $0 | $100 |
| CLAIRE TURNLEY STEWART | $100 | $0 | $0 | $0 | $100 |
| BEAUGH AND LACEE S SWEEZY | $100 | $0 | $0 | $0 | $100 |
| BETTY JANE COVINGTON VICKERS | $100 | $0 | $0 | $0 | $100 |
| BRENDA C ZETTLEMOYER | $100 | $0 | $0 | $0 | $100 |
| ARPENT ENERGY LLC | $90 | $0 | $0 | $0 | $90 |
| Sun Coast Resources, Inc | $0 | $0 | $83 | $0 | $83 |
| Flow Services & Consulting, Inc | $77 | $0 | $0 | $0 | $77 |
| Odelious Dauzat | $0 | $0 | $0 | $60 | $60 |
| Malcolm Dupuis | $0 | $0 | $0 | $60 | $60 |
| Ronnie Ellerbee | $0 | $0 | $0 | $60 | $60 |

| | | | | | |
|---|---|---|---|---|---|
| Michael Oglesby | $0 | $0 | $0 | $60 | $60 |
| Jacqueline Ritchie | $0 | $0 | $0 | $60 | $60 |
| Koby Richard | $0 | $0 | $0 | $60 | $60 |
| JANITH LYNN MILLER | $50 | $0 | $0 | $0 | $50 |
| CHRISTOPHER TRANCHINA | $33 | $0 | $0 | $0 | $33 |
| RICHARD K WATTS | $32 | $0 | $0 | $0 | $32 |
| Daigle Welding Supply | $0 | $0 | $30 | $0 | $31 |
| PAMELA J SMITH | $18 | $0 | $0 | $0 | $18 |
| Ward 2 Water District | $0 | $0 | $14 | $0 | $14 |
| JEFF JEFFERS | $13 | $0 | $0 | $0 | $13 |
| LA Office of Mineral Resources | -$69 | $0 | $0 | $0 | -$69 |
| Hertz Texaco Center, LLC | $0 | $0 | $0 | -$3,918 | -$3,918 |
| **Total** | **$5,190,688** | **$1,006,201** | **$510,448** | **$141,573** | **$6,848,910** |

S-4.6-iv

HW_US:73367004.8

SCHEDULE 4.9

LIABILITIES AND LITIGATION

Liabilities: See Schedule 4.6; as of March 31, 2019 Hedging Liability of $609,741 and ARO $5,262,841

Litigation:  None

SCHEDULE 4.10

AUTHORIZATIONS; CONSENTS

None

SCHEDULE 4.13

ENVIRONMENTAL DISCLOSURES

None

HW_US:73367004.8

SCHEDULE 4.17

REFUNDS

None

HW_US:73367004.8

SCHEDULE 4.18

GAS CONTRACTS

None

SCHEDULE 4.22

SUBSIDIARIES

Falcon V, L.L.C. is a subsidiary of Falcon V Holdings, L.L.C.

Online Resources, L.L.C. is a subsidiary of ORX Resources, L.L.C.

SCHEDULE 4.24

EIN, JURISDICTION OF FORMATION AND LOCATION

| Entity | EIN | Organization No./State |
|---|---|---|
| Falcon V, L.L.C. | 81-4041725 | 42293307K Louisiana |
| Falcon V Holdings, L.L.C. | 81-4808542 | 6263354 Delaware |
| ORX Resources, L.L.C. | 74-2989032 | 3343943 Delaware |

S-4.24-i

SCHEDULE 4.27

RELATED PARTY TRANSFERS

None

SCHEDULE 6.18

DEPOSIT ACCOUNTS

| Deposit Accounts | | | |
|---|---|---|---|
| **Description/ Company** | **Bank** | **Account Number** | **Routing Number** |
| Falcon V Operating | Whitney Bank | 0060025887 | 065400153 |
| Falcon V Revenue | Whitney Bank | 0060131253 | 065400153 |
| Falcon V Revenue Suspense | Whitney Bank | 0060373397 | 065400153 |
| 405 Baxterville/Falcon V, LLC | Citibank | 6783790308 | |
| 405 Baxterville/Falcon V, LLC | Citibank | 6783790295 | |
| Falcon V, LLC | Texas Capital Bank | 201002708 | 111017979 |
| Falcon V Holdings | Whitney Bank | 0060130761 | 065400153 |
| ORX Resources, LLC | Whitney Bank | 0717621049 | 065400153 |
| ORX Resources, LLC | Whitney Bank | 0717621057 | 065400153 |
| ORX Resources, LLC | Whitney Bank | 0717621065 | 065400153 |
| ORX Resources, LLC | Regions Bank | 33795312 | 062000019 |
| ORX Resources, LLC | Regions Bank | 33795320 | 062000019 |
| ORX Resources, LLC | Regions Bank | 45633134 | 062000019 |
| ORX Resources, LLC | Merryl Lynch | 258-3430030-7 | 062000019 |

S-6.18-i

EXHIBIT A

[FORM OF NOTE]

PROMISSORY NOTE
(this "Note")

$_____        New York, New York        _____, \_\_\_\_

      FOR VALUE RECEIVED and WITHOUT GRACE (except to the extent, if any, provided in the Loan Agreement, as hereinafter defined), the undersigned (collectively, "Makers"), jointly and severally, promise to pay to the order of _____ ("Payee"), at the Principal Office (as such term is defined in the Loan Agreement), the sum of _____ AND \_\_/100 DOLLARS ($_____) or so much thereof as may remain unpaid pursuant to the Superpriority Secured Debtor-In-Possession Term Loan Credit Agreement dated _____, 2019 by and among Makers, Agent and the lenders signatory thereto or bound thereby from time to time, including, without limitation, Payee (as amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), together with interest at the rates and calculated as provided in the Loan Agreement.

      Reference is hereby made to the Loan Agreement for matters governed thereby, including, without limitation, certain events which will entitle the holder hereof and/or Agent to accelerate the maturity of all amounts due hereunder. Capitalized terms used but not defined in this Note shall have the respective meanings assigned to such terms in the Loan Agreement.

      This Note is issued pursuant to, is a "Note" under and is payable as provided in the Loan Agreement. Subject to compliance with applicable provisions of the Loan Agreement, Makers or any of them may at any time prepay the full amount or any part of the Loan Balance evidenced by this Note without the payment of any premium or fee, but such payment shall not, until this Note is fully paid and satisfied, excuse the payment as it becomes due of any payment on this Note provided for in the Loan Agreement.

      Without being limited thereto or thereby, this Note is secured by the Security Documents.

      **THIS NOTE SHALL BE GOVERNED AND CONTROLLED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO PRINCIPLES THEREOF RELATING TO CONFLICTS OF LAW.**

**(Signatures appear on following pages)**

A-i

**MAKERS**:

**FALCON V, L.L.C.,**
a Louisiana limited liability company


By:_____
Name: _____
Title: _____


**FALCON V HOLDINGS, L.L.C.,**
a Delaware limited liability company


By:_____
Name: _____
Title: _____


**ORX RESOURCES, L.L.C.,**
a Delaware limited liability company


By:_____
Name: _____
Title: _____

A-ii

EXHIBIT B

[FORM OF COMPLIANCE CERTIFICATE]

[Date]

405 Baxterville LLC
405 Lexington Avenue
59th Floor
New York, New York  10174
Attn:  Greg White

Re:    Superpriority Secured Debtor-In-Possession Term Loan Credit Agreement dated May 14, 2019 by and among Falcon V, L.L.C., a Louisiana limited liability company, Falcon V Holdings, L.L.C., a Delaware limited liability company, and ORX Resources, L.L.C., a Delaware limited liability company (collectively, the "Borrowers"), the lenders party thereto or bound thereby from time to time and 405 Baxterville LLC, as administrative agent for such lenders (as amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement")

Ladies and Gentlemen:

Pursuant to applicable requirements of the Loan Agreement, the undersigned, as the Financial Officer of Borrowers, acting on behalf of Borrowers, based on [**his/her**] familiarity with the books and records of the Borrowers and [**his/her**] review of the provisions of the Loan Agreement and the other Loan Documents, hereby certifies to the Agent and the Lenders the following information as true and correct, in all material respects, as of the date hereof or for the period indicated, as the case may be:

1.      [To the best of the knowledge of the undersigned, no Default or Event of Default (including, without limitation, any arising from any violation or alleged violation of any Environmental Law) exists as of the date hereof or has occurred since the date of our most recent previous certification to you, if any.]

[To the best of the knowledge of the undersigned, the following Defaults or Events of Default (including, without limitation, any arising from any violation or alleged violation of any Environmental Law) exist as of the date hereof or have occurred since the date of our most recent previous certification to you, if any, and the actions set forth below are being taken to remedy such circumstances:]

2.      The compliance of the Borrowers with the financial covenants of the Loan Agreement, as of the close of business on _____, for the fiscal month ended _____ or as of _____, as the case may be and as provided in the relevant Section of the Loan Agreement, is evidenced by the following:

B-i

(a)       Section 6.22:  Capital Expenditures

<u>Required</u>                          <u>Actual</u>

Not more than $_____          $_____

3.       The Borrowers [is] [is not] in compliance with the provisions of Section 5.8 of the Loan Agreement relating to Commodity Hedge Agreements.

4.       No Material Adverse Effect has occurred since the date of the consolidated Financial Statements of the Borrowers as of _____ and for the period then ended.

Each capitalized term used but not defined herein shall have the meaning assigned to such term in the Loan Agreement.

HW_US:73367004.8

Very truly yours,

**FALCON V, L.L.C.,**
a Louisiana limited liability company


By:_____
Name: _____
Title: _____


**FALCON V HOLDINGS, L.L.C.,**
a Delaware limited liability company


By:_____
Name: _____
Title: _____


**ORX RESOURCES, L.L.C.,**
a Delaware limited liability company


By:_____
Name: _____
Title: _____

B-iii

EXHIBIT C

FORM OF
ASSIGNMENT AGREEMENT

This ASSIGNMENT AGREEMENT (as amended, supplemented, restated or otherwise modified from time to time, this "Agreement") is dated as of ____, ___, by and between _____ (the "Assignor") and _____ (the "Assignee").

RECITALS

WHEREAS, the Assignor is a party to the Superpriority Secured Debtor-In-Possession Term Loan Credit Agreement dated as of May 14, 2019 (as amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement") by and among Falcon V, L.L.C., a Louisiana limited liability company, Falcon V Holdings, L.L.C., a Delaware limited liability company, and ORX Resources, L.L.C., a Delaware limited liability company (collectively, the "Borrowers"), each of the lenders that is or becomes a party thereto as provided in Section 9.1(b) of the Loan Agreement (individually, together with its successors and assigns, a "Lender", and collectively, together with their successors and assigns, the "Lenders"), and 405 Baxterville LLC, a Delaware limited liability company, as agent for the Lenders (in such capacity, together with its successors in such capacity, the "Agent"); and

WHEREAS, the Assignor proposes to sell, assign and transfer to the Assignee, and the Assignee proposes to purchase and assume from the Assignor, **[all][a portion]** of the Assignor's Percentage Share of the Loan Balance and related rights under the Loan Agreement, all on the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS AND INTERPRETATION

1.1     Definitions from Loan Agreement.  All capitalized terms used but not defined herein have the respective meanings given to such terms in the Loan Agreement.

1.2     Additional Defined Terms.  As used herein, the following terms have the following respective meanings:

"Assigned Interest" shall mean all of Assignor's (in its capacity as a "Lender") rights and obligations under the Loan Agreement and the other Loan Documents in respect of **[all of] [the portion of]** the Assignor's Percentage Share of the Loan Balance [**, being the Assigned Loan Balance**] $_____ and any right to receive payments on such portion of the Loan Balance.

"Assignee's Loan Balance" shall mean the principal balance of $_____.

"Assignment Date" shall mean _____, ____.

1.3     References.  References in this Agreement to Schedule, Exhibit, Article, or Section numbers shall be to Schedules, Exhibits, Articles, or Sections of this Agreement, unless expressly stated to the contrary.  References in this Agreement to "hereby," "herein," "hereinafter," "hereinabove," "hereinbelow," "hereof," "hereunder" and words of similar import shall be to this Agreement in its entirety and not only to the particular Schedule, Exhibit, Article, or Section in which such reference appears.  Except as otherwise indicated, references in this Agreement to statutes, sections, or regulations are to be construed as including all statutory or regulatory provisions consolidating, amending, replacing, succeeding, or supplementing the statute, section, or regulation referred to.  References in this Agreement to "writing" include printing, typing, lithography, facsimile reproduction, and other means of reproducing words in a tangible visible form.  References in this Agreement to agreements and other contractual instruments shall be deemed to include all exhibits and appendices attached thereto and all subsequent amendments and other modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement.  References in this Agreement to Persons include their respective successors and permitted assigns.

