**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **FALCON V, L.L.C., *et al.*,**[1] | **Case No. 19-10547** |
| **Reorganized Debtors.** | **Jointly Administered** |

**REORGANIZED DEBTORS' POST-HEARING BRIEF IN OPPOSITION TO MOTION OF ARGONAUT INSURANCE COMPANY TO INTERPRET AND AFFIRM THE TERMS OF THE CONFIRMED CHAPTER 11 PLAN BY WHICH ARGONAUT'S SURETY BOND PROGRAM WAS DEEMED ASSUMED**

The above-caption reorganized debtors (the "Reorganized Debtors") file this post-hearing brief in opposition to the *Motion of Argonaut Insurance Company to Interpret and Affirm the Terms of the Confirmed Chapter 11 Plan by Which Argonaut's Surety Bond Program Was Deemed Assumed* (the "Motion")[2] [Docket No. 570], and respectfully state as follows:

**PRELIMINARY STATEMENT**

1. After the close of argument on June 5, 2020, this court allowed the parties until June 19, 2020 to file any final briefing. The Reorganized Debtors submit the following short closing brief in this proceeding (subject to further directives of the Court).

**SECTION 365, COUNTRYMAN, WHY THE ARGONAUT CONTRACTS ARE NOT SECTION 365 CONTRACTS**

2. Argonaut has decided the Countryman definition of executory contracts covered by Section 365 does not fit its set of agreements (the "Bonds and Indemnification Agreement")[3]

---

[1] The "Debtors" or "Reorganized Debtors" (as applicable) are the following entities (the corresponding bankruptcy case numbers follow in parentheses): Falcon V, L.L.C. (Case No. 19-10547), ORX Resources, L.L.C. (Case No. 19-10548), and Falcon V Holdings, L.L.C. (Case No. 19-10561). The address of the Debtors is 400 Poydras Street, Suite 1100, New Orleans, Louisiana 70130.

[2] Capitalized terms used herein and not otherwise defined have the meaning in the Motion.

[3] See Transcript pp. 14 (lines 23-25)-15 (Lines 1-5). "A flaw in Countryman's analysis is that, reviewing hundreds of cases decided before the date of his article in 1973, he formulates a test that is, basically, a both-

and, therefore, argues Countryman should not be applied here. This is despite the fact that the Fifth Circuit has adopted the Countryman definition for purposes of analyzing whether a contract is one subject to and governed by the assumption/rejection provisions of Section 365. See, *In the Matter of Provider Meds, L.L.C.*, 907 F.3d 845 (5th Cir. 2018.)[4]

3.    The Reorganized Debtors agree with Argonaut that the Bonds and Indemnification Agreement do not meet the *Countryman* definition adopted by the Fifth Circuit as the test for determining whether an agreement is an executory contract.. As such, Argonaut's suggestion that the *Countryman* definition is flawed is irrelevant, even if correct. However, Argonaut is not correct. It is not disputed that there are three parties to the overall arrangement of relationships under the various agreements. But, Section 365 is section 365, and Argonaut provided no authority for its position that *Countryman* should not apply to agreements involving three parties or that the analysis should be different. .

4.    Argonaut's arguments fail under *Countryman.* Falcon V, L.L.C. is a party to the Hilcorp Bond (as Principal). Review of the bond reveals obligations of Falcon, but none that would excuse performance by Argonaut:(i)the bond remains in effect regardless of actions of Principal or Surety (pp. 1, 2); (ii) Surety has no obligation to Principal for any loss (p. 3); and (iii) Principal shall pay all premiums under the bond, but failure to pay in no way excuses performance of Surety (p. 5). Accordingly, despite Falcon V, L.L.C. being party to the Hilcorp

---

sides test and that contemplates a situation where you've got one party that owes an obligation to another party and one party that owes an obligation to the same party so that the obligations are, essentially, reciprocal. That really doesn't work in the case of surety bonds."