1.4     Articles and Sections.  This Agreement, for convenience only, has been divided into Articles and Sections; and it is understood that the rights and other legal relations of the parties hereto shall be determined from this instrument as an entirety and without regard to the aforesaid division into Articles and Sections and without regard to headings prefixed to such Articles or Sections.

1.5     Number and Gender.  Whenever the context requires, reference herein made to the single number shall be understood to include the plural; and likewise, the plural shall be understood to include the singular.  Definitions of terms defined in the singular or plural shall be equally applicable to the plural or singular, as the case may be, unless otherwise indicated.  Words denoting sex shall be construed to include the masculine, feminine and neuter, when such construction is appropriate; and specific enumeration shall not exclude the general but shall be construed as cumulative.

1.6     Negotiated Transaction.  Each party to this Agreement affirms to the other that it has had the opportunity to consult, and discuss the provisions of this Agreement with, independent counsel and fully understands the legal effect of each provision.

ARTICLE II

SALE AND ASSIGNMENT

2.1     Sale and Assignment.  On the terms and conditions set forth herein, effective on and as of the Assignment Date, the Assignor hereby sells, assigns and transfers to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, all of the right, title and interest of the Assignor in and to, and all of the obligations of the Assignor in respect of, the

C-ii

Assigned Interest. Such sale, assignment and transfer is without recourse and, except as expressly provided in this Agreement, without representation or warranty.

2.2  <u>Assumption of Obligations</u>.  The Assignee agrees with the Assignor (for the express benefit of the Assignor and the Borrowers) that the Assignee will, from and after the Assignment Date, assume and perform all of the obligations of the Assignor in respect of the Assigned Interest. From and after the Assignment Date: (a) the Assignor shall be released from the Assignor's obligations in respect of the Assigned Interest, and (b) the Assignee shall be entitled to all of the Assignor's rights, powers and privileges under the Loan Agreement and the other Loan Documents in respect of the Assigned Interest.

2.3  <u>Required Consent</u>.  By executing this Agreement as provided below, if required in accordance with Section 9.1(b) of the Loan Agreement, each of the Agent and the Borrowers hereby acknowledges notice of the transactions contemplated by this Agreement and consents to such transactions.

ARTICLE III

PAYMENTS

3.1  <u>Payments</u>.  As consideration for the sale, assignment and transfer contemplated by <u>Section 2.1</u>, the Assignee shall, on the Assignment Date, assume Assignor's obligations in respect of the Assigned Interest and pay to the Assignor an amount equal to the Assigned Loan Balance and all accrued and unpaid interest and fees with respect to the Assigned Interest as of the Assignment Date. Except as otherwise provided in this Agreement, all payments hereunder shall be made in Dollars and in immediately available funds, without setoff, deduction or counterclaim.

3.2  <u>Allocation of Payments</u>.  The Assignor and the Assignee agree that (a) the Assignor shall be entitled to any payments of principal with respect to the Assigned Interest made prior to the Assignment Date, together with any interest and fees with respect to the Assigned Interest accrued prior to the Assignment Date, (b) the Assignee shall be entitled to any payments of principal with respect to the Assigned Interest made from and after the Assignment Date, together with any and all interest and fees with respect to the Assigned Interest accruing from and after the Assignment Date and (c) the Agent is authorized and instructed to allocate payments received by it for the account of the Assignor and the Assignee as provided in the foregoing clauses.  Each party hereto agrees that it will hold any interest, fees or other amounts that it may receive to which the other party hereto shall be entitled pursuant to the preceding sentence for the account of such other party and pay, in like money and funds, any such amounts that it may receive to such other party promptly upon receipt.

3.3  <u>Delivery of Notes</u>.  Promptly following the receipt by the Assignor of the consideration required to be paid under <u>Section 3.1</u>, the Assignor shall, in the manner contemplated by Section 9.1(b) of the Loan Agreement, (a) deliver to the Agent (or its counsel) the Note held by the Assignor and (b) notify the Agent to request that the Borrowers execute and deliver new Notes to the Assignor, if Assignor continues to be a Lender, and the

C-iii

Assignee, dated the Assignment Date in the appropriate respective principal amounts after giving effect to the sale, assignment and transfer contemplated hereby.

      3.4   <u>Further Assurances</u>.  The Assignor and the Assignee hereby agree to execute and deliver such other instruments, and take such other actions, as either party may reasonably request in connection with the transactions contemplated by this Agreement.

ARTICLE IV

<u>CONDITIONS PRECEDENT</u>

The effectiveness of the sale, assignment and transfer contemplated hereby is subject to the satisfaction of each of the following conditions precedent:

      (a)   the execution and delivery of this Agreement by the Assignor and the Assignee;

      (b)   the receipt by the Assignor of the payments required to be made under <u>Section 3.1</u>; and

      (c)   the receipt by the Agent of all documentation and other information with respect to the assignee that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

ARTICLE V

<u>REPRESENTATIONS AND WARRANTIES</u>

      5.1   <u>Representations and Warranties of Assignor</u>.  The Assignor represents and warrants to the Assignee as follows:

      (a)   it has all requisite power and authority, and has taken all action necessary to execute and deliver this Agreement and to fulfill its obligations under, and consummate the transactions contemplated by, this Agreement;

      (b)   the execution, delivery and compliance with the terms hereof by the Assignor and the delivery of all instruments required to be delivered by it hereunder do not and will not violate any Requirement of Law applicable to it;

      (c)   this Agreement has been duly executed and delivered by it and constitutes the legal, valid and binding obligation of the Assignor, enforceable against it in accordance with its terms;

      (d)   all approvals and authorizations of, all filings with and all actions by any Governmental Authority necessary for the validity or enforceability of its obligations under this Agreement have been obtained;

C-iv

(e)      the Assignor has good title to, and is the sole legal and beneficial owner of, the Assigned Interest, free and clear of all Liens, claims, participations or other charges of any nature whatsoever; and

(f)      the transactions contemplated by this Agreement are commercial banking transactions entered into in the ordinary course of the banking business of the Assignor.

5.2      <u>Disclaimer</u>.  Except as expressly provided in <u>Section 5.1</u> hereof, the Assignor does not make any representation or warranty, nor shall it have any responsibility to the Assignee, with respect to the accuracy of any recitals, statements, representations or warranties contained in the Loan Agreement or in any other Loan Document or for the value, validity, effectiveness, genuineness, execution, legality, enforceability or sufficiency of the Loan Agreement, the Notes or any other Loan Document or for any failure by the Borrowers or any other Person (other than Assignor) to perform any of its obligations thereunder or for the existence, value, perfection or priority of any collateral security or the financial or other condition of the Borrowers or any other Person, or any other matter relating to the Loan Agreement or any other Loan Document or any extension of credit thereunder.

5.3      <u>Representations and Warranties of Assignee</u>.  The Assignee represents and warrants to the Assignor as follows:

(a)      it has all requisite power and authority, and has taken all action necessary to execute and deliver this Agreement and to fulfill its obligations under, and consummate the transactions contemplated by, this Agreement;

(b)      the execution, delivery and compliance with the terms hereof by the Assignee and the delivery of all instruments required to be delivered by it hereunder do not and will not violate any Requirement of Law applicable to it;

(c)      this Agreement has been duly executed and delivered by it and constitutes the legal, valid and binding obligation of the Assignee, enforceable against it in accordance with its terms;

(d)      all approvals and authorizations of, all filings with and all actions by any Governmental Authority necessary for the validity or enforceability of its obligations under this Agreement have been obtained;

(e)      the Assignee has received copies of the Loan Agreement and the other Loan Documents, as well as copies of all Financial Statements previously provided by the Borrowers in satisfaction of obligations under the Loan Agreement.

(f)      the Assignee has fully reviewed the terms of the Loan Agreement and the other Loan Documents and has independently and without reliance upon the Assignor, and based on such information as the Assignee has deemed appropriate, made its own credit analysis and decision to enter into this Agreement;

(g)    if the Assignee is not incorporated under the laws of the United States of America or a state thereof, the Assignee has contemporaneously herewith delivered to the Agent and the Borrowers such documents as are required by Section 2.6(f) of the Loan Agreement; and

(h)    the transactions contemplated by this Agreement are commercial banking transactions entered into in the ordinary course of the banking business of the Assignee.

## ARTICLE VI

## MISCELLANEOUS

6.1    Notices.  All notices and other communications provided for herein (including any modifications of, or waivers, requests or consents under, this Agreement) shall be given or made in writing (including by telecopy) to the intended recipient at its "Address for Notices" specified below its name on the signature pages hereof or, as to either party, at such other address as shall be designated by such party in a notice to the other party.

6.2    Amendment, Modification or Waiver.  No provision of this Agreement may be amended, modified or waived except by an instrument in writing signed by the Assignor and the Assignee, and consented to by the Agent and, so long as there exists no Default or Event of Default at the time of any such amendment, modification or waiver, the Borrowers.

6.3    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. The representations and warranties made herein by the Assignee are also made for the benefit of the Agent, and the Assignee agrees that the Agent is entitled to rely upon such representations and warranties.

6.4    Assignments.  Neither party hereto may assign any of its rights or obligations hereunder except in accordance with the terms of the Loan Agreement.

6.5    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be identical and all of which, taken together, shall constitute one and the same instrument, and each of the parties hereto may execute this Agreement by signing any such counterpart.

6.6    Governing Law.  This Agreement (including the validity and enforceability hereof) shall be governed by, and construed in accordance with, the laws of the State of New York, other than the conflict of laws rules thereof.

6.7    Expenses.  To the extent not paid by the Borrowers or any one or more of them pursuant to the terms of the Loan Agreement, each party hereto shall bear its own expenses in connection with the execution, delivery and performance of this Agreement.

6.8    Waiver of Jury Trial.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement to be executed and delivered as of the date first above written.

**ASSIGNOR:**

_____

By:_____
Name:_____
Title:_____

Address for Notices:

_____
_____
_____
Telephone No.:_____
Attention:_____

**ASSIGNEE:**

_____

By:_____
Name:_____
Title:_____

Address for Notices:

_____
_____
_____
Telephone No.:_____
Attention:_____

HW_US:73367004.8

EXHIBIT D

FORM OF
BUDGET COMPLIANCE CERTIFICATE

_____, 20____

  The undersigned hereby certifies that he/she is a Responsible Officer of Falcon V Holdings, L.L.C., a Delaware limited liability company, and ORX Resources, L.L.C., a Delaware limited liability company (each a "<u>Borrower</u>" and collectively, "<u>Borrowers</u>"), and that as such he/she is authorized to execute this certificate on behalf of the Borrowers. With reference to the Superpriority Secured Debtor-In-Possession Term Loan Credit Agreement dated as of May 14, 2019 (as amended, supplemented, restated or otherwise modified from time to time, the "<u>Loan Agreement</u>") among the Borrowers, the lenders party thereto or bound thereby from time to time and 405 Baxterville LLC, as administrative agent for such lenders, the undersigned represents and warrants as follows (each capitalized term used herein having the same meaning given to it in the Loan Agreement unless otherwise specified):

  (a)  The proceeds of the Term Loans used during the immediately preceding week were for one of the types of expenditures set forth in <u>Section 6.24(b)</u> and in compliance with the maximum amounts permitted to be expended thereunder for the relevant time period in accordance with the Budget (including any usage of the Permitted Variance) [or specify non-compliance and describe]; and

  (b)  There exists no Default [or specify Default and describe].

**[*Signature page follows*]**

D-i

WITNESS the following signature as of the day and year first written above.

**FALCON V, L.L.C.,**
a Louisiana limited liability company


By:_____
Name:  _____
Title:  _____


**FALCON V HOLDINGS, L.L.C.,**
a Delaware limited liability company


By:_____
Name:  _____
Title:  _____


**ORX RESOURCES, L.L.C.,**
a Delaware limited liability company


By:_____
Name:  _____
Title:  _____

EXHIBIT E

FORM OF
BORROWING REQUEST


Dated as of: _____

405 Baxterville LLC,
as Administrative Agent
405 Lexington Avenue, 59th Floor
New York, New York  10174
Attention: Greg White


Ladies and Gentlemen:

This irrevocable Borrowing Request is delivered to you pursuant to Section 2.1 of the Superpriority Secured Debtor-in-Possession Term Loan Credit Agreement dated as of May 14, 2019 (as amended, restated, supplemented or otherwise modified from time to time, the "Loan Agreement"), by and among Falcon V Holdings, L.L.C., a Delaware limited liability company, and ORX Resources, L.L.C., a Delaware limited liability company (each a "Borrower" and collectively, "Borrowers"), the lenders who are or may become party thereto, and 405 Baxterville LLC, a Delaware limited liability company, as administrative agent for such lenders (the "Agent").  Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Loan Agreement.