[4] "The Bankruptcy Code does not define the term 'executory contract,' but we have concluded that a contract is executory if 'performance remains due to some extent on both sides' and if 'at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party.' We must therefore determine whether both sides—Tech Pharm and each of the OnSite parties—owed additional performance under the License Agreement, and whether any party's failure to perform would constitute a material breach excusing the other side's performance." Id. At pp. 851-852. (Internal citations omitted).

Bond, and being able to breach the bond contract, its breach will not excuse performance of Argonaut. The bond has been issued and remains in place irrespective of any action or inaction of Falcon V, L.L.C.

5. Likewise with the indemnity agreement. At the hearing the provisions of the indemnity agreement were reviewed establishing that, while the Reorganized Debtors can breach the indemnity agreement, no breach can excuse the performance by Argonaut under the bonds. In fact, Argonaut acknowledged that it has no remaining obligation running to the Reorganized Debtors: "It is true that Argonaut does not owe any further performance to Falcon, but it is certainly not true that Argonaut owes no further performance, at least for the purposes of this hearing. There's a surety bond -- and I don't know if we have defenses or not -- in favor of Hilcorp in the amount of $10.5 million. We are exposed on that, depending on how litigation, if there is litigation, if there is a claim, might work out." (Transcript pp. 41(Line 25) – 42 (Lines 1-7)) (Emphasis supplied). That is well and good. But, inapposite, as the performance due by Argonaut is owed because of the bond it issued and has nothing to do with performance of any obligation by the Reorganized Debtors. The fact that the Bonds and Indemnification Agreement do not satisfy the Fifth Circuit definition of a Section 365 executory contract does not reveal a flaw in the *Countryman* definition. Rather, it reveals the flaw in Argonaut's argument. Simply, its agreements are financial accommodations that imposed debt obligations upon the Debtors as of the petition date, nothing more. As such, the Bonds and Indemnification Agreements do not meet the Fifth Circuit's definition of an executory contract under Section 365, are not capable of being assumed under and pursuant to Section 365 and therefore were not assumed under the Plan.

**THE SURETY BOND MOTION AND THE INTERIM AND FINAL ORDERS APPROVING DO NOT HELP ARGONAUT**

6. Argonaut places great weight on the fact that the Debtors sought authority to pay premiums under the bonds during the pendency of the bankruptcy cases and that Argonaut relied on those actions in believing that the Bond and Indemnification Agreement were assumed under the Plan. There is no dispute that the debtors filed the Surety Motion (Dkt. # 9). However, as pointed out to the Court, the orders (two interim; one final) entered by the Court undercut Argonaut's position. In each of these orders (Reorganized Debtors' Exhibits Q, R, and S), there is the same provision: "**IT IS FURTHER ORDERED** that nothing in this order or the Motion shall be deemed to constitute post-petition assumption or adoption of any agreement pursuant to Bankruptcy Code § 365." (See Exhibits Q, R, and S, at P. 2). It is clear that this Court's orders do not advance the prospect that the Debtors considered the Argonaut contracts to be assumable contracts under Section 365, and any argument that the Surety Motion signaled an intent to assume the Bond and Indemnification Agreements is negated by the express terms of the orders.[5]

### THE DEBTORS' PLAN DOES NOT ASSUME THE ARGONAUT CONTRACTS

7. As discussed more fully below, Argonaut holds cash collateral securing its indemnity claim should the indemnity claim in connection with one bond (SUR 0040845, issued in favor of Hilcorp Energy, I, L.P. ("Hilcorp Bond") become liquidated. This secured claim qualified to be an Other Secured Claim under the Debtors' Plan, and was unimpaired under the Plan as the claim was reinstated under Section 2.7 of the Debtors' Plan (See Exhibit M). The remaining amount of the Argonaut contingent and unliquidated claims under the Bonds were unsecured claims, and as they were fully contingent and on their face in a zero amount, they

---

[5] As pointed out in argument, the only bonding necessary to the operations of the Reorganized Debtors is bonding in favor of governmental entities. Bonding is necessary, not the specific Argonaut Bonds. If Hilcorp seeks to terminate the government Bonds and is successful, it is likely that the Obligees under those two bonds will call them, Argonaut will have to pay, and the Reorganized Debtors would be faced with whatever the governmental unit would direct. The Reorganized Debtors understand that. In no way are the Hilcorp or Chevron Bonds necessary to the operations of the Reorganized Debtors.

were entitled to no distribution.  As noted by the Court, the Argonaut proofs of claim (Exhibits T, U, V) expressly took the position that the Bond and Indemnification Agreements were not subject to assumption under Section 365.