A.    Loan

1.    Borrowers hereby request that the Lenders disburse the [Interim Funding Loan] [Funding Date Loan] to Borrowers in the aggregate principal amount of $ _____. (Complete with an amount in accordance with Section 2.1 of the Loan Agreement.)

2.    Borrowers hereby request that such disbursement be made on the following Business Day: _____.  (Complete with a Business Day in accordance with Section 2.1 of the Loan Agreement).

3.    The aggregate principal amount of all Term Loans outstanding as of the date hereof (including the Term Loan requested herein) does not exceed the maximum amount permitted to be outstanding pursuant to the terms of the Loan Agreement.

4.    In connection with the foregoing and pursuant to the terms and provisions of the Loan Agreement, the undersigned hereby certify to the Agent that the following statements are true and correct:

(a)    such disbursement is necessary to fund the Approved Purposes;

E-i

(b)      as of the date of the requested disbursement, the applicable conditions set forth in [Section 3.1,] [Section 3.2,] Section 3.3 and Section 3.4 of the Loan Agreement have been satisfied;

(c)      the representations and warranties in Article IV of the Loan Agreement are true and correct in all material respects (except for representations and warranties which are qualified by a materiality qualifier, which are true and correct in all respects) on and as of the date of the requested Term Loan with the same effect as if made on and as of the date of the requested Term Loan (except to the extent such representations and warranties expressly refer to an earlier date, in which case they are true and correct as of such earlier date);

(d)      no Default or Event of Default exists and is continuing or shall result from such requested disbursement or proposed or actual use of the proceeds of such requested disbursement;

(e)      the making of the requested disbursement does not violate any Requirement of Law and is not enjoined, temporarily, preliminarily or permanently; and

(f)      immediately before and after giving effect to the requested disbursement, the Borrowers are in pro forma compliance with the Budget.

### [*Signature page follows*.]

HW_US:73367004.8

IN WITNESS WHEREOF, the undersigned has executed this Borrowing Request as of the day and year first written above.

**FALCON V, L.L.C.,**
a Louisiana limited liability company

By:_____
Name: _____
Title: _____

**FALCON V HOLDINGS, L.L.C.,**
a Delaware limited liability company

By:_____
Name: _____
Title: _____

**ORX RESOURCES, L.L.C.**,
a Delaware limited liability company

By:_____
Name: _____
Title: _____

PROMISSORY NOTE

(this "Note")

$5,800,000.00                         New York, New York                         May 14, 2019

FOR VALUE RECEIVED and WITHOUT GRACE (except to the extent, if any, provided in the Loan Agreement, as hereinafter defined), the undersigned (collectively, "Makers"), jointly and severally, promise to pay to the order of 405 Baxterville LLC, a Delaware limited liability company ("Payee"), at the Principal Office (as such term is defined in the Loan Agreement), the sum of Five Million Eight Hundred Thousand AND NO/100 DOLLARS ($5,800,000.00) or so much thereof as may remain unpaid pursuant to the Superpriority Secured Debtor-In-Possession Term Loan Credit Agreement dated May 14, 2019 by and among Makers, Agent (as defined in the Loan Agreement) and the lenders signatory thereto or bound thereby from time to time, including, without limitation, Payee (as amended, supplemented, restated or otherwise modified from time to time, the "Loan Agreement"), together with interest at the rates and calculated as provided in the Loan Agreement.

Reference is hereby made to the Loan Agreement for matters governed thereby, including, without limitation, certain events which will entitle the holder hereof and/or Agent to accelerate the maturity of all amounts due hereunder.  Capitalized terms used but not defined in this Note shall have the respective meanings assigned to such terms in the Loan Agreement.

This Note is issued pursuant to, is a "Note" under and is payable as provided in the Loan Agreement.  Subject to compliance with applicable provisions of the Loan Agreement, Makers or any of them may at any time prepay the full amount or any part of the Loan Balance evidenced by this Note without the payment of any premium or fee, but such payment shall not, until this Note is fully paid and satisfied, excuse the payment as it becomes due of any payment on this Note provided for in the Loan Agreement.

Without being limited thereto or thereby, this Note is secured by the Security Documents.

**THIS NOTE SHALL BE GOVERNED AND CONTROLLED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO PRINCIPLES THEREOF RELATING TO CONFLICTS OF LAW.**

**(Signatures appear on following pages)**

**MAKERS**:

**FALCON V, L.L.C.,**
a Louisiana limited liability company

By: _____
Name: JAMES E. ORTH
Title: PRESIDENT

**FALCON V HOLDINGS, L.L.C.,**
a Delaware limited liability company

By: _____
Name: JAMES E. ORTH
Title: PRESIDENT

**ORX RESOURCES, L.L.C.,**
a Delaware limited liability company

By: _____
Name: JAMES E. ORTH
Title: PRESIDENT

*Signature Page to Promissory Note*

## SECURITY AGREEMENT

This **SECURITY AGREEMENT** (this "Security Agreement") is made and entered into as of May 14, 2019 (the "Effective Date"), by **FALCON V, L.L.C.,** a Louisiana limited liability company ("Falcon"), **FALCON V HOLDINGS, L.L.C.,** a Delaware limited liability company ("Holdings"), and **ORX RESOURCES, L.L.C.,** a Delaware limited liability company ("ORX"; and with Falcon and Holdings, each individually, a "Debtor" and collectively, the "Debtors"), the addresses for each such Debtor, for purposes hereof, being 400 Poydras Street, Suite 1100, New Orleans, Louisiana 70130, in favor of 405 Baxterville LLC, a Delaware limited liability company, as collateral agent (in such capacity, "Secured Party"), the address for which, for purposes hereof, being 405 Lexington Avenue, 59th Floor, New York, NY 10174, Attention: Greg White, for the *pro rata* benefit of the Lenders.

## RECITALS

WHEREAS, the Debtors, the Lenders and Secured Party are parties to that certain Superpriority Secured Debtor-in-Possession Term Loan Credit Agreement dated of even date herewith (as amended, restated, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), pursuant to which, upon the terms and conditions stated therein, the Secured Party and the Lenders agreed to extend credit to Debtors; and

WHEREAS, to secure the Obligations, the Debtors have agreed to assign to Secured Party, and grant to Secured Party a security interest in, all right, title and interest in and to the property hereinafter described;

NOW, THEREFORE, (i) in order to comply with the terms and conditions of the DIP Credit Agreement, (ii) for and in consideration of the premises and the agreements herein contained and (iii) for other good and valuable consideration, the receipt and sufficiency of all of which is hereby acknowledged, the Debtors hereby agree as follows:

## ARTICLE I

## GENERAL TERMS

1.1     Terms Defined Above.  As used in this Security Agreement, each of the terms defined in the preamble hereto and the above recital paragraphs shall have the meaning assigned to such term above.

1.2     Definitions Contained in DIP Credit Agreement.  Each term used herein beginning with a capital letter which is not defined herein shall have the meaning assigned to such term in the DIP Credit Agreement, unless the context hereof otherwise requires.

1.3     Certain Definitions.  As used in this Security Agreement, each of the following terms shall have the meaning set forth for such term below, unless the context otherwise requires:

"Code" shall mean the Uniform Commercial Code as in effect in the State of New York or any other relevant jurisdiction from time to time.

"Collateral" shall mean all Property, including, without limitation, cash or other proceeds, in which Secured Party shall have a security interest pursuant to Article II of this Security Agreement.

"Debtor Relief Laws" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Requirement of Law of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Gas" shall have the meaning assigned to such term in Article II hereof.

"Pledged Securities" means, collectively, (a) any shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Equity Interests of any Person that may be issued or granted to, or held by, the Debtors while this Security Agreement is in effect; and (b) (i) the certificates or instruments, if any, representing such Equity Interests, (ii) all dividends (cash, Equity Interests or otherwise), cash, instruments, rights to subscribe, purchase or sell and all other rights and property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Equity Interests, (iii) all replacements, additions to and substitutions for any of the Property referred to in this definition, including, without limitation, claims against third parties, (iv) the proceeds, interest, profits and other income of or on any of the Property referred to in this definition, (v) all security entitlements in respect of any of the foregoing, if any, and (vi) all books and records relating to any of the Property referred to in this definition.

"Receivable" shall mean any right to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance (including, without limitation, any Account).

"Related Rights" shall mean all chattel papers, documents and instruments relating to the Accounts or the General Intangibles and all rights now or hereafter existing in and to all security agreements, leases, and other contracts securing or otherwise relating to any Accounts or General Intangibles or any such chattel papers, documents or instruments.

"Secured Obligations" shall mean the Obligations and all renewals and extensions thereof.

1.4    Terms Defined in Code.  All terms used herein which are not defined herein or in the DIP Credit Agreement but are defined in the Code shall have the same meaning as defined in the Code, unless the context otherwise requires.

# ARTICLE II

## SECURITY INTEREST

In addition to the security interests created by the Interim Order (and when applicable, the Final Order), upon authorization by the Bankruptcy Court under any of the Orders, including as pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, to secure the

Secured Obligations, the Debtors hereby grant to Secured Party, in the priority specified in the Orders, a continuing security interest in, a general lien upon, and a right of set-off against, the following described Property of the Debtors:

(a)     all now existing and hereafter acquired or arising Accounts, Goods, General Intangibles, Payment Intangibles, Deposit Accounts, Securities Accounts, Chattel Paper (including, without limitation, Electronic Chattel Paper), Documents, Instruments, Software, Investment Property, letters of credit, Letter of Credit Rights, advices of credit, money, As-Extracted Collateral (including As-Extracted Collateral from the Debtors' present and future operations, regardless of whether such mineral or gas interests are presently owned or hereafter acquired by the Debtors), Commercial Tort Claims, Equipment, Inventory, Fixtures and Supporting Obligations, together with all products of and Accessions to any of the foregoing and all Proceeds of any of the foregoing (including, without limitation, all insurance policies and proceeds thereof);

(b)     to the extent, if any, not included in clause (a) above, the Debtors' present and future contracts, agreements, arrangements or understandings (i) for the sale, supply, provision or disposition of any natural gas, casinghead gas, all other hydrocarbons not defined as oil, carbon dioxide, and helium or other substances of a gaseous nature ("Gas"), oil or other minerals by the Debtors or any one or more of its agents, representatives, successors or assigns to any purchaser or acquirer thereof, and all products, replacements and proceeds thereof (including, without limitation, all Gas or oil sales contracts) and (ii) relating to the mining, drilling or recovery of any mineral, crude oil or gas reserves for the benefit of or on behalf of the Debtors or any of its agents, representatives, successors or assigns (including, without limitation, all contract mining, drilling or recovery agreements and arrangements), and all products and Proceeds thereof and payments thereunder, together with all products and Proceeds (including, without limitation, all insurance policies and proceeds) of and any Accessions to any of the foregoing;

(c)     to the extent, if any, not included in above, all Gas, oil and other minerals severed or extracted from the ground (specifically including all "As-Extracted Collateral" of the Debtors and all severed or extracted Gas purchased, acquired or obtained from other parties), and all Accounts, General Intangibles and products and Proceeds thereof or related thereto, regardless of whether any such Gas, oil or other minerals are in raw form or processed for sale;

(d)     to the extent, if any, not included above, each and every other item of personal Property and fixtures, whether now existing or hereafter arising or acquired, including, without limitation, all licenses, contracts and agreements (including, without limitation, Commodity Hedge Agreements), and all collateral for the payment or performance of any contract or agreement, together with all products and Proceeds (including all insurance policies and proceeds) and any Accessions to any of the foregoing;

(e)     all present and future business records and information, including, without limitation, computer tapes and other storage media containing the same and computer

programs and software (including, without limitation, source code, object code and related manuals and documentation and all licenses to use such software) for accessing and manipulating such information; and

(f)      any additional Property of the Debtors from time to time delivered to or deposited with Secured Party as security for the Secured Obligations or otherwise pursuant to the terms of this Security Agreement.

Pursuant to Bankruptcy Code Section 364(c)(1) the Secured Party and the Lenders have been granted a super-priority administrative claim over any and all administrative claims of the type specified in Bankruptcy Code 503(b) and 507(b), subject to the Carve-Out.