8. The Debtors' Plan also provided a process for assumption or rejection of executory contracts and unexpired leases, with the Findings and Conclusion specifically stating that the executory contracts were only assumed *to the extent assumable under section 365*. (Exhibit O, at Section U, p. 7) [6]

9. Article 9.1 of the Debtors' Plan provided for the assumption of executory contracts and unexpired leases, unless rejected.  It is clear that the Debtors' Plan was dealing with executory contracts and unexpired leases subject to Section 365, as the limitation on assumption– express rejection – would have no meaning otherwise. It is fruitless to reject a non-executory contract as such a contract simply generates a claim.[7]  Under Article 9.1 it is clear that the references are to contracts covered by Section 365.  There is reference to the Schedule of Assumed and Rejected Contracts (Exhibit S).  Clearly this schedule included the contracts the

---

[6] "In accordance with Bankruptcy Code section 1123(b)(2), Article IX of the Plan provides that, subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount as set forth in Exhibit D to the Plan Supplement (Confirmation Exhibit 13), **all executory contracts and unexpired leases of the Debtors shall be deemed assumed to the extent assumable under Bankruptcy Code section 365,** in accordance with and subject to the cure amounts within Exhibit D to the First Amended Plan Supplement (P-476-4), unless otherwise ordered by this court."

[7] "Assumed Contracts and Leases. Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into, or deemed to be entered into, in connection with this Plan, as of the Effective Date each Reorganized Debtor shall be deemed to have assumed each executory contract and unexpired lease to which it is a party, unless such contract or lease (a) was previously assumed or rejected by the Debtors, (b) is the subject of a motion to reject filed on or before the Confirmation Date or (c) is set forth in a schedule, as an executory contract or unexpired lease to be rejected, filed as part of the Plan Supplement. The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365 approving the contract and lease assumptions or rejections described above, as of the Effective Date. Each Executory Contract and Unexpired Lease assumed pursuant to this Article IX or by any order of the Bankruptcy Court shall revest **in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law**. (Emphasis supplied)"

Debtors knew of, and the catch-all provision is exactly that, designed to make certain the Reorganized Debtors do not lose rights and value under executory contracts, not to allow claims under agreements that are not executory and that would be otherwise discharged to survive bankruptcy. Further, it is clear that the reason for assumption is that the Debtors' determination that such contracts provide rights that are valuable to the Debtors and Reorganized Debtors, as the Plan expressly refers to the Reorganized Debtors' right to enforce all rights under such contracts in accordance with the terms thereof. As discussed above (and below), the Debtors have no rights to enforce under the Bonds and Indemnification Agreement.

10. The Plan did not otherwise assume the Bonds and Indemnification Agreement. The Plan did, however, contain specific terms and provisions in connection with certain types of agreements that might not be subject to assumption under Section 365. Sections 9.5, 9.6 and 9.7 all deal with the effects of confirmation of the Debtors' Plan with respect to (i) Oil and Gas Leases (as defined under the Plan), (ii) insurance contracts, including but not limited to D&O Insurance policies, and (iii) the rights of governmental entities with respect to police and regulatory authority and rights under Oil and Gas Leases. There is differing authority as to whether oil and gas leases are assumable as executory contracts or unexpired leases,[8] and there is question concerning insurance contracts as well. Therefore the Plan contained provisions for post-confirmation rights under the defined Oil and Gas Leases in the event such are not assumable under Section 365.[9] Likewise, Debtors made provisions with respect to D&O policies

---

[8] *Texaco Inc. v. Louisiana Land and Exploration Co., et al*, 136 B.R. 658 (M.D. LA 1992); *In re WRT Energy Corporation*, 202 B.R. 579 (Bankr. W.D. LA 1996).