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES**

In order to induce Secured Party to accept this Security Agreement, the Debtors represent and warrant to Secured Party (which representations and warranties will survive the creation of the Secured Obligations and any other extension of credit under the DIP Credit Agreement) that:

3.1      <u>Ownership and Liens</u>.  Except for the security interest of Secured Party granted in this Security Agreement and other Permitted Liens, the Debtors own good and marketable title to the Collateral free and clear of any other Liens.  The Debtors have full right, power and authority to grant a security interest in the Collateral to Secured Party in the manner provided herein, free and clear of any other Liens, adverse claims and options other than Permitted Liens.  No other Lien created by the Debtors or is known by the Debtors to exist with respect to any Collateral; and no financing statement or other security instrument is on file in any jurisdiction covering such Collateral, other than those in favor of Secured Party and other Permitted Liens.  At the time the security interest in favor of Secured Party attaches, good and marketable title to all after-acquired Property included within the Collateral, free and clear of any other Liens, other than Permitted Liens, will be vested in Debtors.

3.2      <u>Status of Accounts</u>.  Each Account now existing represents, and each Account hereafter arising will represent, the valid and legally enforceable indebtedness of a bona fide account debtor arising from the sale or lease or rendition by the Debtors of goods and/or services and is not and will not be subject to contra accounts, set-offs, defenses or counterclaims by or available to account debtors obligated on the Accounts except as disclosed to Secured Party in writing; such goods will have been delivered to, or be in the process of being delivered to, the Debtors, and such services will have been rendered by the Debtors to the account debtor and accepted by the account debtor; and the amount shown as to each Account of the Debtors on the Debtors' books will be the true and undisputed amount owing and unpaid thereon, subject to any discounts, allowances, rebates, credits and adjustments to which the account debtor has a right and which have been disclosed to Secured Party in writing.

3.3      <u>Status of Related Rights</u>.  All Related Rights of the Debtors are, and those hereafter arising will be, valid and genuine.

3.4   <u>Location</u>.   The office where the Debtors keep their records concerning their Accounts and the General Intangibles and the originals of all of the Related Rights of each such Debtor is 400 Poydras Street, Suite 1100, New Orleans, Louisiana 70130.   No Equipment and/or Inventory is covered by a certificate of title (other than certain motor vehicles) pursuant to applicable law.   The jurisdiction of organization for Falcon V is the State of Louisiana and the jurisdiction of organization for ORX and Falcon V Holdings is the State of Delaware.   The Debtors' chief executive office and chief place of business is 400 Poydras Street, Suite 1100, New Orleans, Louisiana 70130.

3.5

(a)   <u>Receivables</u>.

(i)   No amount payable to any Debtor under or in connection with any Receivable (in an aggregate amount in excess of $10,000 for all such Receivables) is evidenced by any Instrument or Chattel Paper which has not been delivered to Secured Party.

(ii)   None of the obligors on any Receivables (in an aggregate amount in excess of $10,000 for all such Receivables) is a Governmental Authority.

(iii)   The amounts represented by each Debtor to Secured Party from time to time as owing to such Debtor in respect of the Receivables will at such times be accurate (subject to offsets and refunds in the ordinary course of business).

(b)   <u>Commercial Tort Claims</u>.

(i)   On the date hereof, except to the extent listed in <u>Schedule 3.5(b)</u>, Debtors have no knowledge of rights in any Commercial Tort Claim.

(ii)   Upon the filing of a financing statement covering any Commercial Tort Claim referred to in <u>Section 4.6</u> against Debtors in their state of organization, the security interest granted in such Commercial Tort Claim will constitute a valid perfected security interest in favor of Secured Party, as collateral security for the Secured Obligations, enforceable in accordance with the terms hereof against all creditors of Debtors and any Persons purporting to purchase such Collateral from each Debtor, which security interest shall be prior to all other Liens on such Collateral except for Permitted Liens.

(c)   <u>Certificated Collateral</u>.   No Equipment and/or Inventory is covered by a certificate of title pursuant to applicable law other than certain motor vehicles described on <u>Schedule 3.5(c)</u> attached hereto.

(d)   <u>Deposit Accounts</u>.   <u>Schedule 3.5(d)</u> lists all Deposit Accounts owned by each Debtor in its own name.

(e)   Pledged Notes.  There are no promissory notes issued to or held by the Debtors (other than promissory notes issued in connection with extensions of trade credit by the Debtors in the ordinary course of business).

(f)   Pledged Securities.  There are no Pledged Securities owned by the Debtors other than the 100% membership interest of Falcon V L.L.C. owned by Falcon V Holdings, L.L.C. and the 100% membership interest of Online Resources, L.L.C. owned by ORX Resources, L.L.C.

3.6   Secured Party's Security Interest.  Upon and subject to the entry of the Interim Order (and when applicable, the Final Order), this Security Agreement creates a valid and binding security interest in the Collateral securing the Secured Obligations.  Notwithstanding the perfection of any security interest granted hereunder pursuant to the order of the Bankruptcy Court under the applicable Order, all filings (which filings with Governmental Authorities are described in Article IV of this Security Agreement) and other actions necessary to perfect or protect such security interest will be promptly taken by the Debtors upon request by Secured Party.  No further or subsequent filing, recording, registration or other public notice of such security interest is necessary in any governmental office or jurisdiction in order to perfect such security interest or to continue, preserve or protect such security interest except for continuation statements or for filings upon the occurrence of any of the events stated in Article IV of this Security Agreement.  Such perfected security interest in the Collateral constitutes a first-priority (except as to Permitted Liens or as otherwise provided in the Orders) security interest under the Code.

## ARTICLE IV

## COVENANTS AND AGREEMENTS

Each Debtor covenants and agrees with Secured Party that from and after the date of this Security Agreement until the indefeasible payment of the Obligations in full:

4.1   Delivery of Instruments, Certificated Securities and Chattel Paper.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security or Chattel Paper, such Instrument, Certificated Security or Chattel Paper shall be promptly delivered to Secured Party, duly indorsed in a manner satisfactory to Secured Party, to be held as Collateral pursuant to this Security Agreement; provided that no such Instrument, Certificated Security or Chattel Paper shall be required to be delivered to Secured Party so long as the aggregate amount payable evidenced by all such undelivered Instruments, Certificated Securities or Chattel Papers does not exceed $10,000.

4.2   Maintenance of Perfected Security Interest; Perfection Certificate Updates; Further Documentation.

(a)   The Debtors shall maintain the security interest created by this Security Agreement as a perfected security interest having at least the priority described in Section 3.6 and shall defend such security interest against the material claims and demands of all

Persons whomsoever, subject to the rights of the Debtors under the Loan Documents to dispose of the Collateral.

(b)     The Debtors will furnish to Secured Party from time to time statements and schedules further identifying and describing the Property of such Debtor and such other reports in connection therewith as Secured Party may reasonably request, all in reasonable detail.

(c)     Subject to the Orders, at any time and from time to time, upon the written request of Secured Party, and at the sole expense of the Debtors, the Debtors will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as Secured Party may reasonably request for the purpose of obtaining or preserving the full benefits of this Security Agreement and of the rights and powers herein granted, including, without limitation, (i) filing any financing or continuation statements under the Code (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby and (ii) in the case of Investment Property, Deposit Accounts, Letter-of-Credit Rights and any other relevant Collateral, taking any actions necessary to enable Secured Party to obtain "control" (within the meaning of the Code) with respect thereto.

4.3     <u>Notices</u>.   Debtors will advise Secured Party promptly upon any Responsible Officer obtaining knowledge, in reasonable detail, of:

(a)     any Lien (other than security interests created hereby or Permitted Liens) on any of the Collateral which would adversely affect the ability of Secured Party to exercise any of its remedies hereunder; and

(b)     the occurrence of any other event which could reasonably be expected to have a material adverse effect on the aggregate value of the Collateral or on the security interests created hereby.

4.4     <u>Receivables</u>.

(a)     Other than to the extent deemed prudent business conduct to be determined in good faith by the Debtors, the Debtors will not (i) grant any extension of the time of payment of any Receivable, (ii) compromise or settle any Receivable for less than the full amount thereof, (iii) release, wholly or partially, any Person liable for the payment of any Receivable, (iv) allow any credit or discount whatsoever on any Receivable or (v) amend, supplement or modify any Receivable in any manner that could adversely affect the value thereof.

(b)     The Debtors will deliver to Secured Party a copy of each material demand, notice or document received by it that questions or calls into doubt the validity or enforceability of more than 5% of the aggregate amount of the then outstanding Receivables.

4.5     <u>Commercial Tort Claims</u>.   If any Debtor shall obtain an interest in any Commercial Tort Claim, such Debtor shall within thirty (30) days of a Responsible Officer

obtaining knowledge of such interest sign and deliver documentation acceptable to Secured Party granting a security interest under the terms and provisions of this Security Agreement in and to such Commercial Tort Claim.

4.6    Financing Statement Matters.  The Debtors recognize that one or more financing statement pertaining to the Collateral will be filed in one or more filing offices.  The Debtors will promptly notify Secured Party of any condition or event that may change the proper location for the filing of any financing statement or other public notice or recordings for the purpose of perfecting a security interest in the Collateral.  Without limiting the foregoing, the Debtors will (a) promptly notify Secured Party of any change (i) in the location of the office where the Debtors keep their records concerning their Accounts or (ii) in the "location" of any Debtor within the meaning set forth in the Code of each such Debtor's jurisdiction of formation; (b) prior to any of the Collateral provided by the Debtors becoming so related to any particular real estate so as to become a fixture on such real estate, notify Secured Party of the description of such real estate and the name of the record owner thereof, to the extent such real estate is not already encumbered in favor or for the benefit of Secured Party to secure the Secured Obligations; and (c) promptly notify Secured Party of any change in the Debtors' names, identities or structures.  In any notice furnished pursuant to this paragraph, the Debtors will expressly state that the notice is required by this Security Agreement and contains facts that will or may require additional filings of financing statements or other notices for the purpose of continuing perfection of Secured Party's security interest in the Collateral.  Further, the Debtors authorize Secured Party to file, at the expense of the Debtors, any and all financing statements, pursuant to Article 9 of the Code, as Secured Party deems necessary, in its sole discretion, in conjunction with this Security Agreement.  The Debtors agree that such financing statements may describe the Collateral in the same manner as described in this Security Agreement or as "all assets," "all personal property" or words of similar effect, regardless of whether or not the Collateral includes all assets or all personal property of the Debtors, or such other description as Secured Party, in its sole judgment, determines is necessary or advisable that is of an equal or lesser scope or with greater detail.

## ARTICLE V

## RIGHTS, REMEDIES AND WARRANTIES

5.1    With Respect to Collateral.  If an Event of Default under the DIP Credit Agreement has occurred and is continuing, Secured Party is, subject to the Orders, hereby fully authorized and empowered (without the necessity of any further consent or authorization from the Debtors) and the right is expressly granted to Secured Party, and Debtors hereby appoint Secured Party as their attorney-in-fact and agent to act for them and in their name, place and stead, with full power of substitution, in Secured Party's name or the Debtors' names or otherwise, for the sole use and benefit of Secured Party, but at the Debtors' cost and expense, to exercise, without notice, all or any of the following powers at any time with respect to all or any of the Collateral until termination of the Security Agreement in accordance with its terms:

(a)    to notify account debtors or the obligors on the Accounts, the General Intangibles and the Related Rights to make and deliver payment to Secured Party;

(b)     to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due by virtue thereof and otherwise deal with proceeds;

(c)     to receive, take, endorse, assign and deliver any and all checks, notes, drafts, Documents and other negotiable and non-negotiable Instruments and Chattel Paper taken or received by Secured Party in connection therewith;

(d)     to settle, compromise, compound, prosecute or defend any action or proceeding with respect thereto;

(e)     to sell, transfer, assign or otherwise deal in or with the same or the Proceeds or avails thereof or the relative goods, as fully and effectively as if Secured Party were the absolute owner thereof; and

(f)     to extend the time of payment of any or all thereof and to grant waivers and make any allowance or other adjustment with reference thereto;

provided, however, Secured Party shall be under no obligation or duty to exercise any of the powers hereby conferred upon it and shall be without liability for any act or failure to act in connection with the collection of, or the preservation of any rights under, any Collateral.