[9] "Article 9.5 reads: <u>Oil and Gas Leases</u>. The Debtors' unexpired Oil and Gas Leases are assumed by the Debtors and Reorganized Debtors as of the Effective Date, to the extent such leases are "unexpired leases of non-residential real property" for the purposes of Section 365(d)(4) or "executory contracts" under Section 365. Nothing in the Plan shall be deemed a finding or determination that any Oil and Gas Lease constitute an "unexpired lease" for purposes of Section 365 of the Bankruptcy Code, and the Debtors' rights to contest any such claim or allegation are expressly reserved. Nevertheless, the Reorganized Debtors shall retain all rights

in the event such were not assumable as executory contracts under Section 365, making clear that such agreements survived the bankruptcy and a person could make claims against the policies in the event the policies were not assumable.[10] Finally, the Debtors' Plan, in Article 9.7, reaffirmed the rights of governmental entities in accordance with the terms of the Plan with respect to their regulatory authority regarding and rights under (as applicable) Oil and Gas Leases.

11. Clearly, the Bonds and Indemnification Agreement are not Section 365 executory contracts. Argonaut believed this, took this position in its proofs of claim, and once the Debtor's Plan became effective changed positions (180 degrees). Had the Debtors determined to be bound by the Bonds and Indemnification Agreement post-confirmation, the Plan would have made provision for the Bonds and Indemnification Agreement as it did in Sections 9.5, 9.6 and 9.7 regarding other types of contracts arguably not subject to Section 365 (if it is even possible, given Section 365(c)(2))., However, as the Court is aware, there are no such provisions with respect to Argonaut or the Bonds and Indemnification Agreement.

12. This is because there is no corresponding benefit to the Reorganized Debtors under the Bond and Indemnification Agreement. While the Debtors received benefits under

---

under the Debtors' unexpired Oil and Gas Leases, the terms of which shall be performed after the Effective Date. Nothing in the Plan alter or changes the underlying property rights associated with the Debtors' Oil and Gas Leases, including the underlying property rights of working interest and royalty interest Holders. Notwithstanding the foregoing, the Debtors' rights to dispute the amount of any payment associated with the Oil and Gas Leases (whether expired or unexpired), including any payments on account of royalty interest or working interests, and to assert that Claims for such amounts have been discharged by the Plan are expressly reserved."

[10] Article 9.6 reads: "The Debtors' insurance policies, including all directors' and officers' liability insurance policies maintained by the Debtors, in effect as of the Effective Date, to the extent they are deemed executory contracts, are hereby assumed, subject to any additions and modifications thereto as may be required by the New Board, except to the extent any such additions and modifications impact coverage under said policies. Entry of the Confirmation Order by the clerk of the Bankruptcy Court shall constitute approval of such assumptions pursuant to Section 365(a). No provision of this Plan shall limit any Released Party's rights or the rights of any Person Holding an indemnification Claim (whether Filed or not Filed, or Allowed or not Allowed) and whether such Person is or is not a Released Party under this Plan to seek recovery or reimbursement under any directors' and officers' liability insurance policy, all such rights to be maintained by such Persons regardless of discharge, release or Claim Allowance."

continued ownership of its Oil and Gas Leases and under its insurance policies that formed the basis for Sections 9.5, 9.6 and 9.7 of the Debtors' Plan, there is no rational basis for the Debtors' to assume the Bonds and Indemnification Agreement which together generate nothing more than a contingent and unliquidated secured claim and unsecured claim and provide no value to the Reorganized Debtors.