5.2    Default Remedies.   Upon the occurrence and continuation of any Event of Default, Secured Party may then, or at any time thereafter and from time to time, subject to the Orders, apply, set-off, collect, sell in one or more sales, lease, or otherwise dispose of, any or all of the Collateral, in its then condition or following any commercially reasonable preparation or processing, in such order as Secured Party may elect, and any such sale may be made either at public or private sale at its place of business or elsewhere, or at any brokers' board or securities exchange, either for cash or upon credit or for future delivery, at such price as Secured Party may deem fair, and Secured Party may be the purchaser of any or all Collateral so sold and may hold the same thereafter in its own name free from any claim of the Debtors or right of redemption. No such purchase or holding by Secured Party shall be deemed a retention by Secured Party in satisfaction of the Secured Obligations.   All demands, notices and advertisements and the presentment of Property at sale are hereby waived.  If, notwithstanding the foregoing provisions, any applicable provision of the Code or other law requires Secured Party to give reasonable notice of any such sale or disposition or other action, the Debtors hereby agree that ten (10) days' prior written notice shall constitute reasonable notice.  Secured Party may require the Debtors to assemble the Collateral and make it available to Secured Party at a place designated by Secured Party which is reasonably convenient to Secured Party and the Debtors.  Any sale hereunder may be conducted by an auctioneer or any officer or agent of Secured Party.

5.3    Right of Set-Off.  Upon the occurrence and continuation of any Event of Default, Secured Party is, subject to the Orders, hereby authorized to then, or at any time thereafter and from time to time, without notice to the Debtors (any such notice being expressly waived by the Debtors), apply and set-off against the Secured Obligations (i) any and all deposits (general or special, time or demand, provisional or final) of Debtors at any time held by Secured Party; (ii) any and all other claims of the Debtors against Secured Party, now or hereafter existing, (iii) any and all other indebtedness at any time owing by Secured Party to or for the account of the

Debtors; (iv) any and all money, Instruments, securities, Documents, Chattel Paper, credits, claims, demands and other Property, rights or interests of the Debtors which at any time shall come into the possession or custody or under the control of Secured Party, for any purpose; and (v) the Proceeds of any of the foregoing Property, in accordance with the DIP Credit Agreement, as if the same were included in the Collateral, and in addition to the security interests created by the Interim Order (and when applicable, the Final Order), upon authorization by the Bankruptcy Court under any of the Orders, including as pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the Debtors hereby grant to Secured Party in the priority set forth in the Orders a security interest in, a general lien upon and a right of set-off against the foregoing described Property as security for the Secured Obligations. Secured Party shall have the right to so set-off and apply such Property against the Secured Obligations regardless of whether or not Secured Party shall have made any demand for payment of any of the Secured Obligations or shall have given any other notice. Secured Party agrees to promptly notify the Debtors after any such set-off and application; provided, however, the failure of Secured Party to give any such notice shall not affect the validity of such set-off and application. The rights of Secured Party under this Section 5.3 are in addition to other rights and remedies (including, without limitation, other rights of set-off in this Security Agreement, the other Loan Documents or the Orders) which Secured Party may have.

5.4    Proceeds. Following the occurrence and continuation of any Event of Default, the proceeds of any sale or other disposition of the Collateral and all sums received or collected by Secured Party from or on account of the Collateral shall be applied by Secured Party in the manner set forth in the DIP Credit Agreement.

5.5    Secured Party's Lack of Duties. The powers conferred upon Secured Party by this Security Agreement are solely to protect its interest in the Collateral and shall not impose any duty upon Secured Party to exercise any such powers. Secured Party shall be under no duty whatsoever to make or give any presentment, demand for performance, notice of nonperformance, protest, notice of protest, notice of dishonor or other notice or demand in connection with any Collateral or the Secured Obligations, or to take any steps necessary to preserve any rights against prior parties. Secured Party shall not be liable for failure to collect or realize upon any or all of the Secured Obligations or Collateral, or for any delay in so doing, nor shall Secured Party be under any duty to take any action whatsoever with regard thereto. Secured Party shall use reasonable care in the custody and preservation of any Collateral in its possession, but need not take any steps to keep the Collateral identifiable. Secured Party shall have no duty to comply with any recording, filing or other legal requirements necessary to establish or maintain the validity, priority or enforceability of, or Secured Party's rights in or to, any of the Collateral.

5.6    Secured Party's Actions. To the extent permitted by applicable law (including, without limitation, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection with the Cases), the Debtors waive any right to require Secured Party to marshal or proceed against any Person, exhaust any Collateral or pursue any other remedy in Secured Party's power, and the Debtors waive any and all notice of acceptance of this Security Agreement or of creation, modification, rearrangement, renewal or extension for any period of any of the Secured Obligations from time to time. All dealings between the Debtors and Secured Party, whether or not resulting in the creation of the Secured Obligations, shall conclusively be

presumed to have been had or consummated in reliance upon this Security Agreement.  Until all the Secured Obligations shall have been indefeasibly paid in full and the commitments of the Lenders terminated, the Debtors shall not have any right to subrogation, and the Debtors waive any benefit of and any right to participate in any Collateral or security whatsoever now or hereafter held by Secured Party.  The Debtors authorize Secured Party, without notice or demand and without any reservation of rights against the Debtors and without affecting the Debtors' liability hereunder or on the Secured Obligations, from time to time to (a) take and hold any other Property as collateral, other than the Collateral, as security for any or all of the Secured Obligations and exchange, enforce, waive and release any or all of the Collateral or such other Property to the Secured Obligations; and (b) apply the Collateral or such other Property and direct the order or manner of sale thereof as Secured Party in its discretion may determine, subject, however, to the provisions of the DIP Credit Agreement and the Orders.

5.7    <u>Transfer of Secured Obligations and Collateral</u>.  Any of the Secured Obligations may be transferred, in whole or in part, in accordance with the provisions of the Loan Documents, and, upon any such transfer, Secured Party may transfer any or all of the Collateral and shall be fully discharged thereafter from all liability with respect to the Collateral so transferred, and the transferee shall be vested with all rights, powers and remedies of Secured Party hereunder with respect to Collateral so transferred; but with respect to any Collateral not so transferred, Secured Party shall retain all rights, powers and remedies hereby given.  Secured Party may at any time deliver any or all of the Collateral to the Debtors, whose receipt shall be a complete and full acquittance for the Collateral so delivered, and Secured Party shall thereafter be discharged from any liability therefor.

5.8    <u>Cumulative Security</u>.  The execution and delivery of this Security Agreement in no manner shall impair or affect any other security (by endorsement or otherwise) for the Secured Obligations.  No security taken hereafter as security for the Secured Obligations shall impair in any manner or affect this Security Agreement.  All such present and future additional security is to be considered as cumulative security.

5.9    <u>Continuing Agreement</u>.  This is a continuing Security Agreement and the grant of the security interest hereunder shall remain in full force and effect and all the rights, powers and remedies of Secured Party hereunder shall continue to exist until the Secured Obligations are paid in full as the same become due and payable, until the Debtors are entitled to obtain the release hereof pursuant to the DIP Credit Agreement and until Secured Party, upon request of the Debtors, has executed a written termination statement, reassigned to the Debtors, without recourse, the Collateral and all rights conveyed hereby and returned possession of the Collateral in its possession to Debtors.

5.10    <u>Cumulative Rights</u>.  The rights, powers and remedies of Secured Party hereunder shall be in addition to all rights, powers and remedies given under the Orders, the DIP Credit Agreement, the other Loan Documents or by statute or rule of law and are cumulative.  The exercise of any one or more of the rights, powers and remedies provided herein shall not be construed as a waiver of any other rights, powers and remedies of Secured Party.  Furthermore, regardless of whether or not the Code is in effect in the jurisdiction where such rights, powers and remedies are asserted, Secured Party shall have the rights, powers and remedies of a secured party under the Code.  Secured Party may exercise its bankers' lien or right of set-off with

respect to the Secured Obligations in the same manner as if the Secured Obligations were unsecured.

5.11    <u>Exercise of Rights</u>.  Time shall be of the essence for the performance by the Debtors of any act under this Security Agreement or in respect of the Secured Obligations, but neither Secured Party's acceptance of partial or delinquent payments nor any forbearance, failure or delay by Secured Party in exercising any right, power or remedy shall be deemed a waiver of any obligation of the Debtors or of any right, power or remedy of Secured Party or preclude any other or further exercise thereof; and no single or partial exercise of any right, power or remedy shall preclude any other or further exercise thereof, or the exercise of any other right, power or remedy.

5.12    <u>Remedy and Waiver</u>.  Secured Party may remedy any Default and may waive any Default without waiving the Default remedied or waiving any prior or subsequent Default.

5.13    <u>Non-Judicial Remedies</u>.  To the extent permitted by applicable law (including, without limitation, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection with the Cases), Secured Party may enforce its rights hereunder without prior judicial process or judicial hearing, and the Debtors expressly waive, renounce and knowingly relinquish any and all legal rights which might otherwise require Secured Party to enforce its rights by judicial process.  In so providing for non-judicial remedies, the Debtors recognize and concede that such remedies are consistent with the usage of the trade, are responsive to commercial necessity and are the result of bargain at arm's length.  Nothing herein is intended to prevent Secured Party from resorting to judicial process at its option.

5.14    <u>Expenses</u>.  The Debtors shall pay to Secured Party all expenses, including, without limitation, reasonable attorneys' fees and legal expenses, incurred or paid by Secured Party in exercising or protecting its interests, rights and remedies under this Security Agreement or the other Loan Documents to which any Debtor is a party (including, without limitation, all such costs and expenses incurred during any "workout" or restructuring in respect of the Obligations and during any legal proceeding, including any legal proceeding under any Debtor Relief Law).

## ARTICLE VI

## <u>MISCELLANEOUS</u>

6.1    <u>Preservation of Liability</u>.  Neither this Security Agreement nor the exercise by Secured Party of (or the failure to so exercise) any right, power or remedy conferred herein or by law shall be construed as relieving any Person liable on the Secured Obligations from liability on the Secured Obligations and for any deficiency thereon.

6.2    <u>Notices</u>.  Any notice or demand under this Security Agreement or in connection with this Security Agreement may be given as provided in the DIP Credit Agreement, but actual notice, however given or received, shall always be effective.

6.3 <u>Governing Law</u>. This Security Agreement and the security interest granted hereby shall be governed by the laws of the State of New York (and to the extent applicable, the Bankruptcy Code), without giving effect to principles thereof relating to conflicts of law.

6.4 <u>Amendment and Waiver</u>. This Security Agreement may not be amended (nor may any of its terms be waived) except in the manner provided in the DIP Credit Agreement.

6.5 <u>Invalidity</u>. In case any provision of this Security Agreement is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

6.6 <u>Survival of Agreements</u>. All covenants and agreements of the Debtors herein not fully performed before the effective date of this Security Agreement shall survive such date.

6.7 <u>Successors and Assigns</u>. All representations and warranties of the Debtors herein, and the covenants and agreements herein contained by or on behalf of the Debtors, shall bind the Debtors and the Debtors' legal representatives, successors and assigns and shall inure to the benefit of Secured Party, its successors and assigns.

6.8 <u>Titles of Articles, Sections and Subsections</u>. All titles or headings to articles, sections, subsections or other divisions of this Security Agreement are only for the convenience of the parties and shall not be construed to have any effect or meaning with respect to the other content of such articles, sections, subsections or other divisions, such other content being controlling as to the agreement between the parties hereto.

6.9 <u>Counterparts</u>. This Security Agreement may be executed by one or more of the parties hereto in any number of separate counterparts, and all of such counterparts taken together shall be deemed to constitute one and the same instrument and shall be enforceable as of the date hereof upon the execution of one or more counterparts hereof by each of the parties hereto. In this regard, each of the parties hereto acknowledges that a counterpart of this Security Agreement containing a set of counterpart execution pages reflecting the execution of each party hereto shall be sufficient to reflect the execution of this Security Agreement by each party hereto and shall constitute one instrument.

6.10 <u>Conflict with DIP Credit Agreement</u>. In the event of a conflict between any provision of this Security Agreement and a provision that is in the DIP Credit Agreement, the provision of the DIP Credit Agreement shall control; provided, however, the inclusion in this Security Agreement of a provision with respect to which there is no corresponding provision in the DIP Credit Agreement shall not constitute a conflict with any provision of the DIP Credit Agreement.

6.11 <u>The Orders-No Violation</u>. This Security Agreement is subject in all respects (including with respect to all obligations and agreements of the Debtors provided for hereunder) to the terms of the Interim Order (and when applicable, the Final Order). In the event of any inconsistency or conflict between the provisions of this Security Agreement and the Interim Order (and when applicable, the Final Order), the provisions of the Interim Order (and when applicable, the Final Order) shall govern. Performance of the Debtor's or Secured Party's rights as permitted under this Security Agreement shall in no way constitute for the purpose of the

Cases a violation of the automatic stay provided by Section 362 of the Bankruptcy Code, and the Debtor hereby waives the applicability thereof.