13. Argonaut cannot articulate any value the Reorganized Debtors would obtain by assumption, or any rights the Reorganized Debtors could enforce upon assumption (in fact it argues it owed no performance, and the obligees under the bonds certainly owe no performance pursuant to the terms of the bonds).  There is no basis for the Debtor to have made the determination to assume, in essence, a liability.  Argonaut suggests that the Debtors intended to assume the Bonds and Indemnification Agreement through a catch-all provision designed to capture inadvertently omitted valuable, enforceable contracts (rather than either scheduling them or making special provisions as the Debtors did for other agreements) despite Argonaut's position taken during the cases (and indeed, in other cases) that the Bond and Indemnification Agreement are not executory contracts capable of assumption.  The ridiculousness of this proposition is laid bare by the harshness of the claims and demands asserted by Argonaut here, which would result in the Debtors being subject to a demand for in excess of $7 million of additional collateral that is not necessary for the Reorganized Debtors operations and provides absolutely no benefit to the Reorganized Debtors.

### ARGONAUT'S EQUITY ARGUMENT IS BACKWARDS

14. Argonaut asserts it has been misled, that it was lulled into assuming the Debtors intended to assume and be bound by the Bond and Indemnification Agreement going forward (despite no benefit to the Reorganized Debtors), implying that the Debtors were lying behind the

log (laying in the weeds, or whichever of the phraseologies). Argonaut asserts that it recently determined it would need additional collateral upon doing a diligence/financial investigation.[11] This is wrong and Argonaut is being disingenuous.

15. When the Debtors filed bankruptcy, the Debtors were past due on the premium payments under the bonds (See, Surety Motion, Dkt. # 9).[12] Argonaut held the same collateral it holds now. THE DEBTORS HAD FILED BANKRUPTCY. The Debtors owed some $43 Million in senior secured debt, and other debt between $8 Million and $10 Million. Yet, at that time and in the months leading up to the bankruptcy when the Debtors were past due on premium payments, Argonaut was not concerned about its exposure. This is the same "exposure" it has now and will always have to Hilcorp under the Bond and Indemnification Agreement. Under the Plan the only debt taken out of the case by the Reorganized Debtors was the Exit Facility that was up to $11.8 million.[13] Accordingly, the debt associated with the Reorganized Debtors is some $40+ Million less than the debt load burdening the Debtors at filing, when Argonaut had not been paid its premiums, and the Debtors' debt and exceeded $50 million, with $43 million secured in priority to Argonaut. Argonaut made no assertion that it needed additional collateral prior to the hearing on confirmation of the Plan or the Effective Date.

---

[11] "It was a review by the Argonaut underwriters of the financial condition about -- the review by the underwriters caused the underwriters to become nervous about the amount of collateral it had in relation to the amount of the exposure Argonaut had under the surety bonds. Argonaut has $3 million worth of collateral. It seeks an additional $7 million of collateral bringing it up, roughly, to the level of the Hilcorp bond, the, the penal sum of the Hilcorp bond or, alternatively, replacement of the Argonaut bonds by bonds from another surety." (Transcript, PP. 15 (lines 15-25) – 16 (Line 1).

[12] Yes, the Debtors obtained authority to pay premiums to insure peace and to avoid certain legal issues (administrative claims, for one), but always with the specific reservation quoted above making clear that there was no intention as of that time to assume the Bonds and Indemnification Agreement.

[13] See Exhibit M (Plan), p. 8 – defined term "Exit Facility."

16. Now, though, after (i) the senior lenders funded with DIP loan proceeds the payment of the premiums under the surety motion orders, (ii) the creditors converted the vast majority of senior secured plus unsecured debt to equity in the Reorganized Debtors, (iii) the Reorganized Debtors have assumed the Oil and Gas Leases and bound themselves for obligations thereunder (including the plugging and abandonment liability the Hilcorp Bond was issued to protect Hilcorp against), and (iv) have rightsized the capital structure and balance sheet (or thought they had), Argonaut comes out of the weeds, taking the opposite position taken in its proofs of claim and heralds danger and backdates consent.