6.12 **WAIVER OF RIGHTS TO JURY TRIAL**. **THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, IRREVOCABLY, AND UNCONDITIONALLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, COUNTERCLAIM, OR OTHER LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS SECURITY AGREEMENT OR ANY DOCUMENT EXECUTED IN CONNECTION WITH THIS SECURITY AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO.**

6.13 **FORUM SELECTION AND CONSENT TO NON-EXCLUSIVE JURISDICTION**. **EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF IN ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST ANY BORROWER, THE SECURED PARTY, ANY LENDER, ANY OTHER PARTY HERETO OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO. EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED EXCLUSIVELY IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT AT THE SECURED PARTY'S OPTION IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.3 OF THE DIP CREDIT AGREEMENT; PROVIDED THAT NOTHING IN THIS SECURITY AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS SECURITY AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW. EACH OF THE PARTIES HERETO HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE**

**FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.    TO THE EXTENT THAT ANY OF THE PARTIES HERETO HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH SUCH PARTY HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.**

*(Signature pages follow)*

This Security Agreement has been executed by each Debtor and Secured Party as of the date first above written.

**DEBTORS:**

**FALCON V, L.L.C.**, a Louisiana limited liability company

By: _____

Name: _JAMES E. ORTH_____

Title: _PRESIDENT - MANAGER_____


**FALCON V HOLDINGS, L.L.C.**, a Delaware limited liability company

By: _____

Name: _JAMES E. ORTH_____

Title: _PRESIDENT - MANAGER_____


**ORX RESOURCES, L.L.C.**, a Delaware limited liability company

By: _____

Name: _JAMES E. ORTH_____

Title: _PRESIDENT - MANAGER_____


*(Signatures continue on following page)*

**SECURED PARTY:**

**405 BAXTERVILLE LLC**, a Delaware limited
liability company, as collateral agent

By:_____

Name: Lawrence Cutler

Title: Authorized Signatory

# **SCHEDULE 3.5(b)**

## **Commercial Tort Claims**

### **None**

## <u>SCHEDULE 3.5(c)</u>

**Vehicles**

**[BORROWER TO PROVIDE PRIOR TO THE FINAL ORDER ENTRY DATE]**

HW_US:74101289.3

## **SCHEDULE 3.5(d)**

### **Deposit Accounts**

| Deposit Accounts | | | |
|---|---|---|---|
| **Description/ Company** | **Bank** | **Account Number** | **Routing Number** |
| Falcon V Operating | Whitney Bank | 0060025887 | 065400153 |
| Falcon V Revenue | Whitney Bank | 0060131253 | 065400153 |
| Falcon V Revenue Suspense | Whitney Bank | 0060373397 | 065400153 |
| 405 Baxterville/Falcon V, LLC | Citibank | 6783790308 | |
| 405 Baxterville/Falcon V, LLC | Citibank | 6783790295 | |
| Falcon V, LLC | Texas Capital Bank | 201002708 | 111017979 |
| Falcon V Holdings | Whitney Bank | 0060130761 | 065400153 |
| ORX Resources, LLC | Whitney Bank | 0717621049 | 065400153 |
| ORX Resources, LLC | Whitney Bank | 0717621057 | 065400153 |
| ORX Resources, LLC | Whitney Bank | 0717621065 | 065400153 |
| ORX Resources, LLC | Regions Bank | 33795312 | 062000019 |
| ORX Resources, LLC | Regions Bank | 33795320 | 062000019 |
| ORX Resources, LLC | Regions Bank | 45633134 | 062000019 |
| ORX Resources, LLC | Merryl Lynch | 258-3430030-7 | 062000019 |

HW_US:74101289.3

**PLEDGE AGREEMENT**

**BY**

**FALCON V HOLDINGS, L.L.C.,
AS DEBTOR**

**IN FAVOR OF**

**405 BAXTERVILLE LLC,
IN ITS CAPACITY AS
ADMINISTRATIVE AGENT,
AS SECURED PARTY**

**Effective May 14, 2019**

# TABLE OF CONTENTS

Article I DEFINED TERMS ................................................................................................ 1
    1.1    Terms Defined in the Loan Agreement .................................................... 1
    1.2    Additional Defined Terms ........................................................................ 1

Article II PLEDGE .............................................................................................................. 2

Article III OBLIGATIONS SECURED ............................................................................. 2

Article IV WARRANTIES AND REPRESENTATIONS BY DEBTORS ................... 3
    4.1    Collateral ................................................................................................... 3
    4.2    Prior Financing Statements ...................................................................... 3
    4.3    Jurisdiction of Formation or Principal Residence of Debtor .................. 3

Article V AGREEMENTS OF DEBTOR ........................................................................... 3
    5.1    Filings of Financing Statements .............................................................. 3
    5.2    Transfer of Collateral ............................................................................... 3
    5.3    Defense of Claims .................................................................................... 3
    5.4    Payover ..................................................................................................... 3
    5.5    Power of Attorney .................................................................................... 3
    5.6    Delivery to Secured Party ........................................................................ 4
    5.7    Financing Statement Filings .................................................................... 4
    5.8    Transfer or Pledge of Collateral .............................................................. 4
    5.9    Expenses of Secured Party ....................................................................... 4
    5.10   Payments to Protect Collateral ................................................................ 5
    5.11   Further Assurances ................................................................................... 5

Article VI EVENTS OF DEFAULT; RIGHTS AND REMEDIES OF SECURED PARTY ........ 5
    6.1    Events of Default ...................................................................................... 5
    6.2    Remedies .................................................................................................. 5
    6.3    Subrogation .............................................................................................. 7
    6.4    Waivers .................................................................................................... 7
    6.5    Negation of Liability ............................................................................... 7

Article VII MISCELLANEOUS ........................................................................................ 7
    7.1    Assignment .............................................................................................. 7
    7.2    Waiver ...................................................................................................... 7
    7.3    Release of Lien ......................................................................................... 8
    7.4    Remedies Cumulative .............................................................................. 8
    7.5    Parties in Interest ..................................................................................... 8
    7.6    Reasonable Notice .................................................................................... 8
    7.7    **WAIVER OF RIGHTS TO JURY TRIAL** ........................................ 8
    7.8    **FORUM SELECTION AND CONSENT TO NON-EXCLUSIVE JURISDICTION** ................................................................................... 8
    7.9    **GOVERNING LAW** ......................................................................... 9
    7.10   Notices ..................................................................................................... 10

HW_US:74098635.3

7.11   Invalidity of Certain Provisions ................................................................................. 10
7.12   Counterparts .......................................................................................................... 10
7.13   Controlling Agreement ........................................................................................... 10
7.14   The Orders-No Violation ......................................................................................... 10
7.15   No Oral Agreements ............................................................................................... 10

# PLEDGE AGREEMENT

This PLEDGE AGREEMENT (the "Agreement") is executed effective as of May 14, 2019 (the "Effective Date"), by FALCON V HOLDINGS, L.L.C., a Delaware limited liability company (the "Debtor"), the address for which, for purposes hereof, is 400 Poydras Street, Suite 1100, New Orleans, LA 70130, in favor of 405 BAXTERVILLE LLC, a Delaware limited liability company, the address for which, for purposes hereof, is 405 Lexington Avenue, 59th Floor, New York, NY 10174, in its capacity as administrative agent (in such capacity, "Secured Party") for the lenders (individually, a "Lender" and collectively, the "Lenders") party to that certain Superpriority Secured Debtor-in-Possession Term Loan Credit Agreement dated of even date hereof by and among Falcon V, L.L.C., a Louisiana limited liability company, ORX Resources, L.L.C., a Delaware limited liability company, Debtor, such Lenders and Secured Party (as amended, supplemented restated or otherwise modified from time to time, the "DIP Credit Agreement").

## RECITALS

WHEREAS, the execution and delivery of this Agreement by the Debtor is, among other conditions, a condition precedent under the DIP Credit Agreement;

WHEREAS, the Debtor owns all of the Pledged Equity (as such term is defined hereinafter); and

WHEREAS, to secure the Obligations under the DIP Credit Agreement, and to induce Secured Party and the Lenders to execute the DIP Credit Agreement, the Debtor has agreed to pledge the Pledged Equity to Secured Party;

NOW, THEREFORE, in consideration of the premises, the mutual promises and benefits contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor and Secured Party hereby agree as follows:

## ARTICLE I

## DEFINED TERMS

1.1     Terms Defined in the Loan Agreement.  Any capitalized term used and not

defined herein shall have the meaning assigned to such term in the DIP Credit Agreement.

1.2     Additional Defined Terms.  The following terms, as used in this Agreement, shall have the meanings indicated below, unless the context otherwise requires:

(a)     "Collateral" shall mean all of the Debtor's right, title and interest in and to the Pledged Equity (defined below), including, without limitation, (i) the Distributions (defined below), (ii) allocation of loss, gain, deduction, credit or similar items, (iii) property or rights issued in connection with, or as a result of a conversion of, or substitution or exchange thereof, (iv) all papers, documents, chattel paper, instruments and general intangibles relating to or

evidencing all or any part of the interests described in clauses (i) through (iii) above, including, without limitation, certificates, if any, evidencing the Pledged Equity, (v) all proceeds, income, fees, moneys, salaries or other distributions made with respect to the Pledged Equity and (vi) any and all proceeds of or from any of the above.

(b)     "<u>Debtor Relief Laws</u>" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Requirement of Law of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

(c)     "<u>Distributions</u>" shall mean (i) all rights to receive and payments of proceeds, income, dividends, distributions, returns or repayments of capital or loans, profits, and other sums, whether payable in cash or otherwise, attributable to the Pledged Equity, and (ii) all other payments paid or payable to the Debtor as a result of the Debtor's ownership of the Pledged Equity.

(d)     "<u>Event of Default</u>" shall have the meaning assigned to such term in <u>Section 6.1</u>.

(e)     "<u>Pledged Equity</u>" shall mean all of Debtor's shares or other ownership interest in and to Falcon V, L.L.C., a Louisiana limited liability company.

ARTICLE II

<u>PLEDGE</u>

The Debtor has pledged, and by these presents does pledge, unto Secured Party, and its successors and assigns, and the Debtor hereby grants to Secured Party, and its successors and assigns, in the priority specified in the Orders, a continuing lien on and security interest in and to the Collateral, to the fullest extent the Collateral may be pledged or assigned pursuant to applicable law.

ARTICLE III

<u>OBLIGATIONS SECURED</u>

The pledge, security interest and other rights granted pursuant to <u>Article II</u> are granted to Secured Party to secure the prompt and unconditional payment and performance in full when due, whether by lapse of time, acceleration, mandatory prepayment or otherwise of the Obligations and are in addition to the security interests created by the Interim Order (and when applicable, the Final Order), upon authorization by the Bankruptcy Court under any of the Orders, including as pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code.

- 2 -

## ARTICLE IV

## WARRANTIES AND REPRESENTATIONS BY DEBTORS

The Debtor warrants and represents to Secured Party, as follows:

4.1    <u>Collateral</u>.  The Debtor has good title to the Collateral, free and clear of any Lien (other than the Permitted Liens), and full power and authority to pledge, sell, transfer or assign the Collateral to Secured Party.  No other Person has any right, title or interest in the Collateral (other than the Permitted Liens).  Except for restrictions imposed by applicable state and federal laws and except as set forth in the Orders, the Debtor is not bound by any indentures, contracts, agreements or other documents that could affect the Collateral, directly or indirectly, or which prohibit the execution and delivery of this Agreement or the performance of its terms.

4.2    <u>Prior Financing Statements</u>.  To the best of the Debtor's knowledge, there are no financing statements or security instruments covering the Pledged Equity and there are no existing liens, adverse claims or options or other adverse interests with respect to the Pledged Equity except for the security interests granted herein in favor of Secured Party and the Permitted Liens.

4.3    <u>Jurisdiction of Formation or Principal Residence of Debtor</u>.  The jurisdiction of formation or principal residence, as applicable, of the Debtor is the State of Delaware.

## ARTICLE V

## AGREEMENTS OF DEBTOR

5.1    <u>Filings of Financing Statements</u>.  The Debtor shall not, until the Obligations have been paid in full, authorize the filing of any financing statement (or other evidence of any lien) covering the Collateral or any interest therein, except any financing statement filed or to be filed pursuant to the Orders or in respect of the security interest in favor of Secured Party as provided for in this Agreement.

5.2    <u>Transfer of Collateral</u>.  All certificates or instruments representing or evidencing the Pledged Equity shall be delivered to and held by Secured Party or a person or entity designated by Secured Party and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignments in blank, with signatures appropriately guaranteed.