17. In fact, those creditors who converted their claims to equity in the form of new equity or warrants would bear the brunt of Argonaut's attempt to evade discharge and jump over other unsecured creditors to the top of the debt structure hierarchy through this demand for post-Effective Date collateral. Not when the Debtors were insolvent, in bankruptcy, and past due on their premium payments did Argonaut surface. Only now, after creditors relied on a new capital structure to accept a plan of reorganization, and upon the new found argument (involving a 180 degree turn in position taken by Argonaut in these cases and other bankruptcy proceedings), that the Bonds and Indemnification Agreement are Section 365 executory contracts that have been assumed.[14]

18. Further, as discussed above, the Debtors assumed the Oil and Gas Leases and associated plugging and abandonment liability, the same liability the Hilcorp bond was issued to protect Hilcorp against. If the Argonaut's arguments are accepted and the Bonds and Indemnification Agreement are deemed assumed under the Plan, the Reorganized Debtors would

---

[14] Without mention in the Schedule of Assumed and Rejected Contracts (Exhibit S).

be forced to post collateral to Hilcorp for obligations it agreed to perform under the Plan, in effect being forced to pay twice.

### TO ANSWER THE COURT'S QUESTION CONCERNING THE SURETY'S DUTY OF GOOD FAITH

19. At hearing the court asked: "Doesn't Argonaut have an obligation to fight, for example, frivolous claims? Suppose Hilcorp makes demand on Argonaut and the claim is frivolous or the claim is inflated. Doesn't Argonaut have a duty to the reorganized debtors under the agreement to resist that claim?" (Transcript, P. 27, Lines 14-18).

20. Under Texas law, a bond surety does not owe its principal a common law duty of good faith and fair dealing. See *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 280 (Tex. 1998) (citing *Great Am. Ins. Co. v. N. Austin Municipal Utility District No. 1*, 908 S.W.2d 415 (Tex. 1995)); see also *Insurance Co. of North America v. Morris*, 981 S.W.2d 667, 680 (Tex. 1998) (holding that a commercial surety does not owe a common law duty of good faith to its principal and also rejecting a claim that a surety breached the duty of good faith on the basis that there was no evidence that the surety "contractually agreed to act in good faith"). In *Associated Indem. Corp.*, the Supreme Court of Texas explained why there is not a need to impose a duty of good faith in the surety context unlike in the insurance context:

> Apart from the Arnold factors [regarding a common law duty of good faith for special relationships that exist in the insurance context], other policy considerations not present in the insurance context weigh against imposing a special duty in this case. Under the tripartite suretyship relationship, a bond surety is often called upon to balance the claims of an obligee under a performance bond against the protests of the principal that it did not in fact default. This has sometimes been called the surety's "classic dilemma." See Hinchey, 22 TORT & INS. L.J. at 133; Klinger & Diwick, Dispute Between the Obligee and Principal, in THE LAW OF SURETYSHIP 8–1 (Gallagher ed., 1993). In Great American, we refused to impose a duty of good faith in obligee's favor because it would upset this balance. Just as a surety might be reluctant to assert legitimate defenses on the principal's behalf against the obligee's claim if such a duty were imposed, see Great American, 908 S.W.2d at 419, so a surety might be reluctant to satisfy an obligee's valid claims under a performance bond (even though such a bond exists for the benefit of the obligee) for fear of incurring tort liability to the principal.

*Associated Indem. Corp.* 964 S.W.2d at 281–82. Additionally, the Texas Supreme Court explains further that imposing a common law duty of good faith on sureties is not justified because "[e]xisiting commercial law duties prohibit a surety from disposing of collateral—including causes of action—in a commercially unreasonable manner. See id. at 282 (citing the Texas UCC's commercial reasonableness standards) (citations omitted).

21. It comes back around full circle to whether the Bond and Indemnification Agreements are executory contracts. Texas law answers the Court's question, in agreement with Argonaut's position that it owes no performance to the Reorganized Debtorsunder the Bond and Indemnification Agreements. The Bonds and Indemnification Agreement are not Section 365 executory contracts capable of being assumed, and they were not assumed under the Debtors' Plan. Argonaut has claims against the Debtors that were treated and discharged under the Plan, nothing more.