5.3    <u>Defense of Claims</u>.  The Debtor shall defend the Collateral against all claims and demands of all Persons at any time claiming the same or any interest therein adverse to Secured Party.

5.4    <u>Payover</u>.  Except as otherwise provided in the DIP Credit Agreement, the Debtor shall deliver any funds attributable to the Collateral directly to the Lockbox.

5.5    <u>Power of Attorney</u>.  Subject to the further provisions of this <u>Section 5.5</u>, the Debtor hereby irrevocably appoints Secured Party as the Debtor's true and lawful agent and

attorney-in-fact, with full power of substitution, in the name of Secured Party or in the name of the Debtor, for the sole use and benefit of Secured Party, but at the cost and expense of the Debtor, to exercise all or any of the following powers and rights with respect to the Collateral (without any obligation on the part of Secured Party to exercise any of the following powers and rights): (a) to demand, receive, collect, sue and give acquittance for, settle, compromise, compound, prosecute or defend any action or proceeding with respect to the Collateral; (b) to endorse, collect, deposit and receipt for any checks, drafts or other means of payment thereof received from any source that constitutes all or part of the Collateral; (c) to receive, collect, and demand payment of all the sums due and payable to the Debtor with respect to the Pledged Equity; (d) to make payments thereon directly to Secured Party; and (e) to exercise, enforce, enjoy, carry out, receive and/or perform any and all rights, powers, duties, benefits and remedies of the Debtor with respect to and arising under the Collateral; provided, however, the exercise by Secured Party of or failure of Secured Party to exercise any such authority shall in no manner affect the liability of Debtor hereunder or the liability of the Borrowers under the DIP Credit Agreement, and Secured Party shall be under no obligation or duty to exercise any of the powers hereby conferred upon it and shall be without liability for any act or failure to act in connection with the collection of, or the preservation of any rights under the Collateral. The agency and authority hereby granted and created constitute an agency coupled with an interest and are irrevocable while this Agreement remains in force and effect. Secured Party shall not be bound to take any steps necessary to preserve rights in any of the Collateral against other Persons.

      5.6    <u>Delivery to Secured Party</u>. Except as otherwise provided in the DIP Credit Agreement or the Orders, if any Collateral is received by the Debtor, the Debtor shall deliver, or cause to be delivered, to Secured Party such Collateral on the day received or promptly thereafter, with any checks being endorsed by the Debtor in favor of Secured Party. The Debtor shall not commingle any such Collateral with any other funds, proceeds or monies of the Debtor.

      5.7    <u>Financing Statement Filings</u>. The Debtor authorizes Secured Party to file, with all appropriate jurisdictions, such financing statements describing the Collateral as Secured Party deems reasonably necessary, without the need for further authorization from the Debtor. The Debtor shall pay the cost of filing such financing statements.

      5.8    <u>Transfer or Pledge of Collateral</u>. The Debtor shall not sell, assign, transfer, encumber, pledge, hypothecate or otherwise dispose of any interest in the Collateral, except as permitted hereunder, under the other Loan Documents or in the Orders. Debtor shall not vote to enable a Borrower to, or otherwise permit a Borrower to, issue any stock, certificates, membership interests or other security of any nature in addition to or in exchange or substitution for the Pledged Equity except in accordance with the DIP Credit Agreement.

      5.9    <u>Expenses of Secured Party</u>. The Debtor shall pay to Secured Party all expenses, including, without limitation, reasonable attorneys' fees and legal expenses, incurred or paid by Secured Party in exercising or protecting its interests, rights and remedies under this Agreement or the other Loan Documents to which Debtor is a party (including, without limitation, all such costs and expenses incurred during any "workout" or restructuring in respect of the Obligations and during any legal proceeding, including any legal proceeding under any Debtor Relief Law).

5.10    <u>Payments to Protect Collateral</u>.  Except as otherwise provided in the DIP Credit Agreement or the Orders, the Debtor shall pay, prior to delinquency or any applicable period of grace granted by the relevant Governmental Authority all taxes, charges and other assessments, if any, against the Collateral.  Upon the Debtor's failure to make such payments, Secured Party shall have the right, but not the obligation, to pay the same.  Any such payment made by Secured Party shall be payable by the Debtor to Secured Party upon demand, with interest from the date advanced by Secured Party at a rate equal to the Default Rate.

5.11    <u>Further Assurances</u>.  The Debtor shall make, procure, execute and deliver all acts, things, writings and assurances as Secured Party may at any time reasonably request, to protect, assure or enforce its interests, rights and remedies pursuant to this Agreement, the other Loan Documents or the Orders.

ARTICLE VI

<u>EVENTS OF DEFAULT; RIGHTS AND REMEDIES OF SECURED PARTY</u>

6.1    <u>Events of Default</u>.  The occurrence of an Event of Default under the DIP Credit Agreement shall constitute an "<u>Event of Default</u>" under this Agreement.

6.2    <u>Remedies</u>.  Subject to the Orders, upon the occurrence and continuance of an Event of Default:

(a)    Secured Party shall have the rights and remedies provided in the UCC in force in the State of New York or other applicable jurisdiction;

(b)    Secured Party shall have the rights and remedies provided in the DIP Credit Agreement, any other Loan Document and any security instruments or financing statements executed in connection therewith;

(c)    in addition to, or in conjunction with, the rights and remedies provided pursuant to clauses (a)-(b) of this <u>Section 6.2</u>, Secured Party may in accordance with applicable law:

(i)    in its discretion, sell, assign, transfer and deliver the whole of the Collateral or any part thereof, or any additions thereto, or substitutes therefor, as a whole or in parcels, in such order as Secured Party may elect, at public or private sale, through brokers or otherwise, with such commercially reasonable notice or advertisement as may be required by the UCC or otherwise in any manner permitted by the Bankruptcy Court, the Bankruptcy Code or applicable law;

(ii)    bid and become purchaser at any public sale of the Collateral or any part thereof;

(iii)    apply the net proceeds of disposition of all or any part of the Collateral available for application on the Obligations in the manner set for in the DIP Credit Agreement, and the Debtor shall remain liable for any deficiency, but only if the Debtor is a Borrower;

- 5 -

(iv)    demand, collect and receive all or any part of the Collateral thereafter due and payable to the Debtor;

(v)    transfer to itself or to its nominee all or any part of the Collateral, and receive the monies, interest, income or benefits attributable or accruing to the Collateral, and hold the same as security for the Obligations, whether or not then due;

(d)    Secured Party shall be entitled to immediate possession of all books and records evidencing any Collateral and it or its representatives shall have the authority to enter upon any premises upon which any of the same, or any Collateral, may be situated and remove the same therefrom without liability;

(e)    The Debtor specifically understands and agrees that any sale by Secured Party of all or part of the Collateral pursuant to the terms of this Agreement may be effected by Secured Party at times and in manners which could result in the proceeds of such sale being significantly and materially less than might have been received if such sale had occurred at different times or in different manners, and Debtor hereby releases Secured Party and its officers and representatives from and against any and all obligations and liabilities arising out of or related to the timing or manner of any such sale, except as may be caused through fraud, willful misconduct or gross negligence of Secured Party or any of its officers or representatives;

(f)    Secured Party shall not be obligated to make any sale or other disposition of the Collateral regardless of notice having been given.  Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Debtor shall cooperate fully with Secured Party in all respects in selling or realizing upon all or any part of the Collateral.  In addition, Debtor shall fully comply with federal and state securities laws and take such actions as may be reasonably necessary to permit Secured Party to sell or otherwise dispose of any securities representing the Collateral in compliance with such laws;

(g)    Secured Party shall have the right to receive any and all dividends, payments or other proceeds in respect of the Pledged Equity and make application thereof to the Obligations in the order set forth in the DIP Credit Agreement, and any or all of the Pledged Equity shall be automatically deemed registered without the need for further action in the name of the Secured Party or its nominee, and the Secured Party or its nominee shall have (except to the extent specifically waived in each instance by the Secured Party) the exclusive right to exercise (i) all voting, corporate and other rights pertaining to such Pledged Equity at any meeting of shareholders of the relevant issuer or issuers or otherwise and (ii) any and all rights of conversion, exchange and subscription and any other rights, privileges or options pertaining to such Pledge Equity as if it were the absolute owner thereof (including the right to exchanges, at its discretion, any and all of the Pledged Equity upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate structure of any issuer, or upon the exercise by Debtor or the Secured Party of any right to deposit and deliver any and all of the Pledged Equity with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Secured Party may determine), all without liability except to account for property actually received by it, but Secured Party shall have no duty to

- 6 -

Debtor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing; and

        (h)    Debtor hereby authorizes and instructs each issuer of any Pledged Equity pledged by such Debtor hereunder to comply with any instruction received by it from Secured Party in writing that states that an Event of Default has occurred and is continuing, without any other or further instructions from Debtor, and Debtor agrees that each issuer shall be fully protected in so complying and shall have no duty or right to inquire as to Secured Party's authority to give such instruction, including the payment of any dividends or other payments with respect to the Pledged Equity directly to Secured Party.

        6.3    <u>Subrogation</u>.  Notwithstanding a foreclosure sale, transfer, assignment or other disposition of any of the Collateral hereunder or exercise of any other remedy by Secured Party in connection with an Event of Default, the Debtor shall not be subrogated to any rights of Secured Party against the Collateral or any other security for the Obligations, nor shall the Debtor be deemed to be the owner of any interest in any of the Obligations, nor shall the Debtor exercise any rights or remedies with respect to the Collateral or any other security for the Obligations until the Obligations have been indefeasibly paid in full.

        6.4    <u>Waivers</u>.   The Debtor waives demand, notice, protest, notice of intent to acceleration, acceleration, and all demands and notices of any action taken by Secured Party under this Agreement except as is specifically elsewhere provided herein or in the Orders and except as to notices which are required, and which may not be waived, under the UCC.

        6.5    <u>Negation of Liability</u>.  Secured Party shall not be responsible in any way for any depreciation or diminution in the value or price of the Collateral, nor shall Secured Party have any duty or responsibility whatsoever to enforce collection of the Collateral by legal proceedings or otherwise, the sole duty of Secured Party being to receive collections, remittances and payments on the Collateral if and when tendered to Secured Party, and at Secured Party's option to apply the amount or amounts so received, after deduction of any collection costs incurred, as payment upon the Obligations in the order and manner prescribed in <u>Section 6.2</u>.

ARTICLE VII

<u>MISCELLANEOUS</u>

        7.1    <u>Assignment</u>.  The rights of Secured Party hereunder may be assigned at any time and from time to time, whether in whole or in part, and in such case the assignee shall be entitled to all of the rights, privileges and remedies granted in this Agreement.

        7.2    <u>Waiver</u>.  No delay of Secured Party in exercising any power or right under this Agreement, the other Loan Documents or the Orders shall operate as a waiver thereof; nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.  No waiver by Secured Party of any right hereunder, under the other Loan Documents or the Orders or of any default by the Debtor shall be binding upon Secured Party unless in writing, and no failure by Secured Party to exercise any power or right hereunder, under the other Loan Documents or the Orders or waiver of any default by the

- 7 -

Debtor shall operate as a waiver of any other or further exercise of such right or power or of any further default.  The exercise or beginning of the exercise by Secured Party of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by Secured Party of any or all other such rights, powers or remedies.  No indulgence by Secured Party, or waiver of compliance with any provision hereof, shall be construed as a waiver of the right of Secured Party to subsequently require strict performance hereof by the Debtor.

7.3     <u>Release of Lien</u>.  After indefeasible payment in full of the Obligations, this Agreement shall automatically terminate and be of no further force or effect and within a reasonable time after the Debtor's written request and at the Debtor's expense, Secured Party shall (a) execute and deliver release or termination instruments and (b) return to the Debtor all certificates and other instruments evidencing the Collateral in the possession or control of Secured Party, and take other reasonable action that the Debtor reasonably requests in order to release Secured Party's security interest in the Collateral.

7.4     <u>Remedies Cumulative</u>.  Each right, power and remedy of Secured Party as provided for herein, in the other Loan Documents, in the Orders, at law or in equity or by statute or otherwise, shall be cumulative and in addition to every other such right, power or remedy, and the exercise of any one or more of the remedies provided for herein shall not be construed as a waiver of any of the other remedies of Secured Party.

7.5     <u>Parties in Interest</u>.  The terms "Secured Party" and "Debtor" as used in this instrument include the respective heirs, executors, administrators, successors, representatives, trustees and permitted assigns of such parties.