### THE BONDS AND INDEMNIFICATION AGREEMENT DID NOT "PASS THROUGH" THE BANKRUPTCY

22. Not really argued was the position of Argonaut, relying on *In re O'Connor*, that the Bonds and Indemnification Agreement "passed through" the bankruptcy unaffected. First, as briefed earlier, the pass-through doctrine does not apply to non-executory contracts.[15] To the extent the Bonds and Indemnification Agreement are not executory (as the Reorganized Debtors contend), they could not pass-through the bankruptcy and are no longer enforceable against the Reorganized Debtors as a post confirmation/effective date contract. If such were the case, then any contract, executory or not, would pass through, nullifying the discharge unless every single contract, agreement, and debt instrument, regardless of executory status, was expressly rejected by the plan.

---

[15]   *ASARCO, L.L.C. v. Montana Res., Inc.*, 858 F.3d 949, 959 (5th Cir. 2017).

23. Second, to the extent the Bonds and Indemnification Agreement are an executory contract (which they are not), the facts are distinguishable. In *In re O'Connor*, the court was analyzing a partnership agreement that the parties agreed was executory under section 365(c)(1) of the Bankruptcy Code, not section 365(c)(2).[16] Indeed, a key distinction is that section 365(c)(1) does not prohibit assumption of an agreement, it simply prohibits assumption of certain agreements where the counterparty does not consent. Section 365(c)(2), however, is an outright prohibition on assumption of specific types of contracts, such as loans and financial accommodations, which the Bonds and Indemnification Agreement clearly are.

24. Applying the "ride through" doctrine to a contract that, by the plain language of section 365(c)(2), cannot be assumed, would render the provision meaningless. For example, under Argonaut's theory, if a debtor did not expressly reject a loan agreement, the agreement would "ride through," and a post-bankruptcy debtor could force the lender to advance money under the loan agreement notwithstanding the prohibition on assumption of financial accommodations, and would also except from discharge any pre-petition debt under the loan agreement. This would lead to absurd results and the analysis is the same for the Indemnity Agreement and Bonds.

## CONCLUSION

25. The Court should deny the Motion. The Bonds and Indemnity Agreement are not executory contracts capable of assumption under the Bankruptcy Code.[17] Argonaut's claims relating to the Bonds and Indemnity Agreement have been treated and discharged under the Plan.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order denying

---

[16] *Stumpf v. McGee (In re O'Connor)*, 258 F.3d 392, 405 (5th Cir. 2001) (holding that "there is no difference between a contract that, **under § 365(c)(1), cannot be assumed**, and one which is neither assumed nor rejected. Each is simply unaffected by the bankruptcy proceedings.") (emphasis added).

[17] *Even* if they are executory, they are financial accommodations expressly prohibited from being assumed under section 365(c)(2).

the Motion and granting such other relief as this Court may deem appropriate and just.

Dated: June 19, 2020.

                                           Respectfully submitted,

                                           **KELLY HART PITRE**

                                           */s/ Louis M. Phillips*
                                           Louis M. Phillips (#10505)
                                           One American Place
                                           301 Main Street, Suite 1600
                                           Baton Rouge, LA 70801-1916
                                           Tel:   (225) 381-9643
                                           Fax:   (225) 336-9763
                                           Email: louis.phillips@kellyhart.com

                                           -and-

                                           Timothy A. ("Tad") Davidson II
                                           (TX Bar No. 24012503)
                                           Joseph P. Rovira
                                           (TX Bar No. 24066008)
                                           600 Travis Street, Suite 4200
                                           Houston, Texas 77002
                                           Tel:   (713) 220-4200
                                           Fax:   (713) 220-4285
                                           Email: taddavidson@huntonak.com
                                                           josephrovira@huntonak.com
                                           ***Counsel for the Reorganized Debtors***