7.6     <u>Reasonable Notice</u>.  Notice mailed to the Debtor's address or to Debtor's most recent changed address on file with Secured Party, at least ten (10) days prior to the related action, or if the UCC specifies a longer period, such longer period prior to the related action, shall be deemed reasonable.

**7.7     <u>WAIVER OF RIGHTS TO JURY TRIAL</u>.  THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, IRREVOCABLY, AND UNCONDITIONALLY WAIVE ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, COUNTERCLAIM, OR OTHER LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY DOCUMENT EXECUTED IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO.**

**7.8     <u>FORUM SELECTION AND CONSENT TO NON-EXCLUSIVE JURISDICTION</u>.  EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF IN ANY**

- 8 -

**ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST ANY BORROWER, THE SECURED PARTY, ANY LENDER, ANY OTHER PARTY HERETO OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO. EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED EXCLUSIVELY IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT AT THE SECURED PARTY'S OPTION IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. EACH OF THE PARTIES HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.3 OF THE DIP CREDIT AGREEMENT; PROVIDED THAT NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW. EACH OF THE PARTIES HERETO HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY OF THE PARTIES HERETO HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH SUCH PARTY HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.**

7.9    **GOVERNING LAW. THIS AGREEMENT AND ANY ISSUES RELATED TO IT (INCLUDING, WITHOUT LIMITATION, THE VALIDITY, ENFORCEABILITY, INTERPRETATION, AND CONSTRUCTION OF THIS AGREEMENT AND ANY ISSUES RELATED TO IT) SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICT OF LAW RULES) AND THE LAWS OF THE UNITED STATES APPLICABLE TO TRANSACTIONS IN NEW YORK (AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE).**

7.10    Notices.  All notices, demands, requests and other communications required or permitted hereunder shall be in writing and delivered in the manner set forth in the DIP Credit Agreement.  For purposes hereof, the address for notice to the Debtor shall be as set forth in the preamble hereof and the address for notice to Secured Party shall be as set forth in the DIP Credit Agreement.  The Debtor and Secured Party shall have the right to change its address by designating a new address in a written notice to the other as herein required.

7.11    Invalidity of Certain Provisions.  In the event any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement.

7.12    Counterparts.  This Agreement may be executed by the parties hereto in any number of separate counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  In this regard, each of the parties hereto acknowledges that a counterpart of this Agreement containing a set of counterpart execution pages reflecting the execution of each party hereto shall be sufficient to reflect the execution of this Agreement by each party hereto and shall constitute one instrument.

7.13    Controlling Agreement.  In the event of a conflict between any provision of this Agreement and a provision of the DIP Credit Agreement, the provision of the DIP Credit Agreement shall control; provided, however, the inclusion in this Agreement of a provision with respect to which there is no corresponding provision in the DIP Credit Agreement shall not constitute a conflict with any provision of this Agreement.

7.14    The Orders-No Violation.  This Agreement is subject in all respects (including with respect to all obligations and agreements of the Debtor provided for hereunder) to the terms of the Interim Order (and when applicable, the Final Order).  In the event of any inconsistency or conflict between the provisions of this Agreement and the Interim Order (and when applicable, the Final Order), the provisions of the Interim Order (and when applicable, the Final Order) shall govern.  Performance of the Debtor's or Secured Party's rights as permitted under this Agreement shall in no way constitute for the purpose of the Cases a violation of the automatic stay provided by Section 362 of the Bankruptcy Code, and the Debtor hereby waives the applicability thereof.

7.15    No Oral Agreements.  **THIS AGREEMENT AND THE DOCUMENTS EXECUTED CONCURRENTLY HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

**(Signatures appear on following pages)**

HW_US:74098635.3

IN WITNESS WHEREOF, Debtor and Secured Party have executed this Agreement as of the date first above written.

DEBTOR:

FALCON V HOLDINGS, L.L.C.,
a Delaware limited liability company

By: _____
Name: JAMES E. ORTH
Title: PRESIDENT – MANAGER

(Signatures continue on following page)

*Signature Page to Pledge Agreement - Falcon V Holdings, L.L.C.*

**SECURED PARTY:**

**405 BAXTERVILLE LLC,** a Delaware limited
liability company, as administrative agent

By: _____
Name: Lawrence Cutler
Title: Authorized Signatory

*Signature Page to Pledge Agreement - Falcon V Holdings, L.L.C.*

**<u>EXHIBIT B</u>**

**DIP Budget**

**Weekly Cash For Falcon V DIP Budget**

5/29/2019

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week start | 5/13/2019 | 5/20/2019 | 5/27/2019 | 6/3/2019 | 6/10/2019 | 6/17/2019 | 6/24/2019 | 7/1/2019 | 7/8/2019 | 7/15/2019 | 7/22/2019 | 7/29/2019 | 8/5/2019 | |
| Week Ended | 5/19/2019 | 5/26/2019 | 6/2/2019 | 6/9/2019 | 6/16/2019 | 6/23/2019 | 6/30/2019 | 7/7/2019 | 7/14/2019 | 7/21/2019 | 7/28/2019 | 8/4/2019 | 8/11/2019 | |
| **Production (Gross Receipts)** | | | | | | | | | | | | | | |
| Oil (Bbls) | – | 9,750 | – | – | – | 9,750 | – | – | – | – | 9,750 | – | – | 29,250 |
| $/Bbl | | $61.54 | | | | $64.10 | | | | | $64.10 | | | |
| Gas (MCF) | 82,200 | – | 310,000 | – | – | – | – | 310,000 | – | – | – | – | 310,000 | 1,012,200 |
| $/MCF | | | $2.42 | | | | | $2.42 | | | | | $2.42 | |
| NGL (Barrels) | 5,806 | – | 5,559 | – | – | – | 5,682 | – | – | – | 5,682 | – | – | 22,729 |
| $/Gallon | | | $17.99 | | | | $26.40 | | | | $26.40 | | | |
| **CASH RECEIPTS** | | | | | | | | | | | | | | |
| Gross Oil Revenue | – | 600,000 | – | – | – | 625,000 | – | – | – | – | 625,000 | – | – | 1,850,000 |
| Gross Gas Revenue | – | – | 750,000 | – | – | – | – | 750,000 | – | – | – | – | 750,000 | 2,250,000 |
| Gross NGL Revenue | – | – | 100,000 | – | – | – | 150,000 | – | – | – | 150,000 | – | – | 400,000 |
| Hedge Settlement | – | – | – | (50,000) | – | – | – | (50,000) | – | – | – | – | (50,000) | (150,000) |
| **TOTAL CASH RECEIPTS** | $ – | $ 600,000 | $ 850,000 | $ (50,000) | $ – | $ 625,000 | $ 150,000 | $ 700,000 | $ – | $ – | $ 775,000 | $ – | $ 700,000 | $ 4,350,000 |
| **CASH DISBURSEMENTS** | | | | | | | | | | | | | | |
| Louisiana Royalty | – | 15,000 | – | – | – | – | 15,000 | – | – | – | 15,000 | – | – | 45,000 |
| Mineral Interest Owner Payments | – | – | 490,030 | – | – | – | 474,375 | – | – | – | 474,375 | – | – | 1,438,780 |
| Ad Valorem Taxes / Leasehold | – | – | 1,077,046 | – | – | – | – | – | – | – | – | – | – | 1,077,046 |
| Severance Taxes | – | 75,000 | – | – | – | – | 75,000 | – | – | – | 75,000 | – | – | 225,000 |
| Lease Operating Expense | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 1,170,000 |
| Field Surface Rentals | 500 | – | 161,630 | – | 4,730 | 44,500 | – | 3,550 | 1,750 | – | 750 | – | – | 217,410 |
| Payroll - Office & Field | – | – | 157,000 | – | 157,000 | – | 157,000 | – | 157,000 | – | 157,000 | – | 120,000 | 905,000 |
| G&A Expenses | – | – | 55,000 | – | 30,000 | – | 55,000 | – | 30,000 | – | 55,000 | – | – | 225,000 |
| Surety Bond Premium | – | – | – | – | – | 317,500 | – | – | – | – | – | – | – | 317,500 |
| Annual Insurance Premium | – | – | 625,000 | – | – | – | – | – | – | – | – | – | – | 625,000 |
| Acquisition of Chalk Acreage | 1,020,000 | – | – | – | – | – | – | – | – | – | – | – | – | 1,020,000 |
| Critical Vendors | 400,000 | – | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | – | – | – | – | – | – | 900,000 |
| 1st Lien Professional Fees | – | – | – | 170,000 | – | – | – | 170,000 | – | – | – | 170,000 | – | 510,000 |
| DIP Upfront Fee | 37,500 | – | 75,000 | – | 61,500 | – | – | – | – | – | – | – | – | 174,000 |
| Debtor Professional Fees | – | – | – | 100,000 | 160,000 | 50,000 | – | 280,000 | – | 50,000 | – | 210,000 | – | 850,000 |
| Restructuring Advisor (Seaport) | – | – | – | – | – | – | – | – | – | – | – | – | 650,000 | 650,000 |
| Committee Professional Fees | – | – | – | – | – | 25,000 | – | – | – | – | – | – | – | 25,000 |
| | | | | | | | | | | | | | | – |
| **TOTAL OPERATING EXPENSES** | $ 1,548,000 | $ 180,000 | $ 2,830,706 | $ 460,000 | $ 603,230 | $ 627,000 | $ 966,375 | $ 543,550 | $ 278,750 | $ 140,000 | $ 867,125 | $ 470,000 | $ 860,000 | $ 10,374,736 |
| **DIP Beginning Balance** | 1,250,000 | 1,250,000 | 1,250,000 | 3,750,000 | 3,764,236 | 5,814,236 | 5,814,236 | 5,814,236 | 5,859,458 | 5,859,458 | 5,859,458 | 5,859,458 | 5,905,032 | |
| Upfront Fee | 37,500 | – | 75,000 | – | 61,500 | – | – | – | – | – | – | – | – | |
| PIK Interest Expense | – | – | – | 14,236 | – | – | – | 45,222 | – | – | – | 45,574 | 11,482 | |
| Draw / (Repayment) | – | – | 2,500,000 | – | 2,050,000 | – | – | – | – | – | – | – | – | |
| **DIP Ending Balance** | 1,250,000 | 1,250,000 | 3,750,000 | 3,764,236 | 5,814,236 | 5,814,236 | 5,814,236 | 5,859,458 | 5,859,458 | 5,859,458 | 5,859,458 | 5,905,032 | 5,916,514 | |
| **Beginning Cash** | $ 544,762 | $ 209,262 | $ 629,262 | $ 1,073,556 | $ 549,320 | $ 1,934,590 | $ 1,932,590 | $ 1,116,215 | $ 1,227,443 | $ 948,693 | $ 808,693 | $ 716,568 | $ 200,994 | |
| Net Cash Flow | $ (1,585,500) | $ 420,000 | $ (2,055,706) | $ (524,236) | $ (664,730) | $ (2,000) | $ (816,375) | $ 111,228 | $ (278,750) | $ (140,000) | $ (92,125) | $ (515,574) | $ (171,482) | |
| DIP Borrowing / (Repayment) | 1,250,000 | – | 2,500,000 | – | 2,050,000 | – | – | – | – | – | – | – | – | |
| **Ending Cash Balance** | $ 209,262 | $ 629,262 | $ 1,073,556 | $ 549,320 | $ 1,934,590 | $ 1,932,590 | $ 1,116,215 | $ 1,227,443 | $ 948,693 | $ 808,693 | $ 716,568 | $ 200,994 | $ 29,512 | |

## EXHIBIT C

### Milestones

The following "Milestones" shall apply to the DIP Credit Agreement, subject to extension by the Agent in its sole discretion:

(a)    on the Petition Date, the Debtors shall file a joint chapter 11 plan (the "Chapter 11 Plan"), in form and substance acceptable to the Agent and the Prepetition Agent, pursuant to which, among other things, the Obligations (as defined in the Prepetition Loan Agreement) will be converted into equity of the Debtors;

(b)    the Court shall have entered an order (the "Disclosure Statement Order") approving the disclosure statement accompanying the Chapter 11 Plan (the "Disclosure Statement") in form and substance acceptable to the Prepetition Agent and the Agent and granting related relief by the 55th day after the Petition Date;

(c)    an order confirming the Chapter 11 Plan (the "Confirmation Order"), in form and substance acceptable to the Prepetition Agent and the Agent, shall have been entered by the Court by the 100th day following the Petition Date; and

(d)    the Effective Date (as defined in the Chapter 11 Plan) shall have occurred by the 15th day following entry of the Confirmation Order